# In the United States Court of Appeals for the Fifth Circuit

FREE SPEECH COALITION, INCORPORATED; MG PREMIUM, LIMITED; MG FREESITES, LIMITED; WEBGROUP CZECH REPUBLIC. A.S.; NKL ASSOCIATES, S.R.O.; SONESTA TECHNOLOGIES, S.R.O.; SONESTA MEDIA, S.R.O.; YELLOW PRODUCTION, S.R.O.; PAPER STREET MEDIA, L.L.C.; NEPTUNE MEDIA, L.L.C.; JANE DOE; MEDIAME, S.R.L.; MIDUS HOLDINGS, INCORPORATED,

*Plaintiffs-Appellees*,

*v.*

ANGELA COLMENERO, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Western District of Texas, Austin Division

## DEFENDANT'S MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

ANGELA COLMENERO
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

KYLE D. HIGHFUL
Assistant Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Defendant-Appellant

## CERTIFICATE OF INTERESTED PERSONS

No. 23-50627

FREE SPEECH COALITION, INCORPORATED; MG PREMIUM, LIMITED;
MG FREESITES, LIMITED; WEBGROUP CZECH REPUBLIC. A.S.; NKL
ASSOCIATES, S.R.O.; SONESTA TECHNOLOGIES, S.R.O.; SONESTA
MEDIA, S.R.O.; YELLOW PRODUCTION, S.R.O.; PAPER STREET MEDIA,
L.L.C.; NEPTUNE MEDIA, L.L.C.; JANE DOE; MEDIAME, S.R.L.;
MIDUS HOLDINGS, INCORPORATED,

*Plaintiffs-Appellees*,

*v.*

ANGELA COLMENERO, ATTORNEY GENERAL, STATE OF TEXAS,
*Defendant-Appellant*.

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Lanora C. Pettit
LANORA C. PETTIT
*Counsel of Record for*
*Defendant-Appellant*

# Introduction

For half a century, it has been a criminal offense in Texas—as in many, if not all, States—to distribute obscenity to minors. Tex. Penal Code § 43.24(b) (codifying Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 885). The Texas Legislature, however, received evidence this past Session that due to the growing ubiquity of such materials on the internet, "approximately one in five youth experience unwanted online exposure to sexually explicit material." House Comm. on Judiciary & Civil Jurisprudence, Bill Analysis, Tex. C.S.H.B. 1181, 88th Leg., R.S. (2023). Concerned about the impact such exposure has on the developing minds of Texas's children and adolescents, the Legislature required commercial purveyors of online pornography to verify the age of individuals visiting their websites before displaying sexual material harmful to minors. *See* Act of May 25, 2023, Ch. 676, § 1, 88th Leg., R.S. Known as H.B. 1181, the statute also required these websites to warn of the "potential[]" risks associated with viewing such material, including addiction and other mental-health disorders. *Id.* Unlike existing Texas law, H.B. 1181 carries with it only civil sanctions including monetary penalties and the possibility of an injunction. *Id.*

Nothing in H.B. 1181 prohibits anyone from performing in, producing, or publishing pornography whether on the internet or otherwise. It does not even prohibit anyone from accessing internet pornography. Yet the district court concluded that the State's law violates the First Amendment and is preempted by Section 230 of the Communications Decency Act. Ex. F. Moreover, the court found the claims of chilled speech by pornographers so compelling that it enjoined enforcement of any

part of the law—even where the putative speech easily constitutes obscenity under relevant Supreme Court doctrine and thus could (and would) be a *crime* under Texas law. Such an overbroad injunction is unlikely to survive this Court's scrutiny, and the equities favor protecting children rather than pornographers while this appeal is pending. Accordingly, Provisional Attorney General Colmenero respectfully requests that this Court stay the district court's injunction by September 22, 2023.

## Background

1.    Today's digital environment offers nearly inexhaustible amounts of pornography. In 2019, for example, Plaintiff Pornhub alone transferred 6,587 petabytes of data. Byrin Romney, *Screens, Teens, and Porn Scenes: Legislative Approaches to Protecting Youth from Exposure to Pornography*, 45 Vt. L. Rev. 43, 50 (2020). To put that in perspective, that represents "1.36 million hours (169 years) of new content [that] were uploaded to the site." *Id.* Indeed, Plaintiff Pornhub bragged that if one "started watching 2019's new videos in 1850, you would still be watching them today." Ex. B ¶ 16.

With this staggering amount of pornography on one website alone, it is perhaps no surprise that the average age of pornography exposure is 11 years old. Khadijah B. Watkins, *Impact of Pornography on Youth*, 57 J. Am. Acad. Child & Adolescent Psychiatry 89 (2018). One study reported that 72.8% of more than 500 participants (93.2% of boys, 62.1% of girls) had viewed online pornography before age 18. Chiara Sabina, Janis Wolak, & David Finkelhor, *The Nature and Dynamics of Internet Pornography Exposure for Youth*, 11 CyberPsychology & Behavior 691, 691 (2008). They had viewed pornography as young as eight years old. *Id.* at 692.

And this is no longer your grandfather's pornographers who made their money "selling to a 13-year-old boy a magazine with an image of a nude woman." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 857 (2011) (Breyer, J., dissenting). Today, websites like plaintiff Xnxx host more than 250,000 free videos of "teen bondage gangbangs," including one in which a young woman is restrained, gagged, strangled, and slapped while having sexual intercourse with multiple men for 36 minutes. Ex. B at ¶¶ 10-11. In the study mentioned above, over a third of male participants reported viewing "[s]exual activity involving bondage," almost a third reported viewing "[s]exual activity between people and animals," over a fifth reported viewing "[s]exual activity involving urine or feces," and almost a fifth reported viewing "[r]ape or sexual violence." Sabina *et al.*, *supra*, at 692. To put it mildly, "[m]ost of today's pornography does not reflect consensual, loving, healthy relationships. Instead, pornography teaches dominance, aggression, disrespect, and objectification." Romney, *supra*, at 43 (emphasis omitted).

**2.** To combat the further spread of this degrading material that is potentially dangerous to minors, H.B. 1181 created Texas Civil Practice and Remedies Code chapter 129B, which was to have taken effect on September 1, 2023. *See* Act of May 25, 2023, *supra*, § 2. That chapter applies to commercial entities that "knowingly and intentionally publish[] or distribute[] material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors." Tex. Civ. Prac. & Rem. Code § 129B.002(a). H.B. 1181 imposes two requirements on those sites. *First*, they must "use reasonable age verification methods . . . to verify that an individual attempting to access the material is 18 years

of age or older." *Id. Second*, covered sites must display health warnings on their landing pages and advertisements. *Id.* § 129B.004.

H.B. 1181 further provides that the Texas Attorney General may bring a civil-enforcement action in state court. *Id.* § 129B.006(a). The Attorney General may seek an injunction and recover a civil penalty, attorneys' fees, and costs. *Id.* § 129B.006(a), (d).

**3.**   Four groups of plaintiffs sued Texas's Provisional Attorney General under 42 U.S.C. § 1983: (1) Free Speech Coalition Inc., an association of pornographic actors, producers, distributors, and retailers; (2) domestic producers, sellers, and licensers of pornography; (3) foreign producers, sellers, and licensers of pornography; and (4) Jane Doe, a pornographic actress whose content is featured on various websites (collectively, "Plaintiffs"). Ex. C at 3-8. All Plaintiffs allege that H.B. 1181 violates the First Amendment, *id.* at 26-27, and the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment, *id.* at 27. A subset of Plaintiffs also allege that H.B. 1181 is preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230, Ex. C at 27-28, and violates their Eighth Amendment rights, *id.* at 28. Plaintiffs moved for an expedited preliminary injunction. ECF 5.

**4.**   On August 23, 2023, the district court held a hearing on Plaintiffs' motion—just 16 days after Plaintiffs effectuated service on the Attorney General. At the hearing, there was little dispute that much of the content on Plaintiffs' websites is obscene. And the Attorney General presented expert testimony that age-verification technology is "not new" to pornographic websites like Plaintiffs, which already "use it elsewhere in the world." Ex. D at 26; *see* Ex. E at 2. The court, despite refusing to

view Plaintiffs' content, Ex. D at 53, insisted that mainstream movies containing partial nudity and simulated lovemaking—like Marlon Brando's *Last Tango in Paris*—are "as raw as any pornography," *see id.* at 49-50. *But see supra* p. 3.

On August 31, the district court issued a preliminary injunction on the ground that H.B. 1181 violates the First Amendment, Ex. F at 81, and that certain Plaintiffs are likely to succeed on their Section 230 claims, *id.* at 73. Accordingly, the court enjoined the Attorney General from enforcing any provision of H.B. 1181. *Id.* at 81.

**5.** The Attorney General immediately appealed. ECF 38. The next day, she filed an opposed motion asking the district court to stay its injunction pending appeal. ECF 40. On September 6, the district court denied the motion. Ex. A.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over the district court's order granting a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## STANDARD OF REVIEW

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 447 (5th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). When determining whether to stay a district court's injunction pending appeal, this Court considers four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*E.T. v. Paxton*, 19 F.4th 760, 764 (5th Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). The first two factors are "are the most critical." *Id.*

<h1 align="center">ARGUMENT</h1>

## I. The Attorney General Is Likely to Succeed on Appeal.

The Attorney General's appeal of the district court's injunction is likely to succeed because, having chosen to assert a facial challenge, Plaintiffs bore "the heavy burden of showing that either no set of circumstances exists under which the Act would be valid, or the statute lacks any plainly legitimate sweep." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 220 (5th Cir. 2023) (cleaned up and quotation marks omitted). Plaintiffs have not carried that burden with regard to their claim that H.B. 1181 violates the First Amendment. And their claim that the law is preempted by Section 230 fairs no better.

### A. Plaintiffs have not plausibly alleged that H.B. 1181 violates the First Amendment.

Plaintiffs "have asked a federal court to invalidate HB [1181] in its entirety before Texas even tries to enforce it." *NetChoice*, 49 F.4th at 448. "To put it mildly," even in the First Amendment context, "pre-enforcement facial challenges to legislative acts are disfavored for several reasons." *Id.* (quotation marks omitted). "Invalidate-the-law-now, discover-how-it-works-later judging is particularly troublesome when reviewing state laws, as it deprives state courts [of] the opportunity to construe a law to avoid constitutional infirmities." *Id.* at 449 (quotation marks omitted). Plaintiffs "threaten to short circuit the democratic process" by asking "unelected federal judges to countermand the State's democratically accountable

policymakers." *Id.* Plaintiffs are not entitled to facially invalidate H.B. 1181 because much of their content is obscene. And even if the First Amendment did apply, H.B. 1181's age-verification and notice requirements are both constitutional.

### 1. The First Amendment does not protect Plaintiffs' obscenity.

"This much has been categorically settled by the [Supreme] Court, that obscene material is unprotected by the First Amendment." *Miller v. California*, 413 U.S. 15, 23 (1973). Under this rule, States may regulate "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.* at 24.

That is just what H.B. 1181 does. It applies only to sites that host "sexual material harmful to minors." Tex. Civ. Prac. & Rem. Code § 129B.002(a); *see id.* § 129B.004. And the statute's definition of "[s]exual material harmful to minors" tracks the Supreme Court's language in *Miller*. *Compare id.* § 129B.001(6) *with Miller*, 413 U.S. at 24. Moreover, the content on Plaintiffs' sites fits the Supreme Court's "plain examples" of obscenity. *Compare Miller*, 413 U.S. at 25, *with* Ex. G at ¶¶ 8-16; Ex. B ¶¶ 8-13.

Plaintiffs correctly point out that H.B. 1181's definition "adds the phrases 'with respect to minors' and 'for minors'" to *Miller*'s language. ECF 5 at 5. And some content that is inappropriate for minors is "not obscene by adult standards." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). But this fails to establish

7

Plaintiffs' entitlement to a preliminary injunction on a facial challenge for at least two reasons.[1]

*First*, the Supreme Court has recognized that a legislature may pass laws that protect minors from material that is "obscene *as to youths*." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) (emphasis added). As the Supreme Court explained in *Brown*, a legislature may prohibit "the sale to minors of *sexual* material that would be obscene *from the perspective of a child*," 564 U.S. at 793 (second emphasis added), including by considering minors' perspectives and "adjust[ing] the definition of obscenity to social realities," *id.* at 794 (cleaned up) (quoting *Ginsberg v. State of New York*, 390 U.S. 629, 638 (1968)). Thus, obscenity as to minors is "an existing category of unprotected speech." *Id.* That is precisely what Texas's Legislature did here.

*Second*, the First Amendment does not protect Plaintiffs because some of their content that satisfies H.B. 1181's definition of "sexual material harmful to minors" also meets the Supreme Court's standard for *adult* obscenity. *See* Ex. B. Plaintiffs have not alleged that they have separate landing pages and advertisements for their obscene and non-obscene content, making a preliminary injunction on a facial theory improper. Even if Plaintiffs were to contend in response to this motion that they do not host obscenity, that would at most represent a fact question to be resolved later. *See Miller*, 413 U.S. at 26.

---

[1] The district court did not order a preliminary injunction based on an as-applied First Amendment challenge to H.B. 1181—likely because in a pre-enforcement context, any such challenge is not yet ripe.

*Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004), is not to the contrary. In *ACLU*, the Supreme Court upheld a preliminary injunction of the federal Child Online Protection Act ("COPA") on First Amendment grounds. *Id.* at 673. Although the district court was correct that COPA and H.B. 1181 use somewhat similar language to define what is harmful to minors, Ex. F at 20-22, *ACLU* does not control here for multiple reasons. To start, *Brown* reaffirmed after *ACLU* that laws that protect minors from content that is obscene as to minors do not offend the First Amendment. *See* 564 U.S. at 793-94. Moreover, notwithstanding superficial similarities between their definitions, COPA and H.B. 1181 function very differently: COPA criminalized the "posting, for 'commercial purposes,' of World Wide Web content that is 'harmful to minors.'" *ACLU*, 542 U.S. at 661. By contrast, as far as H.B. 1181 is concerned, Plaintiffs can create, post, and sell as much obscenity as the market will tolerate. Thus, *ACLU*'s foundational premise—that the challenged law "suppresse[d] a large amount of speech," *id.* at 665—does not apply to H.B. 1181. Similarly, age verification is not merely an affirmative defense to prosecution under H.B. 1181 as it was for COPA, and thus, it does not carry with it the same risk that "speakers may self-censor rather than risk the perils of trial." *Id.* at 670-71. That is, if Plaintiffs require age verification and post the required notices, they will not violate H.B. 1181 regardless of what content they offer. *See* Tex. Civ. Prac. & Rem. Code §§ 129B.002(a), 129B.004. That H.B. 1181 is unlikely to lead to a chilling effect is further underscored because—unlike COPA—H.B. 1181 is not "enforced by severe criminal penalties." *ACLU*, 542 U.S. at 660. And finally, COPA was a federal law. As this Court has noted, pre-enforcement facial challenges to state laws like H.B.

1181 raise "particularly troublesome" federalism concerns. *NetChoice*, 49 F.4th at 449.

### 2. H.B. 1181's age-verification requirement does not violate the First Amendment.

Even if the undisputed presence of obscene material did not defeat Plaintiffs' facial claim to First Amendment protection, Plaintiffs still have not met the usual requirement of establishing "that no set of circumstances exists under which [H.B. 1181] would be valid." *United States v. Stevens*, 559 U.S. 460, 472 (2010). They have not even tried. To the contrary, they rely on the Supreme Court's overbreadth doctrine, under which H.B. 1181 is invalid only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 473 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). "[F]acial invalidation for overbreadth" is "strong medicine." *United States v. Hansen*, 143 S. Ct. 1932, 1948 (2023). It is more appropriate when a criminal law is challenged. *See NetChoice*, 49 F.4th at 451.

Even under the overbreadth doctrine, Plaintiffs have failed to show that H.B. 1181's age-verification is facially unconstitutional. As explained above, H.B. 1181 can constitutionally be applied to obscenity, which is not protected by the First Amendment. Plaintiffs have not shown that a substantial number of websites covered by the law host indecent but not obscene content—or even that *their* websites contain substantially more non-obscene pornography than obscenity. They have therefore not met their burden to establish that "the ratio of unlawful-to-lawful applications" is

"lopsided enough to justify the strong medicine of facial invalidation for over-breadth." *Hansen*, 143 S. Ct. at 1948 (quotation marks omitted).

### 3. H.B. 1181's notice requirement does not violate the First Amendment.

The Attorney General is also likely to prevail on the merits regarding H.B. 1181's notice requirement, which satisfies the First Amendment under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). And even if *Zauderer* did not apply, H.B. 1181 would still be constitutional under *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980).

**a.** *Zauderer* upheld commercial disclosure requirements because they were "purely factual and uncontroversial" and "reasonably related to the State's interest." 471 U.S. at 651. Later courts have clarified that *Zauderer* applies to disclosures that inform "purchasers about what the [government] has concluded is appropriate use of the product they are about to buy," so long as they do not require the company to "take sides in a heated political controversy." *CTIA–The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 848 (9th Cir. 2019); *see Am. Meat Inst. v. U.S. Dep't of Ag.*, 760 F.3d 18, 21 (D.C. Cir. 2014) (en banc). Once triggered, *Zauderer* requires only rational-basis review. *Oles v. City of New York*, No. 22-1620-CV, 2023 WL 3263620, at *3 (2d Cir. May 5, 2023); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc).

H.B. 1181 satisfies this test: it warns about potential risks associated with pornography use and truthfully notes the existence of a national telephone hotline. Tex. Civ. Prac. & Rem. Code § 129B.004. Those warnings are made on behalf of a Texas

government agency in a way that make it very difficult to attribute the statements to Plaintiffs—thereby lessening any concern about compelled speech. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 564 (2005). As the district court has acknowledged, Texas has an interest in protecting minors from pornography. Ex. F at 25. And H.B. 1181's notice requirement is rationally related to that interest: common sense, regulatory experience, and Plaintiffs' own theory demonstrate that minors can circumvent age-verification measures. *See, e.g.*, ECF 5 at 1. That is why multiple safeguards are often necessary to prevent minors from obtaining restricted items—even absent the complications incumbent with the internet. *See, e.g.*, *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657, 674 (9th Cir. 2023). The Legislature could have believed that at least some minors would get past the age-verification screen and benefit from the warnings.

The Texas Legislature could also have reasonably believed that the required notices would help protect *adults* from many of the same risks of addiction and criminal conduct as minors. *See* Tex. Civ. Prac. & Rem. Code § 129B.004. Under current doctrine, the Legislature cannot, consistent with the First Amendment, prevent adults from viewing non-obscene pornography. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 251 (2002). But warning adults of the risks of pornography use is well within a State's police power "to prescribe regulations to promote the health, peace, morals, education, and good order of the people." *Barbier v. Connolly*, 113 U.S. 27, 31 (1884); *see Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 6 (1947).

Plaintiffs protest that *Zauderer* cannot apply because H.B. 1181's disclosures are controversial since Plaintiffs dispute whether pornography use has the effects

described by H.B. 1181. *E.g.*, ECF 5 at 15. That does not render them controversial within the meaning of *Zauderer*. For example, in *CTIA*, the Ninth Circuit noted that "there is a controversy concerning whether radio-frequency radiation from cell phones can be dangerous if the phones are kept too close to a user's body over a sustained period." 928 F.3d at 848. The plaintiff in that case "stoutly maintain[ed] that cell phones present no danger whatsoever." *Id.* And in *Milavetz, Gallop & Milavetz, P.A. v. United States*, a law firm providing bankruptcy assistance vigorously disputed whether it was a "debt relief agency" required to make disclosures under Minnesota's consumer-protection laws. 559 U.S. 229, 249-50 (2010). Neither dispute took the disclosure requirement outside *Zauderer* because the disclosures neither chilled protected speech, *id.*, nor required the commercial entity to take a side in a political debate, *CTIA*, 928 F.3d at 848. The Attorney General is unaware of any case showing that encouraging consumers to consider the risks of their behavior creates a legally cognizable chill, or any political campaign that has ever been run to encourage broader access to porn.

Indeed, if commercial entities could render H.B. 1181's notices unconstitutional by raising factual disputes, governments could basically never require safety warnings. After all, "[b]usinesses generally do not welcome the mandated inclusion of a disclosure or safety warning on their products," yet "courts have consistently rejected the argument that a disclosure requirement should be considered controversial because businesses object to it or the public may be put off by it." Sabrina S.

Adler *et. al.*, *You Want a Warning with That? Sugar-Sweetened Beverages, Safety Warnings, and the Constitution*, 71 Food & Drug L.J. 482, 497 (2016).[2]

**b.** Even if *Zauderer* does not apply, H.B. 1181's notice requirement is still constitutional under *Central Hudson* because the Constitution "accords a lesser protection to commercial speech." 447 U.S. at 563. A State may regulate commercial speech if it has "a substantial interest to be achieved by restrictions" and "the regulatory technique" is "in proportion to that interest." *Id.* at 564. That is, "the restriction must directly advance the state interest involved," and "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." *Id.*

H.B. 1181's required notices directly advance Texas's interest in protecting minors from pornography. As noted above (at p. 12), not even Plaintiffs suggest that age verification will prevent 100% of minors from accessing Plaintiffs' sites. The warnings could thus deter at least some minors from proceeding. Indeed, Plaintiffs worry that the notices will be so effective that people will "abandon" their websites. *See* ECF 5 at 19. While Plaintiffs' fears are likely overblown, every child deterred by H.B. 1181's notices is one fewer child who may be subjected to any of Xnxx's 257,987 "teen bondage" or 196,887 "family porn" videos. *See* Ex. B ¶¶ 9-10.

---

[2] For example, tobacco companies denied that their products were harmful for decades—to disastrous results. *See* U.S. Dep't of Health & Human Servs., *The Health Consequences of Smoking—50 Years of Progress: A Report of the Surgeon General* (2014) at 20, available at http://tinyurl.com/smokingreport2014 (last accessed Sept. 7, 2023).

In addition, Plaintiffs have not identified a more limited restriction on their speech that would do as well at protecting minors who have circumvented age verification. Nor could they: having circumvented the technological blocks designed to prevent them from accessing the site, the last line of defense is a warning to make the minor think twice about the risks of proceeding. Given the extraordinary danger pornography poses to minors, *see* Ex. G ¶¶ 17-32, the required notices are "in proportion to" the State's interest, *Central Hudson*, 447 U.S. at 564. The Attorney General is thus likely to convince this Court that H.B. 1181 is consistent with the First Amendment.

### B. Plaintiffs have not plausibly alleged that H.B. 1181 is preempted by Section 230.

She is also likely to prevail on her appeal regarding Plaintiffs' Section 230 claims, which ignore that Congress actually enacted Section 230 "to incentivize telecommunication companies to *participate* in blocking explicit material from reaching children." Mary Graw Leary, *The Indecency and Injustice of Section 230 of the Communications Decency Act*, 41 Harv. J.L. & Pub. Pol'y 553, 559 (2018) (emphasis added). Although the Supreme Court has not yet outlined the full scope of Section 230, there is growing consensus among lower courts that the statute "does not insulate a company from liability for all conduct that happens to be transmitted through the internet." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 129 (4th Cir. 2022). "Instead, protection under § 230(c)(1) extends only to bar certain claims, in specific circumstances, against particular types of parties." *Id.* As the Texas Supreme Court has noted, it is "highly unlikely that Congress, by prohibiting treatment of internet

companies 'as . . . publisher[s],' sought to immunize those companies from *all* liability for the way they run their platforms." *In re Facebook, Inc.*, 625 S.W.3d 80, 98 (Tex. 2021) (orig. proceeding) (quoting 47 U.S.C. § 230(c)(1)), *cert. denied sub nom. Doe v. Facebook, Inc.*, 142 S. Ct. 1087 (2022). And the Ninth Circuit has observed that "[t]he Communications Decency Act was not meant to create a lawless no-man's-land on the Internet." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc).

**1.** With striking temerity, Plaintiffs nonetheless argue that a law enacted to *encourage* the protection of minors from sexually explicit content in fact *prevents* Texas from requiring common-sense measures to shield minors from pornography. But their theory ignores that the age-verification requirements apply *before* the user enters their websites—meaning that to run contrary to Section 230, *all* their content must be subject to the Section 230 shield.

Plaintiffs are exceptionally unlikely to prevail on that point because they have not alleged—let alone shown—that they host *only* "information provided by another information content provider." 47 U.S.C. § 230(c)(1). To the contrary, in support of their First Amendment claims, even Plaintiffs that host *any* third-party content acknowledge they themselves have produced content. *See* Ex. C at 27-28; *see also* ECF 5 at 17-19; ECF 27 at 19-20. But Section 230(c)(1) provides no immunity to information-content providers who are "responsible, in whole or in part, for the creation or development of information provided through the Internet." 47 U.S.C. § 230(f)(3). That is because such providers are *not* just hosting third-party content

but are instead "play[ing] a part in the 'creation or development'" of their websites' content. *NetChoice*, 49 F.4th at 466; *see Henderson*, 53 F.4th at 129.

Section 230 thus has nothing to say about whether Plaintiffs can be required to employ age verification to prevent minors from accessing harmful sexual material that Plaintiffs themselves produce—even if Plaintiffs are correct that Section 230 relieves them of the obligation to employ age verification with respect to third-party content. Because Plaintiffs have not alleged that they completely segregate their own content from third-party content, Section 230 does not preempt H.B. 1181's requirement that Plaintiffs employ age verification to prevent minors from accessing their sites.

**2.** Plaintiffs' contrary argument relies on *Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008). *E.g.*, ECF 5 at 18. But in *MySpace*, the plaintiff alleged that she "lied about her age" and was sexually assaulted by an adult that she met on the defendant's website. 528 F.3d at 416. This Court held that Section 230 barred such claims, which were "merely another way of claiming that MySpace was liable for publishing . . . third-party-generated content." *Id.* at 420.

Unlike the claims in *MySpace*, H.B. 1181 seeks to hold pornographic sites responsible for failing to protect minors from content *they generate*, not just third-party content. In addition, H.B. 1181 does not require "the monitoring, screening, and deletion of content from" pornographic sites. *Id.* (quoting *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003)). If Plaintiffs use the age-verification methods described in section 129B.003, they are not responsible if a minor lies about her age, circumvents the age verification, and is harmed by content. That means that H.B.

1181 would not impose liability for the defendant's conduct at issue in *MySpace*. *See id.* at 416.

**3.** To the extent that Plaintiffs are entitled to Section 230 immunity, they are not protected by the First Amendment. This Court has explained that "§ 230 reflects Congress's judgment that the Platforms are not acting as speakers or publishers when they host user-submitted content." *NetChoice*, 49 F.4th at 468. And if they are not publishers, then they are not entitled to First Amendment protection. *See id.* at 469. Plaintiffs can't have it both ways: either they are the speakers of their content, or others are. Thus, the district court erred in concluding that H.B. 1181 violates both the First Amendment and Section 230 with respect to the same Plaintiffs. *See* Ex. F at 81.

## C. No showing of irreparable injury, the equitable balance, or the public interest favored an injunction.

For related reasons, the district court also erred because Plaintiffs failed to prove irreparable injury. Because, as shown above in Part I.A.1, Plaintiffs do not have a constitutional right to post obscenity, they will suffer no First Amendment harm from being required to verify a person's age before allowing access to sites that they do not dispute contain at least some obscenity.

If anything, Plaintiffs' claim to irreparable harm with respect to the notice requirement demonstrates why the Attorney General is likely to succeed on the merits. Plaintiffs have argued that they "will suffer loss of goodwill as Texas adults abandon Plaintiffs' platforms in response to the demand that they reveal personal information and the false 'health warnings' the Act requires." ECF 5 at 19. Plaintiffs have offered

no actual *evidence that* adults will "abandon" some of the world's leading pornographic websites because of H.B. 1181's required notices. But if Plaintiffs are correct, that just shows that the notices are effective at deterring some visitors who have already made it through age verification. *Supra* p. 14. That means that the notices successfully communicate the risks of pornography and are thus "reasonably related to the State's interest" of protecting its citizens (and particularly minors) from the risks of pornography. *Zauderer*, 471 U.S. at 651.

## II.  The Remaining Factors Favor a Stay.

In addition to being likely to succeed on the merits, the remaining stay factors all favor the Attorney General. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam).[3] The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Even the district court acknowledged Texas's substantial interest in protecting minors from pornography.  Ex. F at 25-26.  Conversely, a stay will not "substantially injure" Plaintiffs. *Nken*, 556 U.S. at 426. They have no constitutional right to traffic in obscenity, and H.B. 1181 does not violate the First Amendment rights they do have for the reasons given above. Rather, a stay is in the public interest because enforcing H.B. 1181 violates no First Amendment right, and enjoining H.B. 1181 protects no child.

---

[3] For similar reasons, the district court also erred in weighing the balance of the equities before issuing the preliminary injunction.

## Conclusion

The Court should stay the district court's preliminary injunction pending appeal.

Respectfully submitted.

ANGELA COLMENERO
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Lanora C. Pettit
LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

KYLE D. HIGHFUL
Assistant Solicitor General

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Defendant-Appellant

## CERTIFICATE OF CONFERENCE

On September 7, 2023, counsel for Appellant conferred with counsel for Appellees, who stated that Appellees oppose the relief requested in this motion and will file a response in opposition to the motion.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## CERTIFICATE OF SERVICE

On September 7, 2023, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## Certificate of Compliance

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,199 words, excluding the parts of the document exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT

**Exhibit A: Order Denying Defendant's Motion to Stay Preliminary Injunction (ECF 45)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al., | § § § | No. 1:23-CV-917-DAE |
| Plaintiffs, | § § § | |
| vs. | § § | |
| ANGELA COLMENERO, in her official capacity as Interim Attorney General for the State of Texas, | § § § § | |
| Defendant. | § | |

_____

## ORDER

Before the Court is Defendant Angela Colmenero's ("Defendant") motion to stay this Court's preliminary injunction pending appeal, (Dkt. 40). Plaintiffs Free Speech Coalition, et al., ("Plaintiffs") filed a response in opposition, (Dkt. 43). Having reviewed the record and the parties' briefing, the Court will deny the motion.

A stay "seeks to maintain the status quo pending a final determination on the merits of the suit." Ruiz v. Estelle, 650 F.2d 555, 565 (5th Cir. 1981). Here, the preliminary injunction itself maintained the status quo by ensuring that a new law cannot take effect when it is likely to violate existing First Amendment precedent. See Texas v. United States, 787 F.3d 733, 768 (5th Cir. 2015). The status quo

would be upended—not preserved—if this Court stayed its injunction. Because H.B. 1181 runs afoul of 20-year-old precedent affirming that age verification is not narrowly tailored against content filtering, the status quo is kept by enjoining its enforcement pending further review. (Order, Dkt. 36, at 33–45 (citing Ashcroft v. ACLU, 542 U.S. 656 (2004))).

Having determined the law is likely unconstitutional, the equities favor Plaintiffs, because "injunctions protecting First Amendment freedoms are always in the public interest." Opulent Life Church v. City of Holly Springs, Miss., 697 F.3d 279, 298 (5th Cir. 2012). Indeed, the Supreme Court has repeatedly upheld preliminary injunctions against unconstitutional internet restrictions. In Reno v. ACLU, 521 U.S. 844 (1997), the Supreme Court affirmed the district court's grant of a preliminary injunction. And in Ashcroft, under almost identical circumstances, the Supreme Court noted that there are "important practical reasons to let the injunction stand pending a full trial on the merits." 542 U.S. at 670. It elaborated, "There is a potential for extraordinary harm and a serious chill upon protected speech. The harm done from letting the injunction stand pending a trial on the merits, in contrast, will not be extensive. No prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands." Id. at 671. These cases make clear that a preliminary injunction against unconstitutional

2

internet restrictions both maintains the status quo and prevents Plaintiffs from suffering irreparable injury.

Nor does this Court find that Defendant is likely to succeed on appeal. The Court has detailed its analysis extensively and need not repeat it here. H.B. 1181 is subject to strict scrutiny, and Defendant's arguments against that standard rest upon the hypothetical possibility that the Supreme Court may overturn its seminal precedents in <u>Miller v. California</u>, 413 U.S. 15 (1973) and <u>Reno v. ACLU</u>, 521 U.S. And Defendant's argument as to the compelled speech cites a standard that is both inapplicable and abrogated. (Mot. Stay, Dkt. 40, at 14 (citing <u>Tex. Med. Providers Performing Abortion Servs. v. Lakey</u>, 667 F.3d 570, 577 (5th Cir. 2012))). Accordingly, and for the reasons set forth at length in this Court's preliminary injunction order, (Dkt. 36), Defendant is not likely to succeed on appeal.

**IT IS ORDERED** that the motion to stay pending appeal, (Dkt. 40), is **DENIED**.

**DATED**: Austin, Texas, September 6, 2023.

David Alan Ezra
Senior United States District Judge

# Exhibit B: Declaration of Erik Cabrera (ECF 27-3)

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC, et. al., | § § § | |
| *Plaintiffs*, | § | |
| v. | § § | Civil Action No. 1:23-cv-00917-DAE |
| ANGELA COLMENERO, in her official capacity as Interim Attorney General for the State of Texas, | § § § | |
| *Defendant*. | § | |

---

## DECLARATION OF ERIK CABRERA

---

1.  I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.

2.  I am a Sergeant in the Child Exploitation Unit of the Criminal Investigations Division in the Office of the Texas Attorney General where I have been employed for 9 years.  Prior to that, I spent 6 years as a law enforcement officer with Uvalde County Sheriff's Department.

3.  As part of my job with the Texas OAG, I conduct investigations involving the online sexual exploitation of children.  I have to visit porn websites on a daily basis.

4.  After reading paragraph 41 of the declaration of Richard L. Sonnier, I recreated the scenario he presents there. I went to Bing.com. I turned off safe search filters and searched "hot sex."  The first page of results was exclusively links to Pornhub.com and XNXX.com.  Images were blurred even though I had turned off "safe search."

5.  When I clicked on the "videos" tab, the vast majority of results—almost all—were for Pornhub.com, XNXX.com, xhamster.com, and xvideos.com.

6.  On the main tab for all results, I clicked the first link, which directed me to XNXX.com.

1



7.   Among other things the landing page of XNXX.com shows still shots of porn videos, 6 images across the screen and about 6 rows down. In total, about 36 still shots of porn videos.  When I moved my mouse over an image, scenes from the video begin to play even if I did not click on the image.

8.   Below each of the images was a title for the video. Titles on the landing page of XNXX.com included, "18yo chubby teen Alba gets her first cock up her tight ass," "Ebony Little Step Sister Cums On Step Brother's Cock," and "White Whore Fucks Biggest Black Cocks Ever."

9.   XNXX.com links to various categories of videos called "Tags" on their site. There are thousands of tags available. They include "balls deep anal" (200,311 results), "family porn" (196,887), "gaping asshole" (44,380), "perfect girl porn" (306,230), "teen hardcore" (579,497), and "young petite porn" (328,273).

10. I also searched the word "bondage" in the search bar and the search bar indicated that 49,461 videos matched that tag.  But it also showed that 257,987 videos matched "teen bondage."  Other apparently popular categories of bondage videos include "bondage anal" (199,003), "anal bondage" (198,984), "Asian bondage" (88,713), "Japanese Bondage" (67,340), and "ebony bondage" (91,203).

11. I typed in "teen bondage" in the search bar and the site provided the top auto-fill option as "teen bondage gangbang." I initiated that search and it returned 304,523 free videos in response with additional 18,346 available through XNXX.com Gold

12. I clicked to watch a video titled, "Using and a. the whore." In that 36-minute video, 5 men tie up a woman with electrical tape and rope.  Throughout the video, they take turns penetrating her orally, vaginally, and anally, sometimes simultaneously. At one point, a man puts his hands around her neck. The men also slap her repeatedly.  While she is still tied up, the men later strap a device around her head called a "mouth spreader" or "spider mouth gag" that forces her mouth to remain open. They then take turns ejaculating into her mouth.  This video had approximately 671,000 views and a

98 percent rating. During my time on XNXX.com, I came across other videos that I would prefer not to describe in this declaration.

13. I also clicked on a link to XNXX "Gold." This portal within the website offers access to "Exclusive Content." When I clicked the link to sign up, it took me to xxnx.gold/account/create which advertised "XNXX GOLD originals." It also showed a picture of a man dressed in all black, with black gloves, a black handkerchief over his face, covering the mouth of a naked woman whom he appeared to be taking by surprise. The website Porndoe.com had a similar scheme where I could click to get original content.

14. I also visited the website Pornhub.com. It has the same general layout as xnxx.com, which is a common layout for porn sites, where the landing pages show photos that you can click on to view videos. Or, you can scroll over the pictures to see a preview without clicking. Among the many channels on Pornhub.com, is a channel for Pornhub Originals which indicates Pornhub itself produces content for the site and has been doing so for about 6 years. Pornhub also has a blog.

15. Pornhub provides a "Year In Review" where it analyzes the data Pornhub collects about its visitors. One chart shows how much time each state's residents spent on Pornhub per visit, down to the second. Pornhub also identifies the most popular search terms per state.

16. On their site, Pornhub also represents that in 2019 it had 42 billion visitors, 115 million visitors per day, and 6.83 million new video uploads that constituted 1.36 million hours of new content, which, Pornhub calculates as 169 years. And the site states, "If you started watching 2019's new videos in 1850, you would still be watching them today."

17. I also visited the websites Letsdoeit.com, Superbe.com, MYLF.com, and TeamSkeet.com. The landing pages of those websites likewise show pictures of videos that you can click on to view. However, you can only view short previews, and if you click on the videos, you are taken immediately to a screen that requests payment.

18. Even for the non-subscription websites, the videos posted on the channel often act as advertisements for other porn channels.  Sometimes those content creators provide free full-length videos that provide a link to the channel or content creator that posted the video.  Other times the videos will include a watermark that advertises the content creator. And when you click on a video, an ad usually plays first.

19. The sites' pages are also filled with advertisements along the top banner and/or sidebars. Those ads sometimes promote other porn sites by showing a porn video that leads to another porn site. The ads may also show male or female genitalia being stimulated by an advertised sex toy. The product or purpose of the ads varies, but they are always, or almost always, themselves pornographic.

### DECLARATION UNDER PENALTY OF PERJURY

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and based upon my personal knowledge.

/s/_____
Sgt. Erik Cabrera

# Exhibit C: Complaint (ECF 1)

# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF TEXAS

# AUSTIN DIVISION

| | |
|---|---|
| FREE SPEECH COALITION, INC., MG PREMIUM LTD, MG FREESITES LTD, WEBGROUP CZECH REPUBLIC, A.S., NKL ASSOCIATES, S.R.O., SONESTA TECHNOLOGIES, S.R.O., SONESTA MEDIA, S.R.O., YELLOW PRODUCTION S.R.O., PAPER STREET MEDIA, LLC, NEPTUNE MEDIA, LLC, JANE DOE, MEDIAME SRL, MIDUS HOLDINGS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> ANGELA COLMENERO, IN HER OFFICIAL CAPACITY AS INTERIM ATTORNEY GENERAL FOR THE STATE OF TEXAS, <br><br> Defendant. | **CASE NO. 1:23-cv-917** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs, by their undersigned counsel, bring this Complaint to enjoin the Texas Attorney General from enforcing a newly passed law targeting the free speech rights of internet platforms and individuals that goes into effect September 1, 2023, as it violates both the Constitution of the United States and the federal Communications Decency Act.

## INTRODUCTION

1.      On June 12, 2023, the Texas governor signed into law House Bill 1181 ("the Act"), which goes into effect September 1, 2023.  The Act joins a long tradition of unconstitutional—and ultimately failed—governmental attempts to regulate and censor free speech on the internet.  The Act in effect requires Plaintiffs to block access to their websites in Texas wholesale, unless they implement a system that requires all visitors to transmit their personal information to verify that they are at least eighteen years old.  The Act also purports to compel Plaintiffs to display a lengthy, controversial, and factually false "TEXAS HEALTH AND HUMAN SERVICES WARNING" on their websites—maligning the very constitutionally protected content they feature.  Both of the Act's requirements are enforceable by the Texas Attorney General.  Both requirements are unconstitutional.  Plaintiffs thus seek to enjoin the Attorney General from enforcing the unconstitutional Act.

2.      Pursuant to 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. §§ 2201-02, Plaintiffs seek injunctive and declaratory relief to vindicate rights, privileges, and immunities secured by the Constitution and laws of the United States.  The Act violates the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as section 230 of the Communications Decency Act.

3.      The Act violates the First Amendment in three fundamental ways.

3.1     *First*, the Act's age verification requirement is overbroad and fails strict scrutiny.  Despite impinging on the rights of adults to access protected speech, it fails strict scrutiny by employing the *least* effective and yet also the *most* restrictive means of accomplishing Texas's stated purpose of allegedly protecting minors.  Indeed, minors can use virtual private networks ("VPNs"), proxy servers, the "Tor" browser, and numerous other circumventions to bypass the

Act's verification requirements with ease; the law excludes search engines and most social media sites even though they pose a *greater* risk of exposure to adult content; and protected speech will be chilled as adults refuse to risk sharing and exposing their personal information that could lead to financial or reputational harm.  In contrast, content filtering at the browser and/or the device level allows anyone wishing to implement that technology on minors' devices to block access to any unwanted site, including adult sites, without impairing free speech rights or privacy.  But such far more effective and far less restrictive means don't really matter to Texas, whose true aim is not to protect minors but to squelch constitutionally protected free speech that the State disfavors.

3.2     *Second*, the Act's "health warning" requirement is a classic example of the State mandating an orthodox viewpoint on a controversial issue.  Texas could easily spread its ideological, anti-pornography message through public service announcements and the like without foisting its viewpoint upon others through mandated statements that are a mix of falsehoods, discredited pseudo-science, and baseless accusations.

3.3     *Third*, under the heightened scrutiny required by the First Amendment, the Act is incurably vague as to its fundamental requirements, providing neither a coherent standard for assessing which websites it applies to, nor adequate guidance on what "age verification" entails.

4.     The Act further violates the Supremacy Clause by violating section 230 of the Communications Decency Act, which prohibits treating website operators as if they were responsible for alleged harm caused by content created by third parties.

5.     The Act violates the Fourteenth Amendment in multiple ways, too.  *First*, because of its vagueness, it violates the procedural component of the Due Process Clause.  *Second*, by destroying Plaintiffs' protected property right in the goodwill of Texan viewers without a rational basis, it violates the substantive component of the Due Process Clause.  *Third*, because of its arbitrary exceptions for search engines and most social media sites, it violates the Equal Protection Clause even under rational basis review.

6. The Act also violates the Excessive Fines Clause of the Eighth Amendment, because it imposes fines that are grossly disproportionate to the unsubstantiated, fabricated harms it purports to protect against.

7. Accordingly, Plaintiffs seek to have the Texas Attorney General enjoined from enforcing the Act—both preliminarily, pending the hearing and determination of this action, and permanently. Plaintiffs also seek declaratory relief, as well as damages, costs, and attorneys' fees.

## JURISDICTION AND VENUE

8. This case presents federal questions within this Court's jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331 and 1343(3). Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 (deprivation of rights, privileges, and immunities secured by the Constitution and federal law) and 28 U.S.C. §§ 2201-02 (declaratory judgment as to an actual controversy).

9. Venue is proper pursuant to 28 U.S.C. § 1391(b). The challenged law was passed in Austin, Texas, which is also where the Attorney General performs her official duties.

## PARTIES

10. Defendant Angela Colmenero is a person within the meaning of Section 1983 of Title 42 of the United States Code; and she currently serves as the Interim Attorney General of the State of Texas. The Office of the Attorney General is in Austin, Texas. The Act expressly authorizes that, "[i]f the attorney general believes that an entity is knowingly violating or has knowingly violated this chapter and the action is in the public interest, the attorney general may bring an action in a Travis County district court or the district court in the county in which the principal place of business of the entity is located in this state to enjoin the violation, recover a civil penalty, and obtain other relief the court considers appropriate." Act § 129B.006. The Attorney General of Texas is thus solely and directly responsible for the enforcement of the Act.

11. Plaintiff Free Speech Coalition, Inc. ("FSC") is a not-for-profit trade association organized under the laws of California with its principal place of business in Canoga Park, California. FSC assists filmmakers, producers, distributors, wholesalers, retailers, internet

3

providers, performers, and other creative artists located throughout North America in the exercise
of their First Amendment rights and in the vigorous defense of those rights against censorship.
Founded in 1991, the Free Speech Coalition represents hundreds of businesses and individuals
involved in the production, distribution, sale, and presentation of constitutionally-protected adult
content disseminated to consenting adults via the internet.  FSC sues on its own behalf and on
behalf of its members to vindicate its own constitutional rights, its members' constitutional rights,
and the rights of its members' owners, officers, employees, and current and prospective readers,
viewers, and customers.   Many of FSC's members are individual adult performers gravely
concerned about the consequences of the Act, but who fear for their safety should they come
forward publicly to challenge the Act in court.  FSC's members would directly benefit from an
injunction enjoining the enforcement of the Act.  The potential harm to FSC's members caused by
the recent enactment of state age-verification statutes has caused significant concern among its
members.  FSC has diverted resources away from its normal day-to-day activity, which has
impaired its ability to perform its usual functions.  Over the last six months, both FSC's Executive
Director and Director of Public Affairs have had to devote more than half their time to tracking
legislative developments, meeting with FSC members to discuss risks relating to age-verification
statutes, meeting with litigation attorneys and advisors, and otherwise engaging in activities to
minimize the risk to its members from the age-verification statutes that states, in particular Texas,
have recently enacted.

     12.     Plaintiff MG Premium Ltd, is a limited liability company organized under the laws
of the Republic of Cyprus, with its principal place of business in Nicosia, Cyprus, that operates
SpiceVids.com ("SpiceVids"), a subscription-based website offering high quality adult content
uploaded, owned, copyrighted, and controlled by third party content creators.  MG Premium Ltd
also operates the website Brazzers.com ("Brazzers"), a subscription-based website offering high
quality adult content in which MG Premium Ltd holds all the intellectual property rights.  For
shoots with adult performers, MG Premium Ltd writes the scripts, hires the production team, and
does the pre- and post-production work.  MG Premium Ltd uploads Brazzers content both to

Brazzers.com and to the websites of other Plaintiffs, including Pornhub.com, xvideos.com, xnxx.com, and SpiceVids.  In addition, MG Premium Ltd operates the website FakeTaxi.com ("FakeTaxi"), a subscription-based website offering high quality adult content that is produced and owned by Plaintiff Yellow Production, s.r.o., discussed below.  MG Premium Ltd opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its websites.

13.     Plaintiff MG Freesites Ltd, is a limited liability company organized under the laws of the Republic of Cyprus, with its principal place of business in Nicosia, Cyprus, that operates Pornhub.com ("Pornhub"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators.  MG Freesites Ltd opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience, as well as the government-mandated speech the Act would force it to place on its website.

14.     Plaintiff WebGroup Czech Republic, a.s. ("WebGroup"), is a corporation organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates xvideos.com ("XVideos"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators.  WebGroup opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience, as well as the government-mandated speech the Act would force it to place on its website.

15.     Plaintiff NKL Associates, s.r.o. ("NKL"), is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates xnxx.com ("Xnxx"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators. NKL opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience, as well as the government-mandated speech the Act would force it to place on its website.

5

16.     Plaintiff Sonesta Technologies, s.r.o. ("Sonesta Tech"), is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates the website BangBros.com ("BangBros"), a subscription-based website offering high quality adult content.  Sonesta Tech opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its website.

17.     Plaintiff Sonesta Media, s.r.o., ("Sonesta Media") is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that produces, and owns the intellectual property rights to, the content on BangBros.com.  It also licenses some of its content to be uploaded to other websites, including Pornhub, XVideos, Xnxx, and SpiceVids.  Sonesta Media opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force BangBros to place on its website.

18.     Plaintiff Yellow Production, s.r.o. ("Yellow Production") is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that produces, and owns the intellectual property rights to, the content on FakeTaxi.  It also licenses some of its content to be uploaded to other websites, including Pornhub, Xvideos, Xnxx, and SpiceVids.  Yellow Production opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force FakeTaxi to place on its website.

19.     Plaintiff Paper Street Media, LLC ("Paper Street"), is a limited liability company organized under the laws of Florida, with its principal place in Miami, Florida, that operates the TeamSkeet adult content network, comprised of numerous subscription-based adult websites offering high quality adult content.  Paper Street owns the content on its network sites and, for shoots with adult performers, writes the scripts, hires the production team, and does the pre- and post-production work.  Paper Street also makes some of the content available on the TeamSkeet network available to other adult websites, including Pornhub, XVideos, Xnxx, and

SpiceVids.  Paper Street opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its websites.

20.     Plaintiff Neptune Media, LLC ("Neptune Media"), is a limited liability company organized under the laws of Florida, with its principal place of business in Miami, Florida, that operates the MYLF adult content network, comprised of numerous subscription-based adult websites offering high quality adult content.  Neptune Media owns the content on its network sites and, for shoots with adult performers, writes the scripts, hires the production team, and does the pre- and post-production work.  Neptune Media also makes some of the content available on the MYLF network available to other adult websites, including Pornhub, XVideos, Xnxx, and SpiceVids.  Neptune Media opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its websites.

21.     Plaintiff Jane Doe,[1] a citizen and resident of the State of Oregon, is an adult performer who creates adult content. Their content is featured on numerous adult websites, including Pornhub.  They oppose the restrictions the Act would place on their ability to reach their audience, as well as the government-mandated speech that the Act would force adult websites to place on their websites.

22.     Plaintiff MediaME SRL is a limited liability company organized under the laws of Romania, with its principal place of business in Pipera, Romania, that operates the website Porndoe.com, a popular free adult entertainment websites that hosts content uploaded, owned, copyrighted, and controlled by third party content creators.

23.     Plaintiff Midus Holdings, Inc., is a corporation organized under the laws of Florida, with its principal place of business in Coral Springs, Florida, that operates the

---

[1] "Jane Doe" is a pseudonym necessary to protect Plaintiff from retaliation, stalking, and other harms associated with taking legal action to defend the adult industry against the Act.  Doe's true name may be provided to the Court under seal or pursuant an appropriate protective order.

websites Letsdoeit.com and Superbe.com, each a subscription-based website offering high quality adult content within the United States.

## FACTS

### I.     The Act

24.     During the 2023 legislative session, the Texas Legislature passed House Bill 1181, which amended Section 1, Title 6 of the Texas Civil Practice and Remedies Code by adding Chapter 129B—herein referred to as "the Act."  The Texas Governor signed the bill into law on June 12, 2023, which goes into effect September 1, 2023.  The Act provides:

Chapter 129b. Liability for Allowing Minors to Access Pornographic Material

*Sec. 129b.001. Definitions*.

In this chapter:

(1)     "Commercial entity" includes a corporation, limited liability company, partnership, limited partnership, sole proprietorship, or other legally recognized business entity.

(2)     "Distribute" means to issue, sell, give, provide, deliver, transfer, transmute, circulate, or disseminate by any means.

(3)     "Minor" means an individual younger than 18 years of age.

(4)     "News-gathering organization" includes:

(A)     an employee of a newspaper, news publication, or news source, printed or on an online or mobile platform, of current news and public interest, who is acting within the course and scope of that employment and can provide documentation of that employment with the newspaper, news publication, or news source; and

(B)     an employee of a radio broadcast station, television broadcast station, cable television operator, or wire service who is acting within the course and scope of that employment and can provide documentation of that employment.

(5)     "Publish" means to communicate or make information available to another person or entity on a publicly available Internet website.

(6)     "Sexual material harmful to minors" includes any material that:

(A)     the average person applying contemporary community standards would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest;

(B)     in a manner patently offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated displays or depictions of:

(i)     a person's pubic hair, anus, or genitals or the nipple of the female breast;

(ii)     touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or

(iii)     sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(C)     taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

(7)     "Transactional data" means a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event. The term includes records from mortgage, education, and employment entities.

### Sec. 129B.002. Publication of Material Harmful to Minors.

(a)     A commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors, shall use reasonable age verification methods as described by Section 129B.003 to verify that an individual attempting to access the material is 18 years of age or older.

(b)     A commercial entity that performs the age verification required by Subsection (a) or a third party that performs the age verification required by Subsection (a) may not retain any identifying information of the individual.

### Sec. 129B.003.     Reasonable Age Verification Methods.

(c)     In this section, "digital identification" means information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identity of an individual.

(d)     A commercial entity that knowingly and intentionally publishes or distributes material on an Internet website or a third party that performs age verification under this chapter shall require an individual to:

(1)     display the following notices on the landing page of the Internet website on which sexual material harmful to minors is published or distributed and all advertisements for that Internet website in 14-point font or larger:

"TEXAS HEALTH AND HUMAN SERVICES WARNING: Pornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function."

"TEXAS HEALTH AND HUMAN SERVICES WARNING: Exposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses."

"TEXAS HEALTH AND HUMAN SERVICES WARNING: Pornography increases the demand for prostitution, child exploitation, and child pornography."; and

(2)     display the following notice at the bottom of every page of the Internet website in 14-point font or larger:

"U.S. SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION HELPLINE:

1-800-662-HELP (4357)

THIS HELPLINE IS A FREE, CONFIDENTIAL INFORMATION SERVICE (IN ENGLISH OR SPANISH) OPEN 24 HOURS PER DAY, FOR INDIVIDUALS AND FAMILY MEMBERS FACING MENTAL HEALTH OR SUBSTANCE USE DISORDERS. THE SERVICE PROVIDES REFERRAL TO LOCAL TREATMENT FACILITIES, SUPPORT GROUPS, AND COMMUNITY-BASED ORGANIZATIONS."

**Sec. 129B.005. Applicability of Chapter.**

(a)     This chapter does not apply to a bona fide news or public interest broadcast, website video, report, or event and may not be construed to affect the rights of a news-gathering organization.

(b)      An Internet service provider, or its affiliates or subsidiaries, a search engine, or a cloud service provider may not be held to have violated this chapter solely for providing access or connection to or from a website or other information or content on the Internet or on a facility, system, or network not under that provider's control, including transmission, downloading, intermediate storage, access software, or other services to the extent the provider or search engine is not responsible for the creation of the content that constitutes sexual material harmful to minors.

### Sec. 129B.005. Applicability of Chapter.

(a)      If the attorney general believes that an entity is knowingly violating or has knowingly violated this chapter and the action is in the public interest, the attorney general may bring an action in a Travis County district court or the district court in the county in which the principal place of business of the entity is located in this state to enjoin the violation, recover a civil penalty, and obtain other relief the court considers appropriate.

(b)      A civil penalty imposed under this section for a violation of Section 129B.002 or 129B.003 may be in an amount equal to not more than the total, if applicable, of:

(1)      $10,000 per day that the entity operates an Internet website in violation of the age verification requirements of this chapter;

(2)      $10,000 per instance when the entity retains identifying information in violation of Section 129B.002(b); and

(3)      if, because of the entity's violation of the age verification requirements of this chapter, one or more minors accesses sexual material harmful to minors, an additional amount of not more than $250,000.

(c)      The amount of a civil penalty under this section shall be based on:

(1)      the seriousness of the violation, including the nature, circumstances, extent, and gravity of the violation;

(2)      the history of previous violations;

(3)      the amount necessary to deter a future violation;

(4)      the economic effect of a penalty on the entity on whom the penalty will be imposed;

(5)      the entity's knowledge that the act constituted a violation of this chapter; and

(6)      any other matter that justice may require.

(d)      The attorney general may recover reasonable and necessary attorney's fees and costs incurred in an action under this section."

25.      Section 2 of the Act establishes that "[t]he Act becomes effective September 1, 2023."

## II.      Communication Over the Internet

26.      The internet is a decentralized, global medium of communication that links people, institutions, corporations, and governments around the world.  It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individuals' computers.  The internet connects an estimated 5.39 billion people—or 68% of the world's population[2]—and it is estimated that 77.0% of Texas residents are internet users.[3]

27.      Because the internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the internet or limits the ability of others to access such materials.  Rather, the range of digital information available to internet users is individually created, maintained, controlled, and located on millions of separate individual computers around the world.

28.      The internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it.  Unlike television, cable, radio, newspapers, magazines or books, the internet provides the average citizen and business, whether large or small, with an affordable means for communicating with, accessing, and posting content to a worldwide

---

[2] *See* http://www.internetworldstats.com/stats.htm.
[3] *See* https://www.statista.com/statistics/184691/internet-usage-in-the-us-by-state.

audience.  Although the majority of the information on the internet does not depict or describe nudity or sexual activity, such material is indeed widely available on the internet.

29.     An Internet Protocol ("IP") address is a unique address that identifies a connection to a device on the internet or a local network, much like a telephone number is used to connect a telephone to other telephones.  In essence, an IP address is the identifier that allows information to be sent between devices on a network.   Internet Service Providers ("ISPs") and telecommunications companies control "blocks" of IP addresses, and the location of an internet connection can be very roughly determined according to the geographic region those companies assign to the IP address associated with a connection.

30.     Websites can request that their host server block traffic from particular IP address regions ("geoblocking") or target specific regions with different versions of the website using the same technology ("geolocation").  They can also pay for expensive services that rely on GPS and data modeling to increase the accuracy of geoblocking and geolocation.  However, satellites and cellular towers do not respect state boundaries, and many IP-address databases are highly inaccurate.  The accuracy of geolocation technology is imperfect, and residents of one state, particularly near state borders, may be mistakenly categorized as residents of another.  Indeed, some blocks of IP addresses cover multiple States at once, and the accuracy of geolocating an internet user based on IP address can dip as low as 55%.

31.     Virtual Private Networks ("VPNs") and proxy servers bypass geoblocking and geolocation by websites.  Both function as an intermediary between an individual internet-connected device and the targeted server.  They hide the device's actual public IP address and instead "tunnel" traffic between the device and a remote server—the only difference being that communications sent through VPNs are encrypted.  Setting up a proxy server is generally free and simple, and the same is true of VPNs.  Doing so permits users to obscure their location while browsing the web, whether on wireless or cellular networks.  VPNs are extremely common—used both by consumers and businesses to establish secure, remote connections to their home networks. In fact, they are included by default in most consumer antivirus software.

32.     The freely available "Tor" browser, which is designed to be easily downloaded and used, also hides a user's IP address when browsing the internet.

33.     Even remote and virtual desktop services, which are popular among university students, allow users to appear to internet websites as though they were located wherever the cloud server (in the case of virtual desktops) or the actual computer (in the case of virtual desktops) appears to be located.  In all cases, the user can appear to be located in a different state or country whose laws do not require age verification by websites.

## III.   The Minimal Benefits of Age Verification under the Act

34.     Minors are more at risk of exposure to adult content from social media sites and search engines than traditional adult websites like Plaintiffs.[4]  Search engines, by design, enable anyone to access troves of adult images and videos in seconds—content that is no less explicit than that found directly on Plaintiffs' websites.  And Facebook alone flagged a staggering **73.3 million** pieces of content under "child nudity and sexual exploitation" from Q1 to Q3 of 2022 alone.[5]  Recent research found a majority of children under 13 had their own profile on at least one social media application or site and one-third of children between the ages of 8 and 17 with a social media profile signed up with a false birthdate.[6]

35.     Because most social media sites contain so much content that they will not meet the Act's "more than one-third" threshold for "sexual material harmful to minors," the Act effectively exempts most social media sites, in addition to its explicit exemption for search engines.

---

[4]  Neil Thurman and Fabian Obster, "The regulation of internet pornography: What a survey of under-18s tells us about the necessity for and potential efficacy of emerging legislative approaches," 13 POLICY & INTERNET 415, 417 (2001).
[5]  *See* Paul Bischoff, *The Rising Tide of Child Abuse Content on Social Media*, (Jan. 25, 2023), https://www.comparitech.com/blog/vpn-privacy/child-abuse-online-statistics/.
[6]  *See* https://www.ofcom.org.uk/__data/assets/pdf_file/0024/234609/childrens-media-use-and-attitudes-report-2022.pdf.

36.     There also are far riskier ways to obtain adult content, such as through the Dark Web (e.g., via the freely downloadable "Tor" browser), which is replete with more extreme adult content and also a range of black markets for ransomware, sex trafficking, drugs, and even hitmen. Those determined to access adult content are likely to be pushed by the Act towards unregulated platforms, which is a more dangerous environment for users, *including* underage users, who would then be exposed to far more problematic and hazardous online environments.

37.     In addition to these alternative pathways to adult content, state-specific restrictions on traditional adult websites can be easily bypassed by VPNs and proxy servers.

38.     All of this is magnified by the fact that minors are more tech-savvy than adults, especially older adults, and therefore will be able easily to evade the age verification requirements of the Act.

## IV.     The Burdens and Risks of Age Verification

### A.     The Risks To Adults

39.     While rapid technological progress might suggest it's easy to verify age, in fact there is no current method that does not carry inherent, unacceptable disadvantages and harms.[7] Nor does technological process excuse First Amendment violations, or make the Act any more effective at protecting kids, or any less invasive of people's privacy, or any less dangerous in light

---

[7] *See, e.g.*, Jason Kelley and Adam Schwartz, *Age Verification Mandates Would Undermine Anonymity Online,* Electronic Frontier Foundation, March 10, 2023, https://www.eff.org/deeplinks/2023/03/age-verification-mandates-would-undermine-anonymity-online (explaining the flaws of age verification systems and why they are the wrong approach to protecting young people online, as they would force websites to require visitors to prove their age by submitting information such as government-issued identification. "This scheme would lead us further towards an internet where our private data is collected and sold by default. The tens of millions of Americans who do not have government-issued identification may lose access to much of the internet. And anonymous access to the web could cease to exist.").

of the highly recognized misuse of any such data[8] and vulnerability to hackers and cybersecurity attacks.

40.     Hackers are targeting information shared on the internet at exponentially high rates, including data kept in the safest locations such as federal and state agencies, which have themselves been subjected to multiple breaches.[9]

41.     Any claimed benefit of age verification imposed by the Act does not justify the burdens imposed on adults—the vast majority of whom value their online privacy and do not wish to expose exploitable personal data simply to view constitutionally-protected material they have every right to view.  The high risk of data breaches and leaks resulting from compliance with the Act serves as an unavoidable barrier preventing adults from divulging their information over the internet.  If that is set as a condition to view legal adult content, adults will simply go elsewhere for that content instead (especially since that content is available elsewhere on the internet, not just on adult entertainment websites targeted by the Act).

42.     Online age-verification is fundamentally different from an employee at a brick-and-mortar store checking a driver's license.  Online and offline age verification do not share the same risks.  Offline age verification does not carry the threat of producing an accessible ledger of adults who view adult content (or adults whose identity has been stolen and used to view adult content) or of creating a digital trail that could expose an individual to financial or reputational harm.

---

[8] *See, e.g.*, a proposed Trade Regulation Rule on Commercial Surveillance and Data Security, https://www.federalregister.gov/documents/2022/08/22 (where the Federal Trade Commission requested public comment on the prevalence of commercial surveillance and data security practices that harm consumers, and inviting comment on whether it should implement new trade regulation rules or other regulatory alternatives concerning the ways in which companies collect, aggregate, protect, use, analyze, and retain consumer data, as well as transfer, share, sell, or otherwise monetize that data in ways that are unfair or deceptive, recognized, among others, that data is regularly collected for one purpose and used for another.).

[9] *See e.g.,* Kevin Collier, *U.S. Government Says Several Agencies Hacked As Part Of Broader Cyberattack,* https://www.nbcnews.com/tech/security/us-govement-agencies-hacked-cyberattack-moveit-rcna89525 (discussing several U.S. agencies being hacked on June 15, 2023 as part of a broader cyberattack that hit dozens of companies and organizations in recent weeks through a previously unknown vulnerability in popular file sharing software).

Someone can enter a brick-and-mortar adult bookstore or sex shop merely by briefly displaying

their license, for a human worker's real-time review.  No record is made or kept, and that is the

end of the matter.  Online age verification, in contrast, carries the real risk that the viewer's digital

"fingerprint" will take on a life of its own, enabling a third party to determine the viewer's identity,

expose the viewer as a viewer of adult content, and steal the viewer's identity to commit financial

fraud, extortion, and other crimes.[10]

      43.     This risk is not hypothetical.  Louisiana recently passed an age verification law that

provides for age verification utilizing a state-maintained database of digital driver's licenses.  After

going live, that database was breached almost immediately,[11] exposing the information of

everyone who enrolled in Louisiana's optional digital identification program for the purposes of

accessing adult content.  It is no coincidence that the number of identity thefts in Louisiana have

increased since the age verification law became effective.

      44.     Data minimization is the principle that reducing the amount of data collected in the

first place reduces subsequent risk.[12]  This is true, for instance, in the case of a disreputable adult

site that might take advantage of the age verification law's requirements to force visitors to provide

personal information that can be used for marketing, sold to data brokers, or stolen by attackers.

This problem is exacerbated for certain vulnerable adult populations, such as the elderly, who are

---

[10] *See, e.g.*, Kim Zetter, *Hackers Finally Post Stolen Ashley Madison Data*, Wired, Aug. 18, 2015, https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data (discussing Ashley Madison data breach and hackers' threat to "release all customer records, including profiles with all the customers' secret sexual fantasies and matching credit card transactions, real names and addresses."). The Ashley Madison breach is associated with at least two suicides.  *See* Morgan Sharp, *Two people may have committed suicide after Ashley Madison hack: police*, Reuters, Aug. 24, 2015, https://www.reuters.com/article/us-ashleymadisoncybersecurity-idUSKCN0QT1O720150824//.

[11] *See* https://www.axos.com/local/new-orleans/2023/06/16/louisiana-cyberattack-dmv-moveit

[12] *See, e.g.,* Shoshana Weissmann, *Age-verification legislation discourages data minimization, even when legislators don't intend that*, Rstreet.com, May 24, 2023, https://www.rstreet.org/commentary/age-verification-legislation-discourages-data-minimization-even-when-legislators-dont-intend-that/ (discussing how data minimization lessens the potential of data breach); *see also Data Minimization Principle*, The International Association of Privacy Professionals, https://iapp.org/resources/article/data-minimization-principle/.

more susceptible to online hacks and scams.[13]  Online age verification does not comport with the principle of data minimization.

### B.    The Risks to Minors

45.    The Act's "solution" is far worse than the purported problem it aims to solve. Today's children are "digital natives."  They are more likely than adults to be able to circumvent the Act, and thus be pushed to Tor and the Dark Web, where they will be exposed to illegal activities and more extreme material, including violent pornography and criminal gang activities.[14]

### C.    The Burden on Websites

46.    Commercially available age verification services that are reputable are also exorbitantly expensive.  For instance, Trustmatic, the cheapest option in the table below, still costs $40,000 per 100,000 verifications and intrusively requires users to upload pictures of their face.

| Vendor | Website (pricing) | $ per verification | 100M verifications | 5M verifications | 100k verifications |
|---|---|---|---|---|---|
| Yoti | https://www.yoti.com/business/identity-verification/ | £1.20 | £120,000,000 | £6,000,000 | £120,000 |
| Ondato | https://ondato.com/plans-pricing/ | €0.95 | €95,005,180 | €4,750,259 | €95,005 |
| Stripe | https://stripe.com/identity#pricing | $1.50 | $150,000,000 | $7,500,000 | $150,000 |
| Passbase | https://passbase.com/pricing | $2.00 | $200,000,980 | $10,000,049 | $200,001 |
| veriff | https://www.veriff.com/plans | $1.49 | $149,000,000 | $7,450,000 | $149,000 |
| Trustmatic | https://trustmatic.com/pricing | €0.40 | $40,000,000 | $2,000,000 | $40,000 |
| Berbix | https://www.berbix.com/pricing | $0.99 | $99,000,000 | $4,950,000 | $99,000 |
| Faceki | https://apps.faceki.com/pricing | $0.62 | $62,000,000 | $3,100,000 | $62,000 |

47.    Faced with such costs, many smaller websites will be forced out of business.

## V.    A Less Restrictive Alternative: Blocking and Filtering

48.    Improvements in technology have not made current online age verification methods superior to other alternatives, which do not share the same vulnerabilities and are far more effective in blocking access by minors while placing far lesser burdens on the free speech rights of adults.

---

[13]    *See, e.g.,* Emma Fletcher, Federal Trade Commission Consumer Protection, *Older adults hardest hit by tech support scams,* https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2019/03/older-adults-hardest-hit-tech-support-scams (finding that "[o]lder adults face unique barriers to adoption, ranging from physical challenges to a lack of comfort and familiarity with technology.").

[14] *See* https://www.telegraph.co.uk/news/2018/01/05/warning-age-checks-porn-sites-risks-pushing-children-dark-web/.

49.     Content filtering at the browser and/or the device level allows anyone wishing to implement that technology on minors' devices to block access to any unwanted site, including adult sites.  These methods are more effective and less restrictive in terms of protecting minors from adult content.  While adults have every reason to be concerned about providing their personal information online, parents, who should be the first line of protective defense of their children, have many tools available to them to protect their children from inappropriate adult content.

50.     Virtually every available electronic device capable of accessing content online already has built-in parental controls.  Internet service providers are also capable of filtering unwanted content and do so every day.  And there are additional software and apps freely available on the market allowing for more advanced parental control features, including, for example, from https://www.qustodio.com, https://www.bark.u, https://us.norton.com/products/norton-family, https://usa.kaspersky.com/safe-kids, https://kidlogger.net/, https://www.mobicip.com/, https://www.eset.com, https://www.webwatcher.com/, and https://www.spyrix.com/.

51.     There are websites devoted to evaluating different parent control applications, such as parentalcontrolnow.org.[15]  Similarly, buyersguide.org even offers a chart to compare filtering services:

---

[15]     *See, e.g.,* Parental Control Now, "Best Parental Control Apps for 2023," https://parentalcontrolnow.org/best-parental-control-apps-us/?gclid=EAIaIQobChMIqf6xyuKggAMVxgCtBh3m6g3YEAMYASAAEgJXt_D_BwE.

| | 1. AURA | 2. bark | 3. gabb | 4. kaspersky | 5. Qustodio | 6. norton |
|---|---|---|---|---|---|---|
| **Monitors** | Online activity, online gaming, app usage, online chatting (voice and text) | Texts, emails, social media, and app usage | Phone calls, texting, location, and contacts | Digital activity (app, web, and YouTube), screen time, and location | Browsing history, YouTube views, social media use, location | View child's search terms, videos watched, age-appropriate content, location |
| **Devices** | iOS and Android devices. Safe Gaming available on Windows PC | Android, iPhone, iPad, Chromebook, Kindle Fire | Gabb Phone, Gabb Phone Plus, Gabb Watch 2 | Windows, Mac, iOS, Android | Windows, Mac, iOS, Android, Chromebook, Kindle | Windows PC, Android, or iOS |
| **Time Limits** | Yes. Pause the Internet and set time limits for app and website usage | Yes. Set up customizable screen time rules and schedules | Lock mode available on watches during school and focus time | Yes, including daily time limits for specific apps and overall device use time limits | Yes. Set time limits for screen usage and pause internet access | Yes. Set time limits, schedule days and times for usage |
| **Content Limits** | Yes. Block inappropriate content from all devices where Aura parental controls are enabled | Yes. Block specific websites and apps on phone, gaming consoles, TV, and more | Yes. Gabb devices have simplified parental controls as they come without internet, social media, gaming, time consuming or dangerous apps | Yes, block harmful content with Safe Search and block specific apps | Yes. Filter websites, apps and games | Yes. Block certain content during schooltime, app supervision, block inappropriate sites |
| **Alerts** | Cyberbullying alerts, online usage insights and alerts, online predator alerts, personal information request alerts, and alert parents if a child deleted the app | Cyberbullying, online predators, suicidal ideation, sexting, and more | Safe zone location alerts, SOS emergency call option on watch devices, usage summaries and call/text logs available in the parent account | Low battery alerts for your child's device; web and app use reports | Receive weekly and monthly reports and set alerts for activity you want to know about in real time | Internet usage, search terms, app downloads and installs |
| **Includes** | Safe browsing, dark web monitoring and data breach alerts, password manager, antivirus, anti-malware, anti-spyware protection | Website filters, screentime schedules, location alerts, saved photo and video monitoring, child-psychologist advice and tips | Not applicable | | Call tracking and SMS for Android and iOS, location alerts, block inappropriate apps, games and websites | Antivirus, VPN, identity protection, password manager, reputation defender |

52.     Two widely used personal computer operating systems, Microsoft and Apple, include parental control features by default, straight out of the box, at no additional cost.  All major browsers, including Google Chrome, Mozilla Firefox, Microsoft Edge, and Apple's Safari, likewise have parental control options.  If parents want to add additional parental control features, they may easily purchase supplementary software like Bark or NetNanny or even download additional software for free, including Questodio, Kaspersky Safe Kids, FamilyKeeper, and others. These features enable parents to block access to sexually explicit materials on the Web, prevent minors from giving personal information to strangers by e-mail or in chat rooms, limit a child's screentime, and maintain a log of all online activity on a home computer.  Parents can also use screening software that blocks messages containing certain words, as well as tracking and monitoring software.  A parent also may restrict and observe a child's use of the internet merely by placing a computer in a public space within the home.  All of these methods constitute "less restrictive means" for accomplishing the same ends.

53.     Filtering technology carries an additional benefit, in that a seventeen-year-old is very different than a twelve-year-old.  Parents of an older minor can tailor exceptions for websites that offer, for instance, sexual education materials of clear benefit to an older minor but potentially inappropriate for a younger minor.

54.    Filtering technology is available for smartphones and cellular networks as well, such as on the Android operating system.

55.    Filtering technology includes not only Domain Name System (DNS) filtering, but also artificial intelligence (AI).  DNS filtering blocks websites based on how their domain names are categorized.  This filtering is dynamic in that once the user blocks a category like adult content, the DNS filtering services constantly scan the Internet and update that category with the latest websites.  In fact, uncategorized websites can be blocked as well, given that newly registered websites are among the most common sources of malware, viruses, and other malicious content. For families, Cisco Systems, one of the largest companies for Internet technologies, provides DNS filtering free of charge via its OpenDNS FamilyShield service.  AI is also being incorporated into filtering technology, enabling dynamic, real-time scanning and filtering of website content to block specific images, videos, and text within a webpage that are identified as falling under a blocked category.

## VI.    A Less Restrictive Alternative: Verifying Age at the Device Level

56.    Allowing parents to verify their child's age at the device level is another viable alternative.  Rather than requiring a user to verify with a website, an application can be installed on children's devices that allows parents to input their child's age.  Requests to visit a website coming from the device can imbed that information and allow the website to reject the request if the child is underage for the website.[16]  The privacy advantages of this are unmistakable, as protecting minors using this system would not rely on collecting even more data that can be used for malicious purposes.

## VII.    The Falsity Of The Required "Health Warnings"

57.    There is no scientific support for the bold assertions required by the Act's mandated "health warnings."  In fact, most are false and based on discredited (or never-credited) "pop culture science," including the statement that pornography causes mental health disorders.

---

[16]    *See* https://cyberscoop.com/age-verfication-schatz-cotton-social-media/.

58.     Furthermore, pornography is a highly controversial topic, with certain religious, political and other groups seeking to censor constitutionally protected adult content under the guise of falsely labeling pornography a public health crisis, on the basis of misconstrued studies and highly selective, self-serving anecdotes.

59.     Plaintiffs strongly disagree with every statement, express and implied, in the speech that the State purports to compel by the Act.

60.     Complying with the Act's requirement to speak messages approved by the Texas government is both impossible and unduly burdensome: impossible, because the Act requires "14-point font," but font size on websites is measured by pixels ("px") not points ("pt"), and unduly burdensome, because the length of the mandated messages would dwarf and drown out the advertisements the Act requires them to accompany.

61.     Moreover, although the messages are labeled "TEXAS HEALTH AND HUMAN SERVICES WARNING," on information and belief these messages were never approved by health professionals at that agency. The Texas Health and Human Services website provides information about Medicare coverage, Men's Health Month, low-income food programs, disaster relief programs, and "hundreds of other programs and services that help more than 7 million Texans a month live better lives." There is a section devoted solely to mental health and substance abuse issues and provides links to information about adult mental health, adult substance abuse, children's mental health, crisis services, mental health and substance abuse resources, state hospitals, and youth substance abuse.[17] Another section consists entirely of links to data and statistics.[18] Nowhere on its expansive website does the Texas Health and Human Services make claims that pornography has detrimental effects on adults.

62.     Similarly, the phone number the Act requires websites to published at the bottom of every page is for the US Substance Abuse and Mental Health Services Administration

---

[17] See, https://www.hhs.texas.gov/services/mental-health-substance-use/.
[18] See, https://www.hhs.texas.gov/about/records-statistics/data-statistics/.

(SAMHSA) Hotline.  Entering "pornography" into the SAMHSA website's search function returns one result, namely, an Office of Indian Services quarterly newsletter entitled Prevention and Recovery, where the following sentence is found in an article entitled "Fortifying the Circle: Changing the Future for Native Women and Girls": "According to federal statistics, Native American women are more than 2.5 times more likely to be raped or sexually assaulted than other women in the US. Reports have come from Minnesota and South Dakota that Native American girls, have been trafficked into prostitution, pornography, and strip shows over state lines and internationally into Mexico."  That's it; nothing more.  There is no indication that anyone calling this helpline looking for information about any effects of pornography will receive it there.  The required inclusion of these messages is performative and useless.

63.    Indeed, so-called "addiction" to pornography is not medically or scientifically supported.  The American Psychiatric Association (APA) does not recognize pornography or sexual addiction as a mental health disorder.  The DSM-5 TR, the standard manual of classification of mental disorders used by mental health clinicians and physicians, explicitly rejects the concept of sex addiction as unsupported by peer-reviewed evidence.  The American Association of Sexuality Educators, Counselors and Therapists (AASECT) and the Association for the Treatment and Prevention of Sexual Abuse (ATSA) have publicly rejected claims of pornography addiction as empirically unsupported.

## VIII.   Plaintiffs' Additional Injuries

64.    In addition to the "health warnings" required by the Act being false and misleading, this compelled speech deprives Plaintiffs and other adult entertainment providers of the goodwill of their Texan customers by implying that their content poses substantial health risks.  The age verification provisions of the Act similarly deprive Plaintiffs and others of the goodwill of their Texan customers, due to the burden age verification imposes and the risks it carries.

## IX.    The Act's Vagueness

65.    Because many of the terms in the Act are vague, the Act further chills the speech of providers of content online and restricts the availability of certain material to those entitled and

wishing to receive it.  The Act is riddled with vague words, phrases, and requirements, including but not limited to the following.

66.     The phrase "taken as a whole" in the definition of "sexual material harmful to minors" is vague because what constitutes the "whole" is unclear in the context of the internet generally, or a particular website more specifically.  Should one consider only a specific article, certain text, or an individual image on a website?  Or should one consider the web page on which that text or image appears?  Or the entire website?  And should one include linked material?  The Act does not say, and Plaintiffs are left only to guess.

67.     The application of the Act to websites that publish or distribute material, "more than one-third of which is sexual material harmful to minors," is also vague, insofar as it fails to explain how "total material" is calculated.  Is it by the volume of data?  The number of posts?  What is the proper metric to measure?  Gigabytes?  Character count?  Number of images?  Video runtime?  Not to mention linked material.  May a website avoid the problem altogether by providing a link to all the anodyne content in the local public library?  Where a website "distributes" material, is the calculation based on the number of downloads? Where a website both "publishes" and "distributes" material, how is published material calculated vis-à-vis "distributed" material?  Again, Plaintiffs can only guess.

68.     The definition for the term "digital identification" is vague and circular.  The Act's age verification can be achieved by "require[ing] an individual to provide digital identification," and the Act defines "Digital identification" as "information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identity of an individual."  Thus, any information on a digital network accessible to commercial entities that is used for age verification is automatically sufficient to age verify users.  This is nonsensical.

69.     The statutory catch-all permitting "any commercially reasonable method that relies on public or private transactional data" as a means of verifying a user's age provides no guideposts whatsoever, as "commercially reasonable" is a vague term not defined by the Act.

70.     The Act does not even explain how often age verification must occur.  Individuals can access a website more than once, and from different devices and browsers.  Must age verification recur every hour; every time a web browser is closed and reopened; just once, if the website operator can find a way link a particular verification to a particular device; or something else?  The Act is once again silent.

71.      Because of the Act's vagueness, cautious operators of even non-pornographic websites must place the State's anti-pornography messaging on the landing page of their website, as well as on any advertisement for the website.  Doing so labels them an "adult business"— resulting not only in potentially less internet traffic, but social stigma in some situations, lost ad revenue, and exclusion from public or private programs or curricula.  If they are a website that processes payments, they may lose the ability to accept major credit cards and be forced to use third-party billing companies that charge fees up to 15% of the purchase price, rather than the 3-5% typically charged by credit card companies.  They also may face difficulty purchasing business liability insurance and hiring employees.

## X.     The Need for Injunctive Relief

72.     The passage of the Act has placed Plaintiffs in reasonable apprehension that, if they continue their current course of conduct as they intend, they will be sued under the Act.  Indeed, the Act squarely targets Plaintiffs.

73.     The Act violates the First Amendment right to access protected speech and expressive conduct.

74.     The Act violates the First Amendment right not to speak orthodox messages dictated by the government.

75.     The Act authorizes a lawsuit in violation of section 230, which provides Plaintiffs with an immunity to court proceedings that will be irretrievably lost if the Attorney General is permitted to enforce the Act.

76.     The Act will destroy Plaintiffs' goodwill in Texas by forcing Plaintiffs to either withdraw from Texas or comply with the Act and nevertheless lose a vast number of  new and

longstanding adult visitors to their websites.  The false "health warnings" required by the Act deprives Plaintiffs and other adult entertainment providers of the goodwill of their adult Texan customers by falsely stating and implying that their content poses substantial health risks.  The age verification provisions of the Act similarly deprive Plaintiffs and other adult entertainment providers of the goodwill of their Texan customers, due to the burden age verification imposes and the risk it carries.

77.     Plaintiffs thus have no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I: Section 1983 (All Plaintiffs)

### (The First Amendment)

78.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

79.     The Act is facially overbroad in violation of the First Amendment (made applicable to the States through the Fourteenth Amendment) because its age verification requirement is substantially overbroad, is not narrowly tailored, and does not pursue a compelling state interest. It is substantially overbroad because it imposes a barrier to the rights of adults to access speech that is constitutionally protected for them.  It not narrowly tailored, because there are at least two superior, less restrictive alternatives: pre-blocking by internet service providers and the use of filtering technology by parents or others at the device level.  It does not pursue a compelling state interest because it is easily circumvented and dramatically underinclusive, exempting internet search engines, most social media sites, and news media.

80.     The Act also violates the First Amendment because it compels website operators to speak a controversial government message that is both contrary to their views and false or unsupported.

81.     The Act is further overbroad because it does not satisfy the First Amendment's heightened standards for clarity.  It is incurably vague regarding to whom it applies and what it

26

requires, thus chilling protected speech as website operators seek to avoid liability by steering clear of the law by a wider margin than would otherwise be required.

### COUNT II: Section 1983 (All Plaintiffs)

### (The Fourteenth Amendment)

82.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

83.     The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (procedural component) because it is impermissibly vague and fails to provide a person of ordinary intelligence fair notice of what is prohibited.

84.     The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (substantive component) because it deprives Plaintiffs of a protected property right, in the form of their goodwill in Texas, without a rational basis.

85.     The Act violates the Equal Protection Clause of the Fourteenth Amendment because, with no rational basis for doing so, it exempts, for example, internet search engines and most social media sites while targeting adult entertainment platforms.

### COUNT III: Section 1983

### (Plaintiffs FSC, MG Premium Ltd as to SpiceVids, MG Freesites Ltd as to Pornhub,

### WebGroup, NKL, and MediaME SRL)

### (The Supremacy Clause and Section 230)

86.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

87.     Under the Supremacy Clause of the United States Constitution, the laws of the United States are "the supreme law of the land."

88.     Federal law confers a right of immunity against proceedings where the theory of liability equates websites with third-party publishers.  47 U.S.C. § 230(c)(1) states:  "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(e)(3) states: "No

cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

89.     Plaintiffs, as website platforms, are providers of an "interactive computer service" under section 230.

90.     As applied to Plaintiffs, the Act is preempted through the Supremacy Clause as a violation of section 230, because it imposes liability on website operators for putative harm caused by the content of third-party publishers.

### COUNT IV: Section 1983 (All Plaintiffs except Jane Doe)

### (The Eighth Amendment)

91.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

92.     Plaintiffs have a right against Excessive Fines under the Eighth Amendment.

93.     The Act authorizes civil penalties that are grossly disproportionate to any putative harm addressed by the Act.

### COUNT V: Section 1983 & 28 U.S.C. §§ 2201-02  (All Plaintiffs)

### (Declaratory Judgment)

94.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

95.     There is a present and justiciable dispute as to whether enforcement of the Act by Defendant violates the Plaintiffs' rights under the U.S. Constitution and federal law, as stated in Counts I-IV.

96.     The interests of Plaintiffs, on the one hand, and Defendant, on the other, are real and adverse.

97.     Absent court intervention, which would resolve the dispute over the Act's lawfulness, Defendant will proceed to enforce the Act even though the Act is unconstitutional and void.

98.     Plaintiffs accordingly seek a declaratory judgment that the Act is unconstitutional and unenforceable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.     Preliminarily and permanently enjoin Defendant, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with those who receive actual notice of the injunction, from enforcing the Act;

B.     Declare the Act unconstitutional and unenforceable, as a violation of the First Amendment, Fourteenth Amendment, Eighth Amendment, and Supremacy Clause of the U.S. Constitution.

C.     Award Plaintiffs damages and their reasonable costs and fees pursuant to 42 U.S.C. § 1988; and

D.     Grant Plaintiffs such other and further relief as the Court deems just and proper.

DATED:  August 4, 2023                    QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                   By _____/s/ *Scott Cole*_____
                                          Scott Cole
                                          scottcole@quinnemanuel.com
                                          **QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP**
                                          300 West 6th Street
                                          Suite 2010
                                          Austin, TX 78701
                                          Telephone: (737) 667-6104

                                          Michael T. Zeller (*pro hac vice* forthcoming)
                                          Derek L. Schaffer (*pro hac vice* forthcoming)
                                          Thomas Nolan (*pro hac vice* forthcoming)
                                          Arian Koochesfahani (*pro hac vice* forthcoming)
                                          michaelzeller@quinnemanuel.com
                                          derekshaffer@quinnemanuel.com
                                          thomasnolan@quinnemanuel.com
                                          ariankoochesfahani@quinnemanuel.com
                                          **QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP**
                                          865 South Figueroa Street, 10th Floor
                                          Los Angeles, CA 90017-2543
                                          Telephone: (213) 443 3000
                                          Fax: (213) 443 3100

                                          Jeffrey Keith Sandman (*pro hac vice*
                                          forthcoming)
                                          jeff.sandman@webbdaniel.law
                                          **WEBB DANIEL FRIEDLANDER LLP**
                                          5208 Magazine St Ste 364
                                          New Orleans, LA 70115
                                          Phone: (978) 886 0639

                                          *Attorneys for Plaintiffs*


                                     30

# Exhibit D: Transcript of Preliminary Injunction Hearing (ECF 42)

```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   FREE SPEECH COALITION, INC.  )
     Plaintiff,                   )
 4                                ) Case Number
     vs.                          ) 1:23-CV-00917-DAE
 5                                )
     ANGELA COLMENERO, In her     )
 6   official capacity as Interim ) Austin, Texas
     Attorney General for the     )
 7   State of Texas,              )
     Defendant.                   ) August 23, 2023
 8   *********************************************************

 9        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
               BEFORE THE HONORABLE DAVID A. EZRA
10             SENIOR UNITED STATES DISTRICT JUDGE

11   APPEARANCES:
     FOR THE PLAINTIFF:
12   Scott L. Cole
     Michael T. Zeller
13   Derek Shaffer
     Arian Joseph Koochesfahani
14   Taylor Comerford
     Emily Couture
15   Quinn Emanuel Urquhart & Sullivan, LLP

16   FOR THE DEFENDANT:
     John T. Ramsey
17   Kelsey L Warren
     Office of the Attorney General of Texas

18

19

20

21   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
22   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
23   San Antonio, Texas  78207
     Phone(210)244-5048; angela_hailey@txwd.uscourts.gov
24
     Proceedings reported by stenotype, transcript produced by
25   computer-aided transcription.
```

1                    **I N D E X**

2    **WITNESS:**                              **PAGE**

3    **TONY ALLEN**

4    By Ms. Warren                         6, 26

5    By Mr. Zeller                            19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    *(Wednesday, August 23, 2023, 1:30 p.m.)*

2                              *   *   *

3          COURT SECURITY OFFICER:  All rise.

4          COURTROOM DEPUTY CLERK:  Austin, 23-CV-917, Free

5    Speech Coalition, Inc., et al versus Angela Colmenero, in her

6    official capacity as Interim Attorney General for the State of

7    Texas.

8          THE COURT:  All right.  Good afternoon.  Can I have

9    appearances please.

10         MR. COLE:  Your Honor, Scott Cole with Quinn Emanuel

11   for the plaintiffs, together with Michael Zeller, Derek

12   Shaffer, Arian Koochesfahani, Taylor Comerford, and Emily

13   Couture.

14         THE COURT:  All right.

15         MR. RAMSEY:  Your Honor, I'm John Ramsey here on

16   behalf of the State, or defendant Colmenero.  I have with me

17   Kelsey Warren.

18         THE COURT:  Good afternoon, all of you.  Now, I do

19   understand that you have witnesses on standby, but to be honest

20   with you, the Court has spent a considerable amount of time

21   going through the materials that have been submitted.  We have

22   declarations and other materials submitted from both sides.

23   Maybe I'm missing something, but I fail to see what witnesses

24   who have already given declarations and are going to say the

25   same thing on the stand that they've already said are going to

 1  add today.  So I really don't think it's necessary, unless
 2  there's something that you see that I don't see.
 3          MR. SHAFFER:  Your Honor, Derek Shaffer for the
 4  plaintiffs.  We agree with that, Your Honor, and we're prepared
 5  if it comes up a particular factual issue to offer a witness
 6  that would be helpful to the Court, but we agree with Your
 7  Honor's assessment, that papers should suffice.
 8          THE COURT:  I mean, we know what the statute says, we
 9  know what the arguments are.  I don't know where the dispute
10  is.
11          MR. RAMSEY:  We have with us an expert on age
12  verification technology, and so to the extent that this Court
13  is going to be trying to make a decision regarding whether or
14  not the age verification law is effective and the least
15  restrictive means for which the State is trying to pursue its
16  compelling interest, we want to make this witness available,
17  especially if there are any questions in the Court's mind about
18  whether the law is effective in the least restrictive means to
19  achieve the government's interest.
20          THE COURT:  Didn't he present a declaration?
21          MR. RAMSEY:  He did, he sent a declaration.
22          THE COURT:  So is he going to say anything different
23  than he said in his declaration?
24          MR. RAMSEY:  I think he might have some information
25  that would be responsive to the reply brief.  At the same time,

1    Your Honor, I'm happy to go along with the plaintiff's counsel

2    and proceed on argument.  And if it seems to you that you still

3    want more information about the exact technology involved and

4    how effective it is, we could at that point call Mr. Allen to

5    the stand.

6              THE COURT:  Do you have any problem with him taking

7    the stand and cross-examining him?

8              MR. SHAFFER:  We don't, Your Honor.

9              THE COURT:  All right.  Let's call him to the stand if

10   you wish to.  Other than that, I don't see any need for any of

11   the other witnesses.  I think I appreciate and understand what

12   this technology is, because you have the declaration, but go

13   ahead and call him.

14             MR. RAMSEY:  Do I understand, Your Honor, you would

15   like to start the proceeding by calling Mr. Allen?

16             THE COURT:  Right.  I don't need an opening statement

17   here.  I've got a ton of briefing here.  We don't have a jury.

18             MS. WARREN:  Your Honor, with that, we would call Tony

19   Allen to the stand.  Your Honor, would you like me to use the

20   podium at counsel table or the actual podium?

21             THE COURT:  No, use the podium here.

22             MS. WARREN:  Yes, Your Honor.

23             COURTROOM DEPUTY CLERK:  Please raise your right hand.

24                          *   *   *

25             *(Oath administered, and TONY ALLEN, defense witness,*

1    *Sworn.)*

2                          *   *   *

3         THE WITNESS:  I do.

4         MS. WARREN:  May I proceed, Your Honor?

5         THE COURT:  Yes.

6         *(1:35 p.m.)*

7                     DIRECT EXAMINATION

8    BY MS. WARREN:

9    Q.  Good afternoon, Mr. Allen.  Can you please introduce

10   yourself to the Court?

11   A.  My name is Tony Allen, I am a global subject matter expert

12   on age verification and age assurance.

13   Q.  I apologize, if I can ask you to make sure you're speaking

14   a little slower than normal just so we can all understand, it's

15   a big room.

16   A.  Okay.

17   Q.  I want you to just go ahead and tell us a little bit about

18   age verification technology, the three kinds of age

19   verification technology that's available to sites such as the

20   plaintiff websites?

21   A.  Yes, so generally speaking, age verification technology is

22   split into three distinct areas.  One is related to what is

23   known as age verification, so that is looking at gaming

24   information about how old you are from official documents or

25   sources such as your driving license or passport or other

1   documentation.  Another one referred to as age estimation deals

2   with looking at you and using computer technology to assess how

3   old you are from your appearance or from your voice or from

4   other biometric features.  And the third one is age inference

5   which is inferring how old you are from the existence of

6   something else.

7   Q.  So the first category is the document verification; is that

8   right?

9   A.  Mainly, yes, it can be against either documents or against

10  things like digital wallets or apps or digital information.

11  Q.  What kind of documents would age verification use to verify

12  your age?  You said driver's license, passport.  Anything else?

13  A.  Yeah, anything from authoritative source, so things like a

14  firearms license or a ID card, an actual ID card or Social

15  Security data or anything else really.

16  Q.  And can you walk us through how that process would work?

17  Say I wanted to gain access to one of the plaintiff websites,

18  let's say Porn Hub, and say they had age verification

19  technology in place.  Can you walk us through what it would

20  look like, the steps I would need to take to verify my age

21  using the document system?

22  A.  So the steps are the same across the areas, so they might

23  be in a different order, but they're broadly the same steps, so

24  generally speaking, you would have to present a document that

25  you wish to rely on.

1    Q.  Let me stop you right there.  I want to start on the web

2    page, on the web page I'm trying to access.  Tell me what I'm

3    going to see.

4    A.  Okay.  So you would be -- you'd try to access it, it would

5    come up with a screen which would say we need to verify how old

6    you are.  Generally speaking, that would go off to another

7    site, to a place where that happens, either a third-party site

8    where you would carry out the process of verifying your age

9    through that site.

10   Q.  And then what would I have to do on that third-party

11   verification site in order to verify my age?

12   A.  So it will ask you to produce a document, so if you're

13   using your driving license, for instance, you would present

14   that document and you could do that to a camera on your Smart

15   phone or on your screen, or in some cases it will allow you to

16   upload a document from a trusted wallet or a digital mobile

17   driving license or something like that, if you have that

18   available to you.

19   Q.  Can I ask you to bring that mic just a little bit closer to

20   you please, or you closer to the mic?  Thank you.

21   A.  Is that better?

22   Q.  That's better.  Thank you.  So once I have presented those

23   documents, either taken a picture or used a digital wallet,

24   then what happens in the age verification software?

25   A.  So then it has to verify that you're the person presenting

1  it, so asking you to present your face, usually your face or

2  image of yourself, and it will then verify the-- in technical

3  terms that's called one-to-one matching, but in normal parlance

4  it's called selfie matching.

5  Q.  Once that is finished, how long will it take for me to be

6  able to access the website that I am trying to access?

7  A.  It's fairly instantaneous, so as soon as it carried out

8  those two things, it will then send back a piece of code to the

9  website.  That code doesn't contain any information other than

10  a transaction code and the answer to the question, *Is this*

11  *person over 18?  Yes or No.*  That enables the website then to

12  allow you to carry on to view the products and services that

13  you want to view.

14  Q.  What happens to the data that I have presented to the age

15  verification website, like my passport or my driver's license

16  and the actual selfie of my face, what happens to that data?

17  A.  In most cases it's instantly deleted, they don't keep it,

18  but there are sometimes legal requirements that they do have to

19  keep it.  So the way that the sites work is that unless there

20  is a legal requirement that they have to keep it, they would

21  delete it.  If there is a legal requirement they have to delete

22  it, which is indeed the case with this particular piece of

23  legislation, they would instantly delete it, it's not kept.

24  The only thing that's kept is the transaction ID.  And if law

25  enforcement came along and said the website have told us that

1  they've carried out age verification, they got this

2  transaction, the age verification service provider would be

3  able to tell them, yes, that's a genuine transaction ID, yes,

4  that was carried out on a particular day, yes, they looked at a

5  driving license, but they wouldn't be able to show them the

6  driving license or the information or the selfie or anything

7  else that they were presented with.

8  Q.   You mentioned that some statutes require age verification

9  technology to retain the information.  Do you know if that's

10 the case here in Texas with HB 1181?

11 A.   In HB 1181, it specifically says you can't retain it.  I'm

12 not sure about your gambling legislation because it's normally

13 gambling legislation which requires the retention of the data,

14 and I haven't looked at the gambling legislation here in Texas,

15 but it wouldn't be uncommon for gambling legislation to require

16 the retention.  But in the case of HB 1181, it specifically

17 prohibits from retaining the information.

18 Q.   And that would be any kind of age verification, any of the

19 three types that you described?

20 A.   Yes.

21 Q.   Let's talk about the second kind of age verification, I

22 think that was age estimation; is that correct?

23 A.   That's correct, yes.

24 Q.   Can you just give us a brief overview of how that works?

25 A.   So similar to age verification, you go onto a website, it

1    will direct you to somewhere to verify your age, you select the

2    option to use age estimation, and you would present either your

3    face or you would say a short sentence, if it's doing voice or

4    there's other technologies out there as well.  And it's very

5    similar to how you open your cell phone, so if you use face ID

6    on your phone just as an example.

7    Q.  Would age estimation software would actually take a

8    photograph of your face?

9    A.  No, it doesn't take a photograph of your face.  What it

10   does is it takes data points.  It doesn't take enough data

11   points to be able to recreate your face in an image, but it

12   uses those data points and the algorithms that train it to be

13   able to make an estimation of how old you are from those

14   points.

15   Q.  So it's kind of like whenever I take a -- whenever I try to

16   open my phone with my glasses on versus my glasses off, it's

17   not actually looking at a picture of my face, it's looking at

18   certain points of data on my face?

19   A.  Yeah, I can get very technical, there are 126 of them that

20   it uses as part of the international standards on how it does

21   these, how it does these things, but it doesn't have enough

22   there to be able to -- if someone says show me the dots, it

23   wouldn't be enough to show me a picture of you.

24   Q.  But even those dots, those cannot be retained under the

25   Texas law?

1   A.   That's correct.

2   Q.   And then what was the third kind of age verification that

3   you mentioned?

4   A.   Age inference, that is being able to infer that you're over

5   18 from the existence of some other fact.  So as example you

6   might be a commercial airline pilot which would require you to

7   be over 18 to hold that role or you might have a .gov e-mail

8   address.  There are all kinds of reasons why you might be able

9   to infer that someone is over 18.

10  Q.   So I might be able to verify my age using my .gov e-mail

11  address?

12  A.   You could, yes, so that would work by the age verification

13  service provider effectively pinging you a message and then

14  giving you a code and you enter that code.  It's normally six

15  digits, doesn't have to be, but it's normally a six-digit code

16  that you enter in and that would verify that you have access to

17  that e-mail address, and from that they can infer that you're

18  over 18.

19  Q.   And I certainly wouldn't want my employer to know that I

20  was accessing pornography, so is that something that anybody

21  would ever be able to figure out if I supplied my government

22  e-mail address?

23  A.   So, first of all, the age verification providers, they are

24  not -- they don't give a reason why they're asking, so they

25  could be asking for any reason.  It could be access to

1   pornography, it could be to buy liquor, could be to buy

2   cigarettes, it could be any reason at all that requires that

3   age verification.  The second thing I would say about that is

4   generally speaking your e-mail address is not kept, unless you

5   want to go on to create an account, but that's the next stage

6   of the process.  If you go back to the porn site and you want

7   to create an account with them to be able to access in the

8   future, you may choose to use that e-mail address or you may

9   choose to use a different e-mail address at that point.  You

10  don't necessarily have to use the same one to create your

11  account and do your age verification.

12  Q.  I want to switch gears a little bit and talk about

13  something that Dr. Sonnier brought up in his declaration that

14  accompanied the reply brief in this case.  He was discussing

15  essentially parental controls.  What is the technical term?

16  A.  Parental controls or filtering software.

17  Q.  Filtering software.

18  A.  Device-based software, various other things.

19  Q.  Can you explain to us what filtering software is?

20  A.  Yes, it's basically tools that can be used in most or

21  pretty much all the browsers or routers which are in your home

22  have these tools where you can set within that filters.  Now,

23  these filters are widely available.  They are used extensively,

24  so here in this building, for instance, you will have a filter

25  that will prevent people on the PCs that we have here from

 1  accessing certain sites, so they are set up to be able to do

 2  that.

 3  Q.  And how effective are those in the home as opposed to in a

 4  business?

 5  A.  One of the key differences -- I mean, here in a federal

 6  building you've got the filtering software working, but you

 7  also have an IT team here all the time checking that that's

 8  working and working properly, set up properly, operating

 9  properly, got all the correct fills, it's got all the correct

10  updates.  That's their job and that's what they do, that's how

11  they keep you protected in this building.  At home you don't

12  have that, so you do rely to a certain extent on, first of all,

13  parents knowing they're available and then understanding how to

14  implement them and how to put them into place.  And then even

15  thereafter, how to keep them updated, how to deal with the fact

16  that children get older and so, therefore, what they might want

17  to experience changes over a period of time.  So the studies

18  and research there has been on filtering that they work, as a

19  tool they work, but they rely on parental knowledge and

20  information and education, and they rely on them keeping them

21  up to date.  And it's those two latter things that generally

22  are lacking.

23  Q.  So what if a parent downloaded some kind of filtering

24  software or got it from their carrier and just decided to set

25  one of the predetermined levels of security, say medium

1    security, what would they have to do to maintain that security

2    on the devices connected to their network?

3    A.  So it depends on the settings that they set, it also

4    depends on the filters, different ones do different things, but

5    generally speaking you're right, they do present you with an

6    option to have -- effectively have a recommended filter or a

7    user filter, you can usually set those at low, medium, high.

8    You can then also create alongside those they're sometimes

9    called white lists or black lists depending on the filtering

10   software.  But you can create ones that you want to give

11   special permission to or ones that you want to deliberately

12   prevent from accessing.  So it depends on the software and the

13   filter and how you want to set it up.

14   Q.  Are you aware of research as to the effectiveness of these

15   filtering softwares and their ability to prevent children from

16   accessing sites that they shouldn't be accessing such as

17   pornographic websites?

18   A.  Yeah, I mean, the research I've seen generally comes to the

19   conclusion that while that filtering software is capable of

20   working, it isn't being deployed in the home in a way that

21   makes it effective.

22   Q.  We don't all have IT Departments at home?

23   A.  Yeah.

24   Q.  And I want to briefly touch on --

25            THE COURT:  Just a minute.  Do you need an IT

1   Department to deploy a filtering software in your home?

2          THE WITNESS:  You don't need an IT Department, you

3   just need --

4          THE COURT:  You just need software.

5          THE WITNESS:  You need the software and you need some

6   knowledge about what you're setting up.

7          THE COURT:  You don't need an IT Department.

8          THE WITNESS:  No.

9          THE COURT:  These things are meant to be deployed by

10  individuals, isn't that true?

11         THE WITNESS:  They can be deployed by individuals,

12  yes.

13         THE COURT:  Okay.  I just want to be sure that I

14  wasn't missing something here.

15         THE WITNESS:  Fine.

16  BY MS. WARREN:

17  Q.  Let's explore that just a little bit more.  So if I was to

18  set parental controls on devices in my house and then I never

19  touched them again, what could happen?

20  A.  Generally they will work, they will do what you set them to

21  do.  As you go through usage of the Internet, what will happen

22  is that when your children either use the permission function

23  or they ask to change something or ask to access something,

24  that then gets set within those controls and that becomes

25  continuous.  And depending on how good they are would depend on

1   how much they're updated for either new sites or new access

2   means or new browsers or new functionality.  That depends on

3   how good the filtering software is and whether it's being done

4   at a device level on your phone or at a router level, i.e.,

5   where you connect to WiFi, where it's being deployed, so

6   there's lots of dependencies there.

7   Q.  If I was to set up the software at a router level and then

8   the router needed a hard reset, would that then reset the

9   controls?

10  A.  With a hard reset it would take you right back to the

11  factory settings, so you would have to go through the process

12  again.  If you just switch it on and off again, it doesn't have

13  that impact, it normally will retain the settings if you're

14  just powering it down and powering it up again.

15  Q.  I want to talk about VPNs just briefly.  What is a VPN?

16  A.  So a VPN is a virtual private network, it effectively is a

17  method by which you can hide where you are in your -- from your

18  Internet address, and enable you to browse a web from an

19  anonymous location.

20  Q.  How do age verification websites grapple with the, I guess,

21  threat of a VPN circumventing their system?

22  A.  Yeah, there are various different ways.  Some of them will

23  look at geo location software that supports the age

24  verification function, some of them will have things that try

25  to detect whether or not it is from a known VPN, IP address.

1    I'm being technical, an IP address, the Internet protocol

2    address.  Some of them will look for dynamic VPNs.  There are

3    various different ways in which they use to detect that.  There

4    are also people that connect not so much via VPN, but via

5    things like cell tower networks so they can use geo location

6    software in relation to that as well.

7          MS. WARREN:  Your Honor, we have nothing further at

8    this time.

9          THE COURT:  I have a question about VPN because

10   there's been a lot of talk about that.  I know that, for

11   instance the -- you're from England originally?

12         THE WITNESS:  Yes.

13         THE COURT:  You're familiar with the BBC?

14         THE WITNESS:  Yes.

15         THE COURT:  And you're not supposed to be able to get

16   the BBC iPlayer unless you are in the UK, but VPNs have been

17   very successful in circumventing the BBC, wouldn't you agree?

18         THE WITNESS:  Yeah, they're used for that for Netflix.

19         THE COURT:  Netflix as well.  There's a different

20   Netflix in the UK than there is in the United States and

21   they've got very sophisticated software that's trying to stop

22   that, but they've been very unsuccessful; isn't that correct?

23         THE WITNESS:  Yes, that's correct.

24         THE COURT:  Any cross-examination?

25         MR. ZELLER:  Just very briefly.  Mike Zeller for

1  plaintiffs.

2          *(1:52 p.m.)*

3                     CROSS-EXAMINATION

4  BY MR. ZELLER:

5  Q.  Just to start off, is there anything that you said here in

6  your testimony today that you think was not in your

7  declaration, so we can focus on that?

8  A.  I think the bit more detail around the issues to do with

9  parental controls and filtering software, I think I covered it

10 very briefly in my declaration.

11 Q.  You don't think you adequately addressed that in your

12 declaration?

13 A.  I covered it briefly, but I think I've covered it in more

14 depth in the questions.

15 Q.  You understand that the law that's at issue here today

16 doesn't require any particular kind of age verification of the

17 various methods that you've mentioned, right?

18 A.  No, I think it's open about your choice, whichever you want

19 to do.

20 Q.  And you acknowledge that at least some of those methods

21 require the disclosure of personal information, passports,

22 driver's license, other kinds of highly personal information

23 for at least some of these age verification methods to even

24 function at all, right?

25 A.  Yes, some of them do.

1    Q.  Does content filtering require that the users impart to

2    third parties their personal information of that kind?

3    A.  Depending on the type of one it is, then generally no.

4    Some of them do, some of them don't.

5    Q.  The law that's at issue here today doesn't require that any

6    of the third-party age verification technologies that you

7    mentioned actually meet the standards of what you refer to as

8    this Age Verification Providers Association, right?

9    A.  No, I think the law is just generally you have to apply age

10   verification, I think it uses the term commercially reasonable

11   sources or something like that.

12   Q.  Right, but they don't have to meet any particular standard

13   such as an industry standard, right?

14   A.  Not by the law, no.

15   Q.  And the law doesn't actually prohibit the, say, the sharing

16   of this personal information with third parties during the

17   validation process, right?

18   A.  Just let me just unpick that slightly.  The process would

19   be that the -- what we call the relying party, the website that

20   wants to allow the user access would refer the user to a third

21   party to collect that information and process it, they wouldn't

22   collect it themselves, they then send it on to the third party.

23   Q.  The law only says that it cannot be stored, right?  It

24   doesn't say it can't be transmitted elsewhere, correct?

25   A.  It says it can't be kept, yes.

```
1   Q.  Now, you mentioned parental controls, but that's only one
2   kind of content filtering, correct?
3   A.  Yes.
4   Q.  And you're aware that content filtering is widely adopted
5   here in the United States by corporate America in order to stop
6   employees from, and blocking employees from seeing adult
7   websites or other kinds of sites that the employer doesn't want
8   to see, right?
9   A.  Yes, that's what I was describing--
10  Q.  In fact, many, many tens of billions of dollars are spent
11  on that every year by corporate America with this technology,
12  right?
13  A.  I'm quite sure that's true, yes.
14  Q.  And you do understand that at least by that measure,
15  content filtering is far more successful than these age
16  verification methods that you've mentioned, correct?
17  A.  I think that's an entirely different context.  I think they
18  are successful at content filtering and removing these from
19  access in the workplace, and the evidence doesn't suggest
20  that's quite the same in the home.
21  Q.  You'll acknowledge that content filtering is far more
22  ubiquitous as a method to block access to adult websites in the
23  United States today than age verification?
24  A.  Yes.
25  Q.  You understand that the -- I think you've already addressed
```

1  that there are certain kinds of technologies that the law does
2  not address at all here, such as VPN technology, right?
3  A.   There's nothing specific in this legislation about VPNs.
4  Q.   And you also understand the law has exceptions in the sense
5  that it doesn't apply to social media sites, correct?
6  A.   I believe that's correct, although I'm not a legal expert
7  on the interpretation of that law.
8  Q.   And you understand that adult images and pornographic
9  materials and that sort of thing are widely available on social
10  media sites, correct?
11  A.   Yes, correct.
12  Q.   You also understand the same is true for search engines?
13  A.   Yes.
14  Q.   You referred I think briefly in your testimony to some
15  research that you were relying on?  What are you referring to
16  specifically?
17  A.   In relation to content filtering?
18  Q.   Yes.
19  A.   Yeah, there's been lots of research done on this.  I think
20  the one I particularly highlighted was research done from the
21  Oxford Internet Institute in relation to the effectiveness of
22  parental content filtering and on the access that I think that
23  particular survey was about adolescent boys having access to
24  pornography.
25  Q.   Are you referring to this Nash study?

 1   A.   Yes.

 2   Q.   And that's referred in your declaration, correct?

 3   A.   Yes.

 4   Q.   So you're not relying on anything else in your testimony

 5   here today other than what you've already cited in your

 6   declaration, correct?

 7   A.   That was just an example of research in this base, there

 8   has been other research in this base too.

 9   Q.   The Nash study doesn't say anything actually about the

10   effectiveness of the technology itself, does it?

11   A.   No, as I said, the technology itself works.

12   Q.   You mentioned this concept of white listing, right?  And

13   that's one way that certain kinds of software, say, parental

14   controls, can ensure that even new websites that have, say, for

15   example, malicious content on them are, in fact, blocked by

16   that software, right?

17   A.   The other way around.  White listing is where you permit

18   access to something.  Black listing is where it's blocking it.

19   Q.   Maybe I poorly phrased it.  What I'm driving at is is you

20   understand that by using white listing software, that that will

21   block access to new websites because it's not listed on the

22   white list, right?

23   A.   Not necessarily.  It depends on the settings in the

24   individual filter control.  Generally speaking, white listing

25   is where you specifically go in and say I do want to give

1   permission to be able to access this site.

2   Q.  You're aware that most of what you're calling this parental

3   control software blocks access to new websites, correct?

4   A.  Some of it does.  Some of it uses labeling, called the RTA

5   label which is restricted to adults label, some of it uses

6   that.  If the website contains that particular RTA coding, that

7   it would pick that up as part of its filtering function.

8   Q.  And you'll agree with me that content filtering software in

9   many iterations actually has a dynamic realtime process where

10  it scans the website, even if it's a new one and has never been

11  encountered by the software previously to block it if it falls

12  in the category of, say, adult website, correct?

13  A.  If they are labeled with the things like the RTA label,

14  then it will spot those and it will add them to its list of

15  restricted sites.

16  Q.  When you say "label", what do you mean by that?

17  A.  So there's a function on the website which is fairly widely

18  used in the adult industry, not universally used, but it's

19  fairly widely used, which is called Restricted To Adults, the

20  RTA, it's run by a U.S. NGO and it is used by things like

21  filtering software to be able to pick up sites, as the name

22  says, restricted to adults.

23  Q.  You're aware that this content filtering will actually

24  block adult websites even if it had not encountered that

25  website before specifically because, say, for example, it was

1    new?

2    A.  It would need to know that it was not a website, it would

3    need to do that and so some of them do have artificial

4    intelligence tools as part of them that look at sites to see

5    what kind of content do they have.  Some of them rely on the

6    company behind the software maintaining continuous surveillance

7    of the Internet, and some of them rely on things like, as I

8    said, the RTA label, some of them rely on data put out by law

9    enforcement agencies of websites of concern and they will rely

10   on different things.

11           THE COURT:  Let me ask you a question before we go any

12   further.  This legislation doesn't require any adult websites

13   that are seeking to have customers in Texas, doesn't require

14   them to have an RTA function; is that right?

15           THE WITNESS:  No.

16           THE COURT:  I didn't see any legislation that requires

17   an RTA.  But if the Texas legislature were to pass a different

18   law that required an RTA label or chip or whatever it is, code,

19   in the website and then gave parents the choice of placing

20   blocking software, filtering software on their computers,

21   anything accessing anything that could be accessed by their

22   children, the RTA code would then work with that software to

23   block the software; is that right?

24           THE WITNESS:  It should, yes.

25           THE COURT:  Okay.

1        MR. ZELLER:  I have nothing further, Your Honor.

2   Thank you.

3        THE COURT:  Any redirect?

4        MS. WARREN:  Very briefly, Your Honor.

5        THE COURT:  Okay.

6        (2:02 p.m.)

7                    REDIRECT EXAMINATION

8   BY MS. WARREN:

9   Q.  Mr. Allen, how difficult would it be for websites like

10  PornHub and XNXX to use this age verification technology, is it

11  completely new to them?

12  A.  It's not new to them, they use it elsewhere in the world.

13  They already have age verification technology built into their

14  systems.  There are a number of global providers of age

15  verification technology, one of them actually based right here

16  in the City of Austin, one of the main ones in the world, and

17  they have this functionality already.

18        MS. WARREN:  Thank you.  Nothing further, Your Honor.

19        MR. ZELLER:  Nothing further, Your Honor.

20        THE COURT:  Sir, thank you very much.  You can step

21  down.

22        THE WITNESS:  Thank you, Your Honor.

23        THE COURT:  Do we have any other witnesses?  Do you

24  want to call somebody, some expert you want to call?

25        MR. SHAFFER:  Thank you, Your Honor, not from the

1   plaintiffs.

2           THE COURT:  Since the plaintiffs are the ones that are

3   seeking this injunction, you can go first.

4           MR. SHAFFER:  Thank you, Your Honor.  Derek Shaffer

5   for the plaintiffs.  Your Honor, we're here challenging what is

6   an entirely new an unprecedented statutory regime in Texas

7   before it takes effect.  HR 1181 imposes hundreds of thousands

8   of dollars in liability on anyone who provides the disfavored

9   content over the Internet without complying with Texas's newly

10  minted burdens and strictures of age verification.  This is not

11  the first time something like this has been attempted, Your

12  Honor.  As you know, this is the latest in a string of similar

13  efforts by other jurisdictions including the United States

14  government to shut down or straightjacket disfavored speech on

15  the Internet.  All of those efforts have been couched as

16  protecting minors and all of them have been uniformly rejected

17  by courts from the U.S. Supreme Court on down the line as

18  violating the First Amendment.  All we're respectfully asking

19  today is that this Court grant a preliminary injunction so as

20  to preserve the status quo while the Court adjudicates the

21  First Amendment and other merits.  As I'll explain, and I think

22  the merits of our First Amendment challenge are strong and this

23  is a case for granting a preliminary injunction.  I know Your

24  Honor's read the papers, so my most important job of course is

25  to answer Your Honor's questions, but do I want --

1          THE COURT:  Before you go any further, one of your

2    arguments in your papers and you repeated it just now was that

3    a great cost, that's not your only argument, your primary

4    argument is the effect that this will have on your client's

5    consumers, scare them away, you know, I think counsel for the

6    state said I don't think I want my employer to know that I

7    was -- I'm sure she isn't accessing pornographic websites, but

8    I wouldn't want my employer at the Attorney General's Office to

9    know that I was accessing a pornographic website.  I can buy

10   that, I can see where she's coming from.  I don't think any

11   person would necessarily want to have their private business

12   out there for the world to see through a hack or something

13   else.  So that's really your main argument, but you also have

14   the money argument.

15          Now, the witness just suggested that your clients

16   actually already have this software in place and they're

17   already using it.

18          MR. SHAFFER:  Your Honor, I would respectfully have to

19   talk to the witness about what he is referring to as far as

20   U.S. age verification.  Let me just focus on Your Honor's

21   question.

22          THE COURT:  Well, you had the opportunity.  He was

23   right up here on the stand.  You want me to call him back?

24          MR. SHAFFER:  Let me address it this way, Your Honor,

25   and see if it suffices.  These third parties that Mr. Allen was

1   referring to, they don't verify a user's age for free.  There's
2   a cost for every single one of those.  So age verification, I
3   think it's common ground between us and the State that there
4   are costs, they are designedly costs that follow from using
5   this age verification.  As Your Honor also noted and as we've
6   set forth in our papers, there are hacks, there are leaks that
7   have them, and yes, that may be directed at a third party, but
8   that's a hit to our clients as far as how their users will feel
9   about whether they're interested in safeguarding properly,
10  whether they've been betrayed if anything goes wrong with this
11  change, so that's a deterrent, that is a hit to good will.  But
12  also, Your Honor, if you put these two things together, the
13  chilling effect on the users, and it was in my mind as it was
14  in Your Honor's mind as it was in the State's mind in examining
15  Mr. Allen, there is a huge invasion that is associated with
16  going through this process with a computer to identify who that
17  individual is and what their age is.  And that's happening in a
18  context, Your Honor, where this law also requires when they
19  reach the site that there be warnings that all this site, to
20  summarize what the State wants, is mandating to have put on
21  there, it's this is bad for you, it is rotting your brain, it
22  is contributing to social diseases, and that's after someone
23  has gone through the age verification.  So the users are being
24  made pariahs and the websites are being made pariahs, and it
25  is, Your Honor, in some sense a big red scarlet letter that

1    every user has to wear.  So I think that there is a huge

2    chilling effect on the expression and the consumption of the

3    expression, but there's a bottom line impact too, Your Honor.

4    So the sites will be paying for an age verification process

5    that is chilling and deterring users in a context where the

6    State is making very clear that we don't want you and like you

7    accessing the site and it's been determined who you are in

8    Texas before you're getting to it.  And you put all that

9    together and I submit it's just --

10          THE COURT:  Make no mistake about it, counsel, I think

11   the State of Texas has a legitimate interest in keeping

12   pornography away from minors, particularly young minors, okay.

13   There is, in my view, with the appropriate legislation properly

14   tailored, the State of Texas has a legitimate, absolutely

15   legitimate and understandable interest in keeping children away

16   from pornography.  The real question is whether this

17   legislation does it without trampling on constitutional rights.

18   That's the question.

19          MR. SHAFFER:  I don't mean to dissuade, Your Honor

20   from that position, I didn't mean in my earlier --

21          THE COURT:  No, I think that in your papers you have

22   acknowledged that they have that right.

23          MR. SHAFFER:  As has the U.S. Supreme Court in cases

24   including *Reno v. ACLU* and *Ashcroft v. ACLU*, in which for the

25   reasons Your Honor was suggesting, the U.S. Supreme Court

1    nonetheless struck down the federal statutes at issue because

2    they were subject to strict scrutiny and they didn't pass

3    strict scrutiny.  And I would note, Your Honor, in terms of the

4    interest Your Honor articulates, a law that was tailored around

5    that would look fundamentally different from the law that's

6    before the Court.  A law that is meant to prevent adult content

7    from reaching minors would block adult content, not based upon

8    the websites from which it comes, but the fact that it is

9    getting to a minor.  So search engines would be of concern,

10   social media would be of concern, websites that have 20 or

11   25 percent of their content, hard core pornographic adult

12   content that Texas has determined unsuitable for minors, that

13   too would be subject to restriction.  None of that, in fact, is

14   subject to the law.  All of that content can continue to flow

15   to minors after September 1st no differently than was true

16   before this law was passed.  So what is this law really doing,

17   Your Honor?  It's going after disfavored speakers, specific

18   websites that Texas wants to keep people away from.  Not only

19   that, Your Honor, it's not just the minors who are having their

20   access restricted, you know from the law, you know from the

21   State their premise is minors after this law is passed will not

22   be able to access those websites in Texas if you credit the

23   State's submission.  But still the law goes further and says

24   there need to be these health warnings, detailed health

25   warnings in 14-point font at the websites telling presumably

1    adult users that they should not be looking at the website.  So

2    I would just underline for Your Honor that the interest that

3    Your Honor articulates is disconnected from the law that is

4    before the Court and that the law that is before the Court is

5    not by any stretch of Supreme Court precedent or otherwise, it

6    is not narrowly tailored and using the least restrictive means

7    for making sure that specific adult content does not find its

8    way to minors.  And I would submit, Your Honor, that Your

9    Honor's decision as to likely success, it's just likely success

10   that you're assessing right now, it is really controlled by the

11   Supreme Court's decisions in *Reno v. ACLU* and in *Ashcroft v.*

12   *ACLU*.  That's essentially what the Supreme Court held.

13          The first question for Your Honor, of course, is what

14   is the standard of scrutiny.  And the Supreme Court has made

15   very clear that when the regulation sweeps beyond obscenity as

16   defined in Miller, content-based regulation is subject to

17   strict scrutiny.

18          THE COURT:  I'm not troubled by the -- there's no

19   question in my view what the standard is.  One of the things

20   that does concern me in looking at this law is the fact that

21   I'm having a hard time -- when you look at the law, and I'm

22   going to be asking counsel, I don't know who's arguing for the

23   State, or the Interim Attorney General, if we're being correct.

24   If you look at the statute, it treats a five-year-old the same

25   as it treats a 17-year-old and you don't know where the -- so

1    for instance, if you turn on public broadcasting, there are

2    shows on public broadcasting, some of which come from overseas

3    and which have very graphic, not pornographic, I wouldn't

4    think, but certainly mature, very mature content with love

5    making and all of that kind of thing going on during the show.

6    Now, a five-year-old or a seven-year-old or a ten-year-old or

7    maybe even a 13 or 14-year-old, probably not a good idea that

8    they be looking at that.  A 17-year-old that's about to turn

9    18, that would be a parent's decision and they may be very

10   mature.  They're seniors in high school ready to go off to

11   college.  This would not be something that would be a big shock

12   to them or that their parents necessarily would have a

13   significant concern with them watching PBS.  So this is one of

14   the problems.  I have a hard time trying to figure out, because

15   it just says -- the law says, I believe the language has

16   something to do with offensive to the minor or harmful to the

17   minor.  What minor?  Which minor?

18            MR. SHAFFER:  Your Honor, that is one of the problems

19   with the test, but it's a problem that is solved, of course, by

20   content filtering.  Because what Your Honor articulates, what's

21   the difference between a five-year-old and 17-year-old, that's

22   something that content filtering can be sensitive to because

23   that technology can evolve and it can be responsive to what is

24   the age of the children in the house and you can have settings

25   that correspond with that, as opposed to this blunt, and as

1   Your Honor points out, potentially inapposite gating of the age

2   verification.  But I also want to note something else for Your

3   Honor.  This law does not regulate movies, those are not

4   subject to the law.  It does not regulate news broadcasts even

5   when those come through websites, so there's a categorical

6   carve-out.  If you could imagine a news website that was

7   devoted to things that are sexually laced and inappropriate for

8   minors, HR 1181 doesn't do anything to them.  There's a total

9   cart 1181 does not regulate that at all.  There's an express

10  exception for that.  Same thing for social media, so even a

11  five-year-old, even the five-year-old is not being protected by

12  this law.

13        THE COURT:  Well, I think websites like YouTube try

14  to -- they do have a parental thing built into them so the

15  parent can select, you know, what kind of filtering they want

16  on YouTube.  There's also YouTube for kids which doesn't

17  theoretically -- but you're right, there is content on YouTube

18  which I think, from what I've read at least, is very close to

19  pornographic.

20        MR. SHAFFER:  That's my understanding and experience

21  too, Your Honor, but I would just --

22        THE COURT:  They try to filter it out, but it's there.

23        MR. SHAFFER:  The filtering that Your Honor is

24  describing, the YouTube default can be adjusted by a user.

25  That's not something that a minor can't circumvent if they so

1   wish.

2          THE COURT:  Because you have a password, a parental

3   password.

4          MR. SHAFFER:  You could have a parental password

5   perhaps specific to that website, Your Honor, but for search

6   engines too, and I don't know of any such thing, if you use

7   Bing, for instance, and I know that -- I would commend to Your

8   Honor the declaration from Mr. Sonnier who explains that minors

9   can go on search engines and change the default safe setting

10  and then they will see exactly the same pornographic images

11  that they could find on websites.  They can see videos, they

12  can see images of those, and again this law is not even trying

13  to regulate that.

14          I would just submit to Your Honor that once we agree

15  that strict scrutiny is the standard here, I think that answers

16  the question of likelihood of success because it is the

17  extraordinarily rare case in which the State is able to satisfy

18  strict scrutiny, and I think it is also apparent that this is

19  not that case.  The legislative record is blank at best,

20  nothing that you heard from Mr. Allen is reflected in inquiries

21  by the Texas legislature.  There is no legislative history,

22  there is no legislative finding, there is no consideration of

23  less restrictive alternatives.

24          THE COURT:  Well, there was at one time, my

25  recollection is that, and I don't know why it was taken out,

1    originally as this legislation was proposed, it was based

2    around a filtering concept.  Then my recollection is a State

3    Senator had that removed and this was installed, this regime.

4    Am I wrong here?

5            MR. SHAFFER:  I defer to Your Honor's very precise

6    recitation of that.  My understanding had been it was both, so

7    that the law would have said you both need to have content

8    filtering and the age verification, and then without

9    explanation it became only the one.

10           THE COURT:  That may be a correct interpretation, but

11   the filtering was taken out.  I know that.

12           MR. SHAFFER:  And I can tell Your Honor having really

13   drilled down on the question, what did the legislature

14   articulate as the rationale for why filters don't work and the

15   State --

16           THE COURT:  All I know is it disappeared and I can't

17   understand why the filtering disappeared, but I think it did

18   disappear.  So let's just leave it at that.

19           MR. SHAFFER:  But I think the fact, Your Honor, that

20   the legislative record doesn't speak to this is telling and

21   ultimately dispositive.  You have the Supreme Court in Reno and

22   in Ashcroft specifically noting that content filtering is a

23   less restrictive alternative in those cases, so I think it

24   would be --

25           THE COURT:  Well, the State's argument is that that

 1  was a long time ago and things have changed.

 2          MR. SHAFFER:  Your Honor, I heard Mr. Allen as you

 3  heard Mr. Allen.  I think what I took away from his testimony

 4  is that content filtering is not theoretical, it is here, it is

 5  widespread, it is effective, it is evolving.  If there's been

 6  any shortcoming, it's been a shortcoming of adoption from which

 7  it would follow that the government has good work that it can

 8  do in encouraging the adoption of content filtering.  It could

 9  say here is what we recommend for parents --

10          THE COURT:  Could the government pass -- I don't know,

11  I haven't looked at this, but would it be constitutional for

12  the government to pass a statute that says that parents have to

13  install content filtering?  How about the State legislature

14  passing a statute that says any device sold in the State of

15  Texas has to have content filtering software installed to

16  protect minors from pornography or other objectionable sites.

17  I just wonder.  I don't know, because I haven't looked at it.

18  I'm not saying that's constitutional, I don't know, because

19  these things are made out of state, they're shipped into state,

20  maybe that's preempted.  Who knows?  I don't know.

21          MR. SHAFFER:  I have no brief on behalf of the parents

22  or on behalf of the manufacturers, Your Honor.  I will say my

23  clients would of course prefer those options, but I think what

24  the government --

25          THE COURT:  I do know that parents can purchase and

1    install on their children's devices and on their router,

2    because we've heard it from the State's own expert, effective

3    content filtering software.

4              MR. SHAFFER:  And you will also see, Your Honor, in

5    Mr. Sonnier's declarations that some of this content filtering

6    is available for free, so it's not like parents face costs in

7    obtaining it, from which it could follow that the State could

8    educate, could encourage, could potentially require that there

9    not be anything misleading or misrepresented on websites as to

10   adult content so as to pair with content filtering, as Your

11   Honor was suggesting to Mr. Allen.  All of those would be less

12   restrictive alternatives by comparison of what you have here,

13   and I think it suffices to note none of them have even been

14   explored or considered by the legislature before it lept to

15   this more extreme and intrusive approach which is exactly what

16   the U.S. Supreme Court had warned against.  So I think that

17   there's more legislative homework that needs to be done before

18   the State has a real shock at potentially satisfying strict

19   scrutiny and rectifying the failures of the statutes that were

20   previously before the U.S. Supreme Court.

21             Apart from that, Your Honor, you have conspicuous

22   defects in this law that I've been alluding to.  It's

23   conspicuous under inclusiveness.  And here I would recommend to

24   Your Honor the decision of the Supreme Court in Brown v. I

25   think it's Entertainment Merchants where the California statute

1    was regulating video games that were deemed unsuitable for

2    minors, but there was no such regulation of violence that was

3    appearing in movies, in books, and it was directed solely

4    against the video game industry which was perceived as a

5    particular scourge, but it was too under-inclusive, that law,

6    to possibly satisfy strict scrutiny.  And I'm sorry to say

7    this, Your Honor, but I do think it is clear from the law that

8    although it is couched as solely about protecting minors, that

9    is truly an incoherent claim as to the purpose because of these

10   health disclaimers, Your Honor.  Because the health disclaimers

11   are there even after minors have been screened out.

12         What I think Texas is really trying to do here and is

13   not permitted to do is to single out a particular industry that

14   has a particular amount of sexual content.  That's really what

15   the law is going after, and that's quite different from the

16   purpose that Your Honor articulated specifically to protect

17   minors.  This is a statute that is jerrymandered to effectuate

18   viewpoint and speaker-base discrimination.  To go after the

19   adult content industry, specific companies that are associated

20   with that and to go after the kind of pro porn, the sex

21   positive viewpoint that is associated with that industry and

22   others who supply exactly the same content, they are screened

23   out from having to answer to the law.  They are especially

24   carved out and exempted.  That, Your Honor, I think makes it

25   essentially impossible, certainly difficult to defend the law

1  successfully, again assessing likelihood of success, I think

2  Your Honor has it.

3          The last thing, Your Honor, there's no real defense of

4  their compelled speech portion of this.  I think my friends for

5  the State don't even defend putting on the -- insisting that

6  every website have references to the substance abuse and mental

7  health hotlines.  And saying things that I think are based

8  on -- making an industry that believes differently in good

9  faith and quite vigorously believes differently, making that

10 industry have to mouth the State's words based on pseudo

11 science that we think is false in critical respects and

12 certainly controversial.  That's enough to say that that's

13 unconstitutional.

14          THE COURT:  Thank you very much, counsel.

15          MR. SHAFFER:  Thank you, Your Honor.

16          THE COURT:  All right, counsel.  Very interested to

17 hear what you have to say about this law.

18          MR. RAMSEY:  Thank you, Your Honor.  John Ramsey for

19 AG Colmenero.  And first, while we're all here, I'd like an

20 agreement that if the 89th legislature passes a law that

21 requires RTA tags and forces a penalty for those who don't

22 comply, that the Free Speech Coalition will agree.

23          MR. SHAFFER:  Your Honor, we're not here to stipulate

24 to any theoretical laws, but I can tell you that Mr. Ramsey

25 would have a stronger defense if that were the law before the

 1    Court.

 2          MR. RAMSEY:  Of course, just joking.  I want to talk

 3    about a few things.  I obviously want to get into the heart of

 4    this, but also I feel like there's a little bit of housekeeping

 5    I want to do to make sure we're talking about the same thing

 6    because there's been a lot of talking about consumers and

 7    there's been a lot of talking about different disparate

 8    plaintiffs.  And I want to start by making sure who we're

 9    talking about and who is in this case and who has a right to

10    bring this case.

11          THE COURT:  I know all about who is in the case.  I've

12    very carefully reviewed all of the pleadings, I understand your

13    standing arguments.

14          MR. RAMSEY:  Well, it's not just standing arguments,

15    Your Honor, and I am here to answer your question, so I'm going

16    to try again and if you still think this is not something you

17    need to here --

18          THE COURT:  I don't know what it is that you're going

19    to tell me, but if you're just going to recite that you don't

20    think so and so has standing, you've already made that argument

21    in your papers.

22          MR. RAMSEY:  Okay.  Well, it's not just about

23    standing, though, it is about whether they have a valid claim

24    and whether they can then win under the four prongs, the four

25    prerequisites of PI.  So for instance, a foreign organization

 1   has no constitutional rights.  The Supreme Court in *Agency For*
 2   *International Development vs. The Aliance For An Open*
 3   *Society* --
 4          THE COURT:  There's a difference between a foreign
 5   organization that is operating outside the United States and
 6   attempting to enforce constitutional rights and a foreign
 7   organization that is operating within the United States.
 8   There's two big differences.
 9          MR. RAMSEY:  So I disagree, Your Honor, because first
10   of all, the plaintiffs --
11          THE COURT:  I'll look at it again, but I've seen cases
12   directly on point.
13          MR. RAMSEY:  Well, the plaintiffs in this case and in
14   the Ninth Circuit District Court have specifically stated to
15   the Court, have represented to the United States District Court
16   that they are not operating in the United States, that they do
17   not direct their content to the United States, and as a result
18   they were dismissed because the Court, the District Court in
19   California said that it did not have personal jurisdiction over
20   MG Freesites, so --
21          THE COURT:  There are plaintiffs in this case that do
22   operate in the United States and are located in the United
23   States.  That doesn't help the law.
24          MR. RAMSEY:  Well, it does when you go to apply the
25   factors because when you look at the harm, for instance, to the

1  plaintiffs, well, the domestic websites, they're already

2  subscription based, they're already taking payment, they

3  already require you to sign up and give an e-mail address.  So

4  when you go to analyze whether this is, for instance, we've

5  heard a lot of discussion about whether this is going to chill

6  people coming to the website.  Well, these are people who are

7  already given their e-mail address, already have payment on

8  file, so asking them to verify has no impact at all.  There's

9  certainly been no evidence it has any impact whatsoever on that

10 population.  So if we're talking about websites and the only

11 ones here that have constitutional rights are the ones that are

12 here in America.  Well, it's a totally different, it's a

13 totally different application of the facts.

14        And that brings me to also this idea that the Free

15 Speech Coalition represents Texas consumers.  They do not.  The

16 Free Speech Coalition has brought associational standing.  As

17 an association, they can bring a claim on behalf of their

18 members.  Their members do not include citizens of Texas, they

19 are not advocating for porn consumers.  Several times in their

20 brief they indicate they are advocating for porn producers and

21 that is it.  So there is no associational standing that they

22 get to go to consumers.  They do point to the *American Book*

23 *Sellers versus Virginia* case.  And in that case, they say,

24 well, the plaintiffs brought suit on behalf of book buyers.

25 Well, the plaintiffs were book stores, brick and mortar book

1    stores, and that is third party standing.

2          THE COURT:  Are you saying that porn sites cannot have

3    associational standing, is that your argument?

4          MR. RAMSEY:  No.  Free Speech Coalition can have

5    associational standing on behalf of its members which are porn

6    sites.

7          THE COURT:  Right.

8          MR. RAMSEY:  What we're hearing is this argument that

9    they're protecting the consumer.  There is no one who has

10   brought this suit on behalf of the Texas consumer.

11         THE COURT:  I did not sense that.  What I sensed is,

12   yes, I mean by implication, but their concern is for their

13   financial wellbeing.  They're saying, look, we provide a

14   service, i.e., not one that maybe you and I might be interested

15   in, but other people may be, obviously are.  It's a multi

16   billion-dollar business in the United States, I think, if I

17   have read correctly.

18         MR. RAMSEY:  Yes.

19         THE COURT:  And I think you would agree with me, you

20   are agreeing with me, so somebody is looking at this stuff.

21   And their concern is that their consumers, people that they

22   deal with are going to be scared away, are not going to want to

23   participate in the content that they have to offer because

24   they're going to have to put their driver's license or their,

25   heaven knows, their passport, or whoever knows, whatever it is

1   there, and they're going to be concerned, certainly given

2   what's happened -- I would say, I think you made the argument

3   in your papers that this is old news, these old cases.  To be

4   honest with you, I think the concern over identity theft and

5   hacking and people losing control of their personal information

6   is greater today than it was in 2006.  Heaven knows.  The

7   federal court system was hacked.  Major governmental entities

8   with huge firewalls and all kinds of security systems have been

9   hacked.  Major United States corporations including in the

10  defense industry have been hacked.  Why wouldn't somebody who

11  was attempting to access a pornography site, let's say someone

12  who has a professional occupation, let's say a doctor, for

13  instance, who for whatever it is they want to access a porn

14  site.  They're going to be concerned that they're going to turn

15  their license over, and I don't know that they're going to be

16  particularly comforted by the suggestion in the statute that

17  their information is going to be in some ethereal way after

18  it's transferred to a third party, somehow disappears.  I think

19  their concern might be that it might reappear in a hack, and I

20  think that's a major concern, I would think, and I would think

21  a huge problem for these websites if they have to comply with

22  this statute.  So how do you address that?  Are you going to

23  tell me that people wouldn't have a legitimate concern that

24  their personal information would be potentially -- maybe it's

25  irrational, I don't know that it's irrational.

1          MR. RAMSEY:  I want to take that point by point, if I

2    may.  Because we started that conversation talking about

3    domestic corporations and if someone was bringing this case on

4    behalf of consumers, and I understand Your Honor to be saying

5    that no one is actually bringing on behalf of consumers,

6    they're bringing it on behalf of themselves and they're fearful

7    of losing consumers.

8          THE COURT:  I think that's a legitimate concern on

9    their part.  Maybe they should lose their consumers, I don't

10   know.  That's what the State of Texas wants to happen.

11         MR. RAMSEY:  I don't know if that's true, Your Honor,

12   and a couple points --

13         THE COURT:  I think it is.

14         MR. RAMSEY:  They certainly want them to lose their

15   child customers, that's for sure.  We can agree on that.

16         THE COURT:  I think they should lose any child

17   customers that they have.  I don't know that this law does it.

18         MR. RAMSEY:  I still want to address your points.

19   Because if we're talking about the fear that they're going to

20   lose customers, that's why it's really important to figure out

21   the playing field here.  If we're talking about just these

22   domestic companies, they already are collecting information

23   about their customers.  Their customers are already going in

24   and putting in their e-mail address and they have a specific

25   account, and they have payment information.  So we can all just

 1   pretend that they would lose customers, but there's no evidence
 2   of that.  There's absolutely no evidence of that.  So then to
 3   the extent that their point is that they may lose an audience,
 4   the Supreme Court is very clear, they do not have the right to
 5   an unlimited audience when what they purvey is material harmful
 6   to children.  There's a Supreme Court case that says that
 7   exactly.  It's Bethel Independent School District and they
 8   specifically say that someone does not have the right -- I'm
 9   quoting as close as I can, you don't have a right to an
10   unlimited audience when that is what you are purveying.  And I
11   want to push back because really if anybody represents the
12   Texas consumers, it's me here today.  And the Texans, those who
13   view pornography and those who do not, elected representatives
14   to go to Austin and vote on legislation, and they voted.  Their
15   representatives voted almost unanimously to pass this law.  So
16   sure, maybe someone doesn't want their .gov account on a porn
17   site.  That's a very, very different question than whether or
18   not they'd be willing to verify their age to make sure our kids
19   don't view porn.  And the Texas legislature has said yes, they
20   will.  So no one here has brought a claim on behalf of
21   consumers.  No one, by the way, has proven that they would lose
22   any consumers, certainly not the domestic corporations.  And
23   PornHub has done this abroad.  Where is their data that when
24   they implemented this in Germany they lost any more viewers
25   than you would expect from kids stopping to view porn?  We

 1 | can't just assume here, especially not this level.
 2 |       THE COURT:  Well, Germany doesn't have the United
 3 | States Constitution.  We do.
 4 |       MR. RAMSEY:  That's a different question when we go to
 5 | apply strict scrutiny.  But the question is whether they lost
 6 | viewers, whether people say I'm not willing to give my personal
 7 | information to save the children of Germany from pornography.
 8 | Where is the evidence?  We can't just assume that the people of
 9 | Texas, those who view pornography, are not willing to give
10 | their information.  I know you talked about a doctor and maybe
11 | he's afraid.  First of all, these websites are totally
12 | independent of porn websites, and Mr. Allen made that clear.
13 | If for instance, if for some reason despite the fact that
14 | there's no evidence--
15 |       THE COURT:  We don't have websites in existence, we
16 | don't know where these are going, nothing has been set up, the
17 | law isn't in effect.  We don't know what websites these are
18 | that are going to be utilized, if they have to be utilized.  We
19 | have no idea.  The State doesn't have any idea.
20 |       MR. RAMSEY:  There are age verification services in
21 | the United States.
22 |       THE COURT:  There's lots of age verification services
23 | in the United States for a bundle of different things.  There's
24 | no question about that, but that's not the point.  The point is
25 | which ones are they and how secure are they, and do you know?

 1    I don't know.  I don't think anybody knows how secure they are.
 2    Believe me, I've had plenty of lawsuits where people were
 3    secure and they weren't secure.
 4            MR. RAMSEY:  In that regard, then, it's just a couple
 5    of things.  One, we do have these, people are using these age
 6    verification websites for different purposes in America.  So to
 7    the extent that their information got out just like it does in
 8    hacks all over the country for reasons totally unrelated to
 9    this legislation, it would not identify anything embarrassing.
10            THE COURT:  How do you address the argument raised by
11    counsel that this applies to the pornography industry, as we
12    understand it generally, but does not apply to social media or
13    movies or a multitude of other things where children can
14    readily access pornography?  I mean, for instance, there are
15    multiple movies out there that children can simply go on
16    Netflix and watch, Netflix or Stars or one of the other
17    services and get and watch, Criterion, whatever their parents
18    happen to have on the television or they can get access through
19    an iPad, you know, Samsung Tab, or a computer.  They can get
20    access to all of this stuff.  Some of it is as raw as any
21    pornography.
22            MR. RAMSEY:  Your Honor, I promise you it's not.
23            THE COURT:  I don't know, I'm not a consumer of
24    either, but I will tell you I have read aplenty because I've
25    had cases where movies like Caligula or others are very, very

1    pornographic.  What was that movie that had Marlon Brando?

2            MR. SHAFFER:  Last Tango in Paris, Your Honor.

3            THE COURT:  Great example, where a woman was sexually

4    assaulted on the camera.  You can watch that on one of these

5    sites.  Children can get access to that, but this law doesn't

6    apply to that.  I'm having a hard time understanding why not.

7            MR. RAMSEY:  I hope I can help.  So first of all --

8            THE COURT:  I hope you can too, that's why I'm asking

9    you.  You're a good lawyer.

10           MR. RAMSEY:  We'll see.  I appreciate it.  So a couple

11   things.  I did research for this case, and I spent three years

12   as a human trafficking prosecutor --

13           THE COURT:  Congratulations, you did good work then.

14   That's something the State of Texas really needs to drill down

15   on.  As the federal government, that's a horrible situation.

16           MR. RAMSEY:  Before that, I spent a year in Kenya

17   helping Nairobi prosecutors prosecute child sexual assault.

18           THE COURT:  That's good stuff.

19           MR. RAMSEY:  I have never seen something as disturbing

20   as I saw when I did the research for this case.  I cannot tell

21   you, the pornography that you're talking about from 1970s, what

22   we have today is not different in degree, it is different in

23   kind.  It is unbelievable.

24           THE COURT:  Well, it may be in certain instances, but

25   the point is that I don't think a parent who wants to have

 1    their child protected from pornography would be interested in

 2    having them watch Last Tango in Paris or Caligula or any of the

 3    other grossly graphic movies that are out there just because

 4    you may be able to find a particular porn site that has human

 5    bondage or some disturbing content in it.

 6              MR. RAMSEY:  When you say particular porn site, I want

 7    to be clear we're talking about the largest porn sites in the

 8    world.  When you talk about Last Tango in Paris, you're talking

 9    about --

10              THE COURT:  The audience for that movie, by the way,

11    is pretty substantial.  There's a lot of people that have seen

12    that movie.

13              MR. RAMSEY:  I want to back up even further.  First of

14    all--

15              THE COURT:  It's still out there, you can still watch

16    it.

17              MR. RAMSEY:  The State does regulate, for instance, an

18    adult movie complex, that you have to be 18 or older to enter a

19    pornographic movie.

20              THE COURT:  You don't have to be 18 years old to watch

21    Last Tango in Paris on your computer.

22              MR. RAMSEY:  No, but if you were to --

23              THE COURT:  That's what we're talking about.

24              MR. RAMSEY:  And this is, of course, the difficulty

25    in--

1          THE COURT:  We're not talking about adult movie

2   theaters, very few of those left around.

3          MR. RAMSEY:  Well, I just want to be clear that when

4   we talk about we don't regulate movies, we do, in fact,

5   regulate adult movie theaters and the book stores that sell

6   pornographic movies.

7          THE COURT:  I didn't say adult movie theaters.  I said

8   the law doesn't prevent, as I understand it, the law has an

9   exemption for movies, the law has an exemption for social media

10  sites.  Not pornographic movies, but regular movies.  Certainly

11  has an exemption for social media sites.

12         MR. RAMSEY:  It doesn't have an exemption for social

13  media sites.

14         THE COURT:  Well, maybe counsel is wrong.

15         MR. RAMSEY:  What the law says, it says, *A commercial*

16  *entity that knowingly intentionally publishes or distributes*

17  *material on Internet website including a social media platform*

18  *more than one-third of which is sexual material harmful to*

19  *minors shall use reasonable verification.*

20         THE COURT:  More than one-third.

21         MR. RAMSEY:  Yes.

22         THE COURT:  But that's not the point.  If you're a

23  minor and you want to see some salacious material on YouTube,

24  you go to the search engine and you find the salacious

25  material.  It isn't going to be more than a third of YouTube,

1    but it doesn't matter.

2          MR. RAMSEY:  And this is the balance the State tried

3    to walk, because if it included all that stuff, we would be

4    over here on overbreadth, so we have tried to tailor the case

5    to the problem.  And to be clear, if you go and you watch Last

6    Tango in Paris, it is not then followed by 300,000 more videos

7    where you can spend 500 years watching pornography far, far,

8    far more graphic than Last Tango in Paris.  So if you view the

9    pornography today, and I didn't go to law school thinking I'd

10   ever tell a federal judge to go look at pornography, but here

11   we are --

12         THE COURT:  It ain't happening.

13         MR. RAMSEY:  The thing is that's the evidence in this

14   case and when Potter Stewart said, you know, I know it when I

15   see it, he followed that, and the video at stake here is not

16   it.  He watched one video.  The evidence here is unbelievable,

17   Your Honor.  And if you watch the evidence and you don't turn

18   away from it and you see what -- geez, Louise, I've learned too

19   much in this last week.  But the point is if you actually view

20   the evidence, there's no doubt, Your Honor, that this is

21   causing depression in young people, that it's causing anxiety

22   and I don't know --

23         THE COURT:  I don't know, counsel, that you really

24   want to go there because I'm not entirely convinced that that

25   warning has a medical basis.  It is, to say the least,

 1   controversial.  There are tons of websites, not websites, tons

 2   of articles and other things which have been produced in this

 3   case showing the exact opposite.  There are some that show what

 4   you've suggested.  It's very controversial as to whether it

 5   does or it doesn't.  Now, my personal view, probably not a good

 6   thing.  I think the children shouldn't have access to

 7   pornography.  I've said that before.  I think the State has an

 8   absolute and legitimate interest in stopping children, if they

 9   can, legitimately and constitutionally from seeing pornography.

10   The question is whether the sledgehammer approach, which the

11   State has used in this law, is the approach that is

12   appropriate.  I think that maybe a scalpel approach would have

13   been better.  I think content filtering would be better than

14   attempting to have them go through this whole thing which I

15   think is troublesome.

16           MR. RAMSEY:  We haven't talked about content

17   filtering.

18           THE COURT:  We have talked about content filtering.

19           MR. RAMSEY:  You and I have not.  I have a whole new

20   perspective, Your Honor.

21           THE COURT:  You have a whole new perspective?

22           MR. RAMSEY:  Their declarant said this is widely

23   available.

24           THE COURT:  What is?

25           MR. RAMSEY:  Content filtering.

1          THE COURT:  It is.

2          MR. RAMSEY:  It's widely available, it's out there.

3    And yet in a 2002 study, 75 percent of teenagers age 13 to 17

4    were viewing pornography.  So it's out there.  We all know it's

5    out there and yet it's not working.  That's clear from the

6    data.

7          THE COURT:  Do you know, has the State of Texas made

8    any concerted effort to have parents employ content filtering?

9    I know that the State of Texas is quite active doing a whole

10   bunch of things.  I know that Judge Albright just had a major

11   hearing last week on a statute where the State of Texas is

12   trying to remove lots and lots of books from the library if

13   they have any mention of I guess we might say adult subjects in

14   them.  I don't know, I wasn't at the hearing, but it didn't

15   look like it was going well for the State.  I don't know what

16   Judge Albright is going to do.

17         MR. RAMSEY:  Is that what someone would say about this

18   hearing?

19         THE COURT:  I don't think so.  Let me tell you a quick

20   story.  I had a big case in Hawaii, my home state, and I really

21   grilled Kathleen Sullivan, former Dean at Stanford Law School,

22   and gave her a very I wouldn't say a hard time, I was certainly

23   probing her position.  And at the end of the hearing, I guess

24   her client got nervous and they ended up settling the case the

25   day before I was about to rule for Kathleen Sullivan's client,

1   in a 100-page opinion which I had drafted, which ended up going

2   into the trash can.  Actually, no, because one of the

3   professors at the University of Hawaii Law School wanted to see

4   it.  So I may rule against your client, I may not, but just

5   because I'm probing you doesn't mean a thing.  I have been a

6   law professor for 38 years.

7              MR. RAMSEY:  I want to answer your question.  I'm not

8   aware of all the efforts the State makes, I can speak

9   personally.

10             THE COURT:  There's nothing in the record that

11  indicates the State has made any significant efforts at all.

12             MR. RAMSEY:  I can tell you our school district has

13  sent e-mails about content filtering.

14             THE COURT:  Maybe they have and I think that's good,

15  but I think maybe they need to do more.  Even if this law is

16  found to be constitutional, content filtering would still be an

17  excellent tool to be used by parents.  You know, the State has

18  placed a lot of gravitas, so to speak, in giving parents the

19  right to control the life of their children rather than third

20  parties.  Right?  We hear that all the time from Governor

21  Abbott, we hear it from others, you know, State senators, Dan

22  Patrick, a lot of people have said this.  Should be the

23  parents, right, who control their children's life, control

24  their content.  This law takes that right out of the hands of

25  the parents and puts it somewhere else because the parents

 1    don't have any control over the operation of this law.  This
 2    law operates not with -- I mean the parents obviously, one
 3    would hope, wouldn't make devices available where their
 4    children can get this kind of material, but they don't always
 5    have control over it, but if you put on a child's computer, if
 6    you put on their laptop, if you put on their -- I mean their
 7    stand-alone computer, their laptop if they have one, their
 8    iPad, their cell phone blocking software, the child can't get
 9    access unless they use somebody else's, which this law doesn't
10    help you with.
11          MR. RAMSEY:  And a couple things.  So first of all, I
12    don't think this law takes anything away from parents.  And you
13    had asked a question earlier about parental rights and that is
14    something I have just happened to have briefed before in
15    Appellate Court and parents have a lot of rights in their
16    raising their kids and if there was a law that --
17          THE COURT:  I'm not saying for a moment that I don't
18    support parental rights.
19          MR. RAMSEY:  Ideally parents are taking care of
20    everything.  But obviously we also have the DFPS, we also have
21    all kinds of situations where we know that parents aren't
22    taking care of everything.  And the Supreme Court has spoken
23    directly to this as well in *Ginsburg versus The State of New*
24    *York*, which is a case, by the way, that is reaffirmed in Brown
25    versus Media Entertainment that was issued in 2011 regarding

1    video games, and Ginsburg says this, *"While supervision of*

2    *children's reading..."* because that's what it was back then

3    *"... may be best left to parents, the knowledge that parental*

4    *control or guidance cannot always be provided and society's*

5    *transcendent interest in protecting the welfare of children*

6    *justifies reasonable regulation of sale of material to them.*

7           So we acknowledge that parents are in charge, but this

8    is also a brave new world and I can speak -- and I don't want

9    to be under oath here, but I have four young children, each of

10   them has a tablet, two of them have an iPod, no iPhone, but

11   iPod that is connected to our WiFi, they all four have

12   computers from their school.  And of course, I have a phone and

13   my wife has a phone, and at times they're not on the same

14   service.  It is, quite frankly, a lot to keep up with and I am

15   obviously as you can tell probably from my background I am

16   really on top of it.  It is not easy.  And that is what the

17   statistics show, even though we all know it's out there, even

18   though we're educated, it is really difficult to keep up with.

19          THE COURT:  All you have to do is go to the Google

20   Play Store or the App Store if you have an Apple and download

21   children protective software and install it and there it is,

22   and you put a lock on it and it takes five minutes.

23          MR. RAMSEY:  Until it blocks something that your kid

24   needs and you have to go to different devices and only allow it

25   on that kid's account.

 1          THE COURT:  The kid wouldn't need pornography, one

 2   would hope.

 3          MR. RAMSEY:  Absolutely not, absolutely not.  So but

 4   all that to say it is not as simple as click of a button or

 5   else parents would be doing it.  I think we all know that

 6   parents care about their kids and parents are trying not to

 7   have their kids look at pornography and yet the stats are

 8   clear.  So to be clear, no one is saying filtering does not

 9   work.  I'm not saying it's belt and suspenders, but it might be

10   hat and gloves.  We need it all.  So yes, parents do their part

11   when they can do it, but there is a government interest in

12   making sure that for those kids whose parents are overwhelmed,

13   for those parents who don't know how to do it, that when those

14   fall through, we also have age verification, or when there's a

15   kid on the bus next to your kid on the way home from school

16   with 30 minutes and nothing to do, they are carrying this

17   around everywhere.  And so the State of Texas legitimately says

18   this is awful for our kids.  And it's not a puritanical thing,

19   Germany and France aren't doing it because they're puritanical.

20   It's because it is so bad for the kids.  So with regard to the

21   advancement of technology and how just ubiquitous the Internet

22   is, this is where we have landed.  Content filtering yes, age

23   verification for sure.

24          THE COURT:  The arguments that you're making are

25   pretty much the same arguments that were made to the United

1   States Supreme Court when the federal government attempted to

2   pass very similar legislation and the Supreme Court wasn't

3   buying it.

4           MR. RAMSEY:  The Supreme Court had never seen an

5   iPhone.  It is so different.

6           THE COURT:  They had computers in those days.

7           MR. RAMSEY:  And in Ashcroft when it got sent back

8   down, the Court said one way the parents could monitor their

9   children and screen them on the Internet was to put the

10  computer in the living room.  That is the technology that they

11  were looking at, where a parent could literally say that's the

12  computer --

13          THE COURT:  Then it got redecided and then the Supreme

14  Court refused to take it the second time because it was even a

15  harder decision.  Counsel, I understand your argument.  We're

16  running out of time.  I've given you more time, I need to hear

17  from the other side on rebuttal.  Thank you very much.  I've

18  got all your papers and your argument.  You're an excellent

19  lawyer, you've done a good job for your client.  I know exactly

20  what your position is.

21          MR. RAMSEY:  Appreciate it.

22          THE COURT:  He's made some very cogent points, I

23  think.

24          MR. SHAFFER:  Your Honor, I don't disagree and I have

25  great respect for Mr. Ramsey and the experience and perspective

1    he brings to this, but I don't think Your Honor should be

2    hearing from the lawyer defending the statute without having

3    heard from the legislature.  Any of what Mr. Ramsey is saying

4    about wrestling with different alternatives, about

5    determinations that age verification will actually work, the

6    extent that Mr. Ramsey makes the point that kids are going to

7    find their way to adult content, I think he persuades everyone,

8    Your Honor.  I think that the scepticism is that age

9    verification requirements are going to talismanically change

10   the nature of technology and keep kids away from bad content.

11   And even if Your Honor were to indulge what I think is a far

12   fetched and implausible hypothetical there, this law is not

13   requiring that there be age verification.

14          THE COURT:  He said, for instance, that it doesn't

15   allow pornography use on social media sites, they're not

16   exempted.

17          MR. SHAFFER:  Well, Your Honor, unless I misheard or

18   misremember Mr. Allen's testimony, he testified to the opposite

19   because he too had read the law, and the way that you avoid any

20   application of the law is take all of your adult content that's

21   really inappropriate for kids and make sure that you have

22   75 percent additional content and you'll never have to answer

23   to this.  And all of that content, as Your Honor points out,

24   will be available to minors who will have ample content, all

25   the content that Mr. Ramsey decries from his homework -- and by

1   the way, Your Honor, I've done my homework, I've seen the

2   opposite.  I've seen content on these sites that is, to me,

3   I've seen content that is political, that is parody, that is

4   soft core, that would not pass any sort of obscenity test.

5   Now, all of that is subject to these very onerous requirements

6   and threat of massive enforcement penalties simply because the

7   providers of that content are part of the adult content

8   industry where more than a third of their content would answer

9   to a different description, all of it is swept in, all of it is

10  subject to age verification, all of it is subject to the

11  disclaimers or else you're subject to the crushing fines that

12  are imposed under the law.

13          So going back, though, Your Honor, to all of the other

14  content that is out there on the Internet, it is only that

15  content that happens to be parked on the adult content industry

16  sites that is subject to the law.  Everything else still gets

17  through unfettered.  It's YouTube, it's search engines, it's

18  social media, it's movies, all of that, Your Honor, is not

19  subject to the law.  And if the legislature was as sincere as

20  Mr. Ramsey is in its convictions and was spending the time to

21  do the homework and to build the legislative record, then Your

22  Honor, I think you'd see a very different law.  I think you'd

23  have to see tailoring that is fundamentally different from what

24  you have in this law.  But at the very least, you would have a

25  legislative record, Your Honor, that is capable of withstanding

1    strict scrutiny.  Mr. Ramsey's arguments, excellent delivery of

2    them here today by Mr. Ramsey, that, Your Honor, is not a

3    ticket for withstanding strict scrutiny, and it's certainly not

4    a reason why Texas is likely to succeed in showing that this

5    law does not violate the First Amendment.  All I'm here to tell

6    Your Honor is that we are entitled to preserve the status quo,

7    to prevent a new law from taking effect in ways that will

8    irreversibly damage --

9          THE COURT:  What about his argument that your clients

10   are being hypocritical because they're complying with a similar

11   law in Germany?

12         MR. SHAFFER:  Your Honor, it's just not true that that

13   is a similar law that they are complying with in Germany.  I

14   know, for instance, these disclaimers are sui-generous, the

15   likes of which have never been used before.  Those are being

16   used in tandem with the State of Texas taking a stance that

17   they don't like this content and they are subjecting users to

18   unspecified means of age verification.  And understand, Your

19   Honor, that this is a very vague law.  Mr. Ramsey is telling

20   you some things about the law that I think are irreconcilable

21   with it, others that I find, frankly, surprising.  And when you

22   have no specificity about the age verification, how it works,

23   whether information can be shared during transmission with

24   third parties, what third parties are going to be suitable for

25   age verification, that's creating uncertainty and doubt and

 1    concern on the part of the users, yes, Your Honor, but also for

 2    our clients.  For companies that are going to have to comply

 3    with this law or else face stiff penalties, they should at

 4    least be told, here is what we mean by age verification, here

 5    is what will suffice for purposes of age verification, here is

 6    how often you need to do the age verification in order to

 7    comply.  None of that is specified by the law.  Here we're

 8    dealing with First Amendment rights.  This is content-based

 9    regulation of expression.  And before the State does that, Your

10    Honor, as the Supreme Court pointed out in *Reno v. ACLU* where

11    the vagueness problem was specifically identified before day

12    one of needing to comply, they should be clear about what are

13    the parameters.

14          THE COURT:  How do you explain away his reference to

15    Ginsburg?

16          MR. SHAFFER:  Sorry, Justice Ginsburg?

17          THE COURT:  No, no.

18          MR. SHAFFER:  The Ginsburg case.

19          THE COURT:  I knew Justice Ginsburg very well, she was

20    a fine woman.

21          MR. SHAFFER:  She was.  The Ginsburg case, Your Honor,

22    was not an Internet case and the Supreme Court was very clear

23    about that in *Reno v. ACLU.*  I think the Ginsburg case stands

24    for the proposition that you so well articulated.  If the State

25    is advancing the purpose of protecting minors by preventing

1    them from accessing adult content that is inappropriate for

2    them, if that is its true purpose, if that is its sole purpose,

3    and it adopts means that are properly tailored to that

4    interest, that can withstand judicial scrutiny.  Your Honor has

5    no quarrel with that, and I have no quarrel with that.  That

6    is, with all due respect to Mr. Ramsey, not relevant to what

7    this Court needs to decide in looking at this law passed by the

8    State of Texas regulating the Internet, regulating the Internet

9    in ways that intrude upon the rights of adults, in fact, as I

10   note and Mr. Ramsey did not deny it, is designedly, it is

11   designedly meant to interfere with adults' access to adult

12   content.  That's what the disclaimers tell you.  That's what

13   the gerrymandering of the law tells you.

14           THE COURT:  Just like I had to call it a day for

15   Mr. Ramsey, I'm going to call it a day for you.

16           MR. SHAFFER:  Thank you, Your Honor.

17           THE COURT:  Thank you very much.  Counsel, I want to

18   thank you so much for your briefing in this matter.  It's been

19   thorough, both counsel for the State have done an excellent

20   job, and I appreciate it.  Listen, federal judges at every

21   level, and I sit by designation on the Ninth Circuit Court of

22   Appeals on a regular basis and have for 30 years, so I know

23   that they appreciate, the Court of Appeals appreciates it as

24   much as the District Court does, good lawyering, and that is

25   true for both sides.  I think there's been very good lawyering

1    here.  You could not have a more opposing views of this statute

2    because you're both zealous advocates for the rights of your

3    client and that's what you're supposed to do in a federal

4    court.  You're supposed to advocate for your client.  It

5    doesn't necessarily mean that you agree or disagree with their

6    personal opinions, but it does mean that you do the very best

7    job possible to represent their interest ethically and I think

8    professionally, and both sides have done that.  I don't give

9    this kind of accolade out lightly, believe me.  I've been a

10   federal judge for almost 36 years now.  I've been around and

11   I've seen good lawyering and I've seen not so good lawyering in

12   my career.  And I was a trial lawyer before that in the federal

13   system, so I do appreciate good lawyering.

14           All right.  I'm going to take this under advisement.

15   We do have a deadline here.  I unfortunately had a different

16   State case yesterday having to do with floating buoys and

17   concrete blocks.  I've got to get that one out pretty quickly

18   too, and then tomorrow I've got yet another one, so this is my

19   week for preliminary injunction hearings, so I'm going to do

20   the very best I can to get this out as promptly as I can

21   consistent with giving it the kind of treatment that it

22   deserves.  And I'm glad to have been able to hear from you.  I

23   think your arguments have been enlightening and helpful, and I

24   try to put out a reasoned opinion.  I don't just put the Court

25   has heard the preliminary injunction motion, the motion is

 1    denied or the motion is granted, you know, two pages.  I don't
 2    do that.  You're going to get a reasoned decision.  A lot of
 3    judges think that's foolish because it gives the Appellate
 4    Court an opportunity to microscope your decision and find flaws
 5    in it, so be it.  That's okay.  My job is to provide a
 6    thorough, reasoned opinion, and you will get one.  You may not
 7    agree with it.  Somebody is not going to agree with it, but I
 8    will relate something to you that a judge who sat on the
 9    federal bench for almost 50 years said to me when I first
10    became a federal judge.  He was a great guy, he was a mentor of
11    mine.  He said, *"David, I want you to remember something..."* he
12    was an old Kansas rancher.  He said, *"When people walk out of*
13    *the courthouse, half the lawyers are going to think you're the*
14    *front end of the horse and the other half are going to think*
15    *you're the other side, and you just have to live with it."*
16    Thank you very much.
17            COURT SECURITY OFFICER:  All rise.
18            *(3:09 p.m.)*
19                         *   *   *
20
21
22
23
24
25

1                    *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  September 1, 2023

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25

**Exhibit E: Declaration of Tony Allen (ECF 27-4)**

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC, et. al., | § § § | |
| *Plaintiffs,* | § | |
| v. | § § | Civil Action No. 1:23-cv-00917-DAE |
| ANGELA COLMENERO, in her official capacity as Interim Attorney General for the State of Texas, | § § § § | |
| *Defendant.* | § | |

---

**DECLARATION OF TONY ALLEN**

---

1.  I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.

2.  I am a Chartered Trading Standards Practitioner and Global Subject Matter Expert on Age Assurance Systems. I am the Technical Editor of ISO/IEC 27566 — Information security, cybersecurity and privacy protection — Age assurance systems — Framework. I am the author of the Law of Age Restricted Sales in England and Wales.

3.  I am also the Founder and Executive Director of the Age Check Certification Scheme, the leading UK Accreditation Service approved auditor and technology testing service for the global age assurance industry. I am also an audit member of the Age Verification Providers Association (AVPA) – the global trade association representing the age assurance industry.

4.  I have personal knowledge of the history, process, and logistics of online age assurance (as defined herein).



1

5.  I have also been closely involved in the development of age assurance legislation in the United Kingdom and elsewhere in the world, including the United States of America.

6.  I have reviewed H.B. 1811, the Complaint, and Plaintiffs' Motion for Preliminary Injunction with its supporting declarations.

7.  Based on my knowledge and experience, modern technology is capable of allowing providers of content, goods and services on the internet to verify the ages of their consumers without jeopardizing either the providers or consumers' interests in both free speech and privacy.

8.  Further, the burden upon both providers of internet content, goods or services and consumers in verifying age is minimal, and reducing as technology evolves ever more.

9.  Based on my knowledge and experience, software filters on devices, when properly installed, can be a useful parental tool in protecting children from online pornography, but in practice only provide a partial solution. They are less effective than, and not a substitute for, website-based age assurance which delivers a substantively different policy intent.

### The availability of age verification services and how they work

10. Age Verification in the context of H.B. 1811 and defined more fully herein is the process by which the provider of internet content that is harmful to minors ("Content Provider") verifies that the consumer of the content is age 18 or older.

11. Age verification is not a new or rare technology.  It is widely used by thousands of sellers and their consumers on a daily basis around the world, in a variety of contexts, such as alcohol and tobacco sales, gambling, gaming and, to a growing extent around the world, accessing pornography. I am aware that age verification is already actively deployed by many adult content service providers including Dorcel, Only Fans, Jacqui & Michel, StripChat, PornHub, MyDirty Hobby, Clips4Sale, MYM, Skokka, Live Jasmin, FanCentro, Loyal Fans, Viva Street and

xHamster, who are all subscribers to at least one Age Verification Provider, a company mentioned by the Plaintiff's called, Yoti[1]. These companies have applied age verification to one extent or another to their services elsewhere in the US, but also in the UK, France, Germany, Italy and in some cases, globally. PornHub have issued public information about their existing approaches to age verification[2].

12. Further, age verification providers continue to grow in number and continuously improve age verification technology. The Age Verification Providers Association began in 2018 with just six members. It now has twenty-four members and there are at least forty providers competing in the global market.

13. Age verification began in rudimentary style, perhaps with a faxed copy of a driver's license, but is now far more sophisticated, far less expensive, and employs robust safeguards for privacy concerns.

14. With the explosion of pornography on the internet, representative governments, including multiple states in the United States and many countries around the world, have looked for ways to protect children from harmful places on the internet, while simultaneously protecting rights of speech and privacy. The goal is to create safer places online where children can enjoy and benefit from the opportunities created by the worldwide web[3].

*Privacy and the security of data*

15. At the same time, Europe was implementing the General Data Protection Regulations ("GDPR"), a strict data protection regime requiring application of the principles of privacy-by-

---

[1] https://www.yoti.com/
[2] https://www.pornhub.com/press/show?id=2172
[3] https://ec.europa.eu/research/participants/documents/downloadPublic?documentIds=080166e5d f252f14&appId=PPGMS

design and data minimization. This reinforced the need to devise a way to prove a user's age without disclosing their identity. In the United States, Consumer Privacy Protection Laws containing similar provisions, such as the CCPA (or California Consumer Privacy Act) are also now in place. In Texas, the Texas Data Privacy and Security Act (TDPSA) contains objectives to limit the collection of personal data to what is adequate, relevant, and reasonably necessary in relation to the purpose of processing as disclosed to the consumer[4]. Consistent with these objectives, H.B. 1811 includes a requirement not to store personal data used for the purpose of age verification. See Texas H.B. 1811 § 29B.002(b)[5].

16. In light of the foregoing, the most straightforward solution was to create trusted Third-Party Servicers who would carry out the age checks, and then pass on only the outcome of those checks to the sites a user wished to visit. The various data protection laws globally, including in Texas, insist that providers only collect, process, and retain the data required for the specified purpose. So, generally where an Age Verification Provider obtained a consumer's personal information in order to confirm a user's age, it then had no further need to retain that data, and could delete it forthwith, storing only a user's account name, their age, and some form of password. This approach, therefore, does not require that all visitors to an adult website transmit to it their personal information and pre-empt any data breach similar to the example of Ashley Madison. [6]

17. Age Assurance Providers who are members of the AVPA and, thus sign up to its code of conduct[7], do not create new central databases when conducting age checks for the adult industry.

---

[4] See, Tex. H.B. 4, 88th Leg., 1st C.S. (2023)

[5] "(b) A commercial entity that performs the age verification required by Subsection (a) or a third party that performs the age verification required by Subsection (a) may not retain any identifying information of the individual" TEXAS H.B. 1811 § 29B.002(B).

[6] See, e.g., Kim Zetter, Hackers Finally Post Stolen Ashley Madison Data, Wired, Aug. 18, 2015, https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data

[7] https://avpassociation.com/membership/avpa-code-of-conduct/

There are, of course, sectors such as online gambling where regulators require audit trails, but H.B. 1811 requires, and indeed the industry's general practice is, not to retain any personal information after an age check is completed. These audited providers do not create new databases of personal data, nor track the behavior of individuals online.

18. During age verification processes, Age Verification providers apply the same degree of security you would expect in financial transactions.

19. Specifically, age verification companies must act to protect personal data and demonstrate their adherence to this through various forms of certification (e.g., ISO 27001, SOC2, CyberEssentials, BSI PAS 1296, etc.) to ensure personal data is dealt with securely.

20. In addition to local laws, such as GDPR in the UK and EU, there is an industry-wide certification protocol, operated by government approved auditors, which tests providers against international standards.  This not only assesses the efficacy of the age check, but also of the data security and privacy measures.  New standards are being developed by the IEEE and ISO which will ensure that age verification processes and procedures are kept up to date.  Adult websites serving users in Texas may choose to use commercially available Age Verification providers certified by these regulatory bodies, not only to consolidate their defense against potential legal claims, but also to build consumer trust and confidence.

21. In 2017, the UK government passed the Digital Economy Act which included a provision that sought to ensure that minors could not normally access pornography without age verification. Both consumers and the adult websites themselves expressed concerns about privacy – particularly the risk that a treasure trove database of users' identities connected to the adult websites they chose to visit would be exposed by hackers.  So, from the outset, privacy was a primary objective for those designing technical solutions for the age verification.  Indeed, the Ashley Madison leak in

2015, cited by the Plaintiffs, was front of mind for the adult industry after seeing the user base of that site decimated by news of the breach.

22. Any question about whether an adult site is compliant with an age restricting law requires only a simple and straightforward audit of the verification process; no individual records or personal identifying information are needed.

23. Although Content Providers may perform Age Verification themselves, as set forth further below, Content Providers may, and often do, contract with third-party companies ("Age Verification Providers") to perform the service for a fee. These fees, discussed in paragraphs 56 to 63 of my declaration, are considerably lower than claimed in the Plaintiff's complaint. H.B. 1811 specifically allows for third-party verification. See (ibid) Texas H.B. 1811 § 29B.002(b).

24. When using an Age Verification Provider, a Content Provider directs the consumer to provide personal information directly to the Age Verification Provider who performs the verification and informs the Content Provider only of the result of the check – "pass" or "fail." It does not pass back the personal information. This is usually in response to a binary question (is this user over 18?) to which the answer can only be 'Yes' or 'No'. It is sometimes accompanied by a statement from the Age Verification Provider about how sure they are that their answer is correct (say 99% or 99.9%). It should be noted that whilst this statement can be a very high percentage, it will never be 100%.

25. The Age Verification Provider does not generally retain a consumer's personal Information other than the date of birth, which can be used to respond to subsequent enquiries about that user's age.

26. The verification process need only be performed once per user and, as discussed further herein, the verification results for any individual user may be shared among Content Providers and

other websites, thereby minimizing the need for multiple age verification checks of the same individual.

27. Users may be asked to authenticate when they wish to re-use a previously completed age check. This is the process of confirming the same user who completed the check is the current user. It can be achieved simply with a password or Personal Identification Number (PIN) or for a higher level of assurance, a biometric interaction such as how users currently open their cell phone.

### *Methods of available age verification*

28. A number of methods have been developed, initially to verify age exactly, and more recently, to estimate it with an ever-increasing degree of accuracy.

29. Previous implementations of Age Verification solutions, such as in France where consumers are offered a range of methods from which to choose, showed consumers vary in their preferences of Age Verification method. A choice of methods, rather than a single one, led to greater adoption of age verification.

30. A choice of methods also addresses issues that arise from inclusivity, should any one method not be suitable for an individual.

### *Definitions of age verification*

31. To assist the court with some terminology, I set out here the definitions and terms that are being included in international standards, including ISO/IEC 27566 – Age Assurance Systems – Framework (of which I am the Technical Editor). It is helpful to distinguish three related phrases:

   *a.*  "Age Assurance" is the process of establishing, determining, and/or confirming either age or an age range of a natural person.

   *b.*  There are three categories of Age Assurance:

      i.  "Age Estimation" is age determination performed using inherent features

or behaviors related to a natural person (where age determination is an indication that a natural person is over or under a certain age or within an age range).

ii. "Age Verification" is age determination based on the validity of a credential that provides information that allows the criterion to be tested.

iii. "Age Inference" is age determination based on the possession of something or access to something from which it can be inferred that only a person over 18 could have that.

32. Age Verification may be achieved by reference to drivers' licenses, passports, electoral rolls, credit reports, cell phone network records, banking, and credit card records. Users may also choose to create a digital identity, and selectively release just their age attributes.

33. Age Estimation, on the other hand, can be achieved by analyzing facial images, voiceprints or game play. The most advanced of these, facial estimation, is accurate to within +/-1 to 1.5 years mean absolute error, according to the latest published data by one certified age assurance provider, Yoti Limited. (https://www.yoti.com/wp-content/uploads/Yoti-Age-Estimation-White-Paper-March-2023.pdf). My certification team has independently verified and validated the results of this testing by Yoti.

34. The value of Age Estimation, as described more fully below, for both Content Providers and consumers is that it does not require consumers to submit any personal information other than suppling a live facial image or saying a short phrase to create a voiceprint.

35. There are a wide range of non-exclusive reasonable age verification methods that Content Providers and Third-Party Services can adopt to assure the ages of their users to varying degrees of certainty. These methods are used across the full range of situations where online age checks are required and have been certified by the Age Check Certification Scheme, which I manage.

36. Those which would be appropriate for implementing H.B. 1811 include the following;

8

### a. *Review of Government Issued Documents*

A reliable, physical identity document can be reviewed, and the age details noted.  Users will typically submit an image of one or more of these documents using a smartphone camera. Technology, known as optical character recognition (OCR) reads the data from the document which is then validated based on known security features built into the form of ID used. The photo on the document can also be compared to a freshly taken photo or video of the user, which is known as a "liveness" check. For the highest levels of assurance Near Field Communication (NFC) technology can be used to allow a smartphone to read a microchip in the document where this is available, and the data on the chip compared to the image on the document, and a fresh photo or video of the user.

### b. *Review of Credit reports and other private sector databases*

In this method, users typically enter their name, address, and date of birth  (Either specifically for the purposes of age verification or as part of their account opening or purchase process for the website they wish to access), and a search is made of credit reports or other reliable databases to confirm the details are accurate and obtain or confirm the date of birth.  Often, this form of check is used where the user will need to be located at the address claimed as part of this process, to prevent users entering the information of other people, so it is well suited to the delivery of age-restricted goods.

### c. *Review of digital identity apps*

Digital identity apps or wallets are being certified in certain parts of the world, e.g., UK, Europe, Australia, Singapore - these approaches can enable citizens to share their over or underage status; via selective disclosure, in a data minimized way. Based on information and belief, I understand that Texas does not yet have a state issued digital identification card or app.

### d.   Submission of Credit Card number

In many countries, credit cards are only issued to adults, so the possession and the ability to use a credit card is a potential indicator that someone is over 18, but it is worth noting that this is not universal.

### e.   Review of bank records

Banks generally require a strong level of identification check to open an account, and keep a record of their customers' dates of birth.  Some banks allow trusted third parties to confirm a date of birth supplied to them by the customer with those records.  Typically, the user logs into their own online banking system, and gives approval for the data to be supplied to the third party, which in this case would be the Age Verification Provider.

### f.   Age estimation via facial, voice, or behavioral analysis

It is important to be clear from the outset that age *estimation* technology is not a *recognition* technology; it detects and assesses information, to give an age estimation. This is expanded on below with a particular focus on facial age estimation.

A number of features and characteristics of people change with age. This allows for them to be analyzed to estimate age. An example of this is facial features. When facial age estimation is applied, users are either prompted to share a still or video image, or an existing profile picture can be used, and software then estimates their age. Systems learn how to do this by reviewing thousands of images of people with a known age to spot patterns common to those of the same age, and this means the technology is becoming better by the day.  A live face is detected using liveness detection (as certified by International Standards) and then a pixel level review of the face is undertaken. The image generated by this method does not uniquely recognize any individual, so

is not deemed to be sensitive personal information by law and regulation, but in any event can and should be instantly deleted. In addition, this form of technology is not trained with associated names or addresses.

As stated above, facial age estimation is often falsely conflated with facial recognition technologies. In fact, the facial estimation technique described here is quite distinct from facial recognition. No image matching takes place for the purpose of estimating age.

Facial recognition may separately be used to check that a user relying on a previous age check is still the same individual who completed the check, but that is a separate process required for "authentication" rather than age estimation. Other estimation methods use voiceprints or analysis of how a user plays a computer game.

Presently, to meet a specific legal requirement for a person to be prevented from accessing material or services on the internet under a given age, increased confidence in the certainty of the age of a user of a site is possible by using systems that can be set with a "buffer" of an age level over and above the legally set age requirement. This approach will return a negative result if someone is estimated to be below the buffer age rather than below the legal threshold.  The size of this buffer depends on the level of accuracy required by the Web service, or any regulatory requirements.

This method is inclusive of people of all ages, who do not own or have access to a government issued document. Age Estimation by facial or voice technology is one tool in a toolbelt. For example, for a law that requires a user to be aged 18 or older, such technology may be useful for

assuring that individuals are, say, 21 years or older even if the Content Provider and Age Verification Provider does not know their exact age. For those individuals, no further inquiry is needed. For those, however, whose facial or voice estimation results indicate an age range of under 21, then another Age Assurance method described herein may be used to confirm the exact age of the user.

37. Other methods of reasonable age verification, but which have not been subject to independent testing and certification, may include physical checks and vouching.

*a.  Physical Check*

This is where a user is enrolled into an age assurance program in person. They may be asked to produce a physical proof of age which is checked by a trained member of staff, or it could be left to the judgement of staff to decide if someone looks at least 35, for example, who then certifies the user to be over 21.

*b.  Vouching*

This is where other people with credibility are able to confirm a user's age. They may be professionals, such as teachers or doctors. It is one of the most inclusive methods of age verification, as users do not need to have any documents or particular records.

You can only vouch for someone if all of the following statements apply:

1. you have an existing relationship with the user;

2. you are sure the user is who they say they are;

3. you are in a position of authority in their community; and

4. you have proved your own identity

38. H.B. 1811 allows for a wide range of the reasonable methods described above, giving users a choice that suits their own circumstances and preferences, and ensures accessibility by not narrowly defining acceptable methods which could then exclude certain groups e.g., those without government-issued ID documents.

39. There are other methods of age assurance that are less reliable than those previously discussed and, subject to the facts of any specific subsequent case, may not amount to reasonable age verification methods for the purpose of H.B. 1811.

40. An example is known as Attestation or Self-Declaration. This is not considered a method that provides any assurance about the user's age, but can provide a starting point for the process, and in some cases where there is no risk in believing the answer given is accurate, it may still be fit-for-purpose.  For example, if a child declares they are a child, then it may not be a problem to assume they are and protect them from harmful material on the internet. There are, however, sometimes good reasons to ensure children accessing websites on the internet are really children; for example, to prevent adults impersonating children online, so a more rigorous method is required.

41. Self-declaration is simply asking users to check a box, or enter their age or date of birth – without any additional checking against other data sources. Technical measures can improve reliability slightly – for example, allowing any year of birth to be entered, not only the year from before which the user would meet the site's minimum age requirement, or preventing users applying trial and error by repeatedly amending their age until they are admitted.

42. These weak methods of age assurance would not, on their own, achieve the level of accuracy required for robust age verification, which satisfies the principal international standard for age checks.  They can be used in combination with other age assurance techniques, which is

why they are included in this summary, but on their own, they fall outside the scope of age assurance and the international standards the industry has developed.

*Accuracy of methods, geolocation and circumvention*

43. Each of these age verification methods, alone or in combination, verify age to a different level of certainty.

44. Regulators, or a regulated business, can determine this "level of assurance." For example, regulators or regulated businesses might use different processes for alcohol sales, gambling, pornography access, and knife, gun or ammunitions purchases.

45. The plaintiffs express a concern that "minors can use virtual private networks (VPNs), proxy servers, the "Tor" browser, and numerous other circumventions to bypass the Act's verification requirements with ease." Many online services already block traffic from well-known VPNs. For example, UK television channels the BBC and ITV[8] actively prevent users from pretending to be in a different geographical location in order to access content they would otherwise be unable to view from their real location. The most common way to achieve this is to look out for a single internet protocol (IP) address which is generating significantly more traffic than other IP addresses, which is a characteristic of most VPN traffic. There are specialist services that allow businesses to check if a user's IP address is associated with a VPN or TOR[9], as well as open-source lists[10] to assist sites which wish to prevent the use of VPNs. Generally, only more expensive, premium VPN services offer each user a new and unique IP address which is harder to

---

[8] "Potentially blocked up to 1M pirate viewers in the historic England v. Denmark Euro 2020 match" https://www.geocomply.com/resources/case-study/itv-tackles-streaming-piracy-with-geoguard/
[9] https://focsec.com/
[10] https://github.com/X4BNet/lists_vpn/blob/main/ipv4.txt

identify and block.  These are considerably more expensive than the most widely used VPNs, making it harder for most minors to take advantage of their services.

46. The online gaming industry already makes extensive use of compliance services which require gaming operators to validate a customer's location to prove that the customer is located in a state or jurisdiction which permits online betting and gaming. One of the leading geolocation compliance providers is GeoComply. The company is licensed by state gaming regulators and its technology is tested for accuracy and adherence to regulatory standards. GeoComply conducts up to 1 billion geolocation transactions monthly from apps installed on 400m devices worldwide which allow a user to prove where they really are located. The company "Collects geolocation signals from multiple sources, including: GPS, WiFi, GSM, browser/HTML5 and IP address" to verify location accuracy. Further, GeoComply technology detects the use of location "spoofing" software or other methods of location obfuscation as is required under various state laws and regulations[11].

47. Age verification providers have invested heavily in anti-spoofing technology.  This includes a number of techniques intended to reduce circumvention or 'spoofing' of age verification systems, including:

   *a.*   Liveness detection is generally deployed to ensure that where a facial image is used for facial age estimation, or is required for comparison with the photograph supplied as part of a government-issued ID, it is of a live human being who is presently using the device through which the age check is being completed.

---

[11] https://cdn.geocomply.com/wp/app/uploads/20230518141903/GeoComply-Core_Brochure_Gaming.pdf

*b.*   Fake or altered documents are detected using a wide range of techniques.   For example, AU10TIX employs a dual-layered defense against fake or altered documents.   The aim is to combat not just visible fraud but also professional, organized-crime level of manipulations that employ advanced tools and possibly insider-expertise. AU10TIX case-level detection goes forensic in detecting altered as well as "manufactured" fakes, while AU10TIX traffic-level detection is detecting professional attack behavior, even when document manipulations are well hidden.

*c.*   The combination of case-level forensics and traffic-level detection has shown that the currently known fraud statistics do not reflect the actual magnitude of fraud activity, with more sophisticated fraud (such as one utilizing generative AI Deepfake) technology actually showing constant increase "thanks" to the increasing availability of off-the-shelf tools.

*d.*   Stolen documents can be detected by checking against published lists of compromised identity documents.

48. In general, the objective of most legislation in this field has been to ensure that sexually explicit content is not normally accessible by minors.   In other words, most children should be prevented from seeing most adult content most of the time.   Neither age verification nor age estimation techniques can guarantee 100 per cent accuracy, any more than staff in an adult bookstore are infallible when they check the age of their customers.   But the technology is more than capable of preventing an adult website from knowingly giving access to children, as is the standard required in H.B. 1811[12].

---

[12] "CIVIL PENALTY; INJUNCTION. (a) If the attorney general believes that an entity is knowingly violating or has knowingly violated this chapter..." TEXAS H.B. 1811 § Sec.129B.006.

*Re-usability*

49. Businesses can offer their users a wide-range of privacy-preserving methods to estimate their age to a level of assurance that is proportionate to the level of risk presented by a site. Once an age verification check has been completed for one site, it is technically possible to re-use the outcome of that same check across any other website through a network that enables interoperability across websites through cooperation between their age verification technology suppliers.  Regulators, standards bodies, or the interoperability networks themselves may place limits on the duration for re-use.

50. This approach means the technology exists now to ensure that H.B. 1811 does not threaten the principle of navigating seamlessly between many websites operated by unrelated entities. In effect, it asks users to take a small step, equivalent in the real world to wearing a seatbelt and using car seats, to protect children from online harm.

51. Historically, the Age Verification industry realized around 2020 that users may be willing to help a site assure their age if they wish to open an account that will last them a lifetime, but for sites they are just visiting temporarily, this could quickly become inconvenient and expensive. Recognizing this, the age verification industry has invested in delivering a mechanism that allows for the re-use of one age check across multiple websites.

52. A project was developed in six member states of the European Union, but has since opened up worldwide and includes major US companies to further develop the concept. The euCONSENT project, funded by the European Commission, was a successful proof of concept where 2,000 individuals from five countries visited three age-restricted websites in turn, relying on a check completed at the first site to access the other two.  The project is now being put into live operation

in Europe, and a similar solution may be made available in the United States, as many states, including Texas, move to require age verification.

53. Users can choose to agree to accept a token on their device that merely indicates to websites they visit later that the user has already had their age verified, so these websites don't trouble the user again but instead ask the organization which did the first age check if this user meets their age condition.  All this is done without sharing any identity details; nor is the user's age stored within the token to preserve their anonymity. As these are held locally on the device, there is no centralized 'honeypot' of data that could be the target of a hack (this is sometimes referred to as decentralized identity attributes). This significantly reduces the risk of data compromise at scale and, in any event, it only indicates that a user is over 18 and nothing about the reasons why they may have needed to prove that (it could be buying tobacco, gambling, gaming, car hire, accessing pornography or anything with an age-related eligibility criteria).

54. The age verification industry has developed reusable solutions and cooperated to develop and pilot interoperability so that age-assurance processes add little to no delay to a user's access to the internet, as their clients do not wish to drive any users away.

55. The convenience of interoperable and reusable age checks will avoid any problematic second-order effects. For example, this approach means that new websites and apps that users do not yet trust with their personal information need not ask them to provide it, as they will be able to rely on a check completed through a site that the user already trusts.

### The Cost of Age Verification

56. The leading sector requiring robust age verification was online gambling.  As an industry with a strong return per customer, it tolerated relatively high costs per age check, perhaps as much

as a dollar each.  Naturally, as the Age Verification industry grew, competition put downward pressure on pricing, and it certainly halved relatively quickly.

57. Alongside competitive pressures, underlying costs were also falling.  The earliest age verification methods almost all relied on accessing third party databases such as credit reports for which there was a substantial cost per check.  The more successful providers secured volume discounts but were still facing a high fixed cost base. Naturally, providers looked for cheaper ways to deliver their services, so they looked beyond credit reports to banking and telecoms where good quality data was available at a much lower cost, or even at no variable cost at all.

58. The Plaintiff has set out a table of costs in their complaint (at paragraph 46). In my opinion, the Plaintiffs are quoting costs for identity verification here (sometimes referred to as 'Know-your-customer' (KYC) checks). These are of an order more expensive than age verification checks (which are merely verifying one attribute (your age) and not all aspects of your identity (like full legal name, address, previous addresses, marital status, credit, etc).

59. As a leader of an independent conformity assessment body, I cannot speak to the specific pricing offered by every individual provider, but the UK Government recently published an Impact Assessment for the Online Safety Bill which estimates the cost per check to be twelve cents (converted from pence), with a caveat this cost is expected to continue to fall through innovation, competition and interoperability.  I am aware of some providers who offer age verification at no cost to certain sectors as part of a wider digital identity service and others have shared with me further details of their pricing which they are content to be shared in public.

60. Trustmatic, one of the providers quoted by the Plaintiff, have been willing to confirm that the plaintiff has incorrectly interpreted its pricing. Face biometric based age verification, according to their public pricing on our website, starts at EUR 0.39 per verification (for 100 monthly

verifications) and goes to EUR 0.14 per verification (for 30,000 monthly verifications). While this provider does not publicly publish pricing for volumes above 30,000 monthly, it has confirmed that it would charge EUR €18,000 for 100,000 verifications, not USD $40,000 as stated by the plaintiff. The claim that Trustmatic's pricing for 1M and 100M transactions is EUR 0.40 per TRX is therefore also incorrect. Their batch pricing for a batch of 1M transactions is EUR €50,000, or EUR 5 cents each; for a batch of 100M, they would charge €1 million, which is just 1 EUR cent each. To give a specific example, in order to help MindGeek fulfil legal obligations under the Bill, and to help address the issue of minors accessing restricted online content, Trustmatic would consider pricing of not more than EUR 3 cents per user to carry out selfie-based age checking on their users based in the State of Texas (subject to scoping – obviously this does not constitute a legally binding offer).

61. Yoti, another provider quoted by the Plaintiff, have confirmed to me that the pricing of £1.20 is quoted incorrectly, out of context and not relevant for this use case. The sterling £1.20 refers to list price i.e. for low volumes of document based identity verification checks (following the one-off upload of a government issued identity document and including identity document authenticity check, liveness detection, data extraction, face match). List pricing is where an organisation is not accessing any volume discounts - i.e. that would not be the case of a global adult site. Yoti state that their Age Verification Service (AVS) pricing ranges between $0.03 (for large volumes eg circa 100 M, $0.10 for circa 5M checks and $0.31 for lower volumes, one time account based checks e.g. under 100,000). They also offer free, $0.0 shares of 18 plus attributes from the reusable Yoti digital identity app, as explained below. The pricing will be dependent upon the age method, monthly volumes and whether the relying party is performing a one-time account based age check or an anonymized returning guest age check.

62. It is also important to highlight that adult content websites can be configured to recognize age attributes from certain age verification app wallets or data stores. These can sometimes be shared free of charge, including the Yoti app which is free for anyone sharing Over Age (eg Over 18). This is a one-time setup, taking 3-5 minutes, which can be created any time and thereafter reused to share age or identity details, privately, with relying parties across multiple industries.

63. The plaintiffs refer to a 700-word blog[13] by Jason Kelley, Activism Director at the Electronic Frontier Foundation, and its Senior Staff Attorney, Adam Schwartz, which argues that "there is no current method that does not carry inherent, unacceptable disadvantages and harms."

*a.* They claim that "This scheme [age verification] would lead us further towards an internet where our private data is collected and sold by default." This is unequivocally prevented by Age Verification providers not retaining centrally, in any new databases, personally identifiable information about the users, or any record of their online behavior. And where facial or voiceprint estimation methods are operated on a user's own device, personal data need not be shared even temporarily, and when it is, it is not retained by certified Age Verification providers.

*b.* The authors further state that "The tens of millions of Americans who do not have government-issued identification may lose access to much of the internet." which ignores the methods of facial and voiceprint age estimation and vouching, that can both enable undocumented people to verify their age online.

*c.* And they are concerned that "anonymous access to the web could cease to exist." The existing age verification industry has as its founding principle that the essence of age

---

[13] See, e.g., Jason Kelley and Adam Schwartz, Age Verification Mandates Would Undermine Anonymity Online, Electronic Frontier Foundation, March 10, 2023, https://www.eff.org/deeplinks/2023/03/age-verification-mandates-would-undermine-anonymityonline

verification is proving your age without disclosing your identity.  The only information given to the sites a user wishes to access is "Pass" or "Fail" in answer to a question about their age qualification.

64. Furthermore, there is no "accessible ledger of adults who view adult content" created by the Age Verification industry, as the plaintiffs fear, because personally identifiable data is not retained.  But even if the anonymized records of users who had proven their age online were somehow deciphered, it would offer only a list of adults who had variously purchased alcohol on the internet, placed a bet online, or any US parent or guardian of a child under the age of thirteen, to whom they had given consent to share their personal data under the Childrens Online Privacy Protection Act (COPPA)[14].  It would be a very long list and give no indication which subset of users had proven their age to access adult content.

65. While it is true that, as the complaint argues, "Hackers are targeting information shared on the internet at exponentially high rates," they are aware there is nothing of interest to be found by targeting certified Age Verification providers who store no personal data.  The example given from Louisiana is of an attack on "MOVEIt" software which allows large amounts of data to be transferred, not of the LA Wallet.[15]  Indeed, LA Wallet has confirmed to me that it was not affected by the recent MOVEit data breach[16].

---

[14] See 15 U.S.C. §§ 6501-6506 and 16 C.F.R. §§ 312.1-312.13

[15] "This attack, reportedly carried out by the Clop ransomware group, did not specifically target mobile driver's licenses in the state or anywhere else, but the nuances of data thievery, such as they are, might get lost on residents, many of whom are skeptical of things like mDLs [mobile Drivers Licenses]."   https://www.biometricupdate.com/202306/theft-of-drivers-license-data-in-louisiana-could-be-a-big-test-for-digital-id

[16] https://nextsteps.la.gov/substitute-notice/

*Adding the latest encryption techniques*

66. In 2022, the French Data Protection Authority, published an article titled Online Age Verification: Balancing Privacy and the Protection of Minors, CNIL (Sept. 22, 2022), http://bit.ly/3EB1ISN [hereinafter CNIL Report].

67. The CNIL Report states:

   *a.*   "The CNIL also recommends, more generally, the use of a trusted independent third party to prevent the direct transmission of identifying data about the user to the site or application offering pornographic content. With its recommendations, the CNIL is pursuing the dual objective of preventing minors from viewing content that is inappropriate for their age, while minimizing the data collected on internet users by the publishers of pornographic sites."

   *b.*   "In order to preserve the trust between all of the stakeholders and a high level of data protection, the CNIL therefore recommends that sites subject to age verification requirements should not carry out age verification operations themselves but should rely on third-party solutions whose validity has been independently verified."

*Age Verification around the world*

68. The EU Better Internet for Kids Strategy mirrors the same desire as H.B. 1811: "Our vision is for age-appropriate digital services, with every child in Europe protected, empowered, and respected online, and no one left behind."

69. The UK Parliament expects to pass the Online Safety Bill in September 2023. This requires "highly effective" age verification or age estimation to prevent children from being exposed to "Primary Priority Content" on social media and adult sites. This content is initially to be defined as relating to suicide, self-harm, dieting and pornography. As when age verification was first developed at scale to prevent minors accessing adult websites, there remains a critical focus on

designing a solution that protects the privacy and data security of users, because this latest Bill is focused on children whose personal data is particularly sensitive. Maintaining the anonymity of children is a core design principle for the age verification sector.

70. It is also worth looking at countries such as Germany, where over 100 age assurance approaches have been reviewed and approved by the KJM regulatory body (https://www.kjm-online.de/aufsicht/technischer-jugendmedienschutz/unzulaessige-angebote/altersverifikationssysteme). There is clearly a healthy eco system of age assurance approaches and methods and many global companies, including some of those association members of the Plaintiff, which are already deploying age assurance approaches in many parts of the world.

71. There are many examples of increasing requirements for age verification for access to adult content online which are all aligned with Texas H.B. 1811.

### *Effectiveness of other methods*

72. Other methods exist to advance the goal of protecting children from harmful material on the internet, including content filtering at the browser and/or the device level.  These are parental controls. They can be device or browser based, applied to local routers in the home, or at the Internet Service Provider level.  The last of these perhaps offers the ability to limit parental discretion by making decisions on what to filter that cannot be overturned by parents.  This is already widely applied to block Child Sexual Abuse Material (CSAM) for example.

73. We know from repeated research by the UK's telecom's regulator, OFCOM, that many parents are unaware of this technology[17]. Those aware of it often do not know how to use it, or

---

[17] (https://www.ofcom.org.uk/__data/assets/pdf_file/0024/234609/childrens-media-use-and-attitudes-report-2022.pdf)

discover their children also know how to use it or have circumvented it some other way. And finally, those who know about it and know how to use it, must still choose to use it. "Just over a quarter of parents used content filters provided by their broadband supplier, where the filters apply to all devices using that service (27%). A much larger proportion (61%) said they were aware of this feature, showing that not all parents are adopting this potentially useful control." Children can be very persuasive, and parents might release the controls to allow them to play a game designed for 18+, unaware the game itself may be a portal to pornographic or other unsuitable content.

74. I do agree with the Plaintiffs that filtering technology includes not only Domain Name System (DNS) filtering, but also artificial intelligence (AI). However, it should be noted that DNS filtering fails when "DNS over HTTPS" is used to cloak a user's usage. This is easily adopted and has been standard for US users since 2019 if they use a Firefox/Mozilla browser, so this control is easily circumvented.[18]

75. The ability of AI, particularly if it only operates locally on the device, browser or router, to detect adult content is also limited. The most widely used approach is digital fingerprinting of known illegal content, for example using PhotoDNA, but this is limited to detecting known CSAM, Terrorist and other illegal content so cannot be considered to be AI based.

76. Filtering has proven an ineffective mechanism, as the level of exposure to adult content by minors clearly demonstrates. A survey of US parents by Kapersky in 2021 found that 48% used parental controls.[19] However, research from the Oxford Internet Institute, University of Oxford

---

[18] https://support.mozilla.org/en-US/kb/firefox-dns-over-https
[19] (https://usa.kaspersky.com/about/press-releases/2021_study-finds-50-of-parents-use-parental-control-apps)

has found that internet filtering tools are ineffective and in most cases, were an insignificant factor in whether young people had seen explicit sexual content[20].

77. Internet service providers are thus exploring many other methods for reducing the exposure of explicit material to general browsers. Google, as an example, has recently announced that it will blur by default search results containing sexually explicit content for all users, not only those who register as minors or turn on their "safe-search" facility[21].

### *What we've learned and what's changed in the last decade*

78. The age-assurance methods discussed above do not necessarily add a new step to a user's visit to a new website or app because through re-usability and interoperability, one age check can be used across multiple sites seamlessly.

79. The user need only complete the age-assurance process once before they can reach their subsequent objectives. For websites and apps where users create accounts, the users may only have to complete the age-assurance process one time. After that, the website or app can store that the user is old enough to access it and authenticate the user when the user presents the login credentials associated with the account. Websites and apps that do not have user accounts need not force their users to repeat the age-assurance process each time the user tries to access the website or app because they can recognize when a user has previously completed an age check and rely on that check again.

80. The Act-mandated age-assurance need not require users to supply any private and sensitive information. For example, facial age estimation can be undertaken without any documentary

---

[20] Andrew K. Przybylski, Victoria Nash. Internet Filtering and Adolescent Exposure to Online Sexual Material. Cyberpsychology, Behavior, and Social Networking, 2018; 21 (7): 405 DOI: 10.1089/cyber.2017.0466
[21] https://techcrunch.com/2023/02/07/google-will-soon-blur-explicit-imagery-in-search-results-by-default/

evidence and either on a SAAS (software as a service) basis or entirely on a user's own device. The latter is offered by AVPA members, Privately and Yoti.[22] There is already technology in use to detect injection attacks (where a fake computer-generated image replaces that from a webcam) and prevent spoofing.

81. The state of Louisiana shows examples of premium and free platforms to view adult content sites deploying age assurance technology, to comply with state laws. In each instance where AVPA members are supplying the service, the adult operator receives an anonymized over age (18+) attribute to allow access to adult content.

82. Age verification technology is clearly working at scale globally, with both small and global brands, where it does not put user privacy at greater risk or merit the other criticisms levelled by the Plaintiffs. The decision to complete the age-assurance process can be an inherently risk-free one for users—i.e., users can select methods that do not require them to disclose personal and sensitive information.

83. Over the past 25 years, the age verification industry has developed a wider range of ways to verify age which offer users choice, including those who do not own or choose to use identity document-based approaches. They can choose, for example, age estimation techniques which do not require ownership or use of a document where the image is instantly deleted. Many hundreds of millions of age assurance checks are now undertaken globally each year. The cost has dropped dramatically, with reusability likely to lead to that trend continuing so there are no longer undue burdens on Web publishers due to the high costs of implementing age verification technologies. Nor would there necessarily be any significant loss of traffic resulting from the use of these

---

[22] *See* https://www.yoti.com/blog/safety-tech-challenge-fund-2021 and https://www.privately.eu/age-estimation/

technologies, except of course from children for whom the sites are unsuitable.  The UK Government estimated in the Impact Assessment for legislation already approved by the House of Commons, a cost per check of twelve cents and lower for high volume platforms but noted cost may reduce further through interoperability and growing competition.  The cost of that one 12 cent check may be defrayed across 100 websites before it might need to be repeated to maintain the ongoing integrity of the age verification ecosystem, and that is only if businesses determine that periodic re-validation is prudent.

84. Concerns about anonymity have also been addressed by developing age verification technology. The age verification sector was created specifically to enable users to access the sites they wished to access through the data minimized sharing of age.  By selecting a trusted third party, even when selective disclosure from full identity document or digital identity wallet is used to prove age, the provider then only confirms "yes" or "no" when a website enquires "is this user an adult?"  In Europe, users are given further reassurance by the enforcement of the General Data Protection Regulations (GDPR) but in the United States, contractual commitments to maintain secrecy and the threat of civil damages claims if that is not applied, offer similar protection.

85. And, of course, users may choose any of many other methods to prove their age, including facial age estimation where neither credit card numbers nor any personal data is required.  Also, Age Verification standards allow for vouching where a user with no documentary proof of age can ask a respected member of their community such as a teacher or doctor to confirm their age.

86. H.B. 1811's age-assurance provision imposes some minimal implementation costs on regulated businesses with zero to minimal lag when a user first accesses an age restricted website – and perhaps, say annually, to revalidate their check.

### *Conclusion*

87. H.B. 1811 does not radically change the internet's architecture, it merely makes it age-aware. It does not require users to share their full identity to go online and engage in constitutionally protected activities. Age checks online can, in fact, be completed in a more privacy-preserving manner than offline, because other personal data visible on a drivers' license is not shown in the process. Any privacy and security risks faced by both adults and children can be managed to the extent consumers demand – to the point with certain methods where there is no greater possibility of breaching either their privacy or security than already exists today when using the internet generally.

88. H.B. 1811 does not jeopardize First Amendment principles but applies the same principles for child protection we have in the real world to the growing online metaverse and should protect children from harm when taking advantage of the many benefits offered by the internet. Many of the Plaintiff's members are already embracing age verification technologies both elsewhere in the United States, but also globally.

### DECLARATION UNDER PENALTY OF PERJURY

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and based upon my personal knowledge.

/s/ _____

Tony Allen, Subject Matter Expert

*Tony Allen*
Tony Allen (Aug 18, 2023 15:32 GMT+1)

Aug 18, 2023

# Texas - Adult - Declaration of Tony Allen FINAL

Final Audit Report                                                             2023-08-18

| | |
|---|---|
| Created: | 2023-08-18 |
| By: | Tony Allen (tony.allen@accscheme.org.uk) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA78Qo5Ehzt0cXggZRijZ_6aaemYRoxrLK |

## "Texas - Adult - Declaration of Tony Allen FINAL" History

Document created by Tony Allen (tony.allen@accscheme.org.uk)
2023-08-18 - 2:29:45 PM GMT- IP address: 150.220.172.34

Document emailed to tony.allen@accscheme.com for signature
2023-08-18 - 2:31:11 PM GMT

Email viewed by tony.allen@accscheme.com
2023-08-18 - 2:31:50 PM GMT- IP address: 150.220.172.34

Signer tony.allen@accscheme.com entered name at signing as Tony Allen
2023-08-18 - 2:32:09 PM GMT- IP address: 150.220.172.34

Document e-signed by Tony Allen (tony.allen@accscheme.com)
Signature Date: 2023-08-18 - 2:32:11 PM GMT - Time Source: server- IP address: 150.220.172.34

Agreement completed.
2023-08-18 - 2:32:11 PM GMT

**Adobe Acrobat Sign**

**Exhibit F: Order Granting Plaintiffs' Motion for a Preliminary Injunction (ECF 36)**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al., | § § § | No. 1:23-CV-917-DAE |
| Plaintiffs, | § § § | |
| vs. | § § | |
| ANGELA COLMENERO, in her official capacity as Interim Attorney General for the State of Texas, | § § § § | |
| Defendant. _____ | § § § § § § | |

ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION

Before the Court is Plaintiff Free Speech Coalition, et al.'s ("Plaintiffs")

motion for a preliminary injunction (Dkt. # 5). On August 23, the Court held a

hearing on the matter. Upon careful consideration of the arguments raised by the

parties in the briefing and at the hearing, the Court—for reasons that follow—

**GRANTS** Plaintiffs' motion as to their First Amendment claims and **GRANTS** the

motion in part as to their Section 230 claims. Defendant Colmenero is

preliminarily **ENJOINED** from enforcing H.B. 1181.

## I. BACKGROUND

This case concerns a law passed by the State of Texas that restricts access to pornographic websites by requiring digital age verification methods and warnings about the alleged harms caused by pornography. *See* Act of June 12, 2023, Ch. 676, § 2 (H.B. 1181) Tex. Sess. Law Serv. (Vernon's) (hereinafter, "HB 1181"). Plaintiffs, comprised of online pornography websites, performers, and advocates, bring suit to stop the law from being enforced before it takes effect on September 1, 2023.

### A.    The Parties

Plaintiffs can largely be split into three categories. First is Free Speech Coalition, Inc. ("Free Speech Coalition"), a nonprofit trade association of adult content performers, producers, distributors, and retailers. (Compl., Dkt. # 1, at 4). Free Speech Coalition assists its members in their First Amendment expression, and its members include adult content performers and businesses that produce and sell adult content. (Id.) Free Speech Coalition alleges that "many of [its] members are . . . gravely concerned about the consequences of [H.B. 1181], but who fear for their safety should they come forward to challenge [H.B. 1181] in court." (Id.). Free Speech Coalition also alleges that it has been forced to divert resources from its normal day-to-day activities in order to track legislation, meet with attorneys,

and engage in risk-management to minimize the harm that age-verification statutes like H.B. 1181 pose to their members.

Second, several Plaintiffs are companies that produce, sell, and license adult content. Many of these are incorporated abroad, while others are U.S.-based companies. Plaintiff MG Premium Ltd. is a Cypriot company that operates SpiceVids.com, Brazzers.com, and FakeTaxi.com, all of which are subscription-based adult-content websites. (Id. at 4–5). MG Premium Ltd writes, hires, and does pre- and post-production work for the adult videos, uploading them to their own sites and to others. (Id. at 5). Similarly, Plaintiff MG Freesites Ltd operates Pornhub.com, which hosts uploaded content owned, copyrighted, and controlled by third parties. (Id.) Plaintiff WebGroup Czech Republic, a.s., operates xvideos.com, a free website that hosts adult videos. (Id.) Plaintiff NKL Associates, s.r.o, operates xnxx.com, which similarly hosts free adult videos. (Id.) Plaintiff Sonesta Technologies, s.r.o. operates BangBros.com, a subscription-based website offering adult videos. (Id. at 6). Plaintiff Yellow Production, s.r.o. owns and produces FakeTaxi and licenses its content to other adult websites, including Pornhub, Xvideos, Xnxx, and SpiceVids.

Three website Plaintiffs reside and principally operate in the United States. Plaintiff Paper Street Media, LLC resides in Florida and operates TeamSkeet, a network of subscription-based adult websites. Paper Street owns the intellectual

property rights to these videos, and shoots with adult performers, writes the scripts, and hires and employs the production teams. (Id.) Plaintiff Neptune Media likewise resides in Florida and operates the MYLF adult content network, which is similarly comprised of several adult-content subscription services and websites. (Id. at 7). Plaintiffs MediaME SRL, a Romanian company, hosts free adult entertainment websites, while Plaintiff Midus Holdings, Inc., another Florida company, operates subscription-based sites. (Id. at 7–8). These companies operating in and outside the United States (collectively, "the Adult Video Companies") oppose H.B. 1181 and allege that it would unconstitutionally restrict their free expression and compel them to post government-mandated speech. They also oppose the law on the basis that it violates the immunity vested on website publishers by Section 230 of the Communications Decadency Act ("CDA").

Third and finally, Plaintiff Jane Doe is an adult performer whose content is featured on several adult websites, including Pornhub.com, as well as CamSoda, Sextpanther, and MyFreeCams. (Id.; Doe Decl., Dkt. 5-6).[1] Doe opposes the restrictions that H.B. 1181 would place on their ability to reach audiences and is

---

[1] As of the date of this order, Defendant has not challenged Jane Doe's pseudonymity. Because her standing is not independently necessary for Plaintiffs' motion to succeed and because Doe has presented facially legitimate concerns regarding intimidation, the Court will allow her to proceed pseudonymously at this early and expedited stage. See U.S. Navy SEALs 1-26 v. Austin, 594 F. Supp. 3d 767, 782 n.5 (N.D. Tex. 2022) (allowing preliminary injunction to proceed before resolving question of anonymity), stay pending appeal denied by 27 F.4th 336 (5th Cir. 2022), appeal dismissed as moot 72 F.4th 666 (5th Cir. 2023). However, the Court will order briefing on Doe's ability to proceed pseudonymously following the issuance of this order.

against the messages websites would have to convey about the purported harmful effects of pornography. (Id.)

Defendant Angela Colmenero is sued in her official capacity as Interim Attorney General for the State of Texas. Plaintiffs bring suit against her under the *Ex parte Young* exception to sovereign immunity, arguing that she has the authority to enforce H.B. 1181. (Id. at 3).

B.    H.B. 1181

On June 12, 2023, Texas Governor Greg Abbott signed H.B. 1181 into law. (Id. at 8). H.B. 1181 is set to take effect on September 1, 2023. H.B. 1181 contains two requirements, both of which are challenged in this litigation. First, the law requires websites to use "reasonable age verification methods . . . to verify that an individual attempting to access the material is 18 years of age or older." H.B. 1181 § 129B.002. Second, the law requires adult content websites to post a warning about the purported harmful effects of pornography and a national helpline for people with mental health disorders. H.B. 1181 § 129B.003.

The law defines "sexual material harmful to minors" as including any material that "(A) the average person applying contemporary community standards would find, taking the material as a whole is and designed to appeal or pander to the prurient interest" to minors, (B) is patently offensive to minors, and (C) "taken

as a whole, lacks serious literary, artistic, political, or scientific value for minors."
Id. § 129b.001.

The law regulates a "commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors . . . ." Id. § 129B.002. H.B. 1181 requires these companies to "comply with a commercial age verification system that verifies age using: (A) government-issued identification; or (B) a commercially reasonable method that relies on public or private transactional data to verify the age of an individual." H.B. 1181 § 129B.003. "Transactional data" refers to a "sequence of information that documents an exchange . . . used for the purpose of satisfying a request or event. The term includes records from mortgage, education, and employment entities." Id. H.B. 1181 does not allow the companies or third-party verifiers to "retain any identifying information of the individual." Id. § 129B.002.

In addition to the age verification, H.B. 1181 requires adult content sites to post a "public health warning" about the psychological dangers of pornography. In 14-point font or larger, sites must post:

> TEXAS   HEALTH   AND   HUMAN   SERVICES
> WARNING:
> Pornography is potentially biologically addictive, is
> proven to harm human brain development, desensitizes
> brain reward circuits, increases conditioned responses, and
> weakens brain function.

> TEXAS HEALTH AND HUMAN SERVICES
> WARNING:
> Exposure to this content is associated with low self-esteem
> and body image, eating disorders, impaired brain
> development, and other emotional and mental illnesses.
> TEXAS HEALTH AND HUMAN SERVICES
> WARNING:
> Pornography increases the demand for prostitution, child
> exploitation, and child pornography.

<u>Id.</u> § 129B.004.

Although these warnings carry the label "Texas Health and Human

Services," it appears that the Texas of Health and Human Services Commission has

not made these findings or announcements.

Finally, the law requires that websites post the number of a mental health

hotline, with the following information:

> 1-800-662-HELP (4357) THIS HELPLINE IS A FREE,
> CONFIDENTIAL INFORMATION SERVICE (IN
> ENGLISH OR SPANISH) OPEN 24 HOURS PER DAY,
> FOR INDIVIDUALS AND FAMILY MEMBERS
> FACING MENTAL HEALTH OR SUBSTANCE USE
> DISORDERS. THE SERVICE PROVIDES REFERRAL
> TO LOCAL TREATMENT FACILITIES, SUPPORT
> GROUPS, AND COMMUNITY BASED
> ORGANIZATIONS.

<u>Id.</u>

H.B. 1181 authorizes the Texas Attorney General to bring an action in state

court to enjoin the violation and recover up to $10,000.00 for each day of a

violation, if it is "in the public interest." <u>Id.</u> § 129B.005. If a minor accesses sexual

7

material, the Attorney General may seek an additional amount up to $250,000.00

per violation. Id.

## II. LEGAL STANDARDS

A.    Preliminary Injunction

A preliminary injunction is an extraordinary remedy, and the decision to

grant such relief is to be treated as the exception rather than the rule. Valley v.

Rapides Par. Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a

preliminary injunction must establish that he is likely to succeed on the merits, that

he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The party seeking

injunctive relief carries the burden of persuasion on all four requirements. PCI

Transp. Inc. v. W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION – LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs' motion and Defendant's response raise four merits issues: (1) do

Plaintiffs have standing to bring suit, (2) is the age verification requirement

unconstitutional, (3) is the health warning unconstitutional, and (4) does Section

230 of the CDA preempt the law? The Court will address each in turn.

A.    Standing

Plaintiffs have standing to bring suit. To have Article III standing, a plaintiff

must "(1) have suffered an injury in fact, (2) that is fairly traceable to the

challenged action of the defendant, and (3) that will likely be redressed by a

favorable decision." Speech First, Inc. v. Fenves, 979 F.3d 319, 330 (5th Cir. 2020)

*as revised* (Oct. 30, 2020) (citing Lujan v. Def's. of Wildlife, 504 U.S. 555, 560–61

(1992)). Here, Plaintiffs bring a pre-enforcement challenge to a statute that

threatens substantial civil penalties. In the context of pre-enforcement challenges,

an injury-in-fact is established when the plaintiff "(1) has an intention to engage in

a course of conduct arguably affected with a constitutional interest, (2) his intended

future conduct is arguably proscribed by the policy in question, and (3) the threat

of future enforcement of the challenged policies is substantial." Fenves, 979 F.3d at

330 (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014)).

    i.    Injury in Fact

Plaintiffs' expression is afforded a constitutional interest. Plaintiffs seek to

produce, distribute, and post legal adult content online, free of overbroad

restrictions and without being compelled to speak about the purported harms of

sexually explicit videos. Jane Doe and members of Free Speech Coalition seek to

continue performances in adult videos with wide audiences. This conduct is

regulated by H.B. 1181, which sets restrictions on when and how adult videos can

9

be posted. Beyond the restrictions on speech, the law interferes with the Adult Video Companies' ability to conduct business, and risks deterring adults from visiting the websites. Finally, "the law is aimed directly at plaintiffs, who . . . will have to take significant and costly compliance measures," which suffices to show pre-enforcement injury. Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 386, 392 (1988). The compliance costs here are substantial, because commercially available age verifications services are costly, even prohibitively so. Plaintiffs' complaint includes several commercial verification services, showing that they cost, at minimum, $40,000.00 per 100,000 verifications.

As to the required disclosures, compelled speech necessarily involves a constitutional interest. Janus v. Am. Fed'n. of State, Cnty., and Mun. Employees, Council 31, 138 S. Ct. 2448 (2018) ("When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions."); see also W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 633 (1943) (noting that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence).

H.B. 1181 imposes substantial liability for violations, including $10,000.00 per day for each violation, and up to $250,000.00 if a minor is shown to have viewed the adult content. Finally, the threat of future enforcement is substantial—

10

the Attorney General has not disavowed enforcement of the law, and there is no reason to believe that the law will not be enforced against those who violate it. "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First*, 979 F.3d at 335 (cleaned up).

Free Speech Coalition has associational standing. An association has standing to bring claims on behalf of its members when "(1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin, 37 F.4th 1078, 1084 (5th Cir. 2022). Free Speech Coalition's members would have standing to sue in their own right, as they suffer the same injuries as the named Adult Video Companies. These interests fall within Free Speech Coalition's mission, which is to advocate for the distribution of adult videos and the First Amendment rights of its performers and producers. *See* Nat'l Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 429 (1963) ("[T]he First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion.").

Defendant contends that Free Speech Coalition lacks associational standing because it has not identified one member with individual standing in its motion for a preliminary injunction. (Def.'s Resp., Dkt. # 27, at 5 (citing NAACP v. City of Kyle, 626 F.3d 233, 237 (5th Cir. 2010)). While an association does have to identify a member with individual standing, it need not do so in the preliminary injunction motion in addition to the complaint. In Plaintiffs' complaint, they identify members of the association, including directors, distributors, and actors. And in their reply, Plaintiffs identify Paper Street Media, LLC, an American company, as a member. (Boden Decl., Dkt. # 28-5, at 2). NAACP v. City of Kyle itself examined associational standing based upon the "evidence in the record," and Plaintiffs likewise identified a member with individual standing in their reply brief. 626 F.3d at 237; *see also* All. for Hippocratic Med. v. U.S. Food & Drug Admin., 23-10362, 2023 WL 5266026, at *11–14 (5th Cir. Aug. 16, 2023) (discussing associational standing based in part on declarations made in support of preliminary injunction).

Beyond their own First Amendment injuries, Plaintiffs have standing for their overbreadth challenge. Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973) ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court

12

to refrain from constitutionally protected speech or expression."); <u>Sec. of State of Md. v. Joseph H. Munson Co., Inc.</u>, 467 U.S. 947, 956 (1984) ("[W]hen there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.").

       ii.     <u>Foreign Websites have First Amendment Protection for Domestic Operations</u>

Defendant repeatedly emphasizes that the foreign website Plaintiffs "have no valid constitutional claims" because they reside outside the United States. (Def.'s Resp., Dkt. # 27, at 6–7). First, it is worth noting that this argument, even if successful, would not bar the remaining Plaintiffs within the United States from bringing their claims. Several website companies, including Midus Holdings, Inc., Neptune Media, LLC, and Paper Street Media, LLC, along with Jane Doe and Free Speech Coalition (with U.S. member Paper Street Media, LLC), are United States residents. Defendant, of course, does not contest that these websites and Doe are entitled to assert rights under the U.S. Constitution. Regardless of the foreign websites, the domestic Plaintiffs have standing.

As to the foreign websites, Defendant cites <u>Agency for Intl. Dev. v. All. for Open Socy. Intl., Inc.</u>, 140 S. Ct. 2082 (2020) ("<u>AOSI</u>"), which reaffirmed the principle that "foreign citizens outside U.S. territory do not possess rights under

the U.S. Constitution." <u>Id.</u> at 2086. <u>AOSI</u>'s denial of standing is distinguishable

from the instant case. That case involved foreign nongovernmental organizations

("NGOs") that received aid—outside the United States—to distribute outside the

United States. These NGOs operated abroad and challenged USAID's ability to

condition aid based on whether an NGO had a policy against prostitution and sex

trafficking. The foreign NGOs had no domestic operations and did not plan to

convey their relevant speech into the United States. Under these circumstances, the

Supreme Court held that the foreign NGOs could not claim First Amendment

protection. <u>Id.</u>

    <u>AOSI</u> differs from the instant litigation in two critical ways. First, Plaintiffs

do not seek to challenge rule or policymaking with extraterritorial effect, as the

foreign plaintiffs did in <u>AOSI</u>. By contrast, the foreign Plaintiffs here seek to

exercise their First Amendment rights only as applied to their conduct inside the

United States and as a preemptive defense to civil prosecution. Indeed, courts have

typically awarded First Amendment protections to foreign companies with

operations in the United States with little thought. *See, e.g.*, <u>Manzari v. Associated</u>

<u>Newspapers Ltd.</u>, 830 F.3d 881 (9th Cir. 2016) (in a case against British

newspaper, noting that defamation claims "are significantly cabined by the First

Amendment"); <u>Mireskandari v. Daily Mail and Gen. Tr. PLC</u>,

CV1202943MMMSSX, 2013 WL 12114762 (C.D. Cal. Oct. 8, 2013) (explicitly

noting that the First Amendment applied to foreign news organization); Times Newspapers Ltd. v. McDonnell Douglas Corp., 387 F. Supp. 189, 192 (C.D. Cal. 1974) (same); Goldfarb v. Channel One Russia, 18 CIV. 8128 (JPC), 2023 WL 2586142 (S.D.N.Y. Mar. 21, 2023) (applying First Amendment limits on defamation to Russian television broadcast in United States); Nygård, Inc. v. Uusi-Kerttula, 159 Cal. App. 4th 1027, 1042 (2008) (granting First Amendment protections to Finnish magazine); United States v. James, 663 F. Supp. 2d 1018, 1020 (W.D. Wash. 2009) (granting foreign media access to court documents under the First Amendment). It would make little sense to allow Plaintiffs to exercise Frist Amendment rights as a defense in litigation but deny them the ability to raise a pre-enforcement challenge to imminent civil liability on the same grounds.

Second, unlike the foreign plaintiffs in AOSI, the foreign website Plaintiffs in the instant case *do* operate in the United States for all purposes relevant to this litigation. As regulated by H.B. 1181, their speech and conduct occurs in Texas. Their pre-enforcement challenge, by definition, requires Plaintiffs to show that the risk of civil prosecution in Texas is concrete and imminent. AOSI itself reaffirmed that "foreign citizens in the United States may enjoy certain constitutional rights . . . ." Id. at 2086. To the extent their conduct "operates" in the United States and

subjects them to real or imminent liability here, the foreign website Plaintiffs

receive First Amendment protection.[2]

The constitutional rights of foreign companies operating in the United States

is particularly important in the First Amendment context. "The First Amendment

protects speech for the sake of both the speaker and the recipient." Thunder

Studios, Inc. v. Kazal, 13 F.4th 736, 743–44 (9th Cir. 2021), *cert. denied* 142 S. Ct.

1674 (2022). "It is now well established that the Constitution protects the right to

receive information and ideas. This right to receive information and ideas,

regardless of their social worth, is fundamental to our free society." Stanley v.

Georgia, 394 U.S. 557, 564 (1969) (citations omitted); *see also* Va. State Bd. of

---

[2] Defendant repeatedly suggests that Plaintiffs should not able to avail themselves of First Amendment protections when they have not availed themselves of personal jurisdiction in Texas. (Def.'s Resp., Dkt. #27, at 7, 21). To this end, they rely on a single district court opinion where a foreign plaintiff was determined not to be subject to personal jurisdiction for posting online pornography as related to child sex-trafficking claims. Doe v. WebGroup Czech Republic, No. 221CV02428VAPSKX, 2022 WL 982248 (C.D. Cal. Jan. 13, 2022). Although personal jurisdiction is not strictly before us, the Court is skeptical of this analysis as applied to H.B. 1181. Unlike child sex-trafficking claims, viewing pornography in a state is more directly related to the claims that would be brought by the Attorney General under H.B. 1181. *See* Luv N'care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir. 2006) (examining, among other things, whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts). And foreign pornography websites have been held subject to U.S. jurisdiction in other contexts. Hydentra HLP Int. Ltd. v. Sagan Ltd., 783 Fed. Appx. 663 (9th Cir. 2019) (unpublished); George S. May Intern. Co. v. Xcentric Ventures, LLC, 409 F. Supp. 2d 1052 (N.D. Ill. 2006) (holding out-of-state defendant subject to personal jurisdiction in similar analysis); AMA Multimedia LLC v. Sagan Ltd., CV-16-01269-PHX-DGC, 2016 WL 5946051 (D. Ariz. Oct. 13, 2016). But if there was any doubt, purposeful availment would likely be established when a website knowingly accepts driver's license data from a state resident, transmits that data to the state, and then proceeds to grant that visitor access to the site, as H.B. 1181 requires. *See* Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (examining website interactivity as keystone for personal jurisdiction); *see also* Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 318 (5th Cir. 2021) (noting that courts in the circuit use the Zippo test). At any rate, it is the threat of enforcement, not the existence of personal jurisdiction, that would lead to First Amendment chill.

Pharmacy, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists, the protection afforded is to the communication, to its source and to its recipients both."). To hold otherwise would drastically expand the government's ability to restrict ideas based on their content or viewpoint. States could ban, for example, the Guardian or the Daily Mail based on their viewpoint, because those newspapers are based in the United Kingdom. Alternatively, those websites could be subject to relaxed defamation laws without any First Amendment protection. This is not the law, and the Court does not read AOSI to abrogate First Amendment protection for speech occurring in the United States and directed at the United States but hosted by foreign entities. See Thunder Studios, Inc., 13 F.4th at 743–44 (extending First Amendment rights to foreign plaintiff for purposes of civil lawsuit in the United States); Kleindienst v. Mandel, 408 U.S. 753 (1972) (acknowledging the First Amendment rights of listeners in the United States but noting that they do not override discretionary immigration decisions).

### iii.   Traceability and Redressability

Plaintiffs' injuries are traceable to Defendant, and Defendant does not contest this in her response. (Def.'s Resp., Dkt. # 27). The Texas Attorney General is tasked with bringing civil prosecutions under H.B. 1181. Their injuries will be redressed by an injunction or declaration that the law is unconstitutional. See Natl. Press Photographers Assn. v. McCraw, 594 F. Supp. 3d 789, 800–01 (W.D. Tex.

17

2022), *appeal docketed* No. 22-500337 (May 3, 2022) ("[A] declaratory judgment will have the practical effect of allowing them to exercise their First Amendment rights by removing the fear of prosecution . . . .") (citing *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

B.    Sovereign Immunity

While Plaintiffs raise the issue of sovereign immunity in their preliminary injunction motion, Defendant does not contest the issue in her response. (Def.'s Resp., Dkt. # 27). Because the issue is jurisdictional, the Court will briefly address it. *See, e.g.*, FDIC v. Meyer, 510 U.S. 471, 475 (1994). The Eleventh Amendment typically deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." Moore v. La. Bd. of Elementary & Secondary Educ., 743 F.3d 959, 963 (5th Cir. 2014). Under the Ex parte Young exception to sovereign immunity, lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations. 209 U.S. 123, 159–60 (1908). "For the [Ex parte Young] exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and

thereby attempting to make the state a party.'" <u>City of Austin v. Paxton</u>, 943 F.3d 993, 997 (5th Cir. 2019) (quoting <u>Young</u>, 209 U.S. at 157).

Neither a specific grant of enforcement authority nor a history of enforcement is required to establish a sufficient connection. <u>City of Austin</u>, 943 F.3d 993 at 1001; <u>Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.</u>, 851 F.3d 507, 519 (5th Cir. 2017). There need be only a "scintilla of enforcement by the relevant state official" for <u>Ex parte Young</u> to apply. <u>City of Austin</u>, 943 F.3d at 1002 (quotations omitted). Actual threat of or imminent enforcement is "not required." <u>Air Evac</u>, 851 F.3d at 519.

Colmenero is plainly tasked with enforcing H.B. 1181. Section 129B.006 vests the Attorney General with the exclusive authority to bring an action. H.B. 1181 § 129B.006(a) ("If the attorney general believes that an entity is knowingly violating . . . this chapter[,] the attorney general may bring an action . . . to enjoin the violation, recover a civil penalty, and obtain other relief the court considers appropriate."). Moreover, the attorney general "may recover reasonable and necessary attorney's fees and costs incurred in an action under this section." <u>Id.</u> § 129B.006(b)(6).

Once it is clear that the named defendant is proper, the Court conducts a <u>Verizon</u> "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."

<u>Verizon Maryland, Inc. v. Pub. Serv. Commn. of Maryland</u>, 535 U.S. 635, 645 (2002). The complaint meets these requirements. It alleges a violation of the United States Constitution through the First, Fifth, and Fourteenth Amendments. And the complaint further alleges that the law is preempted by Section 230 of the CDA. The relief is prospective because Plaintiffs seek an injunction prohibiting future enforcement of the law. Plaintiffs' relief falls under the <u>Ex parte Young</u> exception.

      C.     <u>The Age Verification Requirement is Subject to Strict Scrutiny</u>

          i.     <u>Strict Scrutiny Applies</u>

First, the Court must determine which level of scrutiny to apply. H.B. 1181 differentiates between sexual and non-sexual material for minors, so a short overview of historical regulations on minors' access to pornography is helpful. In 1968 in <u>Ginsberg v. State of New York</u>, the Supreme Court upheld a conviction of a person under a state statute that criminalized knowingly providing obscene materials "for minors" to minors. 390 U.S. 629, 638 (1968). Because obscene materials fell outside the scope of First Amendment protection, the Court analyzed the statute under rational basis scrutiny and upheld the law. <u>Id.</u>

However, beginning in the 1990s, use of the "for minors" language came under more skepticism as applied to internet regulations. In <u>Reno v. ACLU</u>, the Supreme Court held parts of the CDA unconstitutional under strict scrutiny. 521

20

U.S. 844, 850 (1997). The Court noted that the CDA was a content-based regulation that extended far beyond obscene materials and into First Amendment protected speech, especially because the statute contained no exemption for socially important materials for minors. Id. at 865. The Court noted that accessing sexual content online requires "affirmative steps" and "some sophistication," noting that the internet was a unique medium of communication, different from both television broadcast and physical sales. Id. at 854. The Court held Ginsberg distinct on four separate grounds and largely found it inapplicable to digital regulations like the CDA. Id. at 864–68.

After Reno v. ACLU, the federal government tried again, passing the Child Online Protection Act ("COPA"), which restricted the ability to post content online that was harmful to minors for commercial purposes. Ashcroft v. ACLU, 535 U.S. 564 (2002); Child Online Protection Act, 47 U.S.C. § 231 (1998). In separate decisions, the Third Circuit held that the law was similarly unconstitutional under strict scrutiny. Am. Civ. Liberties Union v. Ashcroft, 322 F.3d 240 (3d Cir. 2003), aff'd and remanded, 542 U.S. 656 (2004); Am. Civ. Liberties Union v. Mukasey, 534 F.3d 181 (3d Cir. 2008), cert denied 555 U.S. 1137 (2009). Most notably, the Third Circuit held COPA subject to strict scrutiny because its "definition of harmful material is explicitly focused on minors, it automatically impacts non-obscene, sexually suggestive speech that is otherwise protected for adults." ACLU

21

v. Ashcroft, 322 F.3d at 252. COPA has remained enjoined since the Third Circuit

and Supreme Court's ACLU decisions.

Just like COPA, H.B. 1181 regulates beyond obscene materials. As a result,

the regulation is based on whether content contains sexual material. Because the

law restricts access to speech based on the material's content, it is subject to strict

scrutiny. Id.; Ent. Software Ass'n v. Blagojevich, 469 F.3d 641, 649–50 (7th Cir.

2006) (noting courts have applied strict scrutiny to "a number of statutes . . . that

included the Miller language or some hybrid of Miller and Ginsberg"); ACLU v.

Reno, 521 U.S. at 864–68.

Defendant largely concedes that strict scrutiny applies, (Def.'s Resp., Dkt. #

27, at 6, 9), but hopes that H.B. 1181 should "be subject to a lower standard of

judicial scrutiny because it regulates only 'commercial entities, publication and

distribution of material harmful to minors." (Id. at 9 (citing Ashcroft v. ACLU, 542

U.S. at 676 (Scalia, J., dissenting))). As Defendant tacitly acknowledges, a district

court is not at liberty to disregard existing Supreme Court precedent in favor of a

dissenting opinion. Nor is Defendant entitled to contest Plaintiffs' likelihood of

success based on the possibility that the Supreme Court may revisit its precedent.

This Court cannot reduce the applicable level of scrutiny based on a non-binding,

dissenting opinion.

In a similar vein, Defendant argues that Plaintiffs' content is "obscene" and therefore undeserving of First Amendment coverage. (Id. at 6). Again, this is precedent that the Supreme Court may opt to revisit, but we are bound by the current Miller framework. Miller v. California, 413 U.S. 15, 24 (1973).[3] Moreover, even if we were to abandon Miller, the law would still cover First Amendment-protected speech. H.B. 1181 does not regulate obscene content, it regulates all content that is prurient, offensive, and without value *to minors*. Because most sexual content is offensive to young minors, the law covers virtually all salacious material. This includes sexual, but non-pornographic, content posted or created by Plaintiffs. *See* (Craveiro-Romão Decl., Dkt. # 28-6, at 2; Seifert Decl., Dkt. # 28-7, at 2; Andreou Decl., Dkt. # 28-8, at 2). And it includes Plaintiffs' content that is sexually explicit and arousing, but that a jury would not consider "patently offensive" to adults, using community standards and in the context of online webpages. (Id.); *see also* United States v. Williams, 553 U.S. 285, 288 (2008); Ashcroft v. Free Speech Coal., 535 U.S. 234, 252 (2002). Unlike Ginsberg, the regulation applies regardless of whether the content is being knowingly distributed to minors. 390 U.S. at 639. Even if the Court accepted that many of Plaintiffs' videos are obscene to adults—a question of fact typically reserved for juries—the

---

[3] In particular, Miller requires that patently offensive material be so defined by the applicable state statute. Id. That cannot be the case here for H.B. 1181, which defines material only with reference to whether it is obscene for minors.

law would still regulate the substantial portion of Plaintiffs' content that is not "patently offensive" to adults.[4] Because H.B. 1181 targets protected speech, Plaintiffs can challenge its discrimination against sexual material.

Defendant also suggests that the Court consider H.B. 1181 a "time, place, and manner" restriction. (Def.'s Resp., Dkt. # 27, at 6 ("A law requiring porn sites to turn away children is no different than one that prohibits a strip club from operating next to an elementary school or allowing a 13-year-old to enter.")). Again, this seems to be inserted largely for the purposes of Supreme Court review as the notion is plainly foreclosed by ACLU v. Reno. There, the Supreme Court held that a law that "applies broadly to the entire universe of cyberspace" and seeks to protect children from offensive speech "is a content-based blanket restriction on speech, and, as such, cannot be 'properly analyzed as a form of time, place, and manner regulation.'" ACLU v. Reno, 521 U.S. at 868 (quoting Renton v. Playtime Theatres, 475 U.S. 41, 46 (1986)).[5] And while Defendant and amici[6]

---

[4] See, e.g., United States v. Cary, 775 F.3d 919, 926 (7th Cir. 2015) ("[A]dult pornography, unlike child pornography, generally has First Amendment protection."); Farrell v. Burke, 449 F.3d 470, 497 (2d Cir. 2006) ("Pornographic materials—at least those that are not obscene—receive full First Amendment protection when in the possession of ordinary adults . . . ."); United States v. Eaglin, 913 F.3d 88, 99 (2d Cir. 2019) (same).

[5] It is worth further noting that H.B. 1181 does not operate like the sort of "strip club" restriction that Defendant analogizes to. It does not just regulate the virtual equivalent of strip clubs or adult DVD stores. Rather, a more apt analogy would be that H.B. 1181 forces movie theaters to catalog all movies that they show, and if at least one-third of those movies are R-rated, H.B. 1181 would require the movie theater to screen everyone at the main entrance for their 18+ identification, regardless of what movie they wanted to see. Defendant is fully entitled to seek appellate review and reconsideration of existing precedent. But the law is still broader than even those time, place, and manner restrictions.

[6] (Amicus Br., Dkt. # 29-2).

argue that H.B. 1181 is akin to a time, place, and manner restriction because of pornography's secondary effects, they ignore the well-established precedent that "'[r]egulations that focus on the direct impact of speech on its audience' are not properly analyzed under <u>Renton</u>." <u>Boos v. Barry</u>, 485 U.S. 312, 321 (1988); *see also* <u>ACLU v. Reno</u>, 521 U.S. at 868 (same); <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation.").

Because the law regulates speech based upon the content therein, including content deserving of First Amendment protection, it must survive strict scrutiny. To endure strict scrutiny, H.B. 1181 must: (1) serve a compelling governmental interest, (2) be narrowly tailored to achieve it, and (3) be the least restrictive means of advancing it. <u>Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n</u>, 492 U.S. 115, 126 (1989).

ii.    <u>H.B. 1181 Nominally Protects a Compelling State Interest</u>

Plaintiffs concede for the purposes of this motion that Defendant's stated interest here is compelling. It is uncontested that pornography is generally inappropriate for children, and the state may regulate a minor's access to pornography. <u>Ginsberg</u>, 390 U.S. at 63. The strength of that interest alone, however, is not enough for a law to survive strict scrutiny. The state must still show

that H.B. 1181 is narrowly tailored and the least restrictive means of advancing that interest. It fails on both these grounds.

        D.      <u>The Statute is not Narrowly Tailored</u>

              i.      <u>The law is underinclusive</u>

Although the state defends H.B. 1181 as protecting minors, it is not tailored to this purpose. Rather, the law is severely underinclusive. When a statute is dramatically underinclusive, that is a red flag that it pursues forbidden viewpoint discrimination under false auspices, or at a minimum simply does not serve its purported purpose. *See* <u>City of Ladue v. Gilleo</u>, 512 U.S. 43, 52 (1994).

H.B. 1181 will regulate adult video companies that post sexual material to their website. But it will do little else to prevent children from accessing pornography. Search engines, for example, do not need to implement age verification, even when they are aware that someone is using their services to view pornography. H.B. 1181 § 129B.005(b). Defendant argues that the Act still protects children because they will be directed to links that require age verification. (Def.'s Resp., Dkt. # 27, at 12). This argument ignores visual search, much of which is sexually explicit or pornographic, and can be extracted from Plaintiffs' websites regardless of age verification. (Sonnier Decl., Dkt. # 31-1, at 1–2). Defendant's own expert suggests that exposure to online pornography often begins with "misspelled searches[.]" (Dines Decl., Dkt. # 27-1, at 2).

Even more problematic is that H.B. 1181 applies only to the subset of pornographic websites that are subject to personal jurisdiction in Texas. Indeed, Defendant implicitly concedes this when they argue that the foreign Adult Video Company Plaintiffs are not subject to jurisdiction in the United States. If foreign websites are not subject to personal jurisdiction in Texas, then H.B. 1181 will have no valid enforcement mechanism against those websites, leaving minors able to access any pornography as long as it is hosted by foreign websites with no ties to the United States.

In addition, social media companies are de facto exempted, because they likely do not distribute at least one-third sexual material. This means that certain social media sites, such as Reddit, can maintain entire communities and forums (i.e., subreddits), dedicated to posting online pornography with no regulation under H.B. 1181. (Sonnier Decl., Dkt. # 31-1, at 5). The same is true for blogs posted to Tumblr, including subdomains that only display sexually explicit content. (Id.) Likewise, Instagram and Facebook pages can show material which is sexually explicit for minors without compelled age verification. (Cole Decl., Dkt. # 5-1, at 37–40). The problem, in short, is that the law targets websites as a whole, rather than at the level of the individual page or subdomain. The result is that the law will likely have a greatly diminished effect because it fails to reduce the online

pornography that is most readily available to minors. (Id. at 36–38; Dines Decl., Dkt. # 27-1, at 2).

The compelled disclosures are especially underinclusive. H.B. 1181's health warnings apply to websites with one-third sexual material, but these websites will already screen out minors through age verification. By contrast, websites with less than one-third sexual material do not need to post any warning at all, even though they have no age verification requirement. The result is that a health disclaimer, ostensibly designed for minors, will be seen by adults visiting Pornhub, but not by minors visiting pornographic subreddits.

In sum, the law is severely underinclusive. It nominally attempts to prevent minors' access to pornography, but contains substantial exemptions, including material most likely to serve as a gateway to pornography use. Williams-Yulee v. Fla. Bar, 575 U.S. 433, 448–49 (2015) ("[U]nderinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint . . . ."); Brown v. Ent. Merchants Ass'n, 564 U.S. 786, 802 (2011) ("[The] regulation is wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it . . . ."). The Court need not determine whether the under-inclusiveness is independently fatal at this stage. Rather, it is one of many elements of H.B. 1181 that show the law is not narrowly tailored.

ii.   <u>The statute's sweep is unclear</u>

The statute's tailoring is also problematic because of several key ambiguities in H.B. 1181's language. Although the Court declines to rest its holding on a vagueness challenge, those vagueness issues still speak to the statute's broad tailoring. First, the law is problematic because it refers to "minors" as a broad category, but material that is patently offensive to young minors is not necessarily offensive to 17-year-olds. As previously stated, H.B. 1181 lifts its language from the Supreme Court's holdings in <u>Ginsberg</u> and <u>Miller</u>, which remains the test for obscenity. H.B. 1181 § 129B.001; <u>Miller</u>, 413 U.S. at 24; <u>Ginsberg</u>, 390 U.S. at 633. As the Third Circuit held, "The type of material that might be considered harmful to a younger minor is vastly different—and encompasses a much greater universe of speech—than material that is harmful to a minor just shy of seventeen years old. . . ." <u>ACLU v. Ashcroft</u>, 322 F.3d at 268.[7] H.B. 1181 provides no guidance as to what age group should be considered for "patently offensive" material. Nor does the statute define when material may have educational, cultural, or scientific value "for minors," which will likewise vary greatly between 5-year-olds and 17-year-olds.

---

[7] H.B. 1181 is even more problematic than COPA, because it defines "minor" as all individuals under 18, while COPA set the limit at 17. *See* <u>ACLU v. Reno</u>, 521 U.S. at 865–66 (noting that CDA was problematic because it defined minors to include 17-year-olds).

The result of this language as applied to online webpages is that constitutionally protected speech will be chilled. A website dedicated to sex education for high school seniors, for example, may have to implement age verification measures because that material is "patently offensive" to *young* minors and lacks educational value for *young* minors. Websites for prurient R-rated movies, which likewise are inappropriate and lacking artistic value for minors under the age of 17, would need to implement age verification (and more strangely, warn visitors about the dangers of pornography).

Second, H.B. 1181 is subject to multiple interpretations as to the scope of its liability. H.B. 1181 limits its coverage to a "commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors." H.B. 1181 § 129B.002(a). But it is unclear whether "one-third" modifies "material" or "website." Does "material" refer to all content posted on a site, or does it apply to any single piece of content? By example, if a small fraction of YouTube's videos contain sexual material, does it need to verify user's ages with the State? The law's text is vague on this point, but risks enormous financial harm, including fines up to $250,000 per violation if Defendant opts for the broader

interpretation.[8] And the law offers no guidance as to how to calculate the "one-third"—whether it be the number of files, total length, or size.

Third, H.B. 1181 similarly fails to define proper age verification with sufficient meaning. The law requires sites to use "any commercially reasonable method that relies on public or private transactional data" but fails to define what "commercially reasonable" means. Id. § 129B.03(b)(2)(B). "Digital verification" is defined as "information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identify of an individual." Id. § 129B.003(a). As Plaintiffs argue, this definition is circular. In effect, the law defines "identity verification" as information that can verify an identity. Likewise, the law requires "14-point font," but text size on webpages is typically measured by pixels, not points. See Erik D. Kennedy, The Responsive Website Font Size Guidelines, Learn UI Design Blog (Aug. 7, 2021) (describing font sizes by pixels) (Dkt. # 5-1 at 52–58). Overall, because the Court finds the law unconstitutional on other grounds, it does not reach a determination on the vagueness question. But the failure to define key terms in a comprehensible way in the digital age speaks to the

---

[8] This interpretation is problematic because it is severely underinclusive. If the Attorney General adopts the narrower definition, then a website could quite easily evade the law by simply adding non-sexual material up to the point that it constitutes at least two-thirds of the site. Indeed, the cost of hosting additional content may be much lower than the costs of age verification and compelled speech. See (Compl., Dkt. # 1, at 24 (raising the possibility that "a link to all the anodyne content in the local public library" could circumvent the law)). And at that point, the law would effectively become moot, doing little to regulate adult video companies beyond forcing them to host non-sexual materials. If the Attorney General opts for the broader interpretation, then the law encounters other grave challenges by sweeping far beyond its purported effects.

lack of care to ensure that this law is narrowly tailored. *See* Reno, 521 U.S. at 870 ("Regardless of whether the CDA is so vague that it violates the Fifth Amendment, the many ambiguities concerning the scope of its coverage render it problematic for purposes of the First Amendment.").

   iii. <u>The law is overbroad, even under narrow constructions</u>

   Even if the Court were to adopt narrow constructions of the statute, it would overburden the protected speech of both sexual websites and their visitors. Indeed, Courts have routinely struck down restrictions on sexual content as improperly tailored when they impermissibly restrict adult's access to sexual materials in the name of protecting minors. *See, e.g.*, Ex Parte Lo, 424 S.W.3d 10, 23 (Tex. Crim. App. 2013) (striking down restrictions on "grooming" as overbroad and not narrowly tailored); Garden Dist. Book Shop, Inc. v. Stewart, 184 F. Supp. 3d 331, 338–40 (M.D. La. 2016) (striking down law that criminalized publication of "material harmful to minors" under strict scrutiny); Am. Booksellers Found. for Free Expression v. Sullivan, 799 F. Supp. 2d 1078 (D. Alaska 2011) (striking down law that restricted dissemination of material depicting sexual activity under strict scrutiny); ACLU v. Johnson, 194 F.3d 1149, 1158–60 (10th Cir. 1999) (distinguishing Ginsberg and following Reno to find a statute criminalizing dissemination of material harmful to minors was overbroad); PSINet, Inc. v. Chapman, 362 F.3d 227, 234–36 (4th Cir. 2004) (same).

Plaintiffs are likely to succeed on their overbreadth and narrow tailoring challenge because H.B. 1181 contains provisions largely identical to those twice deemed unconstitutional in COPA. *See* <u>ACLU v. Ashcroft</u>, 322 F.3d 240 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004); <u>ACLU v. Mukasey</u>, 534 F.3d 181 (3d Cir. 2008), *cert denied* 555 U.S. 1137 (2009).[9] COPA defined material "harmful to minors" as:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest; (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

*ACLU v. Mukasey*, 534 F.3d at 191 (citing 47 U.S.C. § 231(e)(6)).

By comparison, H.B. 1181 defines material "harmful to minors" as:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest; (B) in a manner patently

---

[9] The Supreme Court's affirmance of the Third Circuit's decision in <u>ACLU v. Ashcroft</u> focused on the type of restriction used, not whether the law was narrowly tailored. *See* <u>Ashcroft v. ACLU</u>, 542 U.S. at 665 ("[W]e decline to consider the correctness of the other arguments relied on by the Court of Appeals."). However, upon remand, the Third Circuit again held that the law was not narrowly tailored in a final decision on the merits. <u>ACLU v. Mukasey</u>, 534 F.3d at 197–98 ("[W]e are quite certain that . . . the Government has not met its burden of showing that [the law] is narrowly tailored so as to survive strict scrutiny analysis and thereby permit us to hold it constitutional."). The Supreme Court declined a petition for writ of certiorari as to the nationwide permanent injunction. Accordingly, while the ACLU discussion of narrow tailoring is not strictly binding authority, the Court affords it substantial weight.

offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated display or depiction of: (i) a person's pubic hair, anus, or genitals or the nipple of the female breast; (ii) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or (iii) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

H.B. 1181 § 129B(6)(B).

The statutes are identical, save for Texas's inclusion of specific sexual offenses. Unsurprisingly, then, H.B. 1181 runs into the same narrow tailoring and overbreadth issues as COPA. In particular, the use of "for minors" and "with respect to minors" has been held overbroad in the context of internet speech. As ACLU v. Ashcroft held:

> The term "minor," as Congress has drafted it, thus applies in a literal sense to an infant, a five-year old, or a person just shy of age seventeen. In abiding by this definition, Web publishers who seek to determine whether their Web sites will run afoul of COPA cannot tell which of these "minors" should be considered in deciding the particular content of their Internet postings. Instead, they must guess at which minor should be considered in determining whether the content of their Web site has "serious ... value for [those] minors." 47 U.S.C. § 231(e)(6)(C). Likewise, if they try to comply with COPA's "harmful to minors" definition, they must guess at the potential audience of minors and their ages so that the publishers can refrain from posting material that will trigger the prurient interest, or be patently offensive with respect to those minors who may be deemed to have such interests.

322 F.3d at 254.

Despite this decades-long precedent, Texas includes the exact same drafting language previously held unconstitutional. H.B. 1181 only exempts sexual material that "taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." H.B. 1181 § 129B.001(6)(C). Material that is sexual will likely satisfy H.B. 1181's test, because it is inappropriate for minors, even though it is not obscene for adults. Any prurient material risks being regulated, because it will likely be offensive to minors and lack artistic or scientific value to them. Although this may be permissible when someone knowingly sells material to a minor, such as in Ginsberg, it is constitutionally problematic applied to online speech, where the speech is necessarily broadcast widely. See ACLU v. Ashcroft, 535 U.S. at 568; Am. Booksellers Found. for Free Expression v. Sullivan, 799 F. Supp. 2d 1078, 1082 (D. Al. 2011) (noting an online statute is "dramatically different" from another statute that "applies only to personally directed communication between an adult and a person that the adult knows or should know is a minor."); Ent. Software Ass'n, 469 F.3d at 649–50 (noting that "a number of statutes have been found unconstitutional that included the Miller language or some hybrid of Miller and Ginsberg" in the context of restrictions on material for minors).

Defendant argues that its language is permissible because the Supreme Court in Sable allowed the government to protect minors from non-obscene material.

(Def.'s Resp., Dkt. # 27, at 17 (citing <u>Sable Commun. of California, Inc.</u>, 492 U.S. at 126)). Defendant stretches the holding of <u>Sable</u> too far. While <u>Sable</u> upheld the government's interest in "shielding minors from the influence of literature that is not obscene by adult standards," it still noted that those restrictions must survive strict scrutiny. <u>Sable</u>, 492 U.S. at 126. Nothing in <u>Sable</u> or Defendant's response differentiates this analysis or restricts the broad scope of H.B. 1181. Moreover, in the <u>ACLU</u> decisions, the Third Circuit found that the addition of "for minors" was constitutionally problematic because it chills substantial speech for adults based on whether it is inappropriate for minors. 322 F.3d at 266–71; 534 F.3d at 190–93, 205–07. And the Supreme Court reaffirmed in <u>Reno v. ACLU</u> that the government may not "reduce the adult population to only what is fit for children." 521 U.S. 875 (cleaned up) (quoting <u>Denver Area Ed. Telecommunications Consortium, Inc. v. FCC</u>, 518 U.S. 727, 759 (1996)).

Accordingly, the <u>ACLU</u> decisions control here. The law sweeps far beyond obscene material and includes all content offensive to minors, while failing to exempt material that has cultural, scientific, or educational value to adults only. At the same time, the law allows other websites to show and display explicit material,

as long as they have two-thirds non-obscene content. The result is that H.B. 1181's

age verification is not narrowly tailored and fails strict scrutiny.[10]

      E.      <u>H.B. 1181 is Overly Restrictive</u>

To endure strict scrutiny, a statute must employ the least restrictive means of

protecting minors. <u>Reno</u>, 521 U.S. at 874 ("That burden on adult speech is

unacceptable if less restrictive alternatives would be at least as effective in

achieving the legitimate purpose that the statute was enacted to serve."). The

government bears the burden to show that less restrictive means would not be as

effective. <u>Ashcroft v. ACLU</u>, 542 U.S. at 669. Again, because H.B. 1181

substantially restricts adults' protected speech, it is not sufficiently tailored.

Nonetheless, the Court also finds that the age verification enforcement mechanism

is overly restrictive.

      i.      <u>Compelled verification chills protected speech</u>

Like the narrow tailoring, this issue has been addressed by the Third Circuit

and Supreme Court regarding COPA. In particular, whereas the Supreme Court did

---

[10] Plaintiffs also ask the Court to hold that H.B. 1181 is unconstitutionally overbroad. In general, "[t]he overbreadth doctrine is strong medicine" that should be employed "only as a last resort." <u>Los Angeles Police Dept. v. United Reporting Pub. Corp.</u>, 528 U.S. 32, 39 (1999). Plaintiffs have standing to challenge H.B. 1181 under strict scrutiny. The law is unconstitutional as it regulates Plaintiffs' websites because it discriminates broadly and uses restrictive means to do so. Plaintiffs' websites are the target of the H.B. 1181, which cannot constitutionally regulate their sites. It necessarily follows, then, that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." <u>United States v. Stevens</u>, 559 U.S. 460, 473 (2010); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1344–48. (2000) (suggesting that certain doctrinal tests logically lead to the conclusion that a statute is facially invalid). It is the structure of the law, and not its application to any particular Plaintiff, that renders it unconstitutional.

not discuss COPA's overbreadth, its did discuss less restrictive means, making it binding precedent. Id. at 666–73. As the district court found, and the Supreme Court affirmed, "Blocking and filtering software is an alternative that is less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them." Id. The Court elaborated that filtering software is less restrictive because "adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information. Even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers." Id. at 667.

Defendant argues that Ashcroft v. ACLU's analysis no longer applies because it was based on the evidentiary record made by the district court in 1999, which is not applicable to the instant case and of limited relevance to modern internet usage. (Def.'s Resp., Dkt. # 27, at 8–12). As Defendant argues, H.B. 1181 uses more secure information, requires companies to delete their data, and is designed for convenience and privacy protection. (Id. at 11). The Court does not dispute that online interactions have changed since the Supreme Court's decisions in 1997 and 2004. See Reno v. ACLU, 521 U.S.; Ashcroft v. ACLU, 542 U.S. But as determined by the facts on the record and presented at the hearing, age verification laws remain overly restrictive. Despite changes to the internet in the

38

past two decades, the Court comes to the same conclusion regarding the efficacy and intrusiveness of age verification as the ACLU courts did in the early 2000s.

First, the restriction is constitutionally problematic because it deters adults' access to legal sexually explicit material, far beyond the interest of protecting minors. The Third Circuit's holding regarding COPA applies equally to H.B. 1181:

> "[The law] will likely deter many adults from accessing restricted content because they are unwilling to provide identification information in order to gain access to content, especially where the information they wish to access is sensitive or controversial. People may fear to transmit their personal information, and may also fear that their personal, identifying information will be collected and stored in the records of various Web sites or providers of adult identification numbers."

ACLU v. Ashcroft, 322 F.3d at 259.[11]

Indeed, as the Third Circuit noted, the "Supreme Court has disapproved of content-based restrictions that require recipients to identify themselves affirmatively before being granted access to disfavored speech . . . ." Id. (collecting cases). The same is true here—adults must affirmatively identify themselves before accessing controversial material, chilling them from accessing that speech. Whatever changes have been made to the internet since 2004, these privacy concerns have not gone away, and indeed have amplified.

---

[11] If anything, the language from ACLU v. Ashcroft is more relevant to today than it was when it was written, given the ubiquity of modern technology.

Privacy is an especially important concern under H.B. 1181, because the government is not required to delete data regarding access, and one of the two permissible mechanisms of age-verification is through government ID. People will be particularly concerned about accessing controversial speech when the state government can log and track that access. By verifying information through government identification, the law will allow the government to peer into the most intimate and personal aspects of people's lives. It runs the risk that the state can monitor when an adult views sexually explicit materials and what kind of websites they visit. In effect, the law risks forcing individuals to divulge specific details of their sexuality to the state government to gain access to certain speech. Such restrictions have a substantial chilling effect. _See_ Denver Area Educ. Telecomm. Consortium, Inc., 518 U.S. at 754 ("[T]he written notice requirement will further restrict viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the patently offensive channel.").

The deterrence is particularly acute because access to sexual material can reveal intimate desires and preferences. No more than two decades ago, Texas sought to criminalize two men seeking to have sex in the privacy of a bedroom. Lawrence v. Texas, 539 U.S. 558 (2003). To this date, Texas has not repealed its

law criminalizing sodomy. [12] Given Texas's ongoing criminalization of homosexual intercourse, it is apparent that people who wish to view homosexual material will be profoundly chilled from doing so if they must first affirmatively identify themselves to the state.[13]

Defendant contests this, arguing that the chilling effect will be limited by age verification's ease and deletion of information. This argument, however, assumes that consumers will (1) know that their data is required to be deleted and (2) trust that companies will actually delete it. Both premises are dubious, and so the speech will be chilled whether or not the deletion occurs. In short, it is the deterrence that creates the injury, not the actual retention. Moreover, while the commercial entities (e.g., Plaintiffs) are required to delete the data, that is not true for the data in transmission. In short, any intermediary between the commercial websites and the third-party verifiers will not be required to delete the identifying data.

Even beyond the capacity for state monitoring, the First Amendment injury is exacerbated by the risk of inadvertent disclosures, leaks, or hacks. Indeed, the State of Louisiana passed a highly similar bill to H.B. 1181 shortly before a vendor

---

[12] The attorney general has explicitly taken the position that state laws remain in place even when held unconstitutional. Fund Texas Choice v. Paxton, 1:22-CV-859-RP (W.D. Tex. filed Aug. 24, 2022) (Def.'s Resp., Dkt. # 33, at 28 (citing Pidgeon v. Turner, 538 S.W.3d 73, 88 n.21 (Tex. 2017)).
[13] See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756 (1976) ("[T]he protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both.").

for its Office of Motor Vehicles was breached by a cyberattack. In a related challenge to a similar law, Louisiana argues that age-verification users were not identified, but this misses the point. *See* <u>Free Speech Coalition v. Leblanc</u>, No. 2:23-cv-2123 (E.D. La. filed June 20, 2023) (Defs.' Resp., Dkt. # 18, at 10). The First Amendment injury does not just occur if the Texas or Louisiana DMV (or a third-party site) is breached. Rather, the injury occurs because individuals know the information is at risk. Private information, including online sexual activity, can be particularly valuable because users may be more willing to pay to keep that information private, compared to other identifying information. (Compl. Dkt. # 1, at 17); Kim Zetter, *Hackers Finally Post Stolen Ashley Madison Data*, Wired, Aug. 18, 2015, https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data (discussing Ashley Madison data breach and hackers' threat to "release all customer records, including profiles with all the customers' secret sexual fantasies and matching credit card transactions, real names and addresses."). It is the threat of a leak that causes the First Amendment injury, regardless of whether a leak ends up occurring.

In short, while the internet has changed since 2004, privacy concerns have not. Defendant offers its digital verification as more secure and convenient than the ones struck down in COPA and the CDA. This simply does not match the evidence and declarations supported in the parties' briefing. Users today are more cognizant

42

of privacy concerns, data breaches have become more high-profile, and data related to users' sexual activity is more likely to be targeted. (Sonnier Decl., Dkt. #5-2, at 44–56; Allen Decl., Dkt. # 27-4, at 4–5). The risks of compelled digital verification are just as large, if not greater, than those in ACLU v. Ashcroft. 322 F.3d at 259.

ii.     Less restrictive alternatives are available

Plaintiffs offer several alternatives that would target minor's access to pornography with fewer burdens on adults' access to protected sexually explicit materials. First, the government could use internet service providers, or ISPs, to block adult content until the adults opt-out of the block. This prevents the repeated submission of identifying information to a third party, and operating at a higher level, would not need to reveal the specific websites visited. If implemented on a device-level, sexual information would be allowed for adults' devices but not for children when connected to home internet.

In addition, Plaintiffs propose adult controls on children's devices, many of which already exist and can be readily set up. This "content filtering" is effectively the modern version of "blocking and filtering software" that the Supreme Court proposed as a viable alternative in Ashcroft v. ACLU. 542 U.S. at 666–73. Blocking and filtering software is less restrictive because adults may access information without having to identify themselves. And the Court agreed with the

43

finding that "filters are more effective than age-verification requirements." Id. at 667. Nor is this cabined to the early 2000s—a 2016 district court in Louisiana likewise expressed a preference for blocking and filtering over age verification. Garden Dist. Book Shop, Inc., 184 F. Supp. 3d at 339.

(a) <u>Defendant's expert highlights alternatives that H.B. 1181</u>

<u>does not allow</u>

Defendant's own expert shows how H.B. 1181 is unreasonably intrusive in its use of age verification. Tony Allen, a digital technology expert who submitted a declaration on behalf of Defendant, suggests several ways that age-verification can be less restrictive and costly than other measures. (Allen Decl., Dkt. # 26-6). For example, he notes that age verification can be easy because websites can track if someone is already verified, so that they do not have to constantly prove verification when someone visits the page. But H.B. 1181 contains no such exception, and on its face, appears to require age verification for each visit. H.B. 1181 § 129B.003. Commercial age verification systems must use "public or private transactional data" which by its definition includes "records from mortgage, education, and employment entities" but does include third-party verification. Id. § 129B.001. The same goes for Allen's discussion of "vouching"—where age is verified based on others' credibility. (Allen Decl., Dkt. # 26-6, at 12). H.B. 1181

44

does not appear to allow for vouching because it is not based on transactional data.

H.B. 1181 § 129B.003.

Similarly, Allen discusses how websites may check age using age estimation

based on a user's voice or face. (Allen Decl., Dkt. # 26-6, at 8, 10–12). But it is not

clear that "transactional" data includes biometric verification. H.B. 1181 §

129B.003. Allen also suggests digital identity apps can make the process easier, but

then acknowledges that "Texas does not yet have a state issued digital

identification card or app." (<u>Id.</u> at 9). In short, Allen identifies multiple ways that

age verification can be less intrusive on users and websites. But H.B. 1181 does not

allow these methods.

(b) <u>Defendant's scientific research emphasizes the benefits of</u>

<u>parental-led content filtering</u>

Beyond Defendant's technical expert, one of their medical surveys also

suggests that content filtering can be effective compared to legal bans. The

position, taken from a literature review of medical research on children's access to

online sexual material, is worth quoting at length:

> In order to contain the risk of inadvertent exposure for
> children, some technical measures may be adopted by
> websites, social networks, Internet search engines and
> Internet providers. **Most search engines offer options for
> safe browsing and are able to block pop-up ads, which
> are one of the most prominent causes of unintended
> exposition to age-inappropriate content**. However,
> **many authors agree that despite the existence of legal**

**bans for minors' use of adult sites and the implementation of these measures, it is concretely extremely difficult to block access**. Although the web is indeed the major source of pornographic material, the problem can hardly be solved by simply adopting technical limitations. Instead, its deep social roots stress the importance of education and communication with parents, teachers and healthcare professionals.

The literature divides strategies of parental approach in mainly two categories: restrictive mediation and active mediation. Restrictive mediation mostly consists of defining rules about the use of Internet in terms of timing, setting and type of online activity, and possibly making use of the aforementioned technical aids. Active mediation, on the contrary, requires a sharper awareness from parents who qualify themselves as promoters of a safe and responsible use of Internet. This kind of mediation seems to be favoured by Italian parents (56%) and mostly chosen when dealing with younger boys and girls. **These mediation strategies have been shown their effectiveness in contrasting the use of [sexually explicit material], and many studies confirm that careful parental control and supervision remain key protective factors**.

(Def.'s Resp., Dkt. # 27-2, at 9–10 (citing Niccolò Principi, et al., *Consumption of sexually explicit internet material and its effects on minors' health: latest evidence from the literature*,74 Minerva Pediatr., 332 (June 2022) ("Principi Article") (internal citations omitted) (emphasis added)).

In short, Defendant's own study suggests several ways that H.B. 1181 is flawed. As the study points out, pop-up ads, not pornographic websites, are the most common forms of sexual material encountered by adolescents. The study also

confirms that blocking pornographic websites and material altogether is extremely difficult to accomplish through "legal bans." And most crucially, the study highlights the importance of content filtering alongside parental intervention as the most effective method of limiting any harm to minors. Defendant cannot claim that age-verification is narrowly tailored when one of their own key studies suggests that parental-led content-filtering is a more effective alternative.

(c) Content filtering is more tailored to sexual material than age verification

Content-filtering also helps address the under-inclusivity issue. At the hearing, Defendant argued that if H.B. 1181 covered more websites, such as search engines, then Plaintiffs would instead argue that it is overbroad. The point is well-taken, but it misses a crucial aspect: the law would be overbroad because age verification is a broad method of enforcement. Under H.B. 1181, age verification works by requiring a user's age at a website's landing page. This forces Texas (and other states) to choose some broad threshold (e.g., one-third) for what percentage of a website must be sexual before requiring age verification. But this is not true for content filtering, which applies to the material on a webpage, not just the site as a whole. So users can browse Reddit, but will be screened from the sexual material within the site by the content filter. (Sonnier Decl., Dkt. # 31-1, at 3–4). Similarly, a user can search Google, but not encounter pornographic images. (Id.) This is the

47

definition of tailoring: content filtering, as opposed to age verification, can more precisely screen out sexual content for minors without limiting access to other speech.

Content filtering is especially tailored because parents can choose the level of access. In other words, parents with an 8-year-old can filter out content inappropriate for an 8-year-old, while parents with a 17-year-old can filter out content inappropriate for a 17-year-old. Using age verification, a 17-year-old will be denied access to material simply because it might be inappropriate for a young minor. Content filtering, by contrast, allows for much more precise restrictions within age groups.

In general, content filtering also comports with the notion that parents, not the government, should make key decisions on how to raise their children. *See* United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 824–25 (2000) ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."). Likewise, even as it upheld obscenity laws, Ginsberg affirmed that "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." 390 U.S. at 639.

Content filtering allows parents to determine the level of access that their children should have, and it encourages those parents to have discussions with their children regarding safe online browsing. As the Principi article notes, it is this combination that is most effective for preventing unwanted exposure to online pornography. (Principi article, Dkt. # 27-2, at 9–10). Age verification, by contrast, places little to no control in the hands of parents and caretakers.[14] Thus, content filtering keeps the "parents' claim to authority in their own household to direct the rearing of their children . . . ." Id.: *see also* Brown, 564 U.S. at 832–35 (2011) (detailing the Founding Era's attitudes towards raising children and noting that the "history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents to direct the development of those children.") (Thomas, J., dissenting).

### (d) Content filtering is less burdensome and more effective

Again, changes to the internet since 2003 have made age verification more—not less—cumbersome than alternatives. Parental controls are commonplace on devices. They require little effort to set up and are far less restrictive because they do not target adults' devices.

---

[14] Parents may only allow access through age verification by providing their ID or credentials to a minor. This is unlikely in light of the obvious awkwardness of a teenager asking their parents' permission each time they wish to view sexual content.

Moreover, content filtering is likely to be more effective because it will place a more comprehensive ban on pornography compared to geography-based age restrictions, which can be circumvented through a virtual private network ("VPN") or a browser using Tor. Adult controls, by contrast, typically prevent VPNs (or Tor-capable browsers) from being installed on devices in the first place. (*See* Sonnier Decl., Dkt. # 31-1, at 3–4). And minors who wish to access pornography are more likely to know how to use Tor or VPNs. (Sonnier Decl., Dkt. # 5-1, at 45).

In addition, content filtering blocks out pornography from foreign websites, while age verification is only effective as far as the state's jurisdiction can reach. This is particularly troublesome for Texas because, based on the parties here alone, foreign websites constitute some of the largest online pornographic websites globally. If they are not subject to personal jurisdiction in the state, they will have no legal obligation to comply with the H.B. 1181. Age verification is thus limited to Texas's jurisdictional reach. Content filtering, by contrast, works at the device level and does not depend on any material's country of origin.

Defendant disputes the effects of content filtering and argues that it is only as effective as the caretakers' ability to implement it. But even as Defendant's technical expert noted at the hearing, content filtering is designed for parents and caretakers to be easy to use in a family. The technical knowledge required to

50

implement content-filtering is quite basic, and usually requires only a few steps. (Sonnier Decl., Dkt. # 31-1, at 3–4; Dkt. # 5-2, at 15–17). And the legislature made no findings regarding difficulty of use when it passed the law.

At the hearing, Defendant's expert repeatedly emphasized that parents often fail to implement parental controls on minors' devices. But Defendant has not pointed to any measures Texas has taken to educate parents about content filtering. And more problematically, the argument disregards the steps Texas *could* take to ensure content filtering's use, including incentives for its use or civil penalties for parents or caretakers who refuse to implement the tool. Indeed, draft bills of H.B. 1181 included such a measure, but it was abandoned without discussion. (Pls.' Reply, Dkt. # 31, at 7). In Ashcroft v. ACLU, the Supreme Court gave this precise argument "little weight," noting that the government has ample means of encouraging content filtering's use. 542 U.S. at 669–70. In short, Texas cannot show that content filtering would be ineffective when it has detailed no efforts to promote its use.

(e) <u>Texas has not met its burden</u>

In sum, Plaintiffs have shown that content filtering offers a more tailored, less restrictive method of ensuring that minors do not access adult sexual content. This finding is not surprising, because Defendant offers zero evidence that the legislature even considered the law's tailoring or made any effort whatsoever to

51

choose the least-restrictive measure. To satisfy strict scrutiny, Texas must provide evidence supporting the Legislature's judgments. *See* Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 195–96 (1997). This is Texas's burden to meet—not Plaintiffs'. Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 171 (2015). But it is virtually impossible for Texas to make this showing when the Legislature did not consider the issue at all. *See, e.g.*, Ass'n of Club Executives of Dallas, Inc. v. City of Dallas, Texas, 604 F. Supp. 3d 414, 426 (N.D. Tex. 2022) ("[N]o evidence was presented that the City considered less restrictive means of achieving its stated interest"); Brewer v. City of Albuquerque, 18 F.4th 1205, 1255 (10th Cir. 2021) ("[W]hile such a less-restrictive-means analysis need not entail the government affirmatively proving that it tried less-restrictive mean . . . it does entail the government giving serious consideration to such less-restrictive means before opting for a particular regulation."). The state cannot show that it made *any* analysis as to the differences between age verification and content filtering, despite established Supreme Court precedent favoring the latter. Ashcroft v. ACLU, 542 U.S. at 668. The complete failure of the legislature to consider less-restrictive alternatives is fatal at the preliminary injunction stage.

Based on the evidence in the parties' briefing, declarations, and hearing testimony, it is clear that age verification is considerably more intrusive while less

effective than other alternatives. For that reason, it does not withstand strict scrutiny.

      F.    <u>H.B. 1181 Unconstitutionally Compels Speech</u>

There is no doubt that H.B. 1181 forces the adult video companies into compelled speech. The law requires that they post three disclaimers, calling pornography "potentially biologically addictive [and] proven to harm human brain development" among other purported neurological issues. H.B. 1181 § 129B.004(1). The sites must also state, "Exposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses." <u>Id.</u> It must also state, "Pornography increases the demand for prostitution, child exploitation, and child pornography." <u>Id.</u> Finally, sites must provide the number of a national mental health illness hotline.  <u>Id.</u>

This is compelled speech. The government is forcing commercial sites to speak and broadcast a proposition that they disagree with. The Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." <u>Janus</u>, 138 S. Ct. at 2463 (collecting cases) (quotations omitted). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command . . . ." <u>Id.</u>; *see also* <u>Nat'l Inst. of Fam. & Life Advocs. v. Becerra</u>, 138 S. Ct. 2361, 2371 (2018)

("NIFLA"). Even if, as Defendant argues, the law compels only commercial

speech, it does not pass constitutional muster.

       i.      Strict Scrutiny Applies to the Disclosures

            (a) The law targets speech by its content, not its commercial

                nature

Although H.B. 1181 targets for-profit websites, the speech it regulates is

likely non-commercial. First, H.B. 1181's compelled disclosures are content-based,

regardless of whether they regulate commercial activity. *See* Cincinnati v.

Discovery Network, 507 U.S. 410, 429–30 (1993) ("It is the absence of a neutral

justification . . . that prevents the city from defending its [] policy as content

neutral."); Sorrell v. IMS Health Inc., 564 U.S. 552, 565 (2011) ("Government's

content-based burdens must satisfy the same rigorous scrutiny as its content-based

bans. . . . Commercial speech is no exception."); Intl. Outdoor, Inc. v. City of Troy,

Michigan, 974 F.3d 690, 706 (6th Cir. 2020) (applying strict scrutiny standard to

content-based commercial regulations); Reed, 576 U.S. at 166 ("Because strict

scrutiny applies either when a law is content based on its face or when the purpose

and justification for the law are content based, a court must evaluate each question

before it concludes that the law is content neutral and thus subject to a lower level

of scrutiny."). H.B. 1181 targets speech based upon the "subject matter [and] its

content." Reed, 576 U.S. at 163. Speakers who promote the regulated subject

matter must then place disclosures on their advertisements and landing pages. The threshold inquiry examines the content of a website, not whether something is an advertisement. H.B. 1181 cannot have effect without reference to content. Therefore, because the law targets speech based on its content, it is subject to strict scrutiny. Discovery Network, 507 U.S. at 429–30; Reed, 576 U.S. at 166.

Separately, the regulation is also content-based under the logic of NIFLA. The heath disclosure notice "compel[s] individuals to speak a particular message" and "such notices alter the content of their speech." NIFLA, 138 S. Ct. at 2371 (cleaned up). As in NIFLA, individuals must "provide a government-drafted script" regarding the controversial effects of pornography, "as well as contact information" for mental health services. Id. And just like NIFLA, the speakers must provide information that is "devoted to opposing" the speaker's actual preferred message. Id. Because the compelled disclosure alters the content of Plaintiffs' speech, H.B 1181 is content-based under NIFLA.[15] The logic of NIFLA demands that the law be subject to strict scrutiny.

(b) The proposed targets are not commercial transactions

Even setting aside Discovery Network and Reed, H.B. 1181 does not regulate commercial transactions related to speech. "[T]he core notion of commercial speech [is] speech which does no more than propose a commercial

---

[15] This applies even if, as Defendant argues, Plaintiffs produce only obscene material.

55

transaction." Bolger v. Youngs Drug Prod. Corp., 463 U.S. 60, 66 (1983) (cleaned

up). Alternatively, speech may be commercial if it constitutes "expression related

solely to the economic interests of the speaker and its audience." Cent. Hudson Gas

& Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 561 (1980).

Unlike cigarettes, lightbulbs, or food content, where compelled disclosures have

been upheld, sexual material is not a fungible consumer good. Rather, "[s]exual

expression which is indecent but not obscene is protected by the First

Amendment." ACLU v. Reno, 521 U.S. at 875. At the outset, then, doctrines

surrounding commercial speech disclosures likely do not apply, because the law

regulates First Amendment-protected activity beyond "propos[ing] a commercial

transaction." And while performers may earn money on sexual expression, they do

not have a "sole" economic interest in that performance.

    Volokh v. James is helpful. 22-CV-10195 (ALC), 2023 WL 1991435, at *7–8

(S.D.N.Y. Feb. 14, 2023). There, the court dealt with a requirement that certain

online platforms create a mechanism to file complaints about "hateful speech" and

disclose the policy for dealing with the complaints. Id. at *1–2. The court found

that the disclosures did not constitute commercial speech because "the policy

requirement compels a social media network to speak about the range of protected

speech it will allow its users to engage (or not engage) in." Id. at 7. The court noted

that "lodestars in deciding what level of scrutiny to apply to a compelled statement

56

must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." Id. at *8 (citing Riley, 487 U.S. at 796). "Where speech is 'inextricably intertwined with otherwise fully protected speech, it does not retain any of its potential commercial character.'" Id. Like Volokh, the law targets protected speech based on its content outside of commercial applications. The lessened commercial speech standard does not apply.

 Defendant argues that the speech is commercial because the landing pages for the paid subscription sites "is nothing more than a place to click and then follow a prompt to enter your payment information . . . ." (Def.'s Resp., Dkt. # 27, at 16). Again, this ignores the content-based nature of the regulation in the first place. But even setting that aside, the argument is dubious. First, existing subscribers will have already paid, so the "proposed commercial transaction" will only apply to new visitors. For returning subscribers, the page is not proposing a transaction. Second, by way of example, several newspapers offer landing pages (or paywalls) that force visitors to purchase a subscription before reading an article. Yet it is doubtful that these websites would have diminished First Amendment rights as a result.[16] It is the content the websites offer, and not the existence of a paywall, that should determine its commercial nature, because paid

---

[16] Similarly, it is doubtful that the government could regulate shrink-wrapped books in a bookstore differently than others because those books require a transaction before accessing the content therein.

access that makes speech commercially viable is "inextricably intertwined" with the speech itself. Riley, 487 U.S. at 796.

Defendant is on slightly stronger footing as to the requirements for advertisements, but the Court still finds them to be inextricably intertwined with non-commercial speech. Plainly, the advertisements by themselves are commercial, to the extent they link to paid-subscription websites, because they propose a transaction. Under Bolger, courts should examine (1) an advertising format, (2) reference to a specific product, and (3) economic motivation for publication. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983).

Setting aside the content-based nature of H.B. 1181 as a whole, the advertisements likely constitute commercial speech, even when those advertisements relate to protected speech. Id. at 66. Plainly, they meet the first and third criteria of Bolger. However, it is a close call whether those advertisements are inextricably intertwined with protected speech. See Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 958 (9th Cir. 2012) ("[T]he inextricably intertwined test operates as a narrow exception to the general principle that speech meeting the Bolger factors will be treated as commercial speech."); Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore, 879 F.3d 101, 108–09 (4th Cir. 2018). Assuming that the law is not content based as a whole, the compelled disclosures are likely commercial as applied to advertising. However,

the difficulty regarding the "inextricably intertwined" standard shows why the compelled disclosures must be considered content-based at the outset. To ignore the content-based nature of the regulation overall would be to allow the government to regulate disfavored speech with less scrutiny, so long as the government only targets the commercial aspects of that speech. Nonetheless, because Defendant considers the disclosures commercial speech, the Court will also analyze them under commercial speech precedent.

ii.   The compelled disclosures do not survive strict scrutiny

Assuming that strict scrutiny applies, the compelled disclosures do not pass constitutional muster. Under strict scrutiny, the law must be narrowly tailored to serve a compelling government interest. *See, e.g.*, Playboy Entm't Grp., Inc., 529 U.S.at 813 (2000). As previously stated, the state has a compelling interest in preventing minors from accessing pornography. However, for many reasons, the disclosures are not narrowly tailored. First, and most critically, the disclosures do not target a minor's access to pornography because a minor will be screened out by the age-verification mechanism. Assuming age-verification works, minors will not be able to access the content on pornographic websites. As a result, the law targets the group *outside* the state's interest (i.e., adults who wish to view legal explicit

materials).[17] A law cannot be narrowly tailored to the state's interest when it targets the group exactly outside of the government's stated interest.

More generally, the state has not met its burden that the disclosures are narrowly tailored in general. They require large fonts, multiple warnings, and phone numbers to mental health helplines. But the state provides virtually no evidence that this is an effective method to combat children's access to sexual material. The messages themselves do not mention health effects on minors. And the language requires a relatively high reading level, such as "potentially biologically addictive," "desensitizes brain development," and "increases conditioned responses." H.B. 1181 § 129B.004. Quite plainly, these are not disclosures that most minors would understand. Moreover, the disclosures are restrictive, impinging on the website's First Amendment expression by forcing them to speak government messages that have not been shown to reduce or deter minors' access to pornography. *See* 303 Creative LLC v. Elenis, 143 S. Ct. 2298, 2312 (2023) ("[T]he government may not compel a person to speak its own preferred messages."). Under strict scrutiny, the disclosures do not survive.

iii.   H.B. 1181 Fails as a Commercial Speech Regulation

---

[17] The state has not argued a compelling interest in preventing *adults* from accessing pornography. Indeed, Defendant argues that the law is permissible precisely because it *does not* restrict adult access. (Def.'s Resp., Dkt. # 27, at 13).

(a) <u>The regulations do not directly advance a substantial</u>

<u>government interest</u>

Even using commercial speech standards, the disclosures do not pass muster.

For a commercial speech regulation to survive, it must directly advance a

substantial government interest and be narrowly tailored so as not to be more

extensive than necessary. <u>Cent. Hudson</u>, 447 U.S. at 566. For the same reasons that

the law fails strict scrutiny, it fails the more relaxed commercial speech standard.

Although the compelled disclosures apply almost exclusively to adults, the state

claims its interest is in "protecting children from porn." (Def.'s Resp., Dkt. # 27, at

16). This is not "directly advancing" the interest because only adults can access the

material on websites that post this warning.  Moreover, the disclosures are plainly

more excessive than necessary, requiring the parties to post in all caps, three times,

"TEXAS HEALTH AND HUMAN SERVICES WARNING." H.B. 1181 §

129.B.004. And, as discussed below, the disclosures state scientific findings as a

matter of fact, when in reality, they range from heavily contested to unsupported by

the evidence. *See infra*, Section III.F.iii.b.

In its response, the state does not assert an interest in protecting *adults* from

non-obscene pornography, who will be the actual target of the messages. It is likely

that this interest would not be substantial or permissible. The mere fact that non-

obscene pornography greatly offends some adults does not justify its restriction to

all adults. *See* <u>Carey v. Population Services Int'l</u>, 431 U.S. 678, 701 (1977)

("[W]here obscenity is not involved, we have consistently held that the fact that

protected speech may be offensive to some does not justify its suppression.");

<u>Matal v. Tam</u>, 582 U.S. 218, 243–44 ("Giving offense is a viewpoint. We have said

time and time again that the public expression of ideas may not be prohibited

merely because the ideas are themselves offensive to some of their hearers.")

(cleaned up); *see also* Robert C. Post, *Cultural Heterogeneity and Law:*

*Pornography, Blasphemy, and the First Amendment,* 76 Cal. L. Rev. 297, 325–26

(1988) ("[T]he government would acquire enormous and intolerable powers of

censorship if it were to be given the authority to penalize any speech that would

tend to induce in an audience disagreeable attitudinal changes with respect to

future conduct.").

      This applies equally to commercial speech. <u>C. Hudson</u>, 447 U.S. at 578 ("No

differences between commercial speech and other protected speech justify

suppression of commercial speech in order to influence public conduct through

manipulation of the availability of information.") (Blackmun, J., concurring);

<u>Zauderer v. Off. of Disc. Counsel of S. Ct. of Ohio</u>, 471 U.S. 626, 651 (1985)

(differentiating government regulations meant to protect consumers from those that

seek to "prescribe what shall be orthodox in politics, nationalism, religion, or other

matters of opinion") (quoting W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)).

In short, if the interest is in protecting children, then it may arguably be substantial, but it is advanced indirectly. If the interest is in changing adults' attitudes on porn and sexuality, then the state cannot claim a valid, substantial interest. Either way, the compelled messages fail under Central Hudson.

(b) Zauderer does not apply

Defendant argues that H.B. 1181 regulates commercial speech in a manner that is "truthful, non-misleading, and [requires] relevant disclosures" and is therefore constitutional. (Def.'s Resp., Dkt. # 27, at 13 (citing Texas Med. Providers Performing Abortion Servs. v. Lakey, 667 F.3d 570, 577 (5th Cir. 2012)). But Texas Med. Providers dealt with speech regarding abortion, and the case adopted its language from since-overruled abortion precedent regarding "undue burdens." Texas Med. Providers, 667 F.3d at 577 (citing Planned Parenthood of S.E. Pennsylvania v. Casey, 505 U.S. 833 (1992), *overruled by* Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228 (2022)). It does not apply to other forms of commercial speech. Instead, the relaxed standard for certain compelled disclosures applies if they contain "purely factual and uncontroversial information." Zauderer, 471 U.S. at 651. If the information is "purely factual and uncontroversial," the government must only show that the compelled disclosures reasonably relate to a

63

substantial government interest and are not "unjustified or unduly burdensome."
Id.

At the initial stage, H.B. 1181 still fails, because the government lacks a
substantial interest that reasonably relates to the regulation. It is unreasonable to
warn *adults* about the dangers of legal pornography in order to protect *minors*. But
even assuming this was a cognizable interest, Zauderer would still not apply. First,
H.B. 1181's messages are unduly burdensome. The requirement requires no fewer
than four distinct messages to be presented each time a person visits the landing
page or advertisement. The disclosures must be in 14-point font size, which is
again unclear and burdensome because digital fonts on webpages are not measured
in points. This is particularly difficult for advertisements, because they rarely take
up an entire page. Often, online advertisements are limited to a small sliver of a
webpage. Requiring large font sizes in the context of advertisements would likely
be overly burdensome because they risk swallowing up the entire advertisement
itself. *See* Ibanez v. Fla. Dept. of Bus. and Prof. Reg., Bd. of Accountancy, 512
U.S. 136, 146 (1994) (holding a compelled message was unconstitutional when it
"effectively rule[d] out" the initial message). And the warnings themselves are
somewhat deceptive. Defendant has not shown that the Texas Health and Human
Services Commission has actually endorsed the message or made the relevant
medical findings, despite requiring speakers to display "TEXAS HEALTH AND

64

HUMAN SERVICES WARNING" three separate times in all caps.[18] Because of the size and repeated nature of the warnings, as well as their potential for misleading visitors, they are likely to be unduly burdensome.

Second, the disclosures are deeply controversial. To receive the more lenient Zauderer standard, the message at issue must be "purely factual and uncontroversial information." Id. Outside of factual and non-controversial information, Zauderer's relaxed standard does not apply. See Hurley v. Irish–Am. Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 573 (1995). The warnings are controversial, both as a matter of fact and opinion.

The Court assumes, at the preliminary injunction stage, that the health disclosures—as opposed to the mental health hotline—are "purely factual."[19] Regardless of their accuracy, the health disclosures purport to show scientific findings. The mental health line, however, is not factual. It does not assert a fact, and instead requires companies to post the number of a mental health hotline. The implication, when viewers see the notice, is that consumption of pornography (or any sexual material) is so associated with mental illness that those viewing it

---

[18] Ironically, while Zauderer allowed the government to regulate deceptive speech, here, it is the government's message that is potentially deceptive. 471 U.S. at 651.

[19] In particular, whether the disclosures are "purely factual" depends on whether scientifically contested statements are still "factual." See, e.g., Nat'l Ass'n of Manufacturers v. S.E.C., 800 F.3d 518, 528 (D.C. Cir. 2015); Am. Meat Inst. v. U.S. Dep't of Agric., 760 F.3d 18, 22 (D.C. Cir. 2014); Am. Beverage Ass'n v. City & Cnty. of San Francisco, 916 F.3d 749, 763 (9th Cir. 2019) (Ikuta, J., concurring in part and dissenting in part). But the Court reserves the "purely factual" question for a later stage, because factual or not, the disclosures are plainly controversial.

should consider seeking professional crisis help. The statement itself is not factual, and it necessarily places a severe stigma on both the websites and its visitors.[20]

Much more seriously, however, is the deep controversy regarding the benefits and drawbacks of consumption of pornography and other sexual materials. Just like debates involving abortion, pornography is "anything but an uncontroversial topic." Natl. Inst. of Fam. and Life Advocates v. Becerra, 138 S. Ct. 2361, 2372 (2018). Defendant's own exhibit admits this. (Principi article, Dkt. # 27, at 2 ("Scientific evidence supporting the negative effects of exposure to [sexually explicit internet material] is controversial, and studies addressing this topic are difficult because of important methodological discrepancies.")). As a political, religious, and social matter, consumption of pornography raises difficult and intensely debated questions about what level and type of sexual exposure is dangerous or healthy. See, e.g., Jeneanne Orlowski, *Beyond Gratification: The Benefits of Pornography and the Demedicalization of Female Sexuality*, 8 Modern Am. 53 (Fall 2012) (arguing for constitutional protection of non-obscene pornography); Andrea Dworkin, *Against the Male Flood: Censorship, Pornography, and Equality*, 8 Harv. Women's L.J. 1 (1985) (arguing, among other

---

[20] For an expression to be purely factual, "it must be information with an objective truth or existence." R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin., 6:20-CV-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) (appeal docketed, Feb. 6, 2023) (citing Lawrence Solum, Legal Theory Lexicon: Fact and Value, https://lsolum.typepad.com/legaltheory/2019/07/legal-theory-lexicon-fact-and-value.html (July 7, 2019)).

things, that pornography depicts and leads to the subordination of women);

Athanasia Daskalopoulou & Maria Carolina Zanette, *Women's Consumption of*

*Pornography: Pleasure, Contestation, and Empowerment*, 54 Sociology 969

(2020) (noting that female consumption of pornography is both "empowering and

disciplining" for women); Samuel L. Perry, *Banning Because of Science or In Spite*

*of it? Scientific Authority, Religious Conservatism, and Support for Outlawing*

*Pornography, 1984–2018*, 100 Social Forces 1385 (March 2022) (examining

scientific citations in anti-pornography advocacy and suggesting that the anti-

pornography movement is growing "more connected to religious conservatism than

views about scientific authority"). The intense debate and endless sociological

studies regarding pornography show that it is a deeply controversial subject. The

government cannot compel a proponent of pornography to display a highly

controversial "disclosure" that is profoundly antithetical to their beliefs.

Beyond the differing moral values regarding pornography, the state's health

disclosures are factually disputed. Plaintiffs introduce substantial evidence

showing that Texas's health disclosures are either inaccurate or contested by

existing medical research. Dr. David Ley, for example, is a clinical psychologist in

the states of New Mexico and North Carolina who specializes in treating sexuality

issues. (Ley Decl., Dkt # 5-3, at 1–4). As Ley states, "There currently exists no

generally accepted, peer-reviewed research studies or scientific evidence which

67

indicate that viewing adult oriented erotic material causes physical, neurological, or psychological damage such as 'weakened brain function' or 'impaired brain development.'" (Id.) Included in Ley's declaration are more than 30 psychological studies and metanalyses contradicting the state's position on pornography. (Id.) Moreover, Ley points out that the mental health hotline number is unsupported because the standard manual of classification of mental disorders, the DSM-5-TR, does not consider pornography addiction as a mental health disorder, and in fact, explicitly rejected that categorization as unsupported in 2022. (Id. at 5–6). Finally, the hotline, which links to the Substance Abuse and Mental Health Services Administration helpline, will be of little to no aid because they are likely not trained to deal with pornographic use or addiction. (Id. at 5–7).

Defendant, meanwhile, introduces evidence suggesting that pornography *is* dangerous for *children* to consume. One study of boys in Belgium, for example, suggests that "an increased use of Internet pornography decreased boys' academic performance six months later." (Bouché Decl. Dkt. # 26-8, at 2). Another meta-analysis suggests that pornography is harmful to adolescents but encourages parental intervention alongside content filtering to mitigate these harms. (Principi Article, Dkt. #. 27-6, at 9–10). These studies, however, are inapplicable to the compelled disclosures, which make no mention of the effects on children and are primarily targeted at adults.

68

Each portion of the compelled message is politically and scientifically controversial. This is a far cry from cigarette warnings. Unlike cigarettes, pornography is the center of a moral debate that strikes at the heart of a pluralistic society, involving contested issues of sexual freedom, religious values, and gender roles. And the relevant science, shows, at best, substantial disagreement amongst physicians and psychologists regarding the effects of pornography.[21] Even if the disclosures are commercial speech, Zauderer cannot apply.

G.    Section 230

Separate from the First Amendment claim, Plaintiffs argue that Section 230 of the CDA preempts H.B. 1181. (Mot. Prelim. Inj., Dkt. # 5, at 17–18). The CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Websites are the most common interactive computer services." Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1097 (9th Cir. 2019).

In Doe v. MySpace, Inc., the Fifth Circuit held that "Congress provided broad immunity under the CDA to Web-based service providers for all claims

---

[21] At worst for Texas, the science shows that many of their claims are entirely without support. For example, one disclosure requires websites to state that pornography "desensitizes brain reward circuits [and] increases conditioned responses" for viewers. H.B. 1181 129B.004. Defendant's study, however, shows that "sensation seeking" is predictive of pornography consumption, not the other way around. (Bouché Decl. Dkt. # 26-8, at 2). No other studies appear to support the position.

stemming from their publication of information created by third parties[.]" 528

F.3d 413, 418 (5th Cir. 2008). This includes sexual materials. *See, e.g.*,

Backpage.com, LLC v. Cooper, 939 F. Supp. 2d 805, 813, 828 (M.D. Tenn. 2013)

(applying section 230 to a Tennessee law "criminaliz[ing] the sale of certain sex-

oriented advertisements"). Under section 230, "[p]arties complaining that they

were harmed by a Web site's publication of user-generated content . . . may sue the

third-party user who generated the content." MySpace, 528 F.3d at 419. But they

cannot sue "the interactive computer service that enabled them to publish the

content online." Id.

Defendant seeks to differentiate MySpace because the case dealt with a

negligence claim, which she characterizes as an "individualized harm." (Def.'s

Resp., Dkt. # 27, at 19). MySpace makes no such distinction. The case dealt with a

claim for individualized harm but did not limit its holding to those sorts of harms.

Nor does it make sense that Congress's goal of "[paving] the way for a robust new

forum for public speech" would be served by treating individual tort claims

differently than state regulatory violations. Bennett v. Google, LLC,

882 F.3d 1163, 1166 (D.C. Cir. 2018) (cleaned up). The text of the CDA is clear:

"No cause of action may be brought and no liability may be imposed under any

State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

"[A]ny" state law necessarily includes those brought by state governments, so

70

Defendant's distinction between individual vs. regulatory claims is without merit.[22]

The Fifth Circuit "and other circuits have consistently given [Section 230(c)] a wide scope." <u>Google, Inc. v. Hood</u>, 822 F.3d 212, 220-21 (5th Cir. 2016) (quoting <u>MySpace</u>, 528 F.3d at 418). "The expansive scope of CDA immunity has been found to encompass state tort claims, alleged violations of state statutory law, requests for injunctive relief, and purported violations of federal statutes not specifically excepted by § 230(e)." <u>Hinton v. Amazon.com.dedc, LLC</u>, 72 F. Supp. 3d 685, 689 (S.D. Miss. 2014) (citing cases).

Next, Defendant argues that Section 230 does not apply because only the domestic websites are protected by the law, and those websites only post their own content—not those of third parties. (Def.'s Resp., Dkt. # 27, at 19–20 (citing <u>AOSI</u>, 140 S. Ct. at 2087)).  <u>AOSI</u> does not deal with protection under Section 230, and the Supreme Court's dicta regarding extraterritoriality deals with the statutory rights of "foreign citizens *abroad*"—not those speaking within the country. <u>AOSI</u>, 140 S. Ct. at 2087. Cases that do discuss Section 230, dealing with conduct that occurs domestically, have extended the law's protection to foreign publishers. *See* <u>Force v. Facebook, Inc.</u>, 934 F.3d 53, 74 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2761 (2020); <u>Fairfield Sentry Ltd. (In Liquidation) by and through Krys v.</u>

---

[22] Even if Section 230 did apply exclusively to individual harms, the law would still be preempted, because H.B. 1181 creates increased penalties when an individual minor accesses a violating website. H.B. 1181 § 129B.006(b). Pure regulatory violations lead to $10,000.00 in damages, but the state imposes an additional $240,000.00 in damages for a minor's access to the website.

<u>Citibank, N.A. London</u>, 630 F. Supp. 3d 463, 495 (S.D.N.Y. 2022).[23] As the Second

Circuit held in <u>Force</u>:

> "[W]e conclude from the text of Section 230, particularly
> the words "shall be treated," that its primary purpose is
> limiting civil liability in American courts. The regulated
> conduct—the litigation of civil claims in federal courts—
> occurs entirely domestically in its application here. We
> thus hold that the presumption against extraterritoriality is
> no barrier to the application of Section 230(c)(1) in this
> case."

934 F.3d at 74.

Thus, the foreign website Plaintiffs may claim the protection of Section 230

when failing to do so would subject them to imminent liability for speech that

occurs in the United States. <u>Force</u>, 934 F.3d at 74. Because the foreign website

Plaintiffs host content provided by other parties, they receive protection under

Section 230. <u>MySpace</u>, 528 F.3d at 419.

As Defendant notes, the second element of immunity under § 230(c)

"requires that the claims are all based on content provided by *another* information

content provider." <u>Wells v. YouTube, LLC</u>, 3:20-CV-2849-S-BH, 2021 WL

2652966, at *3 (N.D. Tex. May 17, 2021) (emphasis added), *adopted* 3:20-CV-

2849-S-BH, 2021 WL 2652514 (N.D. Tex. June 28, 2021). To the extent that the

---

[23] The Ninth Circuit came to a similar conclusion, finding that the "relevant conduct occurs where immunity is imposed . . . ." <u>Gonzalez v. Google LLC</u>, 2 F.4th 871, 888 (9th Cir. 2021). The Supreme Court granted cert, but declined to reach the Section 230 analysis because it found that the statute at issue did not apply to the Defendants' conduct. <u>Gonzalez v. Google LLC</u>, 598 U.S. 617 (2023); <u>Twitter, Inc. v. Taamneh</u>, 598 U.S. 471 (2023).

domestic website Plaintiffs and foreign website Plaintiffs create or develop the content they themselves post, they are not entitled to immunity. 47 U.S.C. § 230(c)(1); *id.* § 230(f)(3). Based on Plaintiffs' pleadings, it is clear that certain websites create their own content to be posted. For example, MG Premium Ltd owns the website Brazzers.com and creates content for the site. Those Plaintiffs that develop and post their own content are not entitled to an injunction on Section 230 grounds. Still, other Plaintiffs, such as WebGroup, which operates XVideos, only hosts third-party content, and therefore is entitled to Section 230 protection.

Because certain Plaintiffs are likely to succeed on the Section 230 claims, they are entitled to a preliminary injunction. "[S]ection 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1175 (9th Cir. 2008); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254 (4th Cir. 2009) ("[I]mmunity is an immunity from suit rather than a mere defense to liability and . . . is effectively lost if a case is erroneously permitted to go to trial."). Because Section 230 provides immunity, rather than a simple defense to liability, those Plaintiffs are entitled to an injunction.

Specifically, Plaintiffs MG Freesites LTD, WebGroup Czech Republic, NKL Associates, s.r.o., and MediaMe SRL shall be entitled to an injunction under Section 230.

## IV. DISCUSSION – HARM AND EQUITIES

A.    Irreparable Harm

Plaintiffs are likely to suffer irreparable harm in the absence of an injunction. To show irreparable harm, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." Humana, Inc. v. Avram A. Jacobson, M.D., P.A., 804 F.2d 1390, 1394 (5th Cir. 1986). In addition, ongoing, non-recoverable compliance costs constitute irreparable harm, even where the district court does not consider evidence of the costs credible, so long as the harm is more than de minimis. Rest. L. Ctr. v. U.S. Dept. of Lab., 66 F.4th 593 (5th Cir. 2023).

Without a preliminary injunction, Plaintiffs will suffer several types of irreparable harm. First, they will endure non-recoverable compliance costs. Under Fifth Circuit precedent, "[N]onrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." Id. (citing Louisiana v. Biden, 55 F.4th 1017, 1034 (5th Cir. 2022)). "Complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable

compliance costs." Id. A court should emphasize compliance costs' recoverability, rather than their magnitude. Id.

Defendant's argument directly contradicts the Fifth Circuit's instruction in Restaurant Law. Defendant states that "Plaintiffs provide insufficient evidence to show that any alleged monetary losses are significant" in light of their large global operations. (Def.'s Resp., Dkt. # 27, at 22). This runs headfirst into the Restaurant Law's holding that "the key inquiry is 'not so much the magnitude but the irreparability.'" 66 F.4th at 597 (citing Texas v. EPA, 829 F.3d 405, 433 (5th Cir. 2016)). Like Restaurant Law, Plaintiffs' monetary injuries are nonrecoverable— Defendant does not contend otherwise. And they are more than de minimis, because Plaintiffs will have to find, contract with, and integrate age verification systems into their websites. These services come at substantial cost—at the cheapest around $40,000.00 per 100,000 visits. (Compl., Dkt. # 1, at 18; Sonnier Decl., Dkt. # 5-2, at 54). Under Restaurant Law, the ongoing compliance costs constitute irreparable harm.

Second, Plaintiffs will incur irreparable harm through violations of their First Amendment rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). In ACLU v. Ashcroft, the Third Circuit considered this issue so obvious that it devoted no more than a footnote to the

question. 322 F.3d at 251 n.11 (noting that likelihood of success on the merits "is the only [prong] about which any real debate exists"). A party cannot speak freely when they must first verify the age of each audience member, and this has a particular chilling effect when the identity of audience members is potentially stored by third parties or the government.

Irreparable harm is particularly acute in the context of compelled speech because the association of a speaker with the compelled message cannot be easily undone. *See* <u>Barnette</u>, 319 U.S. at 633 (noting that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence). This harm includes, as Plaintiffs argue, a loss of goodwill. H.B. 1181 will force Plaintiffs to display a controversial position as though it were scientific fact, and this will result in incalculable damages to their goodwill and reputation. Wright & Miller, Federal Practice and Procedure: Civil § 2948.1 ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

Defendant argues that these losses are "compensable." (Def.'s Resp., Dkt. # 27, at 21–22). But to be compensable, damages must be capable of calculation or estimation. <u>Innovative Manpower Sols., LLC v. Ironman Staffing, LLC</u>, 929 F. Supp. 2d 597, 620 (W.D. La. 2013). Here, they are not, because the loss of goodwill and visitors may endure for years beyond this litigation. Second, and

more seriously, Defendant ignores that the state is entitled to sovereign immunity from monetary claims. VanDerStok v. Garland, No. 4:22-CV-00691-O, 2022 WL 4809376, at *3 (N.D. Tex. Oct. 1, 2022) (citing Wages & White Lion Invs., L.L.C. v. FDA, 16 F.4th 1130, 1142 (5th Cir. 2021)); Kimel v. Florida Bd. of Regents, 528 U.S. 62, 72–73 (2000). Because the monetary losses are significant and non-recoverable, their imminent occurrence constitutes irreparable harm.

Finally, in the context of Section 230, Plaintiffs will suffer irreparable harm by having to expend non-recoverable resources litigating lawsuits where federal law expressly prohibits causes of action from being brought. 47 U.S.C. § 230(e)(3).

In short, Plaintiffs have shown that their First Amendment rights will likely be violated if the statute takes effect, and that they will suffer irreparable harm absent an injunction. Defendant suggests this injury is speculative and not-imminent, (Def.'s Resp., Dkt. # 27, at 21–23), but this is doubtful. H.B. 1181 takes effect on September 1—mere days from today. That is imminent. Nor is the harm speculative. The Attorney General has not disavowed enforcement. To the contrary, her brief suggests a genuine belief that the law should be vigorously enforced because of the severe harms purportedly associated with what is legal pornography. (Id. at 1–5). It is not credible for the Attorney General to state that "[p]orn is absolutely terrible for our kids" but simultaneously claim that they will not enforce a law ostensibly aimed at preventing that very harm. Because the threat of

77

enforcement is real and imminent, Plaintiffs' harm is non-speculative. It is axiomatic that a plaintiff need not wait for actual prosecution to seek a pre-enforcement challenge. *See* Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979). In short, Plaintiffs have more than met their burden of irreparable harm.

> **B.**    The Balance of Harms and Public Interest Favor an Injunction

"[E]nforcement of an unconstitutional law is always contrary to the public interest." Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013). "Injunctions protecting First Amendment freedoms are always in the public interest." Opulent Life Church v. City of Holly Springs, Miss., 697 F.3d 279, 298 (5th Cir. 2012) (quoting Christian Legal Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006)). The Fifth Circuit recently reaffirmed this principle, explicitly noting that although the government "suffers a form of irreparable injury" when it is enjoined from enforcing its statutes, it likewise has no "interest in enforcing a regulation that violates federal law." All. for Hippocratic Med., 2023 WL 5266026, at *28 (quoting Maryland v. King, 567 U.S. 1301, 1303 (2012)). As the circuit court noted, when assessing the state's interest in a law that conflicts with federal statutes or the Constitution, the "government/public-interest analysis collapses with the merits." Id. Because H.B. 1181 is likely unconstitutional, the state cannot claim an interest in its enforcement. Id.

C.    <u>Scope of the Injunction</u>

The Court finds that H.B. 1181 is unconstitutional on its face. The statute is not narrowly tailored and chills the speech of Plaintiffs and adults who wish to access sexual materials. "[I]f the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is proper." <u>Whole Woman's Health v. Hellerstedt</u>, 579 U.S. 582, (2016) (cleaned up), *abrogated on other grounds by* <u>Dobbs v. Jackson Women's Health Org.</u>, 142 S. Ct. 2228 (2022). A statute that is unconstitutional on its face "is invalid in toto— and therefore incapable of any valid application." <u>People for Ethical Treatment of Animals v. Hinckley</u>, 526 F. Supp. 3d 218, 226 (S.D. Tex. 2021) (cleaned up). H.B. 1181 is unconstitutional on its face. The text of the law is facially content based because it screens out sexual content for regulation. *See infra*, Section III.C.i. And the law is not narrowly tailored because it substantially regulates protected speech, is severely underinclusive, and uses overly restrictive enforcement methods. *See infra*, Section III.D. "As the foregoing analysis confirms, the Court cannot resolve this case on a narrower ground without chilling" protected speech. <u>Citizens United v. Fed. Election Commn.</u>, 558 U.S. 310, 329 (2010); Fallon, *supra* note 10, at 1344–48; *see also* <u>Am. Civ. Liberties Union v. Mukasey</u>, 534 F.3d (affirming nationwide injunction against Attorney General for enforcement of COPA as unconstitutional on its face), *cert denied* 129 S. Ct. 1033. Accordingly, the Court

79

will enjoin Defendant Colmenero from taking any enforcement action under H.B. 1181 pending further order or final judgment.[24]

## V. CONCLUSION

At the core of Defendant's argument is the suggestion that H.B. 1181 is constitutional if the Supreme Court changes its precedent on obscenity. Defendant may certainly attempt a challenge to <u>Miller</u> and <u>Reno</u> at the Supreme Court. But it cannot argue that it is likely to succeed on the merits as they currently stand based upon the mere possibility of a change in precedent. Nor can Defendant argue that the status quo is maintained at the district court level by disregarding Supreme Court precedent. The status quo has been—and still is today—that content filtering is a narrower alternative than age verification. <u>Ashcroft v. ACLU</u>, 542 U.S. at 667.

The Court agrees that the state has a legitimate goal in protecting children from sexually explicit material online. But that goal, however crucial, does not negate this Court's burden to ensure that the laws passed in its pursuit comport with established First Amendment doctrine. There are viable and constitutional means to achieve Texas's goal, and nothing in this order prevents the state from pursuing those means. *See* <u>ACLU v. Gonzales</u>, 478 F. Supp. 2d 775 (E.D. Pa. 2007), *aff'd*, 534 F.3d 181. ("I may not turn a blind eye to the law in order to

---

[24] As previously stated, the injunction for Plaintiffs' Section 230 claims shall apply only to Plaintiffs MG Freesites LTD, WebGroup Czech Republic, NKL Associates, s.r.o., and MediaMe SRL.

attempt to satisfy my urge to protect this nation's youth by upholding a flawed statute, especially when a more effective and less restrictive alternative is readily available[.]").

Because the Court finds that H.B. 1181 violates the First Amendment of the United States Constitution, it will **GRANT** Plaintiffs' motion for a preliminary injunction, (Dkt. # 5), as to their First Amendment claims and **GRANT** the motion in part and **DENY** the motion in part as to their Section 230 claims.

Defendant Angela Colmenero, in her official capacity as Attorney General for the State of Texas, is preliminarily **ENJOINED** from enforcing any provision of H.B. 1181.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, August 31, 2023.

David Alan Ezra
Senior United States District Judge

**Exhibit G: Declaration of Dr. Gail Dines (ECF 27-1)**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FREE SPEECH COALITION, INC., *et al.*,<br><br>                Plaintiffs,<br><br>v.<br><br>JAMES M. LEBLANC, *in his official capacity as* SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, *et al.*,<br><br>                Defendants. | Civil Action<br><br>No. 23-02123<br><br>Judge Susie Morgan<br><br>Magistrate Judge Donna Phillips Currault<br><br>Section "E" (2) |

## DECLARATION OF DR. GAIL DINES

I, Gail Dines, Ph.D., under 28 U.S.C. § 1746, declare as follows:

1.     I am over eighteen years of age and have personal and professional knowledge of the facts set forth in this Declaration.

2.     I am President and CEO of Culture Reframed, a nonprofit organization dedicated to building resilience and resistance in youth to hypersexualized media and porn.

3.     I am also a Professor Emerita of Sociology and Women's Studies at Wheelock College in Boston, Massachusetts. (Wheelock College merged with Boston University in 2018)

4.     I have been researching and writing about the porn industry and sexual violence for over 30 years. For my work, I received the Myers Center Award for the Study of Human Rights in North America.  I was also named as one of the top 10 most influential women sociologists in the last 10 years by Academic Influence.[1]

5.     I have devoted my professional life to studying the effects of pornography on children and adults. I have written numerous articles and my latest book, *Pornland: How Porn Has Hijacked our Sexuality*,[2] has been translated into 5 languages. Given my professional expertise

1


EXHIBIT 1

I am well-positioned to speak to the harms of pornography on young people from a social-scientific stance.

## **Age of Children First Viewing Pornography**

6.      Pornography has now become the major form of sex education for children.[3]  Studies show that a majority of adolescents (90+% of boys and 60+% of girls) are exposed to pornography at some point in their teenage years,[4] with 11 being the average age of first exposure, usually on a digital device accessible within the home.[5]  Exposure is often accidental or unwanted[6] as a result of advertisements, misspelled searches, and "redirections."[7] According to a 2019 study by the British Board of Film Classification, "Children see pornography as young as seven."[8]

7.      The majority of the most popular porn website are called Tube Sites, and much like YouTube, the vast amount of content is free, and requires no Age Verification. Any child with a mobile device can access the mainstream hardcore pornography in a matter of seconds.

## **Content of Mainstream Pornography**

8.      It is a mistake to think of Playboy, Penthouse, or even Hustler when discussing the contemporary porn online porn industry. Dominated by Mindgeek,[9] a company located in Quebec, with offices all over the world, this huge enterprise owns most of the popular porn sites, including its flagship porn site, Pornhub (see section below on the porn industry for further discussion). Rather than the images of yesterday, which showcased pinup pornography, today's mainstream pornography is violent, body-punishing, and cruel.[10]

9.      The obvious next question is what are children seeing when they are exposed to pornography. Spanking, gagging, slapping, hair pulling, and choking are the five most common forms of physical aggression shown in pornography. Women are the target of the aggression in

97% of the scenes, and their response to aggression was either neutral or positive and rarely negative.[11]

10.    The industry has seen a dramatic increase in what is commonly called "choking" but is in reality defined by medical science as "nonfatal strangulation" which poses grave neurological harms to victims, including unconsciousness, brain injury, seizure, motor and speech disorders, memory loss, and post-traumatic stress disorder (PTSD).[12]

11.    Some Pornhub videos also show scenes of rape. Although Pornhub claims that all the videos they upload feature consensual sex, there are tags that intentionally misspell the word consensual as "consesual," to avoid legal action.  In July 2023, there were over 200,000 videos in the "Un Consesual" category, and 198,000 videos in the "Non Consesual Porn Porn videos."[13] The theme of the videos, as the name suggests, is forcing sex on an unwilling woman. This normalizes rape for the consumers, especially children, who are more likely to believe that the violence being played out is real, rather than staged[14].

12.    In its latest "Year in Review," Pornhub (2022)[15]  announced that the most popular search term on the site was "hentai." In January 2023 Pornhub hosted more than 109,000 hentai videos, some with more than five million views. The term is an English loanword from a Japanese phrase that in the early 20th century came to mean 'sexual perversion.'

13.    In the West today, hentai refers to pornified renditions of anime, the distinctive, colorful, action-packed style of Japanese animation much beloved by kids everywhere. In fact, the characters in hentai typically *look* like kids, except for their enlarged breasts and genitals. They are typically entangled in brutal, often monstrous sex. The latter is literally true, since a common theme in hentai is a grotesque creature penetrating a girl with an enormous phallus or tentacle. The

sexual violence in hentai is so extreme that in real life it would result in the bloody harm and death of the women and children so victimized.[16]

14.     A study by the British Board of Film Classification or BBFC (2022)[17], an independent regulatory agency, examined online computer-generated or drawn images – cartoons and animation - depicting the sexual abuse of children and child-like characters. A key finding of the report was that "children aged 6-12 are," compared to adults, "disproportionately exposed to pornography sites specializing in non-photographic content". That content mainly consists of hentai - the very content prominently featured on Pornhub.

15.     Hentai, as the BBFC report stated, promotes "an interest in abusive relationships." Much of the hentai available on free porn sites consists of characters from movies, television, games, and the internet "likely to be familiar or appealing to children." In fact, Pornhub features cartoons, animation, and costumed skits drawn from a wide range of children's entertainment and games.

16.     Another popular theme in hentai is incest, which almost always involves depictions of children. I googled "hentai incest" in January 2023 and received 5.4 million results.The latter was hosted by Hentai.tv, which displayed advertisements for Brazzers, another MindGeek company that also has its own Pornhub channel.

**Research exploring the Social, Emotional, Cognitive and Sexual Harms of Pornography on Young People**

17.     Peer-reviewed research continues to deepen and validate our knowledge of the harms of pornography. The habitual viewing of pornography remains linked to a host of mental health afflictions, such as depression, dissociation ("become increasingly detached from both their

own feelings and reality"), and behavioral problems such as sexual impulsivity.[18] Studies show that many young people are so obsessed with porn that they continue to watch it even though they know that what they are seeing is unreal, wrong in the offline world, and goes against their own values. Porn is not only violence against women. But it is violence against the self. And against others, of course, since adolescent users of porn are at a higher risk of perpetrating intimate partner cyberstalking.[19] They also "have lower degrees of social integration…and decreased emotional bonding with caregivers."[20]

18.      Studies also show that both young men and young women emulate in their own lives what they see in pornography. This is especially true for sexual strangulation,[21] verbal or physical sexual coercion,[22] and dating violence.[23] In a study from the UK, 42% of 15-16 year olds expressed the desire to mirror pornography – and more than half of all boys believe that online porn depicts realistic sexuality.[24]

19.      The latter point is especially troubling since, as a recent study concluded, "far from being represented as aberrant, sexual practices involving coercion, deception, non-consent and criminal activity are described in mainstream online pornography in ways that position them as permissible."[25] One study cautioned that "*any* pornography use resulted in a significantly greater likelihood of physically coercive behavior."[26]

20.      Recent study after recent study has shown that viewing pornography leads young people, especially boys, to engage in sexual aggression.[27]

21.      Research also shows that minors who view porn are at a higher risk of adult perpetration of child sexual abuse and seeking out illegal child porn.[28] They are more likely to display hypersexualization and to develop paraphilias (e.g., exhibitionism, voyeurism).[29]

22.     For girls, early internet exposure to porn is a risk factor for later suffering sexual abuse, sexual coercion, and sexual aggression.[30] Frequent use of pornography is linked to young people perpetrating face-to-face bullying and online cyberbullying.[31]

23.     Adolescents and teens who view porn are more likely to use illegal drugs, alcohol, and tobacco as well as rule-break more generally, such as skipping school.[32]

24.     Higher porn use predicts adolescent and teen sexting (texting nude and semi-nude photos), including the non-consensual sharing of intimate photos ("revenge porn").[33] In many countries, including the US, it is illegal for minors to possess or share naked photos of other minors. The rise of teen sexting is directly tied to the ongoing prevalence of pornography.[34]

25.     Adolescent porn users often lack the social-emotional skills to say no to unhealthy relationships and unwanted sex. They rate themselves poorly at choosing trustworthy partners, communicating how they want to be treated, setting limits and realistic expectations, and making decisions rather than letting things happen.[35]

26.     Regular adolescent porn consumers are more likely to use the internet continuously and compulsively, to the detriment of everyday life. Symptoms of this addiction can include irritability, poor social functioning, impulsiveness, and social anxiety.[36]

27.     Advances in brain science are also increasing our awareness of the harms of pornography. The under-developed adolescent brain is particularly susceptible to the content of porn,[37] which can lead to dysfunctional stress responses and poor executive function, including impairments to judgment, memory, and emotional regulation.[38]

28.     Early use of porn may trigger adolescent depression and psychosomatic symptoms (e.g., headache, irritability, trouble sleeping). Unhappy adolescents may turn to porn for "mood management," leading to further dysfunction and negative effects on their mental health.[39]

29.     Porn continues to teach young people that sexism and misogyny are acceptable. Adolescent boys who consume porn are more likely to value girls and women only for their appearance and willingness to satisfy men's desires, to believe that it is more important for women to be pretty than smart, and that women should learn to obey men.[40]

30.     Both boys and girls who view porn are more accepting of sexual violence against women and rape myths (e.g., the victim asked for it, or wanted it). They are also more likely to trivialize sexual aggression.[41]

31.     Girls who view porn may develop distorted and unrealistic expectations about the appearance of a normal woman's body, thus impairing the healthy development of their self-esteem.[42] Girls who view porn, too, may internalize the message that women are supposed to play only a "supporting role" in sex, thus compromising their own agency.[43]

**32.**     In addition, there is considerable research showing that pornography users, especially young people, say that over time they need to view more extreme and violent porn in order to reach the same sexual satisfaction.[44]

## Conclusion

33.     The evidence presented in this declaration demonstrates the urgent need for an age verification law in Louisiana to address the pervasive harms of pornography on young people. The research findings, supported by a large body of peer-reviewed scientific studies from multiple disciplines, clearly highlight the detrimental effects of pornography on the social, emotional, and cognitive well-being of children and adolescents.

34.     One of the most alarming revelations is that pornography has become the major form of sex education for children, with the average age of first exposure being as young as 11. The easy accessibility of pornographic content through digital devices, coupled with the violent

and non-consensual nature of mainstream pornography, creates a toxic environment for young minds.

35.     Children are being exposed to explicit acts of violence, coercion, and sexual aggression, which normalizes and perpetuates harmful behaviors against them, and increasingly, by them (especially boys) as perpetrators.

36.     The research unequivocally demonstrates that pornography consumption is associated with a range of negative outcomes for young people. These include promoting coercive behavior, sexual violence, depression, drug and alcohol abuse, cyberbullying and cyberstalking. The addictive nature of pornography leads to poor social integration, poor academic and work performance, and impaired social functioning.

37.     Furthermore, the findings reveal that pornography viewers, especially boys, are more likely to emulate what they see in pornography, including sexual strangulation, verbal or physical coercion, and dating violence. The normalization of abusive and non-consensual sexual practices in mainstream pornography contributes to a distorted perception of healthy relationships and consent among young people.

38.     Importantly, the research highlights the alarming connection between pornography consumption and the perpetration of child sexual abuse. Minors who view pornography are at a higher risk of engaging in illegal activities such as seeking out child pornography and developing paraphilias. For girls, early exposure to pornography increases the likelihood of suffering sexual abuse, coercion, and aggression.

39.     The porn industry is highly concentrated and lightly regulated, and dominated by the company MindGeek, which owns Porhhub and many other sites that offer vast amounts of free images and videos. The company has been associated with cases of child exploitation, non-

consensual images, and sex trafficking. The industry facilitates individual and societal harms through its dominance in the online pornography market and its cynical efforts to masquerade as a bastion of free speech.

40.    The findings presented in this declaration are supported by a wealth of scientific research, demonstrating the harmful impact of pornography on young people. It is essential to prioritize public health and safeguarding the well-being of our youth by implementing age verification laws that restrict minors' access to harmful pornographic content, thereby mitigating the negative impacts on their mental, emotional, and social development.

41.    The age verification laws will help to protect the development and healthy growth of future generations, empowering them to form healthy relationships, promote consent, and foster a society free from the damaging effects of pornography

Executed on this 16th day of July, 2023, in the United States, Massachusetts.

Gail Dines, PhD.

[1] https://academicinfluence.com/rankings/people/women-scholars/sociology

[2] http://www.beacon.org/Pornland-P891.aspx

[3] E.g., Rothman, E. F., & Adhia, A. (2015). Adolescent pornography use and dating violence among a sample of primarily black and Hispanic, urban-residing, underage youth. *Behavioral sciences*, *6*(1), 1,

[4] Chen, A. S., Leung, M., Chen, C. H., & Yang, S. C. (2013). Exposure to internet pornography among Taiwanese adolescents. *Social behavior and personality: An international journal*, *41*(1), 157-164.

[5] Allen, K. R., & Lavender-Stott, E. S. (2015). Family contexts of informal sex education: Young men's perceptions of first sexual images. *Family Relations*, *64*(3), 393-406.

[6] https://www.apa.org/news/press/releases/2017/08/pornography-exposure

[7] Bloom, Z. D., & Hagedorn, W. B. (2015). Male adolescents and contemporary pornography: Implications for marriage and family counselors. *The Family Journal*, *23*(1), 82-89.

[8] Children see pornography as young as seven, new report finds, BBFC https://www.bbfc.co.uk/about-us/news/children-see-pornography-as-young-as-seven-new-report-finds.

[9] https://www.newyorker.com/magazine/2016/09/26/making-sense-of-modern-pornography

[10] Bridges, A. J., Wosnitzer, R., Scharrer, E., Sun, C., & Liberman, R. (2010). Aggression and sexual behavior in best-selling pornography videos: A content analysis update. *Violence against women*, *16*(10), 1065-1085.

[11] Fritz, N., Malic, V., Paul, B., & Zhou, Y. (2020). A descriptive analysis of the types, targets, and relative frequency of aggression in mainstream pornography. *Archives of Sexual Behavior*, 1-13.  doi:10.1007/s10508-020-01773-0 . [12] Bichard, H., Byrne, C., Saville, C. W., & Coetzer, R. (2020). The neuropsychological outcomes of non-fatal strangulation in domestic and sexual violence: A systematic review. *Neuropsychological rehabilitation* 32.6 1164-1192

[13] My research conducted July 15th, 2023

[14] https://openparliament.ca/committees/health/42-1/50/dr-sharon-cooper-1/

[15] https://www.pornhub.com/insights/2022-year-in-review

[16] Dines, G., & Sanchez, M. (2023). Hentai and the Pornification of Childhood: How the Porn Industry Just Made the Case for Regulation. *Dignity: A Journal of Analysis of Exploitation and Violence*, *8*(1), 3.

[17] British Board of Film Classification. (2022, December 6). New BBFC research reveals children are more exposed to sites specialising in non-photographic pornography, compared to adults. https://www.bbfc.co.uk/about-us/news/new-bbfc-research-reveals-children-are-more-exposed-to-sites-specialising-in-non-photographic-pornography-compared-to-adults

[18] See, e.g., Bernstein, S., Warburton, W., Bussey, K., & Sweller, N. (2023). Mind the Gap: Internet Pornography Exposure, Influence and Problematic Viewing Amongst Emerging Adults. *Sexuality Research and Social Policy*, *20*(2), 599-613; Castro-Calvo, J., Cervigón-Carrasco, V., Ballester-Arnal, R., & Giménez-García, C. (2021). Cognitive processes related to problematic pornography use (PPU): A systematic review of experimental studies. *Addictive Behaviors Reports*, *13*, 100345; Alexandraki, K., Stavropoulos, V., Anderson, E., Latifi, M. Q., & Gomez, R. (2018). Adolescent pornography use: A systematic literature review of research trends 2000-2017. *Current Psychiatry Reviews*, *14*(1), 47-58.

[19] Rodríguez-Castro, Y., Martínez-Román, R., Alonso-Ruido, P., Adá-Lameiras, A., & Carrera-Fernández, M. V. (2021). Intimate partner cyberstalking, sexism, pornography, and sexting in adolescents: new challenges for sex education. *International journal of environmental research and public health*, *18*(4), 2181.

[20] George, M., Maheshwari, S., Chandran, S., & Rao, T. S. (2019). Psychosocial aspects of pornography. *Journal of Psychosexual Health*, *1*(1), 44-47.

[21] Herbenick, D., Fu, T. C., Eastman-Mueller, H., Thomas, S., Svetina Valdivia, D., Rosenberg, M., ... & Feiner, J. R. (2022). Frequency, method, intensity, and health sequelae of sexual choking among US undergraduate and graduate students. *Archives of sexual behavior*, *51*(6), 3121-3139.

[22] Bernstein, S., Warburton, W., Bussey, K., & Sweller, N. (2022). Pressure, preoccupation, and porn: The relationship between internet pornography, gendered attitudes, and sexual coercion in young adults. *Psychology of Popular Media*.
Pornography, Gendered Attitudes, and Sexual Coercion in Young Adults," Psychology of Popular Media 12(2), 2023, 159-172, https://doi.org/10.1037/ppm0000393; see also Dillard, Rebecca, et al. "Abuse disclosures of youth with problem sexualized behaviors and trauma symptomology." Child abuse & neglect 88 (2019): 201-211; Emily A.

Waterman, et al., Prospective Associations Between Pornography Viewing and Sexual Aggression Among Adolescents, Journal of Research on Adolescence 32, 4, 2022, 1612-1625, DOI: 10.1111/jora.12745

[23] Kara Anne E. Rodenhizer and Katie M. (2019). The Impacts of Sexual Media Exposure on Adolescent and Emerging Adults' Dating and Sexual Violence Attitudes and Behaviors: A Critical Review of the Literature. Trauma, Violence, & Abuse, 20(4), 439–452. https://doi.org/10.1177/1524838017717745

[24] Martellozzo, E., Monaghan, A., Adler, J. R., Davidson, J., Leyva, R., & Horvath, M. A. H. (2016). "I wasn't sure it was normal to watch it…"A quantitative and qualitative examination of the impact of online pornography on the values, attitudes, beliefs and behaviours of children and young people. Middlesex University, NSPCC, OCC. https://doi.org/10.6084/m9.figshare.3382393

[25] Fiona Vera-Gray and others, Sexual violence as a sexual script in mainstream online pornography, The British Journal of Criminology, Volume 61, Issue 5, September 2021, Pages 1243–1260, https://doi.org/10.1093/bjc/azab035

[26] Ethan A. Marshall, Holly A Miller, and Jeff A Bouffard, "Crossing the Threshold From Porn Use to Porn Problem: Frequency and Modality of Porn Use as Predictors of Sexually Coercive Behaviors." Journal of interpersonal violence vol. 36,3-4 (2021): 1472-1497. doi:10.1177/0886260517743549).  See also Nicky Stanley, et al., Pornography, Sexual Coercion and Abuse and Sexting in Young People's Intimate Relationships: A European Study, Journal of Interpersonal Violence 33, 19, 2018, 2919-2944, https://doi.org/10.1177/0886260516633204

[27] Paul J. Wright, Bryant Paul & Debby Herbenick (2021) Preliminary Insights from a U.S. Probability Sample on Adolescents' Pornography Exposure, Media Psychology, and Sexual Aggression, Journal of Health Communication, 26:1, 39-46, DOI:10.1080/10810730.2021.1887980; Rostad, W.L., Gittins-Stone, D., Huntington, C. et al. The Association Between Exposure to Violent Pornography and Teen Dating Violence in Grade 10 High School Students. Arch Sex Behav 48, 2137–2147 (2019). https://doi.org/10.1007/s10508-019-1435-4; Jochen Peter & Patti M. Valkenburg (2016) Adolescents and Pornography: A Review of 20 Years of Research, The Journal of Sex Research, 53:4-5, 509-531, DOI: 10.1080/00224499.2016.1143441

[28] Tegan Insoll, et al., "Risk Factors for Child Sexual Abuse Material Users Contacting Children Online: Results of an Anonymous Multilingual Survey on the Dark Web," Journal of Online Trust and Safety 1 (2), 2022, https://doi.org/10.54501/jots.v1i2.29

[29] Aina M. Gassó and Anna Bruch-Granados, Psychological and Forensic Challenges Regarding Youth Consumption of Pornography: A Narrative Review, Adolescents 1, 2021, 108-122, https://doi.org/10.3390/adolescents1020009

[30] Sarah J. Harsey, et al., "Women's Age of First Exposure to Internet Pornography Predicts Sexual Victimization," *Dignity: A Journal of Analysis of Exploitation and Violence* 6 (5), 2021, Article 1, https://doi.org/10.23860/dignity.2021.06.05.01

[31] Sandra Feijóo, "Cyberbullies, the Cyberbullied, and Problematic Internet Use: Some Reasonable Similarities," *Psicothema* 33 (2), 2021, pp. 198-205, doi: 10.7334/psicothema2020.209; Meghan N. Long and Elizabeth B. Dowdell, "Online and Health Risk Behaviors In High School Students: An Examination of Bullying," *Pediatric Nursing* 44 (5), 2018, pp. 223-228

[32] Meghan Donevan, et al., "Adolescents' Use of Pornography: Trends over a Ten-year Period in Sweden," Archives of Sexual Behavior 51, 2022, pp. 1125–1140, https://doi.org/10.1007/s10508-021-02084-8

[33] Sarah Boer, et al., "Prevalence and Correlates of Sext-Sharing Among a Representative Sample of Youth in the Netherlands," Frontiers in Psychology 12, 2021, Article 655796, doi: 10.3389/fpsyg.2021.655796; Karen M. Holt, et al., "Assessing the role of self-control and technology access on adolescent sexting and sext dissemination," Computers in Human Behavior 125, 2021, Article 106952, https://doi.org/10.1016/j.chb.2021.106952

[34] Eric Silverman, The Harms of Sexting: Scholarly Literature Review, 2022, https://www.culturereframed.org/wp-content/uploads/2022/01/culture-reframed_harms-of-sexting.pdf

[35] Charlie Huntington, Brian Willoughby, and Galena Rhoades, "Associations of Adolescents' Pornography Viewing with their Romantic Relationship Skills and Behaviors," The Journal of Sex Research, 2022, DOI: 10.1080/00224499.2022.2096844.  See also Yaniv Efrati and Yair Amichai-Hamburger, "Are adolescents who consume pornography different from those who engaged in online sexual activities?," Children and Youth Services Review 111, 2020, 104843, https://doi.org/10.1016/j.childyouth.2020.104843.

[36] Kyriaki Alexandraki, et al., "Internet pornography viewing preference as a risk factor for adolescent Internet addiction: The moderating role of classroom personality," Journal of Behavioral Addictions 7(2), 2018, pp. 423–432, DOI: 10.1556/2006.7.2018.34; Kyoung Min Kim, et al., "What Types of Internet Services Make Adolescents Addicted? Correlates of Problematic Internet Use," Neuropsychiatric Disease and Treatment 16, 2020, pp. 1031-1041, doi:10.2147/NDT.S247292

[37] Jennifer A. Brown and Jonathan J. Wisco, "The components of the adolescent brain and its unique sensitivity to sexually explicit material," Journal of Adolescence 72, 2019, pp. 10-13, https://doi.org/10.1016/j.adolescence.2019.01.006

[38] Carolina Valdez-Montero, et al., "Coercive and problematic use of online sexual material and sexual behavior among university students in northern Mexico," Sexual Addiction & Compulsivity 25 (4), 2018, pp. 367-379, https://doi.org/10.1080/10720162.2019.1565847; Pukovisa Prawiroharjo, et al., "Impaired Recent Verbal Memory in Pornography-Addicted Juvenile Subjects," Neurology Research International 2019, Article 2351638, https://doi.org/10.1155/2019/2351638

[39] Ann Rousseau, Beáta Bőthe, and Aleksandar Štulhofer, "Theoretical Antecedents of Male Adolescents' Problematic Pornography Use: A Longitudinal Assessment," Journal of sex research 58 (3), 2021, pp. 331-341, doi:10.1080/00224499.2020.1815637; Magdalena Mattebo, et al., "Pornography consumption and psychosomatic and depressive symptoms among Swedish adolescents: a longitudinal study," Upsala Journal of Medical Sciences 123 (4), 2018, pp. 237-246, https://doi.org./10.1080/03009734.2018.1534907

[40] Niccolò Principi, et al., Consumption of sexually explicit internet material and its effects on minors' health: latest evidence from the literature," Minerva Pediatrics 74 (3), 2022, pp. 332-339, DOI: 10.23736/S2724-5276.19.05367-2; Yolanda Rodríguez-Castro, "Intimate Partner Cyberstalking, Sexism, Pornography, and Sexting in Adolescents: New Challenges for Sex Education," International Journal of Environmental Research and Public Health 18, 2021, Article 2181, https://doi.org/10.3390/ijerph18042181

[41] Megan K. Maas and Shannamar Dewey, "Internet Pornography Use Among Collegiate Women: Gender Attitudes, Body Monitoring, and Sexual Behavior," SAGE Open 8(2), 2018, https://doi.org/10.1177/2158244018786640; Kara Anne E. Rodenhizer and Katie M. Edwards, "The Impacts of Sexual Media Exposure on Adolescent and Emerging Adults' Dating and Sexual Violence Attitudes and Behaviors: A Critical Review of the Literature," Trauma, Violence, & Abuse 20 (4), 2019, pp. 439–452, https://doi.org/10.1177/1524838017717745

[42] Richard Joseph Behun and Eric W. Owens, Youth and Internet Pornography: The Impact and Influence on Adolescent Development (Taylor & Francis Group, 2019).

[43] Michael Tholander, "Traces of Pornography: Shame, Scripted Action, and Agency in Narratives of Young Swedish Women," Sexuality & Culture 26, 2022, pp. 1819-1839, https://doi.org/10.1007/s12119-022-09973-7

[44] Dwulit, Aleksandra Diana, and Piotr Rzymski. 2019. "Prevalence, Patterns and Self-Perceived Effects of Pornography Consumption in Polish University Students: A Cross-Sectional Study" International Journal of Environmental Research and Public Health 16, no. 10: 1861. https://doi.org/10.3390/ijerph16101861; Blinka L,

Ševčíková A, Dreier M, Škařupová K and Wölfling K (2022) Online Sex Addiction: A Qualitative Analysis of Symptoms in Treatment-Seeking Men. Front. Psychiatry 13:907549. doi: 10.3389/fpsyt.2022.907549