# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-50627

FREE SPEECH COALITION, INCORPORATED; MG PREMIUM, LIMITED; MG FREESITES, LIMITED; WEBGROUP CZECH REPUBLIC, A.S.; NKL ASSOCIATES, S.R.O.; SONESTA TECHNOLOGIES, S.R.O.; SONESTA MEDIA, S.R.O.; YELLOW PRODUCTION, S.R.O.; PAPER STREET MEDIA, L.L.C.; NEPTUNE MEDIA, L.L.C.; JANE DOE; MEDIAME, S.R.L.; MIDUS HOLDINGS, INCORPORATED,

*Plaintiffs-Appellees,*

v.

ANGELA COLMENERO, Attorney General, State of Texas,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION IN CASE NO. 1:23-CV-00917-DAE, HON. DAVID ALAN EZRA, SENIOR DISTRICT JUDGE

---

## APPELLEES' CROSS-OPENING BRIEF

---

SCOTT L. COLE
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
300 West Sixth Street, Suite 2010
Austin, Texas 78701
(737) 667-6100

MICHAEL T. ZELLER
ARIAN J. KOOCHESFAHANI
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

DEREK L. SHAFFER
CHRISTOPHER G. MICHEL
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

JEFFREY K. SANDMAN
WEBB DANIEL FRIEDLANDER LLP
5208 Magazine Street, Suite 364
New Orleans, Louisiana 70115
(978) 886-0639

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have a financial interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Plaintiff-Appellees: Free Speech Coalition, Inc., MG Premium Ltd, MG Freesites Ltd, WebGroup Czech Republic, a.s., NKL Associates, s.r.o., Sonesta Technologies, s.r.o., Sonesta Media, s.r.o., Yellow Production s.r.o., Paper Street Media, LLC, Neptune Media, LLC, Jane Doe, MediaME SRL, Midus Holdings, Inc.

2. Counsel for Plaintiff-Appellees: Derek L. Shaffer, Scott L. Cole, Michael T. Zeller, Christopher G. Michel, Arian J. Koochesfahani, Thomas D. Nolan, Nicoletta Malogioglio, Taylor Comerford, and Emily Couture of Quinn Emanuel Urquhart & Sullivan, LLP; Jeffrey K. Sandman of Webb Daniel Friedlander, LLP.

The undersigned counsel further certifies that:

- Free Speech Coalition, Inc. has no parent corporation;
- MG Premium Ltd is a wholly-owned subsidiary of MG CY Holdings Ltd, which is wholly-owned, through affiliates,[1] by 1000498476 Ontario Inc. (OBCA).
- MG Freesites Ltd is a wholly-owned subsidiary of MG CY Holdings Ltd, which is wholly-owned, through the same affiliates identified in note 1, by 1000498476 Ontario Inc. (OBCA).
- WebGroup Czech Republic, a.s. has no parent corporation;
- NKL Associates s.r.o. has no parent corporation;

---

[1] Licensing IP International S.a.r.l.; MindGeek S.a.r.l.; ECP One Ltd BVI; ECP Three Ltd BVI; ECP Four Ltd BVI; ECP Alpha Holding Ltd BVI; ECP Alpha LP; SIE Holdings Limited; ECP Capital Partners Ltd BVI; Roccon Enterprises, Inc.; and FMSM Holdings, Inc. (OBCA).

i

- Sonesta Technologies, s.r.o. is a wholly-owned subsidiary of United Communication Hldg II, a.s.;

- Sonesta Media, s.r.o. is a wholly-owned subsidiary of United Communication Hldg II, a.s.;

- Yellow Production, s.r.o. has no parent corporation;

- Paper Street Media, LLC is a wholly-owned subsidiary of Paper Street Holdings, Inc.;

- Neptune Media, LLC is a wholly-owned subsidiary of Paper Street Holdings, Inc.;

- MediaME SRL has no parent corporation;

- Midus Holdings, Inc., has no parent corporation; and

- No publicly held corporation owns 10 percent or more of any of the above-listed entities' stock

Dated:  September 25, 2023        *s/  Derek L. Shaffer*
                                   Derek L. Shaffer

                                   *Counsel for Appellees*

## REQUEST FOR ORAL ARGUMENT

Appellees respectfully request that this Court hear oral argument to aid its consideration of the important legal questions here posed.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................ I

REQUEST FOR ORAL ARGUMENT .................................................................. III

TABLE OF AUTHORITIES ................................................................................ VII

PRELIMINARY STATEMENT ............................................................................ 1

JURISDICTIONAL STATEMENT ....................................................................... 6

QUESTIONS PRESENTED .................................................................................. 6

STATEMENT OF THE CASE ............................................................................... 6

I.      PROCEDURAL HISTORY ......................................................................... 6

II.     THE STATUTORY TEXT .......................................................................... 7

III.    THE EVIDENCE ........................................................................................ 10

IV.     THE DISTRICT COURT'S ORDER ......................................................... 13

SUMMARY OF ARGUMENT ............................................................................. 14

STANDARD OF REVIEW ................................................................................... 20

ARGUMENT ........................................................................................................ 20

I.      APPELLEES' STANDING IS BEYOND DOUBT ................................... 20

II.     APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS IN
        MULTIPLE RESPECTS ............................................................................. 21

        A.      The Age-Verification Requirement Is Subject To Strict Scrutiny
                And Incapable Of Withstanding It ................................................. 21

                1.      Strict Scrutiny Applies Because The Act Chills A
                        Substantial Amount Of Protected Speech Based On Its
                        Content ............................................................................... 22

                        (a)     *The Act Expressly Ensnares A Substantial Amount
                                Of Protected Speech* ............................................... 23

                        (b)     *The District Court's Factual Findings Confirm
                                That The Act Ensnares And Chills A Substantial
                                Amount Of Protected Speech* .................................. 25

                        (c)     *The Act's Vagueness Further Chills Protected
                                Speech* ...................................................................... 30

(d) *Ginsberg And Brown Are Not To The Contrary* ............. 31

2. Strict Scrutiny Also Applies Because The Act Discriminates Based On Speaker And Viewpoint .................... 32

3. Intermediate Scrutiny Under *Renton* Does Not Apply ............. 36

B. The Age-Verification Requirement Fails Strict Scrutiny ................... 37

1. The Act Is Not Narrowly Tailored, Because It Is Underinclusive ........................................................................ 37

2. The Act Fails To Employ The Least Restrictive Means ........... 38

3. The Act Does Not Effectively Pursue Its Interest .................... 41

4. The Legislature's Failure To Make Any Supporting Record Or Consider Alternatives Is Independently Fatal ......... 42

C. The "Health Warnings" Fail Scrutiny Under Any Available Standard ................................................................................ 44

1. Compelled Speech Draws Strict Scrutiny, Which The Act Fails ...................................................................................... 45

2. *Zauderer* Does Not Apply And Is Violated In Any Event ....... 47

(a) *The "Abuse Hotline" Is Not Factual* ............................. 47

(b) *The "Health Warnings" And "Abuse Hotline" Are Scientifically, Morally, And Politically Controversial* .................................................................. 48

(c) *The "Health Warnings" And "Abuse Hotline" Are Unduly Burdensome, Misleading, And Irrational* .......... 49

3. *Central Hudson* Does Not Apply And The Statute Falls Even If It Does ...................................................................... 50

(a) *The "Health Warnings" And "Abuse Hotline" Target Non-Commercial, Fully-Protected Speech* ......... 50

(b) *The "Health Warnings" And "Abuse Hotline" Fail Even Intermediate Scrutiny* ............................................. 51

D. Section 230 Is Likely Violated As To Certain Appellees ................... 52

III. IRREPARABLE HARMS AND THE EQUITIES LIKEWISE FAVOR A PRELIMINARY INJUNCTION .................................................. 55

A. Appellees Face Numerous Irreparable Harms ................................... 56

B. The Balance of Harms And Public Interest Favor Appellees ............. 57

CONCLUSION ...................................................................................... 58

CERTIFICATE OF SERVICE ................................................................ 61

CERTIFICATE OF COMPLIANCE ....................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*303 Creative LLC v. Elenis*,
  143 S. Ct. 2298 (2023)................................................................3, 45

*ACLU v. Ashcroft*,
  322 F.3d 240 (2003)...................................................................30

*ACLU v. Gonzales*,
  478 F. Supp. 2d 775 (E.D. Pa. 2007).................................................1

*ACLU v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008) ........................................................30

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
  78 F.4th 210 (5th Cir. 2023) .......................................................58

*Am. Acad. of Implant Dentistry v. Parker*,
  860 F.3d 300 (5th Cir. 2017) ..................................................51, 52

*Ark. Writers' Project, Inc. v. Ragland*,
  481 U.S. 221 (1987)...................................................................33

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)................................... 1, 3, 5, 22, 28, 36, 37, 38, 39,  55, 56

*Bennett v. Google, LLC*,
  882 F.3d 1163 (D.C. Cir. 2018) ....................................................53

*Bennie v. Munn*,
  822 F.3d 392 (8th Cir. 2016) .......................................................26

*Bolger v. Youngs Drug Prod. Corp.*,
  463 U.S. 60 (1983).....................................................................50

*Brewer v. City of Albuquerque*,
  18 F.4th 1205 (10th Cir. 2021) ....................................................42

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011)............................................ 15, 32, 33, 37, 45, 46

*Bruni v. City of Pittsburgh*,
   824 F.3d 353 (3d Cir. 2016) ...............................................................42

*City of Houston, Tex. v. Hill*,
   482 U.S. 451 (1987).............................................................................23

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994)...............................................................................33

*City of Houston, Tex. v. Hill*,
   482 U.S. 451 (1987) .............................................................................23

*City of Renton v. Playtime Theatres, Inc.*,
   475 U.S. 41 (1986)...............................................................................36

*CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*,
   928 F.3d 832 (9th Cir. 2019) .........................................................48, 49

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) ...............................................................20

*Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery
   Comm'n*,
   760 F.3d 427 (5th Cir. 2014) ...............................................................34

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008) ...................................5, 18, 53, 54, 55

*Elrod v. Burns*,
   427 U.S. 347 (1976)..............................................................................56

*Ent. Software Ass'n v. Blagojevich*,
   469 F.3d 641 (7th Cir. 2006) ...............................................................48

*Fabulous Assocs. v. Pa. Pub. Util. Comm'n,*,
   896 F.2d 780 (3d Cir. 1990) .........................................................27, 28

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) .............................................................57

*FF Cosms. FL, Inc. v. City of Miami Beach*,
   866 F.3d 1290 (11th Cir. 2017) ...........................................................42

*Free Speech Coal., Inc. v. Att'y Gen. U.S.*,
    825 F.3d 149 (3d Cir. 2016) ................................................................37

*Ginsberg v. State of N.Y.*,
    390 U.S. 629 (1968)....................................................................16, 31

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ...........................................................58

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019)........................................................................34

*Jackson Women's Health Org. v. Dobbs*,
    945 F.3d 265 (5th Cir. 2019), *rev'd*, 142 S. Ct. 2228 (2022) .............................3

*Junior Sports Mags. Inc. v. Bonta*,
    2023 WL 5945879 (9th Cir. Sept. 13, 2023) ................................51, 52

*McAllen Grace Brethren Church v. Salazar*,
    764 F.3d 465 (5th Cir. 2014) ..............................................................21

*Miller v. California*,
    413 U.S. 15 (1973)..............................................................................10

*Minneapolis Star & Trib. Co. v. Minn. Com'r of Rev.*,
    460 U.S. 575 (1983)............................................................................33

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ..............................................................57

*NetChoice v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ..............................................................23

*NIFLA v. Becerra*,
    138 S. Ct. 2361 (2018)..............................................4, 35, 45, 48, 49

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................57

*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ..............................................................58

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
 475 U.S. 1 (1986) ................................................................................. 45

*R.A.V. v. City of St. Paul*,
 505 U.S. 377 (1992) ............................................................................ 34

*Randell v. Johnson*,
 227 F.3d 300 (5th Cir. 2000) ............................................................. 44

*Reed v. Town of Gilbert, Ariz.*,
 576 U.S. 155 (2015) ............................................................................ 27

*Reno v. ACLU*,
 521 U.S. 844 (1997) ....................... 1, 2, 5, 15, 16, 22, 28, 30, 31, 36, 37, 43, 55

*Rest. L. Ctr. v. U.S. Dept. of Lab.*,
 66 F.4th 593 (5th Cir. 2023) ............................................................. 57

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
 515 U.S. 819 (1995) ............................................................................ 47

*Sable Commc'ns of Cal., Inc. v. F.C.C.*,
 492 U.S. 115 (1989) ............................................................................ 36

*Seals v. McBee*,
 898 F.3d 587 (5th Cir. 2018) ............................................................. 24

*Smith v. Daily Mail Pub. Co.*,
 443 U.S. 97 (1979) .............................................................................. 41

*Sorrell v. IMS Health Inc.*,
 564 U.S. 552 (2011) ............................................................................ 34

*St. Joseph Abbey v. Castille*,
 712 F.3d 215 (5th Cir. 2013) ............................................................. 44

*State v. Biden*,
 2023 WL 5821788 (5th Cir. Sept. 8, 2023) ...................................... 5

*The Fla. Star v. B.J.F.*,
 491 U.S. 524 (1989) ............................................................................ 33

*Thunder Studios, Inc. v. Kazal*,
   13 F.4th 736 (9th Cir. 2021) ...........................................................20, 21

*Turner Broad. Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994)...................................................................................42

*Turner Broad. Sys., Inc. v. F.C.C.*,
   520 U.S. 180 (1997)...................................................................................42

*United States v. Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000)................................................2, 17, 28, 33, 36

*United States v. Stevens*,
   559 U.S. 460 (2010)...................................................................................24

*Va. v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988)...................................................................................21

*Zauderer v. Office of Disciplinary Counsel*,
   471 U.S. 626 (1985)...........................................................................4, 47

*Zwickler v. Koota*,
   389 U.S. 241 (1967)...................................................................................23

## **Statutes**

28 U.S.C. § 1292(a)(1)..............................................................................6

28 U.S.C. § 1331 ........................................................................................6

28 U.S.C. § 1343(3) ..................................................................................6

47 U.S.C. § 230(c)(1)..........................................................................4, 52

47 U.S.C. § 230(e)(3).................................................................52, 54, 57

Tex. Civ. Prac. & Rem. Code § 129B *et seq.* .................7, 8, 9, 10, 29, 34

## PRELIMINARY STATEMENT

Like the federal government twice before it, Texas has enacted legislation that restricts broad swaths of protected speech on the Internet under auspices of protecting minors from exposure to sexually explicit material.  The Supreme Court has twice held that strict scrutiny applies to such laws, meaning only the least restrictive means may be employed.  And the Supreme Court has twice upheld preliminary injunctions against laws that failed to adopt the least-restrictive means—particularly content-filtering software, as identified in *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004)—to ensure speech was restricted for minors but not adults.  *See also Reno v. ACLU*, 521 U.S. 844, 882 (1997).[1]  In HB 1181 ("the Act"), Texas has gone down the same path while disregarding the same less-restrictive alternative, thus warranting the same result:  a preliminary injunction that should be affirmed on appeal.

---

[1]   As explained by the district on remand post-*Ashcroft*, content filters are computer applications installed on users' devices that block access to certain categories of material on the Internet, including sexually explicit material.  *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 789-90 (E.D. Pa. 2007).  Not only can such filters "be used to prevent children from seeing material that might be considered unsuitable," but "businesses often use filters to prevent employees from accessing on employer controlled computers Internet resources that are either not work related or otherwise deemed inappropriate."  *Id.*  "[T]hese filters are widely available." ROA.1841.

To affirm, this Court need not fault the goal of protecting minors, which the district court commended. The fatal defects with the Act lie in its contours. Because its age-verification and "health warning" mandates apply to *websites*, rather than *users*, the Act does not restrict only minors' access to sexually explicit content; it also burdens "a large amount of speech that *adults* have a constitutional right to receive." *Reno*, 521 U.S. at 874 (emphasis added). That is precisely what led the Supreme Court in *Reno*, *Ashcroft*, and other seminal precedents to subject the laws at issue to strict scrutiny. *See, e.g.*, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811-14 (2000). The same exacting standard governs here.

The district court found, in its meticulously reasoned preliminary injunction opinion, that the Act is unlikely to clear that high bar. With respect to its age-verification requirement, the law is severely underinclusive, imposing its cumbersome and intrusive mandate on adult-entertainment websites but not on search engines or social-media platforms that carry the same content and pose the same purported dangers. The law is also vastly overinclusive and chilling, compelling huge numbers of adults to submit personally identifying information over the Internet on the most intimate of subjects, with only a fig leaf of statutory protection against disclosure. And critically, the law fails to adopt less-restrictive

2

means that would accomplish its stated goal more narrowly and more effectively than its blunderbuss approach. *See Ashcroft*, 542 U.S. at 666-70.

Texas offers little defense of the Act's age-verification burdens under governing law. Its lead argument below was that "HB 1181 is constitutional if the Supreme Court changes its precedent on obscenity." ROA.1711-12, 1769. Of course, any such change in precedent would be reserved exclusively for the Supreme Court and is not a recipe for *likely* success today, as relevant to the preliminary injunction under appeal. *See, e.g.*, *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019), *rev'd*, 142 S. Ct. 2228 (2022).

The Act's infirmity becomes even clearer upon considering its requirement that Appellees' condemn their own content through the so-called health warnings and related notices. Indeed, the Act discredits its claimed purposes by mandating that covered website operators warn *adult* patrons away from the supposed dangers of pornography. Among the First Amendment's most hallowed commands is that "the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023). The Act upends that venerable protection by compelling website operators to incant sensational and overwrought messages that are based on pseudo-science (at best) and serve to chill

3

and shame adult users rather than to inform them—to say nothing of protecting *minors*, whom the Act would have already *screened out* by hypothesis.

As the district court rightly held, such government propaganda bears no resemblance to the factual, uncontroversial disclaimers sustained under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), and its progeny. Rather, these ideologically-loaded warnings parallel the compelled pro-abortion statements that the Supreme Court recently struck down in *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), further confirming the likely result in this case. Indeed, if Texas could regulate in this fashion, it would be open season for the government to demand like "health warnings" from providers whose offerings touch the disfavored side of issues that divide Americans, from firearms, to climate change, to transgender counseling, *etc.* The First Amendment does not countenance governmental mandates that one side condemn itself in the face of real, ongoing policy debates.

Separately, as the district court correctly held, any imposition of liability against website operators for hosting the expressive content of others is independently barred by Section 230 of the Communications Decency Act (CDA), 47 U.S.C. § 230(c)(1). As the statutory text makes clear and this Court's precedent confirms, "Congress provided broad immunity under the CDA to Web-based service providers for *all claims* stemming from their publication of information

4

created by third parties." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (emphasis added). The Act does not—and could not—dislodge that congressionally conferred immunity, which further protects a subset of the covered websites from enforcement.

For all those reasons, Appellees' likelihood of success is apparent. And the other relevant factors weigh heavily in favor of preliminary relief, as the district court found. "Deprivation of First Amendment rights, even for a short period, is sufficient to establish irreparable injury." *State v. Biden*, 2023 WL 5821788, at *28 (5th Cir. Sept. 8, 2023). Atop that, the Act imposes massive compliance costs and crippling financial penalties—up to a quarter-million dollars per violation—on website operators, who might well "self-censor rather than risk the perils of trial." *Ashcroft*, 542 U.S. at 658 (affirming preliminary injunction). The public interest strongly favors maintaining the status quo by barring enforcement of the law until its validity has been adjudicated on the merits. *See id.* at 671. Especially considering that the Supreme Court endorsed unstayed preliminary injunctions of strikingly similar laws in *Reno* and *Ashcroft*, the district court cannot have abused its discretion in arriving at the same result here. 521 U.S. at 862; 542 U.S. at 673. This Court should deny Texas's requested stay and affirm the preliminary injunction.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Appellees' suit pursuant to 28 U.S.C. §§ 1331, 1343(3). ROA.19. This Court has jurisdiction over Texas's appeal under 28 U.S.C. § 1292(a)(1). ROA.1771-72.

## QUESTIONS PRESENTED

1.    Whether this Court should deny the State's request to stay the preliminary injunction granted below, as currently subject to an administrative stay pending decision by the merits panel.

2.    Whether the district court abused its discretion in determining that the Act is likely infirm and should be preliminarily enjoined consistent with the equities and public interest.

## STATEMENT OF THE CASE

## I.    PROCEDURAL HISTORY

On August 4, 2023, Appellees—the primary trade association for the adult industry, an array of providers of third-party content, and certain content creators—sued Angela Colmenero, the interim Attorney General for Texas, to enjoin enforcement of the Act, alleging (*inter alia*) violations of the First Amendment and Section 230 of the Communications Decency Act (CDA). ROA.16-46. Appellees moved for a preliminary injunction backed by experts attesting to scientific and technological premises and fact declarations regarding

Appellees' websites and the law's burdens. ROA.54-83. The district court set an expedited schedule to enable a ruling before the law's effective date of September 1, 2023; briefing concluded on August 21, 2023. ROA.316-17, 326-27.

After holding a hearing on August 23, 2023, the court on August 31 issued an 81-page decision preliminarily enjoining enforcement. ROA.1690-1770. Texas appealed (ROA.1771-72) and moved for a stay pending appeal, which Appellees opposed and the district court denied. ROA.1793-1829. Texas then sought a stay from this Court on September 7, 2023. Dkt. #12.

On September 19, 2023, this Court administratively stayed the preliminary injunction, while carrying forward the motion for stay pending appeal and expediting the case to the next available oral argument panel. Dkt. #66. On September 20, 2023, this Court issued an expedited briefing schedule directing the parties to file simultaneous opening and reply briefs, setting oral argument for October 4, 2023, and inviting the parties to argue the stay question alongside the merits. Dkt. #69.

## II.    THE STATUTORY TEXT

The Act applies to "commercial entities" that "operate[] an Internet website." Tex. Civ. Prac. & Rem. Code §§ 129B.002(a), 006(b)(1). A website operator who "knowingly and intentionally publishes or distributes material on an

Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors, shall use reasonable age verification methods ... to verify that an individual attempting to access the material is 18 years of age or older." § 129B.002(a). To comply, websites must require that visitors either "provide digital identification" or "comply with a commercial age verification system" that utilizes "government-issued identification" or "a commercially reasonable method that relies on public or private transactional data." § 129B.0003. The entity performing age verification "may not retain any identifying information of the individual," but transmission of that information is not prohibited. § 129B.002(b).

Covered websites must also display, on their landing pages and on every advertisement, an extensive "TEXAS HEALTH AND HUMAN SERVICES WARNING," as well as a bulletin, on every webpage, for the "U.S. SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES" helpline. § 129B.004. The "warnings" must state that "[p]ornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function"; that "[e]xposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses"; and that

"[p]ornography increases the demand for prostitution, child exploitation, and child pornography." § 129B.004(1).  Additionally, every webpage must include the U.S. government's helpline telephone number and direct users for possible "REFERRAL TO LOCAL TREATMENT FACILITIES, SUPPORT GROUPS, AND COMMUNITY-BASED ORGANIZATIONS." § 129B.004(2).

Beyond exempting any website, including social-media sites, whose objectionable content lies below the "more than one-third" threshold, § 129B.002(a), the Act expressly exempts search engines and the media. § 129B.005.  It "does not apply to a bona fide news or public interest broadcast, website video, report, or event and may not be construed to affect the rights of a news-gathering organization." § 129B.005(a).  Nor does it apply to an "Internet service provider, or its affiliates or subsidiaries, a search engine, or a cloud service provider" that solely provides "access or connection to or from a website or other information or content on the Internet ... to the extent the provider or search engine is not responsible for the creation of the content that constitutes sexual material harmful to minors." § 129B.005(b).

The Act defines "sexual material harmful to minors" as "any material" that:

(A) the average person applying contemporary community standards would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest;

(B) in a manner patently offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated displays or depictions of: (i) a person's pubic hair, anus, or genitals or the nipple of the female breast; (ii) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or (iii) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

§ 129B.001(6).   This definition modifies the Supreme Court's definition of obscenity by adding the phrases "with respect to minors" and "for minors."  *See Miller v. California*, 413 U.S. 15, 24 (1973).   A "minor" is any "individual younger than 18 years of age." § 129B.001(3).

The Attorney General may "enjoin [violations], recover a civil penalty, and obtain other relief the court considers appropriate." § 129B.006(a).   The Act authorizes civil penalties of up to $10,000 a day, plus an additional amount "up to $250,000" if a minor accesses the website. § 129B.006(b).

## III.   THE EVIDENCE

The preliminary injunction rests on a substantial evidentiary record. Appellees' computer and Internet expert attested to the efficacy and availability of content-filtering software (including for installation on smartphones and personal devices), to the role played by virtual private networks ("VPNs") and other Internet

10

tools that can be used to circumvent jurisdiction-specific regulations (by masking a user's actual geographic location), and to the security risks abounding on the Internet. ROA.158-70. He explained that content filtering works better than age verification, particularly because age verification would *not* prevent search engines from presenting adult content to minors, whereas content filtering *would*. ROA.1223-26.

Appellees' psychologist and pornography expert pointed out the scientific defects and controversies attending the law's compelled "health warnings." ROA.76-77, 227-31. Appellees' human-trafficking expert explained that the law's statements about trafficking, prostitution, and child pornography are not grounded in scientific data or research. ROA 1230-37. Separately, Appellees introduced evidence of the ideological controversies surrounding pornography, including the article "The author of 'The Pornography Wars' thinks we should watch less and listen more," and numerous studies contesting the effects of viewing adult content. ROA.77, 144-151, 1277-1680. Appellees' fact declarations further attested to the social stigma that can surround pornography, as well as the costs of implementing age verification, ROA.73, 253-56; the burdens and problems posed by the law's "health warnings," ROA.78, 249-51, 265-68, 270-72; and the

mass of non-obscene content suffusing their websites.  ROA.1260-62, 1265, 1767-73, 1254-76.

In turn, Texas offered expert declarations to support the law's "health warnings" and to argue that pornography is harmful to minors.  ROA.366-74, 432-33.  Texas also offered a fact declaration from a police officer describing what he saw when browsing some of Appellees' websites.  ROA.389-401.  Further, Texas offered the declaration of Tony Allen, a representative of the "age verification industry," to discuss different types of age verification technologies.  ROA.402-30.  Virtually none of Texas's claimed evidence traced to the legislative record.

Mr. Allen also testified at the hearing.  ROA.1834-54.  He acknowledged that "content filtering is far more ubiquitous as a method to block access to adult websites in the United States today than age verification," and that the "technology itself works."  ROA.1849, 1851.  He also acknowledged that "adult images and pornographic materials and that sort of thing are widely available on social media sites," and that "the same is true for search engines[.]"  ROA.1850.  Per Mr. Allen, there is a technology "fairly widely used in the adult industry ... called Restricted To Adults, the RTA," which, "if the Texas legislature were to pass a different law that required an RTA label ... and then gave parents the choice of placing blocking software, filtering software on their computers ... the RTA code would then work

with that software to block the [adult content.]" ROA. 1852-53. Finally, he stated that some Appellees have "age verification built into their systems." ROA.1854. Appellees contested this point as inaccurate. ROA.1816; *see also infra* at 29 n.3.

## IV.    THE DISTRICT COURT'S ORDER

In granting the preliminary injunction, the district court found that both provisions of the Act likely violate the First Amendment. ROA.1709-58. Addressing the "age verification" provision, it determined that the provision chills adult access to protected speech and is subject to strict scrutiny, applying seminal precedents, including *Reno* and *Ashcroft*. ROA.1709-12, 1721-32. The court then found that the provision fails strict scrutiny because it is severely underinclusive and content filtering—i.e., installing filtering software on users' devices to disable access to Internet content—affords a less restrictive, *more* effective means of protecting minors, which the Legislature failed to consider. ROA.1715-17, 1732-42.

Turning to the "health warnings," the court determined that as compelled speech, they fail strict scrutiny, and further that commercial-speech doctrines do not apply, because the "warnings" target pornography based on its content so as to warrant strict scrutiny, which the "warnings" fail. ROA.1742-49. The court further determined that the "warnings" would fail even under commercial-speech

doctrines, not least because they are scientifically inaccurate, ideologically controversial, and practically unworkable.  ROA.1749-58.

The court additionally determined that, as to certain Appellees, the Act likely violates Section 230, which prohibits causes of action that equate platforms with publishers of third-party content, because the Act effectively holds them liable for harms the Legislature attributes to third-party content and because they host only third-party adult content, as found from uncontested evidence.  ROA.1758-63.

Finally, the court found that Appellees face irreparable harm not only from loss of First Amendment freedoms, but also from loss of their Section 230 immunities, unrecoverable compliance costs ("at minimum, $40,000.00 per 100,000 verifications"), and harm to their customer goodwill.  ROA.1699, 1763-67.  No commensurate interest weighed on the other side of the scale, as Texas has no interest in enforcing unconstitutional laws.  ROA.1767.

## SUMMARY OF ARGUMENT

**I**.    As a threshold matter, this Court's jurisdiction is secure.  As parties directly regulated by the Act and subject to resulting speech restrictions and financial burdens, Appellees have paradigmatic forms of Article III standing.  The State's challenge to Appellees' standing below was hollow, relying on merits

arguments rather than standing arguments (and erroneous ones at that). In any event, because there is no question that at least one Appellee has standing, there is no question that the merits are due to be resolved.

**II.**    As the district court correctly held, Appellees satisfy the first and most important requirement for a preliminary injunction: they are likely to succeed on the merits of their challenge in one or more respects.

**A.**    Although ostensibly aimed at minors, the Act's age-verification requirements fall heavily on the large numbers of adults who visit Appellees' websites. The requirements thus burden substantial amounts of undeniably protected speech—sexually explicit "speech addressed to adults"—and trigger strict scrutiny for the same reasons as did the statutes at issue in *Reno*, *Ashcroft*, and other binding precedents. *Reno*, 521 U.S. at 875; *cf. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 804-05 (2011) ("Even where the protection of children is the object, the constitutional limits on governmental action apply.").

Recognizing the force of those precedents, Texas's lead argument below was that Supreme Court precedent in this area should be revisited. Texas is free to make such a request in the Supreme Court someday, but for now its position is tantamount to conceding that strict scrutiny applies today. The State's attempts in this Court to invoke other precedents involving restrictions on the provision of

sexually explicit material to minors (*e.g.*, *Ginsberg v. New York*, 390 U.S. 629 (1968), and subsequent cases reasserting it) fail for essentially the same reason: the Supreme Court recognized that source-based restrictions on *Internet* expression raise concerns categorically different from those at issue in cases like *Ginsberg* given the nature of cyberspace and the breadth and invasiveness of speech burdens in this context. *See, e.g.*, *Reno*, 521 U.S. at 865.  Although Texas suggests that the Internet's evolution has somehow abrogated that reasoning, the evidence and findings in this case establish the opposite—especially because content-filtering technology is both more available and more effective in 2023 than ever before.  To the extent Texas argues there is now more sexual content on the Internet than ever before, this law burdens more, not less, expression as compared to its predecessors.

**B.**     Like its predecessors, the Act is likely to fail strict scrutiny.  As a measure purportedly aimed at protecting minors, it is severely underinclusive.  After all, the Act makes express exceptions for news media and search engines—as well as effective exceptions for social-media sites—even though all of those platforms contain material *identical* to that on Appellees' websites, while being *likelier* to reach minors.  At the same time, the Act's coverage is egregiously overinclusive relative to its purported aim of protecting minors, because it burdens a huge number of adults.  And the Act eschews less-restrictive means for

preventing minors' access to sexually explicit websites, including user-based content filtering and blocking software—the very alternative means that the Supreme Court specifically identified in *Ashcroft*.

The Legislature's failure to consider that obvious alternative (or any other) betrays that the Act's overriding goal is not to protect minors but rather to condemn the "pornography industry." That ambition may find popular support in some quarters, but it is unconstitutional. Indeed, it is hard to imagine a starker violation of the First Amendment than governmental targeting of protected speech based on its content and speaker. "What the Constitution says is that … judgments" about which protected expression to consume "are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority." *Playboy*, 529 U.S. at 818.

**C.** The Act's command that Appellees post "health warnings" and notices about an "abuse hotline"—effectively condemning their own content—provide further evidence of the ulterior, impermissible enterprise at work. If anything, this aspect of the law is even less constitutionally defensible than the age-verification requirements. As content-based compulsions of speech, the warning and notice requirements draw strict scrutiny. And like the compelled pro-abortion messages that the Supreme Court recently invalidated in *NIFLA*, the Act's

17

requirements are patently invalid, particularly given the myriad other mechanisms Texas can use to express its own views on pornography for itself.

Nor are the Act's speech compulsions defensible under *Zauderer* or related commercial-speech doctrines. Portrayed as product disclosures analogous to cigarette warnings, they wither under the evidentiary record, which establishes that they are not only non-factual and stigmatizing (and designedly so), but also scientifically, morally, and politically contested, if not outright false. Defended as run-of-the-mill regulations of commercial speech, they do not pass muster even under intermediate scrutiny, failing each requirement for numerous reasons—not least because they target *adults* rather than minors and are *themselves* deceptive— as the district court found.

**D.** Separate and apart from the First Amendment violations at issue, it is likely that the Act treats several Appellees as if they were the publishers of adult content, thereby contravening Section 230's protections. That result follows from this Court's decision in *Doe v. MySpace*, which determined that a cause of action aimed at holding a platform responsible for harms attributed to third-party content—*specifically* in the context of age verification—equates platform with publisher. 528 F.3d at 420. Unable to distinguish *MySpace*, Texas would

artificially confine that case to its facts, but such a cramped reading of this Court's precedent is unlikely to carry the day.

**III.**     Finally, the district court found in straightforward fashion—subject only to abuse-of-discretion review—that the remaining factors weigh in favor of preliminary relief.  Appellees face numerous irreparable injuries from potential enforcement of the Act, including the quintessential irreparable harm of a First Amendment violation as well as massive compliance costs and potentially crippling penalties.  Affirming the preliminary injunction would mean maintaining the status quo while the litigation unfolds—precisely the approach the Supreme Court took in the analogous posture of *Reno* and *Ashcroft*.  On the other side of the ledger, Texas has gone decades since the dawn of the Internet without a law like this one, and no great harm will befall the State from waiting to impose the law's burdens until they have been adjudicated on the merits.

Accordingly, this Court should affirm the entry of the preliminary injunction.  And for essentially the same reasons, the Court should deny Texas's motion for a stay pending appeal, thereby dissolving the administrative stay and providing much-needed clarity to all interested parties.

## STANDARD OF REVIEW

A preliminary injunction is reviewed for abuse of discretion, with any legal error or clearly-erroneous finding amounting to *per se* abuse of discretion. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). "If the underlying constitutional question is close ... we should uphold the injunction and remand for trial on the merits." *Ashcroft*, 542 U.S., at 664-65. Once heightened scrutiny applies, "the Government bears the burden of proof on the ultimate question of [the law's] constitutionality," such that Appellees "must be deemed likely to prevail unless the Government has shown that [the] proposed less restrictive alternatives are less effective[.]" *Id.* at 666.

## ARGUMENT

## I.   APPELLEES' STANDING IS BEYOND DOUBT

Because this challenge is brought by entities directly regulated by the Act and others whose speech is chilled by it, standing should be beyond doubt, as the district court explained. ROA.1698-1706, 1760-61. Nevertheless, Texas below extensively challenged Appellees' standing in discrete respects. Suffice it to note that Appellees face injuries in fact from the compulsion, costs, burdens and penalties that are directly traceable to the Act and redressable in court, and that foreign entities naturally have standing to defend their expression in Texas against sanction by Texas, *see, e.g.*, *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743 (9th

Cir. 2021), while also asserting their adult users' rights under the overbreadth doctrine. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386, 392-93 (1988); *see also* ROA.1706. Moreover, because at least one Appellee has standing, this Court has jurisdiction to resolve the appeal. *See, e.g.*, *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014).

## II. APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS IN MULTIPLE RESPECTS

The district court did not err in identifying multiple paths to Appellees' likely success, any one of which suffices to justify the preliminary injunction.

### A. The Age-Verification Requirement Is Subject To Strict Scrutiny And Incapable Of Withstanding It

The Act's age-verification mandate requires that all regulated websites—because they provide mature content—either impose the hurdle of age verification or else shut off access altogether. By thus regulating and chilling protected speech based on its content, the Act triggers strict scrutiny. And because the Act's age-verification requirement is simultaneously underinclusive, overinclusive, and more restrictive than necessary to accomplish the statutory objective, the provision is highly likely to fail strict scrutiny and therefore violate the First Amendment.

**1.    Strict Scrutiny Applies Because The Act Chills A Substantial Amount Of Protected Speech Based On Its Content**

The operative legal framework has been laid down by *Reno* and *Ashcroft*. In *Reno*, the Supreme Court reviewed a preliminary injunction based on evidence "describ[ing] the character and the dimensions of the Internet, the availability of sexually explicit material in that medium, and the problems confronting age verification for recipients of Internet communications." 521 U.S. at 849. The Court applied strict scrutiny in faulting two sections of the CDA that proscribed the online distribution of material inappropriate for minors, unless age verification was used. *Id.* at 870-74. As the Court held, "[i]n order to deny minors access to potentially harmful speech, the CDA effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another," which "is unacceptable if less restrictive alternatives would be at least as effective ...." *Id.* at 874.

When the next statutory iteration returned in *Ashcroft*, in the form of the Child Online Protection Act (COPA), it was apparent once again that it was likely overbroad. 542 U.S. at 665, 670. *Ashcroft* therefore affirmed the district court's finding "that the statute was likely to burden some speech that is protected for adults," thereby again triggering strict scrutiny and the requirement that the least-

restrictive means be employed. *Id.* at 663, 665. The same analysis applies here, where the Act burdens a vast amount of expression, based on its content, that is protected as to adults.[2] It follows that the Act is subject to strict scrutiny.

(a)   *The Act Expressly Ensnares A Substantial Amount Of Protected Speech*

By its express design, the Act sweeps in vast swaths of protected speech. As Texas acknowledges, the statute's trigger is defined in terms of content deemed inappropriate "for minors," even though "some content that is inappropriate for minors is not obscene by adult standards." Dkt. #12 (Mot. at 7 (citations and quotations omitted)). Further, because "the age-verification requirements apply before the user enters their websites," exceeding the one-third threshold triggers restrictions on "*all* their content." *Id.* at 12 (emphasis added). The Act thus

---

[2] *NetChoice v. Paxton*, on which Texas relied in its stay briefing (*see* Dkt. #12, 68) is far afield. 49 F.4th 439 (5th Cir. 2022). There, this Court rejected a facial overbreadth challenge because the law chilled censorship, not speech; because "there are no third parties to chill"; and because the law's "language renders implausible many of the Platforms' extreme hypothesized applications of the law." *Id.* at 450-52. This case differs on all three counts, while closely paralleling *Reno* and *Ashcroft*. As for the passage that Texas cites to suggest "federalism" precludes Appellees' challenge (*id.* at 449), this Court did not suggest that the *First Amendment* has any less force against States as incorporated under the Fourteenth Amendment. *Compare id.* at 449 (discussing facial challenges generally), *with id.* at 450 (discussing the First Amendment specifically); *cf. City of Houston, Tex. v. Hill*, 482 U.S. 451, 467 (1987) (abstention inappropriate in First Amendment challenges); *Zwickler v. Koota*, 389 U.S. 241, 252 (1967) (same).

23

requires adults to pass through age verification to access websites even where most of the content is benign for people of any age.

As the district court observed, "[b]ecause most sexual content is offensive to young minors, the law covers virtually all salacious material. This includes sexual, but non-pornographic, content posted or created by Plaintiffs. And it includes Plaintiffs' content that is sexually explicit and arousing, but that a jury would not consider 'patently offensive' to adults, using community standards and in the context of online webpages." ROA.1712-13. Such content-based restriction of access to protected expression—reaching even as far as 66% of a website's content—raises grave First Amendment concerns, as both the Supreme Court and this Court have continued to affirm. *See, e.g. United States v. Stevens*, 559 U.S. 460, 473 (2010) (a statute is facially unconstitutional under the First Amendment when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."); *Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018) ("the government [cannot] proscribe unprotected content through a regulation that simultaneously encompasses a substantial amount of protected content[.]").

(b)     *The District Court's Factual Findings Confirm That The Act Ensnares And Chills A Substantial Amount Of Protected Speech*

What is more, the district court rightly found from unrebutted evidence that the Act will sweep in substantial amounts of non-obscene content specifically hosted by Appellees.  ROA.674-75, 679, 681, 684-87, 690.  Appellees' websites include, for example, blog posts advising women on what to expect following a hysterectomy, and the content on one of Appellees' websites is *exclusively* "soft core" nude modeling.  ROA.675, 684.  Although Texas points to the sheer volume of pornography on the Internet, it takes no account of the *non*-obscene, albeit adult-themed, content that is commonplace on Appellees' sites (as elsewhere on the Internet), and that the Act designedly restricts.

To assert, as Texas does, that a subset of the regulated content is obscene—*sans* any rigorous, work-specific application of the *Miller* test—cannot obviate or change the operative First Amendment analysis.  "Even if the Court accepted that many of Plaintiffs' videos are obscene to adults ... the law would still regulate the substantial portion of Plaintiffs' content that is not 'patently offensive' to adults." ROA.1712-13.  Unable to challenge that finding as clearly erroneous, Texas relies on one declarant's description of a *single* video, together with a targeted selection of video titles, category names, and supposed search-term results from xnxx.com—

one website operated by one Appellee.  ROA.538.  Texas also points to a few sentences from an expert declaration from a different case that was never offered there to prove obscenity and characterizes all "mainstream" pornography in sweeping, tendentious fashion (ROA.505-11), based entirely on a misunderstanding of how search terms function, without any review of any specific content.  *See* ROA.1268.  None of this establishes clear error.  Indeed, Texas is defying the statute, the record, and common sense when it suggests that the Act does not restrict adults' access to protected content.

Texas is no more persuasive in denying that the Act stands to chill protected expression among adults.  The district court's findings on this point are far from clearly erroneous.  *See Bennie v. Munn*, 822 F.3d 392, 398 (8th Cir. 2016) (whether and how a statute chills speech is a factual finding).  As the district court determined, many adults will be deterred by demands to furnish personal information, especially identifying information, over the Internet where it may be leaked, hacked, or exploited—particularly in the context of accessing sensitive content revealing users' sexual preferences.  ROA.1728-32.  Technological progress has only magnified these risks, as "[u]sers today are more cognizant of privacy concerns, data breaches have become more high-profile, and data related to users' sexual activity is more likely to be targeted."  ROA.1731-32.  For example,

"the State of Louisiana passed a highly similar bill to H.B. 1181 shortly before a vendor for its Office of Motor Vehicles was breached by a cyberattack ....  The First Amendment injury does not just occur if the Texas or Louisiana DMV (or a third-party site) is breached.  Rather, the injury occurs because individuals know the information is at risk."  ROA.1731 (cleaned up).

Although Texas touts the supposed safety and security of the nascent "Age Verification Industry," the district court disagreed, noting that Texas's account "simply does not match the evidence and declarations supported in the parties' briefing."  ROA.1731.  Indeed, the Act does not even prohibit the external transmission of personal information during the age-verification process.  ROA.1730, 1848.  The Legislature did nothing to assure users of their online privacy, failing to prescribe even the most basic safeguard appropriate to this medium.

Beyond chilling expression between providers and willing adults, the Act will extinguish much of the underlying expression.  Many websites face the impossible dilemma of choosing between the Act's steep fines and the daunting compliance costs, which, as the district court found, can be prohibitive for smaller websites.  ROA.1699; *see also Fabulous Assocs. v. Pa. Pub. Util. Comm'n*, 896 F.2d 780, 788 (3d Cir. 1990) (considering compliance costs).

27

The upshot is the same chilling of protected speech based on its content that *Reno* and *Ashcroft* confronted, thereby necessitating strict scrutiny. *See* 521 U.S. at 876; 542 U.S. at 670. That the Act does not "ban" pornography, as Texas notes, is immaterial. Dkt. #68 (Reply at 1). Both *Reno* and *Ashcroft* acknowledged that the enjoined laws provided that age verification would be a defense to providing inappropriate content to minors. 521 U.S. at 881; 542 U.S. at 662, 668. More broadly, the Supreme Court has expressly rejected Texas's basic premise, holding that, because "the distinction between laws burdening and laws banning speech is but a matter of degree," the "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Playboy*, 529 U.S. at 812. Texas cannot overcome the Supreme Court's on-point instructions as to why any substantial content-based burdening of protected speech—never mind niceties of gradation—warrants strict scrutiny.

Unable to overcome controlling precedents and factual findings, Texas quibbles about the precise extent of the chill. Texas insists, over contrary findings, that the "Age Verification Industry" includes less-invasive options, but ignores that the surest path to compliance is by requiring visitors to provide government-issued or digital identification §§ 129B.003(a), (b)(1), (b)(2)(A); *see also* ROA.1729, 1733-34. Nor can Texas deny that visitors, upon supplying government-issued

documentation *identifying them by name*, will then be greeted with government-issued *warnings* suggesting they have strayed into off-limits pastures reserved for individuals suffering mental illness and/or drug addiction. *See infra* at 47-48. Nor does the Act authorize the supposed "industry" alternatives. The statutory option of a "commercially reasonable method" depends on using "transactional data," defined in terms of official "documents" and "records," §§ 129B.001(7), 003(b)(2)(B), which ostensibly *exclude* less onerous third-party options. ROA.1733-34, 1837. Finally, while Texas suggests that the Act does *not* require "visitors to pornographic websites to begin age verification anew with every visit" (Dkt. # 68 (Reply at 5)), the district court correctly observed that the Act speaks only of "attempt[s] to access" material and "contains no such exception[.]" ROA.1733. Alternatively, if Texas is now suggesting that a system will be tracking the same individual across various websites, that only *exacerbates* the privacy concerns.[3]

---

[3] Texas distracts by noting that *one* Appellee, Pornhub, has complied with a *different* age verification law in Louisiana. But Louisiana imposes no "health warnings" and maintains a broader, government-sponsored digital-identification system. In other jurisdictions that are introducing new age-verification regimes, Pornhub has shut off access. Texas is also incorrect to contend, citing Mr. Allen's statements, that Appellees already use age verification. Mr. Allen relies primarily on Pornhub's age verification process for adult *performers*, not visitors. ROA.403-04 (at ¶ 11 & at n.2 (citing a press release about verifying performers' ages)). And

(c)   *The Act's Vagueness Further Chills Protected Speech*

Like the law in *Reno*, the Act compounds its chilling effect due to its multiple "ambiguities concerning the scope of its coverage." *Reno*, 521 U.S. at 870. As the district court explained, it is impossible to tell how to perform the Act's "more than one-third" calculation given that the antecedent of "one-third" is unclear. ROA.1720.

Even more problematic is the phrase "with respect to minors," which has no fixed, understood meaning when applied to everyone under the age of 18. *See ACLU v. Mukasey*, 534 F.3d 181, 205 (3d Cir. 2008). "The type of material that might be considered harmful to a younger minor is vastly different—and encompasses a much greater universe of speech—than material that is harmful to a minor just shy of seventeen years old .... [S]ex education materials may have 'serious value' for, and not be 'patently offensive' as to, sixteen-year-olds. The same material, however, might well be considered 'patently offensive' as to, and without 'serious value' for, children aged, say, ten to thirteen." *ACLU v. Ashcroft*, 322 F.3d 240, 268 (3d Cir. 2003). Unfortunately, "H.B. 1181 provides no guidance as to what age group should be considered for 'patently offensive' material." ROA.1718.

---

Pornhub is the only entity listed by Mr. Allen that is a Plaintiff here. ROA.403-04 (at ¶ 11).

All we know is how regulated entities fearing exposure will cope with such inscrutability. To avoid liability, many websites will abide by the most stringent understanding of the Act. The upshot is a chill that could at least be mitigated simply through legislative clarity. *See Reno*, 521 U.S. at 872.

(d)    *Ginsberg And Brown Are Not To The Contrary*

Although Texas points to *Ginsberg v. State of New York*, that decision says nothing about Internet regulation. 390 U.S. 629 (1968). As *Reno* and *Ashcroft* teach and the district court noted, age verification over the Internet poses unique risks compared to age verification in person. ROA.1728-31. In-person age verification poses no appreciable risk of hacks or leaks, of being tracked or monitored, or of being forever linked to sensitive, controversial content. Many adults are never even asked for their identification in person; their appearance alone suffices.

Here, rather than require identification to purchase a nude magazine, the Act requires identification before anyone can enter the store. As the district court observed, "a more apt analogy would be that the Act forces movie theaters ... to screen everyone at the main entrance for their 18+ identification, regardless of what movie they wanted to see." ROA.1713 (at n.5).

31

Still more puzzling is Texas's reliance on *Brown v. Entertainment Merchants Association*. 564 U.S. 786, 793-94 (2011). There, the Supreme Court mentioned *Ginsberg* in passing, en route to holding that a state statute was constitutionally infirm. *Id.* All the Court said about *Ginsberg* was that it had "approved a prohibition on the sale to minors of sexual material that would be obscene from the perspective of a child." *Id.* at 793. So it did, but that hardly suggests strict scrutiny is inapplicable to Internet regulations that restrict adult content as to adults. If anything, *Brown* underscores the importance of tailoring and confirms that underinclusiveness should itself be fatal. *See* 564 U.S. at 802; *infra* at 37-38.

### 2.     Strict Scrutiny Also Applies Because The Act Discriminates Based On Speaker And Viewpoint

As explained above, applying *Reno* and *Ashcroft* to the statute and evidence here leads to straightforward application of strict scrutiny. Yet strict scrutiny also applies because the Act evinces defects exceeding those presented in *Reno* and *Ashcroft*. In those cases, the federal statutes at least had the virtue of even-handedly restricting all content that was deemed inappropriate for minors, whatever its source. Here, the Act is glaringly underinclusive, to the point of pursuing speaker- and viewpoint-based discrimination. This separately triggers strict scrutiny, as Supreme Court precedent confirms. *See, e.g.*, *Playboy*, 529 U.S.

32

at 812 (striking a law restricting channels "primarily dedicated to sexually-oriented programming," because "laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles")

A statute's underinclusiveness sends up a red flag that it is pursuing forbidden viewpoint discrimination under false auspices. *See, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 52 36 (1994) (underinclusivity "diminish[es] the credibility of the government's rationale for restricting speech in the first place"); *The Fla. Star v. B.J.F.*, 491 U.S. 524, 540 (1989) ("facial underinclusiveness ... raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes[.]").  For example, the Supreme Court has held that an "ink and paper tax violates the First Amendment not only because it singles out the press, but also because it targets a small group of newspapers." *Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*, 460 U.S. 575, 591 (1983); *see also Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 234 (1987) (same).

When a statute exhibits "[s]electivity of this sort," it "goes even beyond mere content discrimination" into speaker- and viewpoint-based discrimination, which "alone [is] enough to render the ordinance presumptively invalid[.]"  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391, 393-94 (1992).  Such laws are very nearly

*per se* violations of the First Amendment. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2299-2302 (2019). Thus, "the First Amendment prohibits 'restrictions distinguishing among different speakers, allowing speech by some but not others.'" *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)). A law that specifically "target[s] those speakers and their messages for disfavored treatment," while leaving others alone, prototypically mandates strict scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011).

The Act does not hold up under these precedents. It is undisputed that the Act leaves unregulated all the adult content found on social-media sites, whose large volume of non-adult content brings them outside the statute's scope, as well as search engines, which are expressly exempt. § 129B.005; ROA.1850, 1877-81.[4] Through search engines, however, the exact same content "can be extracted from Plaintiffs' websites regardless of age verification," while social media sites "can maintain entire communities and forums (i.e., subreddits), dedicated to posting online pornography with no regulation under H.B. 1181." ROA.1715-18, 1734-35.

---

[4] In self-defeating fashion, the Act invites websites to dodge age verification entirely, provided only that they inject benign content until at least 67% of their content passes muster for minors. ROA.1720 (at n.8).

In fact, "pop-up ads, not pornographic websites, are the most common forms of sexual material encountered by adolescents." ROA.1735.

Against this backdrop, the Act's compelled "health warnings" and "abuse hotline" provide smoking-gun proof of the Act's *true* purpose: to stigmatize the "porn industry" and deter *all* patronage of such disfavored speech. As the district court found, the scientifically unsupported "warnings"—required even for websites that contain *no* pornography that would be obscene for adults—are directed *precisely* at adults. ROA.1749, 53; *see also infra* at 49-50. Likewise, many of the studies on which Texas relies address *adults*, including on key subjects such as the alleged link between pornography and violence, alleged addiction, and alleged effects on self-esteem and body image. *See* ROA.375-77. The Act thus targets *adult* websites while warning *adults* away from them. It is, in other words, designed to strike a blow against the adult industry itself—as the House Committee Report put it, to hold this one industry "accountable." ROA.1283. The foregoing "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Becerra*, 138 S. Ct. at 2376 (cleaned up). Strict scrutiny is therefore all the more imperative.

### 3.    Intermediate Scrutiny Under *Renton* Does Not Apply

Despite these multiple lines of precedent calling for strict scrutiny, Texas has urged a form of intermediate scrutiny, analogizing the Internet to a town square and the Act to traditional zoning regulation addressing the "secondary effects" (*e.g.*, on property valuations) surrounding physical adult businesses.  ROA.485; *see generally City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).  As telegraphed by Texas's reliance on the dissent in *Ashcroft*, however, governing Supreme Court precedent goes against Texas.  ROA.487-88.  It is settled that laws restricting the distribution of adult content concern the primary effects on viewers and trigger strict scrutiny.  *See Ashcroft*, 542 U.S. at 676; *Playboy*, 529 U.S. at 815; *Reno*, 521 U.S. at 868; *Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).

Lest there be any doubt, the "health warnings" confirm that the Act regulates the supposed primary effects of viewing adult content, *e.g.*, addiction and brain damage.  To term these "secondary effects" would distort the doctrine beyond recognition.  Texas's move would open the door for the government to recharacterize any regulation of disfavored speech and its effects on listeners as a regulation targeting "secondary effects," thereby insulating content- and viewpoint-based regulation from strict scrutiny.  Governing precedent forecloses

36

that move: "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive [or] content-neutral justification," and "a speech regulation targeted at specific subject matter is content based[.]" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165, 169 (2015); *Free Speech Coal., Inc. v. Att'y Gen. United States*, 825 F.3d 149, 161-63 (3d Cir. 2016).

### B.    The Age-Verification Requirement Fails Strict Scrutiny

Strict scrutiny demands that statutes be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *see also Ashcroft*, 542 U.S. at 670. To pass muster, the Act must not only employ the least-restrictive means of protecting minors, *see Reno*, 521 U.S. at 874, but must actually serve that interest. *Ashcroft*, 542 U.S. at 670. Texas bears the burden of showing both, *id.* at 663, yet has shown neither here.

### 1.    The Act Is Not Narrowly Tailored, Because It Is Underinclusive

As the district court found, it is anomalous for the Act to exempt search engines and (*de facto*) social media, without even addressing pop-up ads. ROA.1715-18, 1734-35. These "substantial exemptions, including material most likely to serve as a gateway to pornography use," are fatal to any claim of proper tailoring. ROA.1717; *see also Brown*, 564 U.S. at 802 (noting California's law

was "wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it.").

Texas cannot shift the burden by arguing that "Plaintiffs do not claim to have segregated the obscene and non-obscene materials in such a way that Texas can more narrowly tailor its law to require age verification solely for obscene content." Dkt. #68 (Reply at 4). Nothing indicates that the Legislature even explored tailoring along these lines, let alone needed more from Appellees in order to pursue that. It is Texas's burden to satisfy strict scrutiny, and this legislative record affords no satisfying explanation as to why Texas has swept in non-offending content by certain providers like Appellees, while effectively sanctioning offending content that is freely available to minors from ubiquitous sources that are expressly exempt.

## 2.     The Act Fails To Employ The Least Restrictive Means

Per the Supreme Court's instruction in *Ashcroft*, Texas has impermissibly disregarded a less-restrictive alternative. Specifically, Texas could promote, supply, or mandate the use or pre-installation of filtering technology on minors' devices. *See Ashcroft*, 542 U.S. at 666-73. As the Supreme Court explained, "[b]locking and filtering software is an alternative that is [likely] less restrictive than COPA, and, in addition, likely more effective as a means of restricting

children's access to materials harmful to them." *Id.* at 666-67. Filtering software is less restrictive because "adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information. Even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers." *Id.* at 667. The Court further explained that filtering is more effective than targeting speech at its source, because "a filter can prevent minors from seeing all pornography, not just pornography posted to the Web from America," and "filters are more effective than age-verification requirements." *Id.* at 657, 668.

Applying that instruction in 2023, the district court made rigorous findings establishing that the passage of time has only fortified that content-filtering software is a less-restrictive alternative that works well and constitutes "the definition of narrow tailoring." ROA.1732-41. "[A]s opposed to age verification, [it] can more precisely screen out sexual content for minors without limiting access to other speech," including on social media and search engines. ROA.1737. "Content filtering is especially tailored because parents can choose the level of access. In other words, parents with an 8-year-old can filter out content inappropriate for an 8-year-old, while parents with a 17-year-old can filter out content inappropriate for a 17-year-old." ROA.1737. Texas's own evidence

"suggests that parental-led content-filtering is a more effective alternative." ROA.1736. And "content filtering also comports with the notion that parents, not the government, should make key decisions on how to raise their children." ROA.1737. "[A]s Defendant's technical expert noted at the hearing, content filtering is designed for parents and caretakers to be easy to use in a family. The technical knowledge required to implement content-filtering is quite basic, and usually requires only a few steps." ROA.1739-40. Yet "Defendant has not pointed to any measures Texas has taken to educate parents about content filtering." ROA.1740. No clear error infects any of these dispositive findings.

Nor has Texas even addressed the *other* alternative Appellees proposed: "[T]he government could use Internet service providers, or ISPs, to block adult content until the adults opt-out of the block. This prevents the repeated submission of identifying information to a third party, and operating at a higher level, would not need to reveal the specific websites visited. If implemented on a device-level, sexual information would be allowed for adults' devices but not for children when connected to home Internet." ROA.1732. Texas's total failure to grapple with any such alternative further underscores its inability to withstand this aspect of strict scrutiny.

### 3.    The Act Does Not Effectively Pursue Its Interest

Setting aside the availability of a less-restrictive alternative, which is itself dispositive, there are obvious indications that the Act is not properly tailored to advance the goal of protecting minors.  As the district court found, age verification is ill-suited to this purpose.  Minors who wish to view adult content can and will continue to access websites that implement age verification.  ROA.1739.  Minors can easily bypass the Act's nominal virtual barrier by using freely available VPN services, which hide the IP addresses of devices connected to the Internet and allow users to appear as though they are operating elsewhere geographically. ROA.1739.  Minors can even turn to the dark web using the "Tor" browser, exposing themselves to the Internet's criminal underbelly.  ROA.1739.  Moreover, as explained above, a statute as underinclusive as the Act fails, at a minimum, to serve its purported purpose.  *See supra* at 35; *see also, e.g.*, *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 104-110 (1979) (invalidating a law that restricted newspapers but not radio stations, because "[i]t is difficult to take very seriously West Virginia's asserted need to preserve the anonymity of its youthful offenders when it permits other, equally, if not more, effective means of mass communication to distribute this information without fear of punishment").

41

### 4.    The Legislature's Failure To Make Any Supporting Record Or Consider Alternatives Is Independently Fatal

To satisfy heightened scrutiny, Texas must defend the Legislature's considered judgments. *See, e.g.*, *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195-96 (1997). Yet that task is impossible where the Legislature has not made any considered judgment on the essential points. To be sure, the Legislature "is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994). But the Legislature cannot altogether disregard less-restrictive alternatives, then dispatch its lawyers to posit *post hoc* reasons why those might not work. *See, e.g.*, *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1255 (10th Cir. 2021) ("[W]hile such a less-restrictive-means analysis need not entail the government affirmatively proving that it *tried* less-restrictive means ... it *does* entail the government giving *serious consideration* to such less-restrictive means before opting for a particular regulation."); *Bruni v. City of Pittsburgh*, 824 F.3d 353, 357 (3d Cir. 2016) (same); *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1301 (11th Cir. 2017) (same). As the Supreme Court noted in *Reno*, "[t]he lack of legislative attention" to a statute's tailoring, and the consequent failure to "present a considered

judgment," presents a distinct First Amendment problem. 521 U.S. at 876 n.41 (cleaned up); *see also id.* at 858 n.24

Here, the Legislature ostensibly gave no consideration to content-filtering or any other alternatives. ROA.1740-42. The Legislature at one point considered *combining* age verification with device-level filtering for a maximalist approach. *See* Senate Committee Session from 1:44:00 to 2:27:00, https://tlcsenate.granicus.com/MediaPlayer.php?view_id=53&clip_id=17957. But it never weighed device-level filtering as an alternative, instead doubling-down on age verification without explanation. *See* Senate Session from 3:00:00 to 3:05:00, https://tlcsenate.granicus.com/MediaPlayer.php?view_id=53&clip_id=18068; *compare* ROA.707-08 (Senate Committee Report)), *with* ROA.712-17 (Senate Amendments); *see also* ROA.697 (House Committee Report), 702 (House Engrossed Report). Indeed, the Legislature leaned almost entirely on anecdotes and advocacy groups, without attending to any particulars itself. *See* Senate Committee Session from 1:44:00 to 2:27:00, https://tlcsenate.granicus.com/MediaPlayer.php?view_id=53&clip_id=17957; *see also* ROA.706 (the Legislature citing Morality in Media, now known as the National Center on Child Exploitation ("NCOSE")); ROA.719-736 (explaining NCOSE's anti-porn political lobbying).

The Legislature's disregard for an obvious alternative—the very one spotlighted by the Supreme Court—should be fatal under strict scrutiny, at least when assessing likely success. Here, the Legislature barreled after the adult industry without considering alternatives, or even the First Amendment. ROA.1740 ("the legislature made no findings" about content-filtering). Notably, the Legislature's "failure to define key terms in a comprehensible way in the digital age speaks to the lack of care to ensure that this law is narrowly tailored." ROA.1720-21. Texas cannot now, *post hoc*, construct any satisfactory legislative rationale from whole cloth, consistent with heightened scrutiny. *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). For this reason, too, it is unlikely (to say the least) that Texas can ever develop a satisfying defense for this law, as passed by the Legislature, unless and until the Supreme Court "overrul[es] its own decisions[.]" *Randell v. Johnson*, 227 F.3d 300, 301 (5th Cir. 2000) (cleaned up).

### C.   The "Health Warnings" Fail Scrutiny Under Any Available Standard

The unconstitutionality of the "health warnings" is no less apparent. By compelling controversial expression that is anathema to those forced to espouse them, these warnings strike at the heart of the First Amendment. Lacking any satisfying defense of the particulars, Texas largely obscures them. But the district

court's incisive analysis of why the "health warnings" are likely unconstitutional rings loud and true; that alone suffices to justify the preliminary injunction, which Texas never suggested might be narrowed to differentiate health warnings from age verification.

### 1.    Compelled Speech Draws Strict Scrutiny, Which The Act Fails

It is well settled that government compulsion of private speech is presumptively unconstitutional and draws strict scrutiny.  *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2314 (2023); *Becerra*, 138 S. Ct. at 2371; *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 4, 21 (1986); *see also* ROA.1773-74.  As the district court noted, Texas's focus on obscenity is irrelevant in this connection—it is the content-based nature of the compelled speech that triggers strict scrutiny.  ROA.1744 (at n.5).

In *NIFLA v. Becerra*, the Supreme Court explained that the default less-restrictive alternative to compelling speech is for the government to speak itself, "without burdening a speaker with unwanted speech." 138 S. Ct. at 2376 (citation omitted).  "Most obviously, it could inform [the public directly] with a public-information campaign."  *Id.* at 2376 (cleaned up).  Texas has blown past that option.  And in *Brown*, the Supreme Court explained that a law that is at once "seriously overinclusive" and "seriously underinclusive" cannot stand.  564 U.S. at

805. This Act is both, failing to mandate similar warnings for any other ubiquitous sources of adult content, while simultaneously branding even websites whose content would mostly be *appropriate* for minors as pornography sites. Nor may Texas pursue phantom problems. *Id.* at 799 (explaining that the state must identify an "actual problem," for which purpose evidence "based on correlation, not evidence of causation" is "ambiguous proof [that] will not suffice"). Yet the statements the Act requires are false at worst and scientifically disputed at best, sounding loud alarms lacking corresponding factual basis. *See infra* at 48.

These constitutional defects betray a more fundamental flaw: While couched as protecting minors, the Act's "health warnings" and "abuse hotline" reveal an ulterior agenda to deter adults from accessing adult content. *See* ROA.1749, 53. The Act's true goal is to stigmatize adult websites and all who frequent them; only in service of that goal is it compelling scientifically contested, ideologically controversial speech that is anathema to the adult industry and its countless adult patrons. *See infra* at 47-50; *see also* ROA.1283. Far from reflecting a principled attempt to protect minors, the Act manifests speaker-based viewpoint discrimination and makes pariahs of Appellees' websites, branding them with warnings that say, in essence, "STAY AWAY" and "BE ASHAMED"—even as identical content more widely available from other providers, including from

46

social media and search engines, remains unscathed.  Such regulation violates the

cardinal rule that "government regulation may not favor one speaker over another."

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828  (1995).

### 2.     *Zauderer* **Does Not Apply And Is Violated In Any Event**

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio* upheld

a law requiring an attorney's advertising to disclose "purely factual and

uncontroversial information about the terms under which [the attorney's] services

will be available," using an "unjustified or unduly burdensome" standard quite

different from rational-basis review.  471 U.S. at 651.  This Act, however, cannot

be justified under *Zauderer*, because it fails to satisfy any of the established

requirements, precisely as found below.

### (a)     *The "Abuse Hotline" Is Not Factual*

As the district court found, the "abuse hotline" specially branded on the

targeted websites does not operate as a conveyance of factual information.[5]

Rather, it conveys (falsely) to healthy, informed adults that they are mentally ill,

drug-addicted, and in need of help.  ROA.1754-55.

---

[5]  The district court did not address whether the warnings, as distinct from the hotline, are "purely factual," ruling that this could implicate a thorny question about the *type* of speech—factual *versus* demonstrative or emotive—rather than its content.  ROA.1754.

(b)    *The "Health Warnings" And "Abuse Hotline" Are*
       *Scientifically, Morally, And Politically Controversial*

As the district court further found, the "health warnings" make affirmative claims of causation and association that are false at worst and scientifically contested at best. ROA.1754-58. Indeed, "[j]ust like debates involving abortion, pornography is anything but an uncontroversial topic. [*Texas's*] *own exhibit admits this* …. The intense debate and endless sociological studies regarding pornography show that it is a deeply controversial subject ... involving contested issues of sexual freedom, religious values, and gender roles." ROA.1755-56, 1758 (cleaned up & emphasis added).

Texas lacks any cogent response, missing the mark by claiming that pornography does not "approach[] the status of abortion as a major topic of public debate." Dkt. #68 (Reply at 8). But there is no "like abortion" standard—the relevant question has always been whether the topic is controversial. *See Becerra*, 138 S. Ct. at 2372. For instance, in *Entertainment Software Association v. Blagojevich*, the court held that *Zauderer* did not apply to a law requiring video-game packages to display a symbol of the state's definition of "sexually explicit," because what counts as sexually explicit is a "subjective and highly controversial message." 469 F.3d 641, 652 (7th Cir. 2006). The compelled speech here is even more controversial. "[L]iterally true" disclosures are one thing, *see, e.g., CTIA* -

*The Wireless Association v. City of Berkeley, California*, 928 F.3d 832, 846 (9th Cir. 2019), but the disclosures here differ categorically.  These warnings are "a far cry from cigarette warnings," and Texas cannot show that the district court clearly erred in so determining.  ROA.1758.

(c)  *The "Health Warnings" And "Abuse Hotline" Are*
*Unduly Burdensome, Misleading, And Irrational*

As the district court further found, even if *Zauderer* applied, the "health warnings" go beyond what *Zauderer* permits because they are "unduly burdensome," "deceptive," and ultimately irrational.  ROA.1753.  They are unduly burdensome, because they will swamp Appellees' small advertisements with government speech; unnecessarily require "parties to post in all caps, three times," the branding of the Texas Health and Human Services Department; and require the "abuse hotline" on *every* webpage.  ROA.1750, 1753; *see also Becerra*, 138 S. Ct. at 2378.  They are deceptive, because Texas "has not shown that the Texas Health and Human Services Commission has actually endorsed the message or made the relevant medical findings"; the employees of the federal substance abuse hotline are "likely not trained" to address pornography; and "the disclosures state scientific findings as a matter of fact, when in reality, they range from heavily contested to unsupported by the evidence."  ROA.1750, 1753, 1757.  Finally, in relation to their purported purpose of protecting minors, they are irrational, because they are "not

49

disclosures that most minors would understand," and "[i]t is unreasonable to warn *adults* about the dangers of legal pornography in order to protect *minors*." ROA.1749, 1753.  Even under *Zauderer*, therefore, the Act cannot survive.

### 3.    *Central Hudson* **Does Not Apply And The Statute Falls Even If It Does**

#### (a)    *The "Health Warnings" And "Abuse Hotline" Target Non-Commercial, Fully-Protected Speech*

Texas has never explained how the "health warnings" regulate commercial speech, given that they target constitutionally protected speech transcending economic interests.  ROA.1744-48; *see also  Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983).  Indeed, even if the *subscription* websites' landing pages could be inaccurately interpreted as mere proposals to transact, "existing subscribers will have already paid," so "[f]or returning subscribers, the page is not proposing a transaction."  ROA.1746.  Texas finds its strongest footing when defending application of the "health warnings" solely to advertisements, but that fractional defense of the Act cannot salvage its constitutionality.  Nor can Texas dispel the special concerns attaching to "advertis[ing] an activity itself protected by the First Amendment," *Bolger*, 463 U.S. at 68 n.14, especially when there are such strong indicia of content-, speaker- and viewpoint-based discrimination.

(b)   *The "Health Warnings" And "Abuse Hotline" Fail Even Intermediate Scrutiny*

Even if intermediate scrutiny applied, the Act would fail it, for reasons already noted.  *See supra* 37-44, 47-49; ROA.1750-52.  Texas must justify the speech it compels, yet cannot do so given the Legislature's failure to explain itself substantively.  *See Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 306, 311-12 (5th Cir. 2017).  Texas would also have to show that the Act directly advances a substantial government interest in a manner that is adequately tailored. *Id.*

Part and parcel of this showing is a demonstration "that the harms it recites are real and that its restriction will in fact alleviate them to a material degree," which Texas has failed to marshal   *Id.* (cleaned up).   As the district court explained, "if the interest is in protecting children, then it may arguably be substantial, but it is advanced indirectly.   If the interest is in changing adults' attitudes on porn and sexuality, then the state cannot claim a valid, substantial interest.   Either way, the compelled messages fail" intermediate scrutiny.  ROA.1750-51; *see also, e.g.*, *Junior Sports Mags. Inc. v. Bonta*, 2023 WL 5945879, at *7 (9th Cir. Sept. 13, 2023) (upholding preliminary injunction against California's attempt to ban firearm advertisements "attractive to minors," because

it "does not target advertisements in contexts geared exclusively to minors" but "applies to any firearm-product advertisement—no matter the audience[.]").

In any event, this Court has further held that "[t]he existence of numerous and obvious less-burdensome alternatives to the restriction on commercial speech ... is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *Parker*, 860 F.3d. at 311 (cleaned up). Here, the Legislature overlooked the obvious alternatives of content filtering, as endorsed in *Ashcroft*, and public-information campaigns, as endorsed in *Becerra*. Far from reflecting an abuse of discretion, a preliminary injunction makes eminent sense in this posture and on this record.

### D.    Section 230 Is Likely Violated As To Certain Appellees

Federal statutory law further supports the preliminary injunction. Section 230 of the CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). "The intent of the CDA is ... to promote rather than chill Internet speech ... [paving] the way for a robust new forum for public speech as well as a trillion-

dollar industry centered around user-generated content."  *Bennett v. Google*, LLC,

882 F.3d 1163, 1166 (D.C. Cir. 2018) (cleaned up).

As this Court held in *Doe v. MySpace*, "Congress provided broad immunity

under the CDA to Web-based service providers for *all claims* stemming from their

publication of information created by third parties[.]"  528 F.3d at 418 (emphasis

added).  "Parties complaining that they were harmed by a Web site's publication of

user-generated content ... may sue the third-party user who generated the content."

*MySpace*, 528 F.3d at 419.  But they cannot sue "the interactive computer service

that enabled them to publish the content online." *Id*.  Consequently, when a state

law holds a website responsible for failing to protect minors from harm allegedly

caused by adult content, the law does what Section 230 forbids: it treats the

website as the publisher who should be held responsible for that content. *See id.* at

419-20.

*MySpace* governs here.  Lest there be any doubt, "MySpace" was sued for

negligence in allegedly failing to take precautions to prevent sexual predators from

communicating with minors.  *Id.* at 416.   The plaintiff specifically accused

MySpace of "declining to implement age-verification software[.]" *Id.* at 422.  But

the claim was barred by Section 230.  *Id.* at 420.  As this Court explained,

"notwithstanding their assertion that they only seek to hold MySpace liable for its

failure to implement measures that would have prevented Julie Doe from communicating with Solis ... [t]heir allegations are merely another way of claiming that MySpace was liable for publishing the communications[.]" *Id.* Here, just as in *MySpace*, the Act holds platforms liable for not implementing age verification protocols; the root cause of the alleged harm to minors is content created by third parties; and enforcement is just "another way" of trying to hold platforms—the subset of Appellees hosting third-party content here—"accountable" for that harm, as the legislative history confirms. ROA.1283. Under *MySpace*, the Attorney General's cause of action under the Act is barred and preempted. *See* 47 U.S.C. § 230(e)(3).

Texas has tried to distinguish *MySpace* on the ground that the plaintiff there sought to recover in tort for harm caused by a third party, while the Act does not require an allegation of "individualized harm." ROA.498 (Opp. at 19). Far from supporting this distinction, however, *MySpace* teaches that Section 230 immunity depends on the claim's substance. *See* 528 F.3d at 419. If "recharacterizing the plaintiff's claims" shows that the theory of liability is based, *e.g.*, on "decisions relating to the monitoring, screening, and deletion of content," the claims are barred and preempted. *Id.* (cleaned up). Just so here: the Act forces upon Appellees a responsibility "quintessentially related to a publisher's role,"

specifically to filter their audience in a particular manner through "age verification." *Id* at 419-21 (cleaned up). Even the law's title focuses on "the publication" of adult content, and the House Committee Report reveals that the Legislature sought to hold websites "accountable." ROA.1283. That brings this case within *MySpace*, irrespective of whether "individualized harm" is alleged.

To be clear, only the platform websites are advancing Section 230 claims. As set forth in the allegations and Appellees' declarations, these relevant platform websites host only third-party content. ROA.21, 23, 249, 265-66, 1260-61. No clear error infects the district court's finding that those platform websites that "only host[] third party content" are likely to succeed. ROA.1762, 1769 (at n.24).

## III. IRREPARABLE HARMS AND THE EQUITIES LIKEWISE FAVOR A PRELIMINARY INJUNCTION

The district court's grant of a preliminary injunction preserves the status quo in the face of a new law that has never been enforced and ostensibly evinces the same constitutional defect (disregard of content filtering as a less-restrictive alternative) twice identified by the Supreme Court. Such relief precisely accords with the Supreme Court's on-point holdings and instructions. Both *Reno* and *Ashcroft* affirmed unstayed preliminary injunctions against restrictions on making sexual material available to minors over the Internet absent age verification. 521 U.S. at 862; 542 U.S. at 673. In *Ashcroft*, the Court stressed the "important

practical reasons to let the injunction stand pending a full trial on the merits." 542 U.S. at 670. "There is a potential for extraordinary harm and a serious chill upon protected speech. The harm done from letting the injunction stand pending a trial on the merits, in contrast, will not be extensive. No prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands." *Id.* at 671 (cleaned up). Far from abusing its discretion, the district court simply followed that precedent.

### A. Appellees Face Numerous Irreparable Harms

The preliminary injunction rightly protects against multiple forms of irreparable harm. It is axiomatic that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, the Act discriminates by content and viewpoint, and restricts speech that is protected while compelling speech that is anathema. As a result, the looming irreparable harms surpass those credited in *Reno* and *Ashcroft*: "Irreparable harm is particularly acute in the context of compelled speech because the association of a speaker with the compelled message cannot be easily undone." ROA.1765 (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943)).

56

Moreover, as found below, the costs of compliance and defensive litigation will be unrecoverable given Texas's sovereign immunity. ROA.1763 (citing *Rest. L. Ctr. v. U.S. Dept. of Lab.*, 66 F.4th 593 (5th Cir. 2023)), 1765-66. Further, the damage to Appellees' goodwill, particularly from displaying the "health warnings" to the chagrin of their patrons, will be both immeasurable *and* unrecoverable. ROA.1765. And violations of Section 230 pose independent irreparable harm. Because the statute provides that "[n]o cause of action may be brought," 47 U.S.C. § 230(e)(3), courts interpret it "to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008). Irreparable harm follows from the very fact that Section 230 creates "an immunity from suit," which would be "effectively lost if a case is erroneously permitted to go to trial." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (cleaned up).

## B.     The Balance of Harms And Public Interest Favor Appellees

When the government is the defendant, the balance of harms merges with the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Given the irreparable harms to Appellees, Texas adults, and non-party websites, Texas "would need to present powerful evidence of harm to its interests to prevent [a]

showing that the threatened injury outweighs any harm [Texas] would suffer as a result of the injunction." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). Yet Texas lacks such evidence. Texas claims irreparable harm from not enforcing the Act, but it neither offers evidence of specific harm nor has an "interest in enforcing a regulation that violates federal law." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 251 (5th Cir. 2023) (cleaned up). Having gone without the Act since the advent and popularization of the Internet, Texas identifies no new exigency that necessitates immediate enforcement, or, for that matter, would be meaningfully addressed by this porous law. Certainly Texas lacks any creditable interest in suddenly singling out disfavored viewpoints and speakers for condemnation, even as it lets the same adult content continue to flow freely to minors through search engines and social media. *See supra* 34-35. Most importantly, to the extent the Act is likely unconstitutional, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

## CONCLUSION

For the reasons explained in Appellees' stay opposition (Dkt. #47) and above, this Court should deny Texas's motion for a stay pending appeal before affirming the preliminary injunction. The *sine qua non* of a stay would be to

preserve the status quo while the Court renders a considered judgment. Here, it is the preliminary injunction that maintains the status quo, per the Supreme Court's instruction in parallel circumstances.

This case concerns a never-before enforced law whose constitutionality is questionable, at best. While it proceeds to final judgment, First Amendment interests hang in the balance—interests that can never be properly vindicated unless the preliminary injunction stands. Inviting immediate enforcement of a new, burdensome, chilling statute would upset the status quo and imperil ongoing, longstanding expression over the Internet that could then be penalized for any perceived noncompliance. That approach would be incompatible with Supreme Court precedent as well as the equities. No less than was true in *Reno*, *Ashcroft*, and countless other First Amendment cases, any enforcement by Texas can and should wait until judicial review runs its course.

For the foregoing reasons, Appellees respectfully request that this Court lift the administrative stay, deny Appellant's motion for stay pending appeal, and affirm the preliminary injunction.

Dated:  September 25, 2023       Respectfully submitted,

                                  *s/    Derek L. Shaffer*

                                    Derek L. Shaffer
                                    Michael T. Zeller
                                    Christopher G. Michel
                                    Scott L. Cole
                                    Arian J. Koochesfahani
                                    Jeffrey K. Sandman

                                  *Counsel for Appellees*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  I also certify that service will be accomplished on all registered CM/ECF users by the appellate CM/ECF system, that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13, and that the document has been scanned with CrowdStrike Falcon software and is free of viruses.

Dated:  September 25, 2023          *s/    Derek L. Shaffer*
                                    Derek L. Shaffer

                                    *Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

I certify the following in compliance with Federal Rule of Appellate Procedure 32(g):  The foregoing motion is in 14-point, proportionally spaced Times New Roman font and contains 12,606 words, excluding the parts of the document exempted by Rule 32(f).

Dated:  September 25, 2023          *s/   Derek L. Shaffer*
                                    Derek L. Shaffer

                                    *Counsel for Appellees*