No. 23-50627

In the
United States Court of Appeals for the Fifth Circuit

FREE SPEECH COALITION, INCORPORATED; MG PREMIUM, LIMITED; MG FREESITES, LIMITED; WEBGROUP CZECH REPUBLIC. A.S.; NKL ASSOCIATES, S.R.O.; SONESTA TECHNOLOGIES, S.R.O.; SONESTA MEDIA, S.R.O.; YELLOW PRODUCTION, S.R.O.; PAPER STREET MEDIA, L.L.C.; NEPTUNE MEDIA, L.L.C.; JANE DOE; MEDIAME, S.R.L.; MIDUS HOLDINGS, INCORPORATED,
*Plaintiffs-Appellees*,

v.

ANGELA COLMENERO, Attorney General, State of Texas,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

Brief *Amicus Curiae* of Council on Pornography Reform,
America's Future, Public Advocate of the United States,
U.S. Constitutional Rights Legal Defense Fund, Center for Morality,
and Conservative Legal Defense and Education Fund
in Support of Defendant-Appellant and Reversal

J. MARK BREWER
  Houston, Texas

JAMES N. CLYMER
  Lancaster, Pennsylvania

RICK BOYER
  Lynchburg, Virginia

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Ave. W., Ste. 4
  Vienna, VA  22180
  (703) 356-5070
  wjo@mindspring.com
  Attorneys for *Amici Curiae*

September 25, 2023
*Counsel of Record

Case No. 23-50627

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

FREE SPEECH COALITION, INC., *et al.*,

Plaintiffs-Appellees,

v.

ANGELA COLMENERO,

Defendant-Appellant,

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Free Speech Coalition, Inc., *et al.*, Plaintiffs-Appellees

Angela Colmenero, Defendant-Appellant

Council on Pornography Reform, America's Future, Public Advocate of the United States, U.S. Constitutional Rights Legal Defense Fund, Center for Morality, and Conservative Legal Defense and Education Fund, *Amici Curiae*.

William J. Olson, Jeremiah L. Morgan, J. Mark Brewer, James N. Clymer, and Rick Boyer are counsel for *Amici Curiae*.

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 5th Circuit Rule 28.2.1, it is hereby certified that *Amici Curiae* Council on Pornography Reform, America's Future, Public Advocate of the United States, U.S. Constitutional Rights Legal Defense Fund, Center for Morality, and Conservative Legal Defense and Education Fund are non-stock, nonprofit corporations, have no parent companies, and no person or entity owns them or any part of them.

    */s/ William J. Olson*
William J. Olson
Attorney of Record for *Amici Curiae*

ii

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    THE DISTRICT COURT EMPLOYED A "JUDGE-EMPOWERING
'INTEREST BALANCING INQUIRY'" AND A MYTHICAL RIGHT TO
"FREE EXPRESSION" TO OVERRIDE THE TEXT, HISTORY, AND
TRADITION OF THE FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . 2

II.   BEGINNING WITH ITS ROTH DECISION, THE SUPREME COURT HAS
USURPED STATE POLICE POWER BY IMPOSING THE FIRST
AMENDMENT UPON THE COMMON LAW OF OBSCENITY . . . . . . . . . . . 10

      A.   The Supreme Court, Led by Justice Brennan, Has Usurped
           State Authority over the Law of Obscenity (and Defamation)
           by Constitutionalizing what Was Never Protected under the
           First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.   The Supreme Court Has Wrongly Applied the First
           Amendment to Prevent States from Guarding against
           Wrongdoing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  SUPREME COURT PORNOGRAPHY JURISPRUDENCE HAS BEEN A
FAILURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      A.   The Supreme Court Has Morphed Speech and Press
           Protections into an Atextual Freedom of Expression . . . . . . . . 23

B.    There Is No Constitutional Ban on Protecting Public Morality . . . 25

C.    The *Miller* Standard Should Be Replaced with a Textually
Faithful Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

iv

# TABLE OF AUTHORITIES

Page

**HOLY BIBLE**
*Matthew* 18:10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Luke* 17:2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**U.S. CONSTITUTION**
Article I, Section 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, *passim*
Amendment XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATUTES**
Child Online Protection Act, Pub. L. No. 105-277, 112
    Stat. 2681-736 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Child Pornography Prevention Act of 1996, Pub. L. No. 104-208 . . . . . . . . 5
Children's Internet Protection Act, Pub. L. 106-554, 114
    Stat. 2763A-335 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
PROTECT Act of 2003, Pub. L. No. 108-21 . . . . . . . . . . . . . . . . . . . 5
Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 . . . . . . 4

**CASES**
*Abrams v. United States*, 250 U.S. 616 (1919) . . . . . . . . . . . . . . . . . . 20
*Ashcroft v. ACLU*, 535 U.S. 564 (2002) . . . . . . . . . . . . . . . . . . . . . 2, 5
*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) . . . . . . . . . . . . . 5
*Barnes v. Glen Theatre*, 501 U.S. 560 (1991) . . . . . . . . . . . . . . . . 24, 29
*Cal. v. La Rue*, 409 U.S. 109 (1972) . . . . . . . . . . . . . . . . . . . . . . . 24
*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) . . . . . . . . . . . 11, 12, 28
*Commonwealth v. DeLacey*, 271 Mass. 327, 171 N.E. 455 (1930) . . . . . . . 13
*Commonwealth v. Friede*, 271 Mass. 318, 171 N.E. 472 (1930) . . . . . . . . 13
*Commonwealth v. Heinbaugh*, 467 Pa. 1 (1976) . . . . . . . . . . . . . . . . . 26
*Commonwealth v. Holmes*, 17 Mass. 336 (Mass. 1821) . . . . . . . . . . . . . 26
*Commonwealth v. Sharpless*, 2 Serg. & Rawle 91 (1815) . . . . . . . . . . 12, 26
*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . . . 6, 24
*Ginsberg v. New York*, 390 U.S. 629 (1968) . . . . . . . . . . . . . . . . . . . 3
*Korematsu v. United States*, 323 U.S. 214 (1944) . . . . . . . . . . . . . . . . 7
*Jacobellis v. Ohio*, 378 U.S. 184 (1964) . . . . . . . . . . . . . . . . . . . . . 14

*King v. Curl*, 93 Eng. Rep. 849 (K.B. 1727). . . . . . . . . . . . . . . . . . . . . . 25

*McKee v. Cosby* 139 S. Ct. 675 (2019) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Miller v. California*, 413 U.S. 15, 24 (1973). . . . . . . . . . . . . . . . 22, 28, 29

*New York Times v. Sullivan*, 376 U.S. 254 (1964) . . . . . . . . . 14, 15, 16, 20

*People v. Ruggles*, 8 Johns. 290 (N.Y. 1811) . . . . . . . . . . . . . . . . . . . . 26

*Regina v. Hicklin*, L.R. 3 Q.B. 360, Court of Queen's Bench (1868) . . . . . . 13

*Reno v. ACLU*, 521 U.S. 844 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

*Rex v. Tutchin*, 14 State Trials 1095 (1704). . . . . . . . . . . . . . . . . . . . . . 19

*Roth v. United States*, 354 U.S. 476 (1957). . . . . . . . . . . . . . . . 12, 16, 20

*Schenck v. United States*, 249 U.S. 47 (1919) . . . . . . . . . . . . . . . . . . . . 23

*Swearingen v. United States*, 161 U.S. 446 (1896) . . . . . . . . . . . . . . . . . 27

*United States v. American Library Ass'n*, 539 U.S. 194 (2003) . . . . . . . . . . 5

*United States v. O'Brien*, 391 U.S. 367 (1968) . . . . . . . . . . . . . . . . 23, 24

*United States v. One Book Called "Ulysses,"* 5 F. Supp. 182
     (S.D.N.Y. 1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Johnson*, 383 U.S. 169 (1966) . . . . . . . . . . . . . . . . . . . 18

*United States v. Williams*, 553 U.S. 285 (2008) . . . . . . . . . . . . . . . . . . . . 5

## MISCELLANEOUS

Blackstone's <u>Commentaries on the Laws of England</u> (U. Chi. Press,
     Facsimile ed. 1765). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25

W. Fassuliotis, "Ike's Mistake: The Accidental Creation of the Warren
     Court," *Virginia Law Weekly* (Oct. 17, 2018) . . . . . . . . . . . . . . . . 12

W. Prosser, <u>Law of Torts</u> (4th ed. 1971). . . . . . . . . . . . . . . . . . . . . . . 15

<u>Sources of Our Liberties</u> (R. Perry and J. Cooper, eds., ABA
     Found: 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20

G. Stone, *et al.,* <u>Constitutional Law</u> (2d ed. Little, Brown: 1991) . . . . . 13, 19

W. Strub, <u>Obscenity Rules: Roth v. United States and the Long Struggle
Over Sexual Expression</u> (Kan. University Press: 2013) . . . . . . . . 25, 27

J. Thompson, "The Role of Common Law Concepts in Modern Criminal
     Jurisprudence (A Symposium) – III Common Law Crimes against
     Public Morals," J. CRIM. L. AND CRIMINOLOGY 350 (1959) . . . . . . . . 26

Herbert W. Titus, "The Freedom of Speech, An Introduction," *The
     Forecast*, vol. 2, no. 12 (Sept. 1995). . . . . . . . . . . . . . . . . . . . . 23

Herbert W. Titus, "Obscenity: Perverting the First Amendment,"
     *The Forecast*, vol 3, nos. 7-9 (1966) . . . . . . . . . . . . . . . . . . . . 13, 28

*Webster's 1828 Dictionary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Webster's Third International Dictionary* (1981) . . . . . . . . . . . . . . . . . . . 14

## INTEREST OF *AMICI CURIAE*[1]

Council on Pornography Reform (a project of Reel American Heroes Foundation), America's Future, Public Advocate of the United States, U.S. Constitutional Rights Legal Defense Fund, Center for Morality, and Conservative Legal Defense and Education Fund are nonprofit organizations which work to defend constitutional rights and protect liberties.

## STATEMENT OF THE CASE

On June 12, 2023, Texas enacted H.B. 1181, requiring companies that produce or distribute pornographic material that is harmful to minors to have age-verification capability to ensure that the companies did not distribute the material to minors.[2] *See Free Speech Coal., Inc. v. Colmenero*, 2023 U.S. Dist. LEXIS 154065, at *3 (W.D. Tex. 2023) ("*FSC*").

A coalition of online pornography websites (some domestic and some foreign) and "adult performers" sought injunctive relief from the federal district

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting the brief. No person other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

[2] The Texas law also required the companies to post online warning labels about the harms caused by pornography, an issue not addressed here.

1

court for the Western District of Texas. *Inter alia*, Plaintiffs alleged the law "would unconstitutionally restrict their free expression…." *Id.* at 6.

The district court determined that "[b]ecause the law restricts access to speech based on the material's content, it is subject to strict scrutiny." *Id.* at *23. Citing the Supreme Court's decisions in *Reno v. ACLU*, 521 U.S. 844 (1997), and *Ashcroft v. ACLU*, 535 U.S. 564 (2002), the district court found that the statute was not narrowly tailored, both because it covers at least some material that might not be "obscene," and because it could restrict content provided to adults as well as that provided to children. *See id.* at *38-39. It also found that age verification was not the least restrictive means available, and the statute was not narrowly tailored, as well as both underinclusive and overbroad. *See id.* at *27-28.

## ARGUMENT

## I.  THE DISTRICT COURT EMPLOYED A "JUDGE-EMPOWERING 'INTEREST BALANCING INQUIRY'" AND A MYTHICAL RIGHT TO "FREE EXPRESSION" TO OVERRIDE THE TEXT, HISTORY, AND TRADITION OF THE FIRST AMENDMENT.

The district court began its opinion with a general discussion of the relevant applicable law, observing that until the 1990s, federal courts upheld state laws that criminalized providing obscene materials to minors. *See FSC* at *22.

2

The district court described one of these early cases, *Ginsberg v. New York*, 390 U.S. 629 (1968), as follows:  "Because obscene materials fell outside the scope of First Amendment protection, the Court analyzed the statute under rational basis scrutiny and upheld the law."  *FSC* at *22.  That case description appears to contain a *non sequitur*, for once it determined that the obscene magazine in question was not protected by the First Amendment, what authority did the Supreme Court have to evaluate the challenged statute?  However, the district court had accurately described that Supreme Court decision.  Justice Brennan, writing for a unanimous court, plainly (and correctly) declared that "Obscenity is **not** within the area of protected **speech** or **press**."  *Ginsberg* at 635 (emphasis added).  Nevertheless, the court then evaluated (and rejected[3]) the magazine seller's challenge under an atextual "**freedom of expression**."  However, if "freedom of expression" is not shorthand for the freedom of speech and press, on what constitutional text was Justice Brennan's "free expression" decision grounded?[4]  Justice Brennan, in evaluating the challenge under a made-up phrase

_____

[3]   The Supreme Court ruled New York was allowed to classify the same material as being not obscene for adults, but obscene for minors.

[4]   In a different portion of the decision, a void for vagueness constitutional claim also was rejected.

devoid of meaning — "freedom of expression" — was laying the groundwork for future constitutional error.

Plaintiffs here claim that "H.B. 1181 … would unconstitutionally restrict their free expression…." *FSC* at *6. The district court found "Plaintiffs' expression is afforded a constitutional interest." *Id*. at *11. It cited various authorities referencing a constitutional right to expression, even including a case brought by a litigant that chose its name based on the mythical right to "free expression" — American Booksellers Foundation for Free Expression. *Id*. at *34.

The district court then reviewed a series of Supreme Court cases beginning in the 1990s which found that obscenity is protected by the First Amendment. Historic restrictions applicable to sexual content were cast to the side, as though digital pornography was wholly different from printed pornography. In 1996, Congress enacted the Communications Decency Act ("CDA") as part of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56. The CDA imposed criminal penalties on persons who transmit offensive sexual content or "obscene or indecent" materials to another person under 18 years of age or otherwise use an internet service to display offensive sexual content to someone

under 18 years of age.  In *Reno v. ACLU*, 521 U.S. 844 (1997), the Supreme

Court struck down the anti-indecency provisions of the CDA, holding that those

provisions violate the First Amendment.[5]

In response to *Reno*, Congress enacted the Child Online Protection Act

("COPA"), Pub. L. No. 105-277, 112 Stat. 2681-736 (codified at 47 U.S.C.

§ 231) in 1998.  COPA criminalized knowingly or intentionally making obscene

material available to children under 17.  The Supreme Court struck down COPA

in *Ashcroft v. ACLU*, 535 U.S. 564 (2002) for another First Amendment

violation.[6]

With CDA, CPPA, and COPA all being struck down, the Supreme Court

signaled that it would not be limited by the text, context, tradition, or history of

---

[5]  Also in 1996, addressing a different problem, Congress enacted the
Child Pornography Prevention Act of 1996 ("CPPA"), Pub. L. No. 104-208.
Section 121 of that law expanded the federal prohibition on child pornography to
include computer-generated images — "virtual child pornography."  The
Supreme Court struck down CPPA in *Ashcroft v. Free Speech Coalition*, 535
U.S. 234 (2002) as being overbroad.  Congress responded to that Supreme Court
decision, modifying the CPPA prohibition with the PROTECT Act of 2003, Pub.
L. No. 108-21, which was upheld in *United States v. Williams*, 553 U.S. 285
(2008).

[6]  The Children's Internet Protection Act ("CIPA") Pub. L. 106-554, 114
Stat. 2763A-335 required schools and libraries to have certain technology
protection measures.  The law was upheld as an exercise of the appropriations
power.  *See United States v. American Library Ass'n*, 539 U.S. 194 (2003).

the protections of "speech" and "press," which would need to give way based on evolving societal and judicial standards.

Even though the district court found it "is uncontested that pornography is generally inappropriate for children, and the state may regulate a minor's access to pornography" (*id*. at *27), that was not enough to uphold the law because the district judge felt obligated to apply strict scrutiny. In other words, the judicially created balancing test, termed "strict scrutiny," operated to undermine the constitutional text. This is a perfect First Amendment illustration of the point made by Justice Scalia in the context of the Second Amendment. He rejected the use of balancing tests urged in dissent by Justice Breyer,[7] because they were "judge-empowering," allowing judges to disregard the text, history, and tradition of a constitutional amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 634 (2008). This is exactly what has happened here.

It is a mistake of the first order for courts to assume that application of "judge-empowering 'interest-balancing inquiry'" (*Heller* at 634) inexorably will lead to a proper interpretation of the Constitution. Indeed, from the very first use of an enhanced judicial balancing test — then termed "the most rigid

---

[7] *Heller* at 689 (Breyer, J. dissenting).

scrutiny" — it should have been clear that these tests could not be relied on to faithfully interpret the constitution. *See Korematsu v. United States*, 323 U.S. 214, 216 (1944).

Nevertheless, the district court described its job as follows:

> To endure strict scrutiny, H.B. 1181 must: (1) serve a compelling governmental interest, (2) be narrowly tailored to achieve it, and (3) be the least restrictive means of advancing it. [*FSC* at *26.]

Courts have become so used to applying these made-up tests, they forget what Justice Scalia noted — that they direct the court's attention away from the text, history, and tradition of the Constitution.

We had thought that protecting minors from the corrosive influence of pornography would be considered not just "a compelling governmental interest," but one of the government's most compelling interests. Yet, as the district court said, protecting minors from pornography "is not enough for a law to survive strict scrutiny." *FSC* at *27.

On the "narrowly tailored" test, the district court first admitted the law would be effective, in that "H.B. 1181 will regulate adult video companies that post sexual material to their website." *Id.* But the court then found the law unconstitutional — because some pornography could be reached by minors

7

through other means, such as search engines. *See id*. The fact that Texas' first law on this subject may not have blocked every point of access for pornography, could be a reason for the Texas legislature to revisit the law, but by no means did it render the law unconstitutional under the First Amendment. Actually, the district court's criticism was not that the law was **not** narrowly tailored, but that it was **too** narrowly tailored.

On the least restrictive means test, the district court clearly preferred some type of content filtering to age verification, but can a district judge's personal preference really form the basis for issuance of an injunction to the enforcement of a state law? *Id*. at *51-*53. The district court quoted the Plaintiffs as suggesting that there were "[l]ess restrictive alternatives" to the Texas legislative scheme, including using "internet service providers, or ISPs, to block adult content until the adults opt-out of the block." *FSC* at *46. This may be an approach for the Texas legislature to consider in the future, but can anyone deny that, if that approach had been employed, the Plaintiffs would have found a host of reasons to challenge it as constitutionally offensive? The district court, without any hint of humor, believes the law undesirable because there would be "obvious awkwardness" if children would be required to "ask[] their parents'

8

permission each time they wish to view sexual content." *Id*. at *53, n.14.  The

district court refused to consider that parents often fail to implement parental

controls on minors' devices by blaming Texas for not having taken measures "to

educate parents about content filtering." *Id*. at *55.  Finally, the district court

ruled that the legislature's failure to evaluate the less-restrictive alternatives that

the court preferred was "fatal" to its defense against injunctive relief.  *Id*. at *57.

Lastly, the granting of injunctive relief requires a balancing of the harms

and a discussion of the public interest.  In one paragraph, the district court

disposes of the issue, concluding that "[b]ecause H.B. 1181 is likely

unconstitutional, the state cannot claim an interest in its enforcement." *FSC* at

*83.  The district court did not mention one word about the harm suffered by

children who will continue to be exposed to the destructive influence of

pornography under the court's order.  In view of that omission, the court's

admission that "the state has a legitimate goal in protecting children from

sexually explicit material online" rings hollow.  *Id*. at *85.

9

## II. BEGINNING WITH ITS *ROTH* DECISION, THE SUPREME COURT HAS USURPED STATE POLICE POWER BY IMPOSING THE FIRST AMENDMENT UPON THE COMMON LAW OF OBSCENITY.

The district court ruled for Plaintiffs' challenge to Texas' effort to shield minors from the corrosive influence of pornography on the theory that obscenity constitutes protected speech and/or press which may not be abridged by state law under the First and Fourteenth Amendments. *See FSC* at *85. To support that view, the court relies exclusively on modern court decisions, wholly disregarding the text of the First Amendment, its original public meaning, and how federal courts viewed obscenity during the first two-thirds of our nation's history. This *amicus* brief seeks to provide some of that missing background to reveal how we have come to prize adult access to pornography so highly that federal courts are willing to misuse the First Amendment to override state police power, all while knowing that their rulings will harm our children.[8]

---

[8] *See generally* "Take heed that ye despise not one of these little ones; for I say unto you, That in heaven their angels do always behold the face of my Father which is in heaven." *Matthew* 18:10. "It were better for him that a millstone were hanged about his neck, and be cast into the sea, than that he should offend one of these little ones." *Luke* 17:2.

10

**A.    The Supreme Court, Led by Justice Brennan, Has Usurped State Authority over the Law of Obscenity (and Defamation) by Constitutionalizing what Was Never Protected under the First Amendment.**

From the founding of the Republic until the middle of the Twentieth Century, defining and controlling obscenity and pornography was the exclusive responsibility of the several states.  It was unquestioned that neither the text nor the ratification-era authorities provided any support for the notion that obscenity was protected under the First Amendment.  Thus, federal courts understood they had no authority whatsoever to override state laws protecting the morals of their citizens.  Today, the general proposition that only states have the police power to regulate behavior to advance health, safety, morals, and general welfare is honored only in the breach by federal judges who feel empowered to exercise federal power to override state authority by invoking decades of obscenity decisions which needs to be re-examined and overturned.

In 1942, a unanimous Supreme Court emphatically affirmed that there were "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). Among Justice Murphy's list of five enumerated classes was the obscene and the

11

libelous.  The Court proclaimed that neither was an "essential part of any exposition of ideas," and "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."  *Id.* at 572.

The Supreme Court's constitutionalization of the law of obscenity and pornography is similar to its treatment of defamation, and thus these developments are best examined together.  Both areas of state law were brought under the control of federal courts at the hand of Justice William J. Brennan during his 34-year tenure on the High Court.[9]  Fifteen years after *Chaplinsky*, the Supreme Court reiterated its view that even though "obscenity [like libel] was outside the protection intended for speech and press," it asserted a new rule:  that it was for the Court to define "obscenity."  *See Roth v. United States*, 354 U.S. 476, 483 (1957).  Prior to *Roth*, it was understood that obscenity, a common law offense, was governed by state law, not by federal law.  *See Commonwealth v.*

---

[9]  During this era, the Supreme Court may have been called "the Warren Court," but it has been said that "Brennan would provide [the Court's liberal wing] its intellectual underpinnings.  After he was no longer president, Eisenhower purportedly said, 'I have made two mistakes, and they are both sitting on the Supreme Court.'"  W. Fassuliotis, "Ike's Mistake: The Accidental Creation of the Warren Court," *Virginia Law Weekly* (Oct. 17, 2018).

*Sharpless*, 2 Serg. & Rawle 91 (1815).[10]  Before *Roth*, definitions of what constituted obscenity varied, the most widely accepted of which was the Hicklin test,[11] allowing a finding of obscenity based upon the effect of "isolated passages on the most susceptible readers or viewers."  *See Commonwealth v. Friede*, 271 Mass. 318, 171 N.E. 472 (1930); *Commonwealth v. DeLacey*, 271 Mass. 327, 171 N.E. 455 (1930).  Rejecting the Hicklin test, the U.S. District Court for the Southern District of New York "adopted instead a standard focusing on the effect on the average person of the dominant theme of the work as a whole."  *See United States v. One Book Called "Ulysses,"* 5 F. Supp. 182 (S.D.N.Y. 1933), *aff'd*, 72 F.2d 705 (2d Cir. 1934).

In his *Roth* opinion, Justice Brennan leveraged this modernized test into a First Amendment rule, thereby launching the Court on a constitutional odyssey searching for a principled definition of obscenity.  By 1964, the Court's quest was in such disarray that Justice Potter Stewart gave up the quest entirely, urging

---

[10]  This statement and the following narrative is a paraphrase of a note on obscenity appearing on p. 1203 of G. Stone, *et al.,* Constitutional Law (2d ed. Little, Brown: 1991). *See also*, Herbert W. Titus, "Obscenity: Perverting the First Amendment," *The Forecast*, vol 3, nos. 7-9 (1966).

[11]  *See Regina v. Hicklin*, L.R. 3 Q.B. 360, Court of Queen's Bench (1868).

his colleagues to censor only "hard-core pornography," all the while reassuring

them that:  "I know it when I see it."  *Jacobellis v. Ohio*, 378 U.S. 184, 197

(1964) (Stewart, J., concurring).

While the Court was still entangled in the bramble bush of obscenity, that

same year — 1964 — it decided *New York Times v. Sullivan*, 376 U.S. 254

(1964).  This time, Justice Brennan took his colleagues into the thornbush of

Alabama libel law as applied to a government official in his official capacity.  *Id.*

at 267.  At the outset of his discussion of the merits of the *New York Times*' First

Amendment claim, Justice Brennan acknowledged that the Alabama courts had

relied "on statements of this Court to the effect that the Constitution does not

protect libelous publications."  *Id.* at 268.  "Those statements do not," Justice

Brennan continued, "foreclose our inquiry here."  *Id.*  Instead of conducting a

careful inquiry, Justice Brennan offered only a very brief survey of case

precedents concerning libels of public officials before concluding that "we are

compelled by neither precedent nor policy to give any more weight to the **epithet**

'libel' than we have to other 'mere labels' of state law."  *Id.* at 269 (emphasis

added).  "Libel" — a mere "epithet"!?[12]  According to Blackstone, libel was not

---

[12] *Webster's Third International Dictionary* at 765 (1981) defines "epithet"
as a "disparaging or abusive word."

14

a mere label, but a well-established common law cause of action with specific

elements, including burdens of proof as to the truth or falsity of the defamatory

statements at issue:

> A second way of affecting a man's reputation is by printed or
> written libels … which set him in an odious or ridiculous light, and
> thereby diminish his reputation.  With regard to libels in general,
> there are, as in many other cases, two remedies; one by indictment
> and another by action … the defendant, on an indictment for
> publishing a libel, is not allowed to allege the truth of it by way of
> justification.  But in the remedy by action on the case, which is to
> repair the *party* in damages for the injury done him, the defendant
> may … justify the truth of the facts, and show that the plaintiff has
> received no injury….  [3 Blackstone's <u>Commentaries on the Laws of
> England</u> at 125-26 (U. Chi. Press, Facsimile ed. 1765).]

Undeterred by this English common law pedigree and her American

counterpart,[13] Justice Brennan asserted that "libel can claim no talismanic

immunity from constitutional limitations[,] [but] must be measured by standards

that satisfy the First Amendment." *New York Times* at 269.  And what were

those standards and where might they be found?  Justice Brennan began:

> The general proposition that **freedom of expression** upon public
> questions is secured by the First Amendment has long been **settled
> by our decisions**.  The constitutional safeguard, **we have said**, "was
> fashioned to assure **unfettered** interchange of ideas for the bringing
> about of political and social changes desired by the people." [*Id.*
> (emphasis added).]

---

[13] *See* W. Prosser, <u>Law of Torts</u> at 737-801 (4th ed. 1971).

That quotation was to none other than *Roth v. United States*, decided just seven years before in the case that revolutionized the law of obscenity.  It was put to use by the Court in *New York Times* to justify a brand new federal rule in libel cases, one that "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times* at 279-80.

The *New York Times* case has received robust criticism both from sitting Justices and others, and efforts have been underway to bring to the Supreme Court a case which could require its reassessment.[14]  Likewise, these *amici* hope that the Supreme Court one day will have the opportunity to jettison its obscenity jurisprudence beginning with *Roth* and including decades of its unprincipled progeny.  That process would be aided by judges who write opinions carefully cataloging errors in Supreme Court jurisprudence.

---

[14] *See, e.g.*, *Coral Ridge v. Southern Poverty Law Center*, U.S. Supreme Court, No. 21-802 (petition denied); Brief *Amicus Curiae* of Public Advocate of the United States, *et al.* (Dec. 30, 2021); and *Blankenship v. NBCUniversal, et al.*, U.S. Supreme Court, No. 22-1125 (petition for certiorari pending); Brief *Amicus Curiae* of Seven Nonprofit Organizations, *et al.* (June 20, 2023).

**B.    The Supreme Court Has Wrongly Applied the First Amendment to Prevent States from Guarding against Wrongdoing.**

Some federal courts have treated the freedoms of "speech" and "press" as though those were empty, undefined terms with no established meaning, available to be invested with any meaning that would make the judges' opinions seem less arbitrary.  The history of the First Amendment makes clear that these terms were carefully chosen — not because speech referred to the spoken word and press referred to the printed word — but rather because each had an established, and different, meaning.

In James Madison's initial draft of the First Amendment submitted to the First Congress, the speech guarantee stated:  "The people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments…." *See* Perry and J. Cooper, edts., Sources of Our Liberties at 422 (ABA Found: 1978).  Therefore, Madison's open-ended "right to speak, to write, or to publish" was reduced in Committee to read simply — "the freedom of speech." According to *Webster's 1828 Dictionary*, the word "the" was commonly used "before nouns … to limit their signification to a specific thing or things."  The manifest purpose of the change in Madison's broad-based first draft, then, was designed to limit its reach, not to enlarge it.  Furthermore, by using the definite

17

article, the Framers indicated that they had something definite and certain in mind, thereby indicating that the free speech guarantee was a pre-existing right that was discoverable from antecedent texts and from history.

Like so many of our constitutional rights, "the freedom of speech" is traceable to England. *See United States v. Johnson*, 383 U.S. 169, 177-78 (1966). Section 9 of the 1689 English Bill of Rights secured "the freedom of speech, and debates or proceedings in parliament [and] ought not to be impeached or questioned in any court or place out of parliament." Sources at 247. The adoption of the English Bill of Rights secured to the English people's elected representatives in Parliament assembled protection against the king's misuse of power through tyrannical laws prohibiting "stirring up sedition" and seditious libel for impugning the reputation of the king. *See* Sources at 228 and 235. This same protection was afforded to the American people's representatives by Article I, Section 6 of the U.S. Constitution, which provides jurisdictional immunity for both Senators and Representatives in Congress "for any Speech or Debate in either House."

As for the English people themselves, they remained accountable for actions that called into question the reputations of their rulers. *See* <u>Sources</u> at 306. The English common law against seditious libel remained:

> If people should not be called to account for possessing the people with an ill opinion of the government, no government can subsist. For it is very necessary for all governments that the people should have a good opinion of it. And nothing can be worse to any government than to endeavour to procure animosities as to the management of it; this has always been looked upon as a crime, and no government can be safe without it. [*Rex v. Tutchin*, 14 State Trials 1095 (1704), quoted in F.S. Siebert, <u>Freedom of the Press in England, 1476-1776</u> at 271 (Univ. of Ill. Press: 1952).]

But, both in England and in America, prosecutions for seditious libel were hotly contested. *See* <u>Sources</u> at 307-08. In America, things came to a head with the enactment of the Sedition Act of 1798 which prohibited, in part, "false, scandalous, and malicious writings against the government … with intent to defame or to bring them [into] contempt or disrepute…." *See* G. Stone, <u>Constitutional Law</u> at 1015. The statute was a classic example of a seditious libel law, and it prevailed in courts, only to fail politically with the election of President Thomas Jefferson who, in 1801, pardoned everyone who had been convicted and fined.

In 1919, Justice Oliver Wendell Holmes, Jr., wrote:

> I wholly disagree with the argument of the Government that the First Amendment left the common law as to seditious libel in force. History seems to me against the notion. I had conceived that the United States through many years had shown its repentance for the Sedition Act of 1798, by repaying fines that it imposed. [*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).]

Justice Holmes was right. Both Thomas Jefferson and James Madison led the Republican resistance to the Sedition Act on already-established American constitutional grounds. As Madison wrote in support of the resistance to the Sedition Act, in America, the People are sovereign, not Parliament, and that "the great and essential rights of the people are secured against legislative as well as executive ambition." J. Madison, Report on the Virginia Resolutions quoted in Sources at 426. Thus, "the freedom of speech," which had been secured only to English parliamentarians, was now vested in the People by the First Amendment.

In contrast to this historic, textual approach, Justice Brennan used Holmes' views to launch an attack on common law defamation. Relying on his *Roth* obscenity opinion that the freedom of speech was anchored "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people" (*Roth* at 484; *New York Times* at 269), Justice Brennan forged a contemporary marketplace of ideas based on practical realities as he saw them — not enduring principles. By reinterpreting the First Amendment through his

20

prism of pragmatism, Justice Brennan then took the liberty to fashion his own view of that phrase, unhindered by historical precedent or by the constitutional text. In doing so, Justice Brennan erased the original historical and textual distinction between seditious libel and libel, the one addressing the impermissible protection of the government's reputation and the other designed to protect the good reputations of individual persons. *See McKee v. Cosby*, 139 S. Ct. 675, 679-82 (2019).

The Supreme Court's effort to ignore the historic meaning of "the freedom of speech," begun by Justice Brennan, has led us to where we are today. Defamation, particularly against public figures, is given such strong protection that lower courts routinely dismiss complaints for failing to meet an unachievable standard of specificity of allegation. The reverse is true as to obscenity and pornography, where lower courts routinely enjoin any effort to protect society from the corrosive effects of pornography.

It is past time for the federal courts to recognize that they have usurped the police power of states by asserting constitutional protection of obscenity and pornography which never existed under any type of textual or originalist approach. It is no coincidence that Justice Brennan is revered by an extreme

liberal elite who believe it is the role of courts to ensure policy outcomes which the judges personally prefer, rather than the application of neutral principles to resolve cases and controversies.[15]

## III. SUPREME COURT PORNOGRAPHY JURISPRUDENCE HAS BEEN A FAILURE.

The district court noted: "Defendant argues that Plaintiffs' content is 'obscene' and therefore undeserving of First Amendment coverage" but "we are bound by the current *Miller* framework." *FSC* at *24 (quoting *Miller v. California*, 413 U.S. 15, 24 (1973)). The *Miller* court candidly admitted that its prior obscenity decisions had a "somewhat tortured history" (*Miller* at 20), involving "'a variety of views among the members of the Court unmatched in any other course of constitutional adjudication'" (*id.* at 22). The *Miller* standard

---

[15] Justice Brennan's approach to the Constitution is embodied today in the work of the Brennan Center at New York University Law School, which embraces every liberal and leftist cause. Its mission statement demonstrates that it believes the role of the judiciary is to decide cases not based on the Constitution's text and original public meaning, but rather on fluid and evolving notions of public sentiment that it works to shape: "[W]e take our cue from Abraham Lincoln's admonition at another time of constitutional debate: 'Public sentiment is everything. With public sentiment, nothing can fail; without it, nothing can succeed. Consequently, he who molds public sentiment goes deeper than he who enacts statutes or pronounces decisions. He makes statutes and decisions possible or impossible to be executed.'" "Mission & Impact," The Brennan Center for Justice.

may have survived for a half-century with tweaks, allowing a floodtide of pornography, including much that is indisputably "hard core," to be unleashed on America and its children. Two of the faulty interpretive propositions that have emerged are discussed here.

## A. The Supreme Court Has Morphed Speech and Press Protections into an Atextual Freedom of Expression.

Although freedom of expression can be traced back to *Schenck v. United States*, 249 U.S. 47, 52 (1919), it was embraced by the High Court in *United States v. O'Brien*, 391 U.S. 367 (1968). "The First Amendment of the United States Constitution prohibits … 'abridging the freedom of speech, or of the press….' The freedom of speech is not the same as the freedom of the press…."[16] And, freedom of expression is not the same as either, or both, speech and press. Morphing the two together has warped constitutional analysis.

Despite admitting that the challenged law banning destruction of draft cards proscribed "conduct having no connection with speech" (*O'Brien* at 375), the *O'Brien* Court found it did, devising what Justice Scalia might have called a

---

[16] Herbert W. Titus, "The Freedom of Speech, An Introduction," *The Forecast*, vol. 2, no. 12 (Sept. 1995) at 10.

four-part "judge-empowering 'interest-balancing inquiry,'"[17] designed specifically to extend First Amendment protection to conduct.  By transforming the words inherent in speech to the conduct inherent in expression, the Court reached the decision it wanted, but at considerable cost to constitutional integrity.  The *O'Brien* Court offered the reassurance that "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."  *Id.* at 376.

History has belied the *O'Brien* Court's assurances.  By 1972, the Court had stated that "at least some" performances of "lewd or naked dancing" are "within the limits … of freedom of expression."  *Cal. v. La Rue*, 409 U.S. 109, 118 (1972).  "[V]irtually *any* prohibited conduct can be performed for an expressive purpose — if only … that the actor disagrees with the prohibition."  *Barnes v. Glen Theatre*, 501 U.S. 560, 576 (1991) (Scalia, J., concurring).  Under this approach, not only pornography, but also laws against prostitution, drug use, and countless more would become protected acts.  By creating a new and "limitless" general right of "expression," the Court had no need to evaluate nude dancing based on historic standards of "speech" or "press."  Now, freedom

---

[17]  *See District of Columbia v. Heller* at 634.

of expression is generally taught to law students to be shorthand for speech and press, which allows courts to decide cases without regard to the historic meaning of those distinct constitutional provisions.

## B.     There Is No Constitutional Ban on Protecting Public Morality.

Although not discussed expressly by the district court, the prevailing judicial attitude is that states have no authority to protect public morality in the area of obscenity.  This has never been such a rule of law.  Up to and through the Founding era, obscenity had always been treated as a common law offense. Blackstone describes the offense of "open and notorious lewdness," and "grossly scandalous and public indecency."[18]  British law enshrined "obscene libel" as punishable in the famed case of *King v. Curl*, 93 Eng. Rep. 849 (K.B. 1727). "[T]he American common law quietly absorbed obscene libel" principles from the English law:[19]

> Obscene and indecent acts of a *public* nature were always crimes at common law....  [E]xhibitions of obscene or disgusting pictures and acts, indecent exposure of one's privates, and the utterance of obscene and profane language either shocked the public's sense of

---

[18]  Blackstone, Commentaries on the Laws of England abridged, 9th ed. 442 W. Sprague, ed., Chicago: Callahan & Co. (1915).

[19]  W. Strub, Obscenity Rules: Roth v. United States and the Long Struggle Over Sexual Expression at 7 (Kan. University Press: 2013).

decency or tended to the corruption of its morals and so were
nuisances not to be tolerated.[20]

In a famous 1811 New York case, *People v. Ruggles*, Judge James Kent,

author of the seminal treatise "Commentaries on American Law," declared that

"[t]hings which corrupt moral sentiment, as obscene actions, prints and writings"

were indictable offenses, as they "tend[] to corrupt the morals of the people...."

*People v. Ruggles*, 8 Johns. 290, 294 (N.Y. 1811).  The Pennsylvania Supreme

Court concurred in the 1815 indecency case of *Commonwealth v. Sharpless*, 2

Serg. R. 91, 100 (1815) (cited in *Commonwealth v. Heinbaugh*, 267 Pa. 1, 8

(1976)).  Citing England's *Curl* case, the court ruled that "actions of *public*

*indecency*, were always indictable, as tending to corrupt the public morals."

*Sharpless* at 101.  The *Sharpless* court used "obscene" and "indecent"

interchangeably.  The picture in question was described by the Court as

"representing a man in an obscene, impudent, and indecent posture with a

woman."  *Id.* at 103.  The Massachusetts Supreme Court agreed in 1821,

upholding a conviction for publishing a book that contained an obscene print.

*Commonwealth v. Holmes*, 17 Mass. 336 (Mass. 1821).  The Massachusetts

---

[20]  J. Thompson, "The Role of Common Law Concepts in Modern
Criminal Jurisprudence (A Symposium) – III Common Law Crimes against
Public Morals," J. Crim. L. and Criminology 350, 351 (1959).

court, too, treated the words "obscene" and "indecent" interchangeably. Indeed, the first federal obscenity statute prohibited importation of "all indecent and obscene prints...."[21] Congress, too, used the words interchangeably, and the First Amendment was not thought to be offended. Indeed, the law "passed without debate...." *Id.*

In 1896, in *Swearingen v. United States*, 161 U.S. 446 (1896), the Court upheld Congress' criminal statute against sending obscene material through the U.S. mail. The statute declared, "'every obscene, lewd or lascivious book, pamphlet, picture, paper, writing or other publication of an indecent character … are hereby declared to be non-mailable matter.'" *Id.* at 449. The Court, quite correctly, never considered the First Amendment, and instead pointed directly to the common law. The Court noted that "[t]he words 'obscene,' 'lewd' and 'lascivious' … signify that form of immorality which has relation to sexual impurity, and have the same meaning as is given them at common law...." *Id.* at 451. Nothing about the Court's common law-based opinion suggested that material must be "hard core" to be prohibited.

---

[21]  W. Strub, <u>Obscenity Rules</u> at 12.

"From … the ratification of the Bill of Rights, until 1957, the … Court had never found the First Amendment even remotely relevant to the constitutionality of a federal or state obscenity law."[22]  As recently as 1942, the Supreme Court recognized that obscenity had never received any protection whatsoever from the First Amendment.

> There are certain … classes of speech, the prevention and punishment of which have **never been thought to raise any Constitutional problem.**  These include **the lewd and obscene….**" [*Chaplinsky v. N.H.* at 571-572.]

Under its current *Miller* formulation, the Court defined obscenity under an atextual three-part test:  "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest… (b) whether the work depicts or describes, in a patently offensive way, sexual conduct… and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California* at 24.  "Under the holdings announced today, no one will be subject to prosecution for … obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct," the Court promised (without defining "hard core"). *Id*. at 27.

---

[22]  Titus, "Obscenity" at 10.

The common law cases connect seamlessly with the traditional police powers of the states to legislate for "the public health, safety and morals." "Public indecency — including public nudity — has long been an offense at common law. *See* 50 Am. Jur. 2d, Lewdness, Indecency, and Obscenity § 17, pp. 449, 472-474 (1970)." *Barnes* at 573 (Scalia, J., concurring). Nothing before *Roth* in 1957 suggests that the First Amendment protects pornography, "hard core" or not.

## C.    The *Miller* Standard Should Be Replaced with a Textually Faithful Analysis.

When a First Amendment challenge is brought to a pornography law, courts will not discover original constitutional principles in *Miller* and its progeny. Judge-empowering interest balancing tests are dangerous. Courts have a duty to investigate the "text, history, and tradition" of the First Amendment, as written. Does the law violate "the freedom of speech, or of the press" according to the original public meaning of those protections? The approach taken by the district court embraced both the *Miller* line of cases and strict scrutiny and, having asked the wrong question, and applying the wrong method of analysis, it reached the wrong result.

## CONCLUSION

The district court decision should be reversed and its preliminary injunction preventing the Attorney General of Texas from enforcing H.B. 1181 should be vacated.

Respectfully submitted,

/s/ William J. Olson

J. MARK BREWER
  800 Bering Dr., Ste. 201A
  Houston, TX  77057

JAMES N. CLYMER
  CLYMER MUSSER & SARNO, P.C.
  408 West Chestnut St.
  Lancaster, PA  17603

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. BOX 10953
  Lynchburg, VA  24506

September 25, 2023

William J. Olson*
Jeremiah L. Morgan
WILLIAM J. OLSON, P.C.
  370 Maple Ave. W., Ste. 4
  Vienna, VA  22180
  (703) 356-5070
  wjo@mindspring.com
  Attorneys for *Amici Curiae*

*Counsel of Record

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Council on Pornography Reform, *et al*. in Support of Defendant-Appellant and Reversal, was made, this 25th day of September, 2023, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief *Amicus Curiae* of Council on Pornography Reform, *et al.* in Support of Defendant-Appellant and Reversal complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,395 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as Circuit Rule 32.1, because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 18.0.0.200 in 14-point CG Times.

　　　　　　　　　　　　　　　 */s/ William J. Olson*　　　
　　　　　　　　　　　　　　　William J. Olson
　　　　　　　　　　　　　　　Attorney for *Amici Curiae*
　　　　　　　　　　　　　　　Dated:  September 25, 2023