No. 23-50627

# United States Court of Appeals

## for the

# Fifth Circuit

FREE SPEECH COALITION, INC., *et al.*,

*Plaintiffs-Appellees,*

v.

ANGELA COLMENERO, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Western District of Texas, Austin Division
Honorable David Alan Ezra Presiding

**BRIEF OF *AMICI CURIAE*
AMERICAN CIVIL LIBERTIES UNION, CENTER FOR
DEMOCRACY & TECHNOLOGY, ELECTRONIC FRONTIER
FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION, MEDIA COALITION FOUNDATION, AND
TECHFREEDOM IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

ROBERT CORN-REVERE
*Counsel of Record*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

*Attorney for* Amici Curiae

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Case No. 23-50627, *Free Speech Coalition, Inc., et al. v. Colmenero*.

The undersigned counsel of record certifies that, in addition to the persons and entities in the parties' Certificates of Interested Persons, the following listed persons and entities as described in the fourth sentence of Rules 28.2.1 and 29.2 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
|---|---|
| American Civil Liberties Union (ACLU) | *Amicus curiae* |
| Center for Democracy & Technology (CDT) | *Amicus curiae* |
| Electronic Frontier Foundation (EFF) | *Amicus curiae* |
| Foundation for Individual Rights and Expression (FIRE) | *Amicus curiae* |
| Media Coalition Foundation | *Amicus curiae* |
| TechFreedom | *Amicus curiae* |
| Robert Corn-Revere | Counsel for *amici curiae* |

Under Federal Rule of Appellate Procedure 26.1(a), counsel for *amici* certifies that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*.

/s/ Robert Corn-Revere
Attorney of record for *amici curiae*

September 26, 2023

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES .............i

TABLE OF AUTHORITIES......................................................v

INTEREST OF *AMICI CURIAE* ............................................. 1

SUMMARY OF ARGUMENT .................................................. 4

ARGUMENT ........................................................................ 6

    I.    HB 1181's Age Verification Requirement Will Impermissibly Burden Access to Lawful Sexual Content, Including for Adults.................................. 7

        A.    HB 1181's age verification requirement will impermissibly burden adult speech. ............................ 8

        B.    Age verification will rob website visitors of anonymity...................................................... 10

        C.    Age verification will raise additional privacy and security concerns. .................................. 13

        D.    Age verification will prevent some visitors from accessing lawful content online at all. ............... 15

    II.    HB 1181's Disclosure Requirement Compels Speech. ................................................................ 17

        A.    HB 1181 compels speech. ............................. 18

        B.    Longstanding precedent prevents Texas from compelling speech................................. 20

        C.    If left unchecked, other states will attempt to conscript private speakers to voice their preferred ideological views. .......................... 23

CONCLUSION ........................................................................ 25

CERTIFICATE OF SERVICE................................................... 27

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .... 28

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*303 Creative LLC v. Elenis,*
  143 S. Ct. 2298 (2023) ........................................................................... 21

*ACLU v. Gonzales,*
  478 F. Supp. 2d 775 (E.D. Pa. 2007) .................................... 9, 12, 13, 14

*ACLU v. Johnson,*
  4 F. Supp. 2d 1029 (D.N.M.1998) ............................................................ 12

*ACLU v. Mukasey,* 534 F.3d 181 (3d Cir. 2008) ......................... 11, 12, 13

*Am. Booksellers Found. for Free Expression v. Sullivan,*
  799 F. Supp. 2d 1078 (D. Alaska 2011) ................................................. 8

*Am. Booksellers Found. v. Dean,*
  342 F.3d 96 (2d Cir. 2003) .......................................................... 8, 10, 15

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ....................................................................... 8, 10

*Calzone v. Summers,*
  942 F.3d 415 (8th Cir. 2019) ................................................................ 11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
  447 U.S. 557 (1980) .............................................................................. 22

*Cyberspace, Commc'ns, Inc. v. Engler,*
  55 F. Supp. 2d 737 (E.D. Mich. 1999) ................................................. 12

*Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.,*
  518 U.S. 727 (1996) .............................................................................. 14

*Ent. Software Ass'n v. Blagojevich,*
  469 F.3d 641 (7th Cir. 2006) ................................................................ 22

*Free Speech Coal., Inc. v. Colmenero,*
  No. 1:23-CV-917-DAE, 2023 U.S. Dist.
  LEXIS 154065 (W.D. Tex. Aug. 31, 2023) ............... 7, 10, 14, 15, 19, 22

*Garden Dist. Book Shop, Inc. v. Stewart*,
   184 F. Supp. 3d 331 (M.D. La. 2016) ................................... 10

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
   452 U.S. 640 (1981) ............................................................ 21

*In re Anonymous Online Speakers*,
   661 F.3d 1168 (9th Cir. 2011) ............................................. 12

*Janus v. AFSCME, Council 31*,
   138 S. Ct. 2448 (2018) ........................................................ 20

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995) ............................................................ 11

*Missouri v. Biden*,
   No. 23-30445, 2023 U.S. App. LEXIS 23965
   (5th Cir. Sept. 8, 2023) ....................................................... 25

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018) ........................................................ 22

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
   475 U.S. 1 (1986) ................................................................ 21

*PSINet, Inc. v. Chapman*,
   362 F.3d 227 (4th Cir. 2004) ................................. 8, 9, 13, 15

*PSINet, Inc. v. Chapman*,
   167 F. Supp. 2d 878 (W.D. Va. 2001) ................................. 13

*Reno v. ACLU*,
   521 U.S. 844 (1997) ..................................................... 8, 9, 11

*Shipley, Inc. v. Long*,
   454 F. Supp. 2d 819 (E.D. Ark. 2004) ................................... 9

*State v. Weidner*,
   235 Wis. 2d 306 (Wis. 2000) ............................................... 11

*United States v. Playboy Ent. Grp.*,
   529 U.S. 803 (2000) ............................................................ 10

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (2013) ............................................................... 21

*Volokh v. James*, No. 22-CV-10195 (ALC),
  2023 U.S. Dist. LEXIS 25196 (S.D.N.Y. Feb. 14, 2023) ...................... 25

*West Va. State Bd. of Educ. v. Barnette*,
  319 U. S. 624 (1943) ............................................................ 20

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ......................................................... 17, 20

**Statutes**

H.B. 1181, Act of June 12, 2023,
  Ch. 676, Tex. Sess. Law Serv. (Vernon's) .............................. 5, 7, 18, 19

N.Y. Gen. Bus. Law § 394-ccc ................................................. 23

**Other Authorities**

*2021 FDIC National Survey of Unbanked and Underbanked
  Households*, FDIC ............................................................. 16

Megan Russo, *Mismatched Gender Markers on State ID Cards*,
  The Regulatory Review (Mar. 10, 2021) ................................... 16

Sonia Lin, *Identifying and addressing the financial needs of
  immigrants*, Consumer Financial Protection Bureau
  (June 27, 2022) ............................................................. 16

*Verifying Lawful Presence*, Texas Department of Public Safety ........... 15

## INTEREST OF *AMICI CURIAE*[1]

The American Civil Liberties Union (ACLU) is a nonprofit, nonpartisan membership organization devoted to protecting the civil rights and civil liberties of all Americans, including the First Amendment rights to free speech, anonymity, and access to information online. The ACLU has frequently appeared before courts to advocate for First Amendment rights online, *see, e.g., Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (*amicus*). The ACLU has also litigated many of the seminal cases striking down laws that prohibited the communication of certain materials online without age verification. *See, e.g., Reno*, 521 U.S. 844; *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999).

The Center for Democracy & Technology (CDT) is a non-profit public interest organization. For more than twenty-five years, CDT has

---

[1] Under Rule 29(a)(4)(E), counsel for *amici* certifies that no counsel for a party authored this brief in whole or in part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. Plaintiffs-Appellees consented to the filing of this brief, but Defendant-Appellants declined. A motion for leave to file this brief has been filed concurrently herewith.

1

represented the public's interest in an open, decentralized Internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and courts in support of First Amendment rights on the Internet and other protections for online speech.

Recognizing the internet's power as a tool of democratization, the Electronic Frontier Foundation (EFF) has, for nearly 30 years, worked, on behalf of its more than 39,000 dues-paying members, to protect the rights of users to transmit and receive information online. EFF represents clients in impact litigation at the intersection of civil liberties and technology and frequently files *amicus* briefs in cases raising those issues.

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the individual rights of all Americans to free speech and free thought—the most essential qualities of liberty. Since 1999, FIRE has successfully defended the rights of individuals through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate

expressive rights under the First Amendment. *See, e.g.*, *Villarreal v. City of Laredo, Texas*, No. 20-40359 (5th Cir. argued *en banc* Jan. 25, 2023); Brief of FIRE as *Amicus Curiae* in Support of Plaintiff-Appellee, *Rogers v. Smith*, No. 22-30352 (5th Cir. filed Jan. 27, 2023); Brief of FIRE as *Amicus Curiae* in Support of Plaintiffs-Appellees, *Little v. Llano County*, No. 23-50224 (5th Cir. filed June 2, 2023).

The Media Coalition Foundation, Inc. works to protect the First Amendment and the public's right to access the broadest possible range of information, opinion, and entertainment. The Foundation monitors potential legal threats to the First Amendment rights, engages in strategic litigation, and provides *amicus* support in notable cases to protect the rights of speakers and those seeking to access speech, as guaranteed by the First Amendment.

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. It seeks to advance public policy that makes experimentation, entrepreneurship, and investment possible. TechFreedom opposes government attempts to control online speech. *See, e.g.,* Corbin K. Barthold, *In Internet Speech Cases, SCOTUS Should Stick*

*Up for Reno v. ACLU*, Techdirt, https://tinyurl.com/mprkf2vy (Mar. 28, 2023), and has particular concern about the effects of age-gating the Internet on First Amendment rights. *See, e.g.*, Ari Cohn, *The Moral Panic Over Internet Porn Can't Overrule the First Amendment*, Daily Beast, https://tinyurl.com/3njst5p4 (Sept. 7, 2023); Ari Cohn, *Texas Legislature Convinced First Amendment Simply Does Not Exist*, TechDirt, https://tinyurl.com/2s3upju7 (Jun. 20, 2023); *Utah Age Verification Mandate Violates First Amendment*, TechFreedom, https://tinyurl.com/5n8xnhpa (Feb. 16, 2023). It appears often as *amicus curiae* in cases where the government attempts to dictate what views are acceptable online. *See, e.g.*, *NetChoice v. Moody*, 34 F.4th 1196, 1219 n.17 (11th Cir. 2022) (quoting TechFreedom's *amicus* brief).

*Amici* submit this brief to highlight the threat HB 1181 poses to the First Amendment rights of both the website visitors who wish to access lawful sexual content online and the websites that host such content.

## SUMMARY OF ARGUMENT

Texas' age-verification law, HB 1181, violates the First Amendment in two fundamental ways: It burdens Texans' ability to access lawful sexual material online, and it compels websites that host such content to

voice the government's criticism of it. Act of June 12, 2023, Ch. 676, § 2 (H.B. 1181) Tex. Sess. Law Serv. (Vernon's) ("HB 1181").

HB 1181 will require every person—including every adult—to verify their age before they can access legal adult content online. Requiring individuals to verify their ages before accessing protected content imposes significant burdens on the exercise of First Amendment rights online. HB 1181 will rob people of anonymity, chill privacy- and security-minded users, and block some individuals from accessing online content fully protected by the First Amendment. Time and again, courts have held such burdens on users' access to and ability to engage with protected speech are unconstitutional. Courts have repeatedly invalidated laws that prohibit communication of lawful expression online without verifying the ages of recipients, as they have laws restricting minors' access to access violent video games and other content government actors deem objectionable. The same result is warranted here.

Burdening access to protected speech online is not HB 1181's only constitutional flaw. It also compels websites whose content includes lawful, fully protected sexual material to post three "disclosures"

capturing Texas' view of pornography. Yet long-settled First Amendment precedent shields private speakers from compulsion to serve as government mouthpieces under pain of punishment. Texas may not commandeer private websites to trumpet its own views.

Correctly assessing HB 1181's double threat, the district court enjoined Texas' attempt to burden online expression and force private websites into parroting the State's views. To protect our First Amendment freedoms from state intrusion, this Court should affirm.

## ARGUMENT

HB 1181 violates the First Amendment rights of both website visitors and the websites themselves. The statute is riddled with constitutional defects—the district court properly held the statute was not narrowly tailored and could not withstand strict scrutiny because it was "severely underinclusive," failed to "define key terms in a comprehensible way," did not "exempt material that has cultural, scientific, or educational value to adults only," and was overly restrictive, among other fatal flaws. *Free Speech Coal., Inc. v. Colmenero*, No. 1:23-CV-917-DAE, 2023 U.S. Dist. LEXIS 154065, at *27, *33, *39 (W.D. Tex. Aug. 31, 2023). And at its core, HB 1181's threatens the First

Amendment by imposing a substantial burden on access to protected expression and by compelling speech.

## I. HB 1181's Age Verification Requirement Will Impermissibly Burden Access to Lawful Sexual Content, Including for Adults.

If HB 1181 is allowed to take effect, websites Texas deems to be at least "one-third" composed of "sexual material harmful to minors" must "verify that an individual attempting to access the material is 18 years of age or older" before that individual may access the site's content. HB 1181 § 129B.002(a). Under the statute, the site must verify a visitor's age via "a commercial age verification system . . . using: (A) government-issued identification; or (B) a commercially reasonable method that relies on public or private transactional data to verify the age of an individual." § 129B.003. By forcing adults to identify themselves in this manner to access lawful, fully protected sexual content online, HB 1181 imposes an unconstitutional burden on adult access to protected speech.

HB 1181's age verification requirement will likewise burden users who do not have government identification; who wish to exercise their First Amendment right to anonymity or who are otherwise concerned about privacy and security; or whose age or identity "commercially

reasonable . . . method[s]" will fail to accurately gauge. For these reasons, courts have consistently struck down attempts to impose age verification schemes online in the name of protecting children. The district court correctly followed longstanding precedent in reaching the same conclusion, and this Court should affirm.

### A. HB 1181's age verification requirement will impermissibly burden adult speech.

Courts have consistently invalidated laws that prohibit granting minors access to online content without age verification, due in significant part to the burden such verification imposes on all users. A law that "'effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another . . . is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purposes that the statute was enacted to serve.'" *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (quoting *Reno v. ACLU*, 521 U.S. 844, 874 (1997)). *See also PSINet Inc. v. Chapman*, 362 F.3d 227, 235 (4th Cir. 2004) (same); *Am. Booksellers Found. for Free Expression v. Sullivan*, 799 F. Supp. 2d 1078, 1082–83 (D. Alaska 2011) (same); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003) ("[R]estrictions aimed at minors may not limit non-obscene expression

8

among adults."); *Shipley, Inc. v. Long*, <u>454 F. Supp. 2d 819, 831</u> (E.D. Ark. 2004) (holding unconstitutional a prohibition on the display of material harmful to minors because it would burden adults' and older minors' access to non-obscene materials).[2] Many of the cases considering laws prohibiting communication of online information without age verification have relied on the availability of less restrictive alternatives when invalidating the laws as overbroad. *See Reno*, <u>521 U.S. at 864</u> (noting "the overbreadth of the CDA"); *id.* at 879 (describing the law's "facial overbreadth"); *ACLU v. Gonzales*, <u>478 F. Supp. 2d 775, 812</u> (E.D. Pa. 2007), *aff'd sub nom* (noting that the Fourth Circuit in *PSINet* struck down such a law as "overly broad" (citing *PSINet*, <u>362 F.3d at 239</u>)).

The availability of less-restrictive means is fatal to HB 1181. Age verification requirements are more restrictive than, for example, policies enabling or encouraging users (or their parents) to control their own access to information, whether through user-installed devices and filters

---

[2] Additionally, approximately sixty percent of U.S. households do not include children under the age of 18, which means laws that seek to protect minors from certain materials but affect Internet access in all households are inherently overinclusive. Statista Research Dep't, *Average size of a family in the US 1960–2022*, Statista (June 2, 2023), https://www.statista.com/statistics/183657/average-size-of-a-family-in-the-us [https://perma.cc/4XZN-PD27].

or affirmative requests to third party companies. "Filters impose selective restrictions on speech at the receiving end, not universal restrictions at the source." *Ashcroft*, 542 U.S. at 657. "Under a filtering regime, adults . . . may gain access to speech they have a right to see without having to identify themselves[.]" *Id. See also Garden Dist. Book Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331, 338–39 (M.D. La. 2016) (holding that law requiring age verification fails strict scrutiny because content filters offer a less restrictive alternative). Similarly, Congress could "act to encourage the use of filters . . . by parents" to protect minors. *Id. Cf. United States v. Playboy Ent. Grp.*, 529 U.S. 803, 809–10, 815 (2000) (finding voluntary, "targeted blocking" of content by viewers "less restrictive than banning" that content). For this reason alone, the district court properly found HB 1181 unconstitutional. *Free Speech Coal., Inc.*, at \*56.

### B. Age verification will rob website visitors of anonymity.

Age verification schemes "are not only an additional hassle," but "require that website visitors forgo the anonymity otherwise available on the internet." *Am. Booksellers Found. v. Dean*, 342 F.3d at 99. They force users to "relinquish their anonymity to access protected speech, and . . .

create a potentially permanent electronic record" of the sites users choose to visit. *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008). That "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity." *State v. Weidne*r, 235 Wis. 2d 306, 320 (Wis. 2000). And, not surprisingly, it "discourage[s] users from accessing [the regulated] sites." *Reno*, 521 U.S. at 856.

"As the Supreme Court has recognized, speakers ordinarily have the right to keep their identities private. In fact, the right to remain nameless is 'an aspect of the freedom of speech protected by the First Amendment' and a component of 'a respected tradition of anonymity in the advocacy of political causes.'" *Calzone v. Summers*, 942 F.3d 415, 425 (8th Cir. 2019) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–43 (1995)). "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre*, 514 U.S. at 341–42. These concerns—and the right to speak anonymously—necessarily translate to the Internet, where "any person . . . can become a town crier" and the content "is as diverse as human thought." *Reno*, 521 U.S. at 870. "As with other forms

of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

Courts have recognized the importance of protecting anonymous speech online when invalidating age verification requirements like the one here. "[P]reserv[ing] anonymity" may be essential for users who seek to have "a distinct online identity," *Cyberspace, Commc'ns, Inc. v. Engler*, 55 F. Supp. 2d 737, 742 (E.D. Mich. 1999), *aff'd and remanded*, 238 F.3d 420 (6th Cir. 2000), or who want to discuss "sensitive, personal, controversial, or stigmatized content," *Gonzales*, 478 F. Supp. 2d at 806. *Mukasey*, 534 F.3d 181, or who want to ask personal questions. *See, e.g., Cyberspace, Commc'ns, Inc.*, 55 F. Supp. 2d at 749 (noting example of teenager relying on anonymity when "asking . . . about an encounter with her boyfriend that she incorrectly reasoned was not sexual intercourse"); *Gonzales,* 478 F. Supp. 2d at 806 (recognizing "importan[ce]" of anonymity "for users with embarrassing medical and sexual questions which they would not even discuss with their mates or personal physicians"); *ACLU v. Johnson*, 4 F. Supp. 2d 1029, 1032 (D.N.M.1998),

12

*aff'd*, 194 F.3d 1149 (10th Cir. 1999) ("Requiring age verification before providing access to speech on the Internet would bar many people from accessing important information—such as gynecological information—anonymously.").

Without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236. That chilling effect only underscores the impermissible burden on protected anonymity that Texas' statute imposes on its residents.

## C. Age verification will raise additional privacy and security concerns.

Age verification schemes also implicate other "privacy and security concerns." *Mukasey*, 534 F.3d at 197. Courts have repeatedly found that "[r]equiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and because Internet users are afraid of fraud and identity theft on the Internet." *Gonzales*, 478 F. Supp. 2d at 806; *see also PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access

their [identifying information] . . . may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide.").

"Even beyond the capacity for state monitoring," the district court observed, "the First Amendment injury is exacerbated by the risk of inadvertent disclosures, leaks, or hacks." *Free Speech Coal., Inc.*, at *44. Other courts have reached the same conclusion, reasoning that requirements fail to "alleviate the deterrent effect of age verification on users, because users must still disclose the personal information to [a company] . . . and then rely on [said company] . . . to comply with the confidentiality requirement." *Gonzales*, 478 F. Supp. 2d at 806. *Cf. Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 754 (1996) (requiring subscribers to provide written notice to operators if they wanted access to certain TV channels was unconstitutional in part it "will further restrict viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish the watch the 'patently offensive' channel").

As the district court noted, HB 1181 does not require Texas "to delete data regarding access, and one of the two permissible mechanisms

14

of age-verification is through government ID"—meaning the "risks of compelled digital verification are just as large, if not greater," than they were in the Internet's nascency. *Free Speech Coal., Inc.*, at \*45–46. The First Amendment does not require Texans to give up their privacy for free expression. Yet that is exactly the impossible choice HB 1181 forces.

### D. Age verification will prevent some visitors from accessing lawful content online at all.

Age verification requirements further "serve as a complete block to adults who wish to access [online] material but do not" have the necessary form of identification. *PSINet*, 362 F.3d at 237; *see also Am. Booksellers Found.*, 342 F.3d at 99 (invalidating age verification requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites"). Under HB 1181, that could include individuals who do not have a driver's license or other government-issued form of identification, including undocumented immigrants who cannot obtain a State ID or driver's license.[3]

---

[3] *See Verifying Lawful Presence*, Texas Department of Public Safety, https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawfulpresence.pdf [https://perma.cc/B7QZ-4TGB] ("An applicant for a driver license (DL) or identification card (ID) must present proof of lawful presence in the US.").

Transgender and gender-nonconforming people also might lack identification that matches their true identity.[4]

Although HB 1181 allows services to verify users' ages by other means, the alternative is unlikely to provide an easier route for those lacking a State ID or driver's license. Assuming a service opts to use private transactional data—usually, a credit card—to verify users' ages, close to 30 percent of U.S. households do not have a credit card.[5] Immigrants, regardless of their legal status, may not be able to obtain credit cards, either.[6]

****

---

[4] Megan Russo, *Mismatched Gender Markers on State ID Cards*, The Regulatory Review (Mar. 10, 2021), https://www.theregreview.org/2021/03/10/russo-mismatched-gender-markers-state-id-cards/ [https://perma.cc/2N9H-HK4G].

[5] *See 2021 FDIC National Survey of Unbanked and Underbanked Households*, FDIC (last updated July 24, 2023) (reporting that in 2021, 71.5 percent of households had a credit card), https://www.fdic.gov/analysis/household-survey/index.html [https://perma.cc/V3M3-G6MU].

[6] *See* Sonia Lin, *Identifying and addressing the financial needs of immigrants*, Consumer Financial Protection Bureau (June 27, 2022) (describing how "many financial institutions have policies and practices in place that effectively exclude immigrants from access to bank services and to credit due to immigration status"), https://www.consumerfinance.gov/about-us/blog/identifying-and-addressing-the-financial-needs-of-immigrants [https://perma.cc/GWK7-8MJZ].

For these reasons, HB 1181's age verification requirement impermissibly burdens access to protected sexual material. An unbroken string of decisions spanning over two decades has held that similarly flawed legislative attempts to wall off lawful online speech failed to pass constitutional muster. The district court was thus correct to conclude that HB 1181 must suffer the same fate. This Court should affirm.

## II.    HB 1181's Disclosure Requirement Compels Speech.

HB 1181 not only unconstitutionally restricts access to lawful online sexual content through age-verification, but also affirmatively compels websites to speak in violation of the First Amendment. It is well-settled that the government cannot force a private speaker "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). But HB 1181 would do exactly that, forcing websites containing lawful sexual content to publish Texas' criticism of that material under pain of punishment.

HB 1181 thus violates longstanding precedent that protects private speakers against conscription into the government's ideological

17

army. If the First Amendment protects anything, it protects the right of speakers to express themselves in ways the government dislikes—and to do so without first reciting a state-mandated "WARNING." Left unchecked by this Court, similarly unconstitutional governmental intrusions into private speech like HB 1181 will flourish along predictable ideological lines.

**A.    HB 1181 compels speech.**

Texas' HB 1181 includes a "disclosure requirement" compelling websites that the State deems to include at least "one-third" "sexual material harmful to minors" to post three warnings on their landing pages, "in 14-point font or larger," about the alleged dangers of viewing sexual material. § 129B.004. Specifically, the law requires sites to publish the following messages:

> TEXAS HEALTH AND HUMAN SERVICES WARNING:
> Pornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function.

> TEXAS HEALTH AND HUMAN SERVICES WARNING:
> Exposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses.

> TEXAS HEALTH AND HUMAN SERVICES WARNING:

18

> Pornography increases the demand for prostitution, child
> exploitation, and child pornography.

*Id.* In addition to these warnings, the law also requires the websites to

publish the following message "at the bottom of every page," again "in

14-point font or larger":

> U.S. SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES
> ADMINISTRATION
>
> 1-800-662-HELP (4357)
>
> THIS HELPLINE IS A FREE, CONFIDENTIAL INFORMATION
> SERVICE (IN ENGLISH OR SPANISH) OPEN 24 HOURS PER
> DAY, FOR INDIVIDUALS AND FAMILY MEMBERS FACING
> MENTAL HEALTH OR SUBSTANCE USE DISORDERS. THE
> SERVICE PROVIDES REFERRAL TO LOCAL TREATMENT
> FACILITIES, SUPPORT GROUPS, AND COMMUNITY BASED
> ORGANIZATIONS.

*Id.* A website that fails to post this State messaging violates HB 1181

and risks civil prosecution.

Requiring publication of the warnings and helpline message that

articulate Texas' views about lawful sexual material unconstitutionally

compels speech. Importantly, Plaintiff-Appellees operating lawful adult

websites do not agree with Texas' views on these points and they do not

want to post them. *Free Speech Coal., Inc.*, at \*58. By mandating

publication of these controversial and disputed messages, HB 1181

forces websites to speak—indeed, it forces them to voice Texas' criticism of their own lawful expression—under pain of punishment. Decades of First Amendment precedent prevents Texas from doing so.

## B. Longstanding precedent prevents Texas from compelling speech.

Eighty years ago, the Supreme Court identified the First Amendment's bar against compelled speech as the "fixed star" in "our constitutional constellation," holding that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Va. State Bd. of Educ. v. Barnette*, <u>319 U. S. 624, 642</u> (1943). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command[.]" *Janus v. AFSCME, Council 31*, <u>138 S. Ct. 2448, 2463</u> (2018). It is thus well established that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley*, <u>430 U.S. at 714</u>.

But Texas' disclosure requirement violates this long-standing precedent. Forcing websites "either to appear to agree with" Texas' view

on lawful sexual material or face civil prosecution for violating HB 1181 takes away "the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15–16 (1986). As a foundational principle, "the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023).

The district court correctly rejected the State's argument that the disclosure requirements' compulsion of speech passes muster as a regulation on commercial speech. The First Amendment's "protection is [not] lost because the written materials sought to be distributed are sold rather than given away." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). As the Supreme Court reaffirmed last term, speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech." *303 Creative LLC*, 143 S. Ct. at 2316. Moreover, the commercial-speech doctrine does not apply at the threshold, because the websites caught within HB 1181's wide ambit do far more "than propose a commercial transaction," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (2013), as they offer

protected expression related to far more than the "economic interests" of the sites and their audiences. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).

Even if the websites *did* contain solely commercial speech, HB 1181 forces them to voice "a subjective and highly controversial message": that the lawful sexual material on their sites will cause a striking variety of physical, mental, and social harms. *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006). The impact of the lawful sexual material that HB 1181 seeks to regulate is "anything but an 'uncontroversial' topic," and Texas may not require websites containing such material to take the State's side in this long-running debate. *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018).

The district court recognized HB 1181's disclosure requirement for what it is: a brazen attempt to coerce private speakers into ideological compliance with Texas' preferred viewpoint. *Free Speech Coal., Inc.*, at *63–74. To ensure that Texas cannot coerce speakers to parrot the state's views—and that other states do not follow its unconstitutional lead—this Court should affirm.

**C.    If left unchecked, other states will attempt to conscript private speakers to voice their preferred ideological views.**

The threat posed to protected speech by HB 1181's mandatory "disclosure requirement" is serious, but not unique. Texas is not the only state with views on controversial and contested matters of public concern, nor is it the only state that unlawfully seeks to conscript private websites to parrot those views.

In 2022, in the tragic wake of a white supremacist committing mass murder in Buffalo, New York, the State of New York enacted N.Y. Gen. Bus. Law § 394-ccc. Titled "Social media networks; hateful conduct prohibited," New York's law requires social media networks (defined broadly to include even websites that simply allow users to post comments) to promulgate and post a policy regarding "hateful conduct," defined by the State as speech which "vilif[ies], humiliate[s], or incite[s] violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." N.Y. Gen. Bus. Law § 394-ccc(1)(a).

Represented by *amicus* FIRE, three sites challenged the law's "hate speech" requirements as unlawful compelled speech. The plaintiffs—Professor Eugene Volokh, who operates the legal blog *The Volokh Conspiracy*, and social media platforms Rumble and Locals—did not want to promulgate and publish State-prescribed policies on their sites, and argued that "hate speech" is a contested concept on which they want to post only their own opinions or about which they wish to remain silent. A federal district court agreed with their contention that the requirement unconstitutionally compels speech:

> Requiring Plaintiffs to endorse the state's definition of "hateful conduct", forces them to weigh in on the debate about the contours of hate speech when they may otherwise choose not to speak. . . .
>
> Here, the Hateful Conduct Law requires social media networks to disseminate a message about the definition of "hateful conduct" or hate speech—a fraught and heavily debated topic today. Even though the Hateful Conduct Law ostensibly does not dictate what a social media website's response to a complaint must be and does not even require that the networks respond to any complaints or take down offensive material, the dissemination of a policy about "hateful conduct" forces Plaintiffs to publish a message with which they disagree. Thus, the Hateful Conduct Law places Plaintiffs in the incongruous position of stating that they promote an explicit "pro-free speech" ethos, but also requires them to enact a policy allowing users to complain about "hateful conduct" as defined by the state.

24

*Volokh v. James*, No. 22-CV-10195 (ALC), 2023 U.S. Dist. LEXIS 25196, at *15–17 (S.D.N.Y. Feb. 14, 2023).

Like HB 1181, New York's effort to compel private websites to voice a message of the state's choosing failed to pass constitutional muster. But Texas and New York will not be the only states to attempt to conscript private speakers into carrying the government's preferred message. In our polarized political environment, it is all too easy to imagine that if states are granted the power, they will seek to append "disclosure requirements" to all manner of online speech about issues of the day. But as this Court recently reaffirmed, the government may speak for itself, but may not force others to publish only its preferred views online. *Missouri v. Biden*, No. 23-30445, 2023 U.S. App. LEXIS 23965, at *44–45 (5th Cir. Sept. 8, 2023). To ensure other states do not attempt similar statutory gambits, this Court should affirm.

## CONCLUSION

For all the reasons stated above, this Court should affirm the district court's finding to protect First Amendment freedoms from state intrusion.

Dated: September 26, 2023                    /s/ Robert Corn-Revere
                                            _____

                                            ROBERT CORN-REVERE
                                            FOUNDATION FOR INDIVIDUAL
                                              RIGHTS AND EXPRESSION
                                            700 Pennsylvania Avenue SE
                                            Suite 340
                                            Washington, DC 20003 (215) 717-
                                            3473
                                            bob.corn-revere@thefire.org

26

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 26, 2023, an electronic copy of the Brief of *Amici Curiae* American Civil Liberties Union, Electronic Frontier Foundation, Foundation for Individual Rights and Expression, and Media Coalition Foundation in Support of Plaintiffs-Appellees and Affirmance was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: September 26, 2023       /s/ Robert Corn-Revere
                                _____

                                ROBERT CORN-REVERE
                                FOUNDATION FOR INDIVIDUAL
                                  RIGHTS AND EXPRESSION
                                700 Pennsylvania Avenue SE
                                Suite 340
                                Washington, DC 20003 (215) 717-
                                3473
                                bob.corn-revere@thefire.org

## Certificate of Compliance With Type-Volume Limit

1. This document complies with the word limit of <u>Fed. R. App. P. 29(a)(5)</u> because, excluding the parts of the document exempted by the <u>Fed. R. App. P. 32(f)</u>: this document contains 4,873 words.

2. This document complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type-style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook and 12-point Century Schoolbook for footnotes.

Dated: September 26, 2023          /s/ Robert Corn-Revere
                                   _____

                                   ROBERT CORN-REVERE
                                   FOUNDATION FOR INDIVIDUAL
                                     RIGHTS AND EXPRESSION
                                   700 Pennsylvania Avenue SE
                                   Suite 340
                                   Washington, DC 20003 (215) 717-3473
                                   bob.corn-revere@thefire.org