# United States Court of Appeals
*for the*
# Fifth Circuit

---

Case No. 23-50627

FREE SPEECH COALITION, INCORPORATED; MG PREMIUM, LIMITED; MG FREESITES, LIMITED; WEBGROUP CZECH REPUBLIC, A.S.; NKL ASSOCIATES, S.R.O.; SONESTA TECHNOLOGIES, S.R.O.; SONESTA MEDIA, S.R.O.; YELLOW PRODUCTION, S.R.O.; PAPER STREET MEDIA, L.L.C.; NEPTUNE MEDIA, L.L.C.; JANE DOE; MEDIAME, S.R.L.; MIDUS HOLDINGS, INCORPORATED,

*Plaintiffs-Appellees,*

v.

ANGELA COLMENERO, Attorney General, State of Texas,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION IN CASE NO. 1:23-CV-00917-DAE, HON. DAVID ALAN EZRA, SENIOR DISTRICT JUDGE

## APPELLEES' CROSS-REPLY BRIEF

SCOTT L. COLE
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
300 West Sixth Street, Suite 2010
Austin, Texas 78701
(737) 667-6100

MICHAEL T. ZELLER
ARIAN J. KOOCHESFAHANI
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

DEREK L. SHAFFER
CHRISTOPHER G. MICHEL
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

JEFFREY K. SANDMAN
WEBB DANIEL FRIEDLANDER LLP
5208 Magazine Street, Suite 364
New Orleans, Louisiana 70115
(978) 886-0639

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................ 1

ARGUMENT .................................................................................... 3

I.    TEXAS FAILS TO OVERCOME SUPREME COURT PRECEDENT AND FACTUAL FINDINGS POINTING TO APPELLEES' LIKELY SUCCESS ........................................................................ 3

    A.    Texas Cannot Rebut That The Age-Verification Requirement Warrants Strict Scrutiny ............................................... 4

        1.    Texas Fails To Ward Off Strict Scrutiny Of The Age-Verification Requirement ......................................... 4

        2.    Texas Effectively Concedes That The Act Pursues Speaker-Based Discrimination .................................... 8

        3.    Texas Cannot Properly Invoke The "Secondary Effects" Doctrine ................................................................. 10

    B.    Texas Effectively Confirms That The Age-Verification Requirement Is Unlikely To Withstand Strict Scrutiny ...................... 13

    C.    Texas Misstates And Misapplies The Standard For Facial Challenges ................................................................ 16

    D.    Texas Scarcely Defends The "Health Warnings" ............... 17

        1.    Texas Fails To Show *Zauderer* Applies Or That The Act Could Survive It ...................................................... 19

        2.    Texas Fails To Show Intermediate Scrutiny Applies Or That The Act Could Survive It .................................... 22

    E.    Texas Fails To Confront Precedent And Evidence Showing Why Section 230 Is Likely Violated As To Certain Appellees ......... 23

II.    TEXAS CANNOT REFUTE THAT THE IRREPARABLE HARMS AND THE EQUITIES FAVOR AFFIRMANCE ......................................... 26

    A.    Texas Fails To Rebut Appellees' Numerous Irreparable Harms ........ 26

        1.    The District Court Did Not Clearly Err In Finding Multiple Dimensions Of Irreparable Harm .............................. 26

2.    Contrary To Texas's Partial Attack, All Appellees Have First Amendment Claims ........................................................28

B.    Texas Lacks Any Plausible Basis For Reversal Based On The Balance of Harms And Public Interest ................................................29

CONCLUSION ........................................................................................31

CERTIFICATE OF SERVICE ................................................................32

CERTIFICATE OF COMPLIANCE ........................................................32

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*303 Creative LLC v. Elenis*,
  143 S. Ct. 2298 (2023) ..................................................................................1

*Am. Meat Inst. v. USDA*,
  760 F.3d 18 (D.C. Cir. 2014) ......................................................................20

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ..........................................................2, 3, 4, 6, 7, 15, 30

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989) ....................................................................................22

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986) ....................................................................................27

*Boos v. Barry*,
  485 U.S. 312 (1998) ....................................................................................11

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011) ..............................................................................1, 8, 12

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ..........................................................................................6

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980) ....................................................................................23

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
  508 U.S. 520 (1993) ....................................................................................10

*Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*,
  760 F.3d 427 (5th Cir. 2014) ......................................................................10

*Doe v. MySpace, Inc.*,
  528 F.3d 413 (5th Cir. 2008) ..............................................................23, 24, 25

*Free Speech Coal., Inc. v. Att'y Gen. U.S.*,
  825 F.3d 149 (3d Cir. 2016) ...............................................................12

*Ginsberg v. New York*,
  390 U.S. 629 (1968)......................................................................4, 7

*Henderson v. Source for Pub. Data, L.P.*,
  53 F.4th 110 (4th Cir. 2022) ...............................................................25

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988)...............................................................................2

*Johanns v. Livestock Marketing Association*,
  544 U.S. 550 (2005)..........................................................................21

*Junior Sports Mags. Inc. v. Bonta*,
  2023 WL 5945879 (9th Cir. Sept. 13, 2023) .......................................23

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010)..........................................................................20

*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018)........................................................................7

*Nat'l Ass'n of Mfs. v. S.E.C.*,
  800 F.3d 518 (D.C. Cir. 2015) ...........................................................21

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ...........................................9, 20, 22, 25

*NIFLA v. Becerra*,
  138 S. Ct. 2361 (2018)..........................................................3, 18, 19, 21

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022).........................................................................6

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983)............................................................................27

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)..............................................................................1

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015)......................................................................7

*Reno v. ACLU*,
  521 U.S. 844 (1997)........................................... 2, 4,  6, 7, 12, 13, 30

*Riley v. Nat'l Fed'n of the Blind of N. C., Inc.*,
  487 U.S. 781 (1988).....................................................................22

*Sable Commc'ns of Cal., Inc. v. FCC*,
  492 U.S. 115 (1989).....................................................................2, 4

*Schwarz v. Folloder*,
  767 F.2d 125 (5th Cir. 1985) ...........................................................9

*Seals v. McBee*,
  898 F.3d 587 (5th Cir. 2018) .........................................................17

*SEIU, Local 5  v. City of Houston*,
  595 F.3d 588 (5th Cir. 2010) ...........................................................7

*Snyder v. Phelps*,
  562 U.S. 443 (2011)......................................................................27

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)......................................................................10

*Texas v. Johnson*,
  491 U.S. 397 (1989)........................................................................1

*Thomas v. Ameritas Life Ins. Corp.*,
  34 F.4th 395 (5th Cir. 2022) .........................................................24

*Thunder Studios v. Kazal*,
  13 F.4th 736 (9th Cir. 2021) .........................................................29

*Turtle Island Foods, S.P.C. v. Strain*,
  65 F.4th 211 (5th Cir. 2023) .........................................................17

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000)...............................................2, 5, 6, 7, 12, 25

v

*United States v. Stevens*,
   559 U.S. 460 (2010) .......................................................................... 17

*USAID v. All. for Open Soc. Int'l (AOSI II)*,
   140 S. Ct. 2082 (2020) ................................................................... 28, 29

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) ....................................................................... 25, 26

*Zauderer v. Off. of Disciplinary Counsel*,
   471 U.S. 626 (1985) ............................................................... 18, 19, 20, 22

## Statutes

42 U.S. Code § 1983 ................................................................................. 29

Texas Penal Code § 43.21 .................................................................... 5, 6, 9

Tex. Civ. Prac. & Rem. Code § 129B *et seq*. ......................... 9, 12, 18, 22

**PRELIMINARY STATEMENT**

Texas wants to convey its contempt for Appellees and their genre. Had the Act left any doubt (which it didn't), that message has now been emphatically delivered by Texas's opening brief. Texas heaps scorn upon "Big Porn," castigating Appellees—officially designated "Pornographers"—for societal ills ranging from tobacco use to headaches. Br. 5. Appellees' content is deemed "too graphic to describe to this Court" (Br. 12), although the Attorney General manages a fair amount of purported description. The aim is "to disgust," *Brown v. Ent. Merchts Ass'n*, 564 U.S. 786, 798 (2011), and many readers might be disgusted.

Under our Constitution, however, "disgust is not a valid basis for restricting expression." *Id.* The First Amendment's protections do not "belong only to speakers whose motives the government finds worthy; its protections belong to all, including to speakers whose motives others may find misinformed or offensive." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2317 (2023) (cleaned up). There is little need to safeguard speech that enjoys popular approval or scholarly esteem; the First Amendment makes a vital difference because it protects speech that draws disdain. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

1

Appellees' speech falls within the wide, protective tent. The Supreme Court has held squarely and repeatedly that "[s]exual expression which is indecent but not obscene is protected by the First Amendment." *Sable Commc'ns of Cal., Inc., v. FCC*, 492 U.S. 115, 126 (1989). And one seminal First Amendment precedent after another, yielding vital protections for all, has been won by litigants that Texas might denounce as "Big Porn." *See, e.g.*, *U.S. v. Playboy Ent. Grp.*, 529 U.S. 803, 826-27 (2000); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 57 (1988). Texas now suggests (and its *amici* proclaim outright) that the Supreme Court should reverse course. Texas is free to make that request down the road. For now, however, this Court should take the law as it finds it and gauge likely success in light of it.

Because the Act burdens the protected speech of adults based on that speech's content, both its mandates are subject to strict scrutiny. Neither is likely to survive. The age-verification requirement has the same flaws that led the Court twice to uphold preliminary injunctions enjoining similar federal statutes. *See Ashcroft v. ACLU*, 542 U.S. 656, 667-68 (2004); *Reno v. ACLU*, 521 U.S. 844, 881-82 (1997). And the health warnings, which force protected speakers to blare the same sensationalist, self-condemning message as the State's opening brief, are

2

flatly impermissible under precedent barring the government from compelling such controversial speech. *See NIFLA v. Becerra*, 138 S. Ct. 2361, 2372 (2018).

As aptly summarized in an *amicus* brief submitted by six free-speech organizations, including the American Civil Liberties Union (ACLU) and Foundation for Individual Rights and Expression (FIRE), the Act poses a "double threat" that will both "burden online expression and force private websites into parroting the State's views." Free Speech Orgs. Br. 6.   Because the State fails to refute the likely unconstitutionality of either provision—and because Appellees and the public would be severely and irreparably harmed by permitting those provisions' interim enforcement—the Act should remain enjoined pending full merits review, just as closely parallel laws have been.

## ARGUMENT

## I.   TEXAS FAILS TO OVERCOME SUPREME COURT PRECEDENT AND FACTUAL FINDINGS POINTING TO APPELLEES' LIKELY SUCCESS

The district court thoroughly explained why Appellees are likely to succeed on the merits of their challenge to the Act's age-verification and health-warning provisions.   Texas falls far short of establishing that the court thereby abused its discretion, as would be required to vacate the preliminary injunction. *See Ashcroft*,

542 U.S. at 664-65.  To the contrary, Appellees have multiple paths to likely success according to controlling precedent and irreproachable factual findings.

### A.    Texas Cannot Rebut That The Age-Verification Requirement Warrants Strict Scrutiny

Because the Act's age-verification requirement burdens protected speech based on its content, it triggers strict scrutiny.  Texas fails to refute either that settled understanding or the multiple reasons why the age-verification requirement likely cannot clear that high bar.

### 1.    Texas Fails To Ward Off Strict Scrutiny Of The Age-Verification Requirement

The applicable legal framework is not "notoriously unclear" (Tex. Br. 12); it is straightforward.  The First Amendment does not protect obscenity, nor does it prevent a state from restricting minors' access to sexually explicit material. *Ginsberg v. New York*, 390 U.S. 629, 638 (1968).  As to adults, however, it has been black-letter law for generations that "[s]exual expression which is indecent but not obscene is protected by the First Amendment." *Sable*, 492 U.S. at 126. Accordingly, when a regulation purportedly designed to restrict *minors'* access to sexually explicit (but non-obscene) material also restricts *adults'* access to such material, the regulation's application to adults burdens constitutionally protected speech. *See Ashcroft*, 542 U.S. at 665; *Reno*, 521 U.S. at 874-75.  And because

4

such regulations burden protected speech based on content (*i.e.*, whether it is sexually explicit), they must withstand strict scrutiny. *Playboy*, 529 U.S. at 814.

Texas tries to evade that wall of precedent in multiple ways, but none works. First, the State suggests that Appellees' "content is 'obscene' and therefore undeserving of First Amendment coverage." Tex. Br. 14 (quoting ROA.1712). As the district court explained and Texas seems to acknowledge, accepting that logic would require a wholesale revision of Supreme Court precedent, which is not an available option for this Court. ROA.1711-12, 1769.[1]

Texas retreats to the position that "*some* of [Appellees'] content" may meet "the Supreme Court's standard for *adult* obscenity." Tex. Br. 12-13 (first emphasis added). That claim is factually disputed, at best, and not advanced in a way that even purports to take serious account of the governing test for obscenity. Regardless, the *raison d'être* of the Act is to regulate content that is *not* obscene as to adults, as *other* Texas provisions (not at issue here) *separately* criminalize obscenity. *See* Texas Penal Code § 43.21; Tex. Br. 1. Indeed, the necessary implication of Texas's brief is that at least "some of" Appellees' content *is*

---

[1] Texas's *amici* say the silent part out loud by seeking to discard 70-years-worth of Supreme Court precedent, which establishes that non-obscene, adult- and sex-themed content, including pornography, is generally protected by the First Amendment.

constitutionally protected.  Tex. Br. 12-13.  Because Texas cannot deny that the
Act burdens protected speech based on its content, strict scrutiny applies under
*Reno*, *Ashcroft*, and the other precedents already discussed.

Texas tries (Br. 13-14) to distinguish *Reno* and *Ashcroft* on the ground that
they involved criminal bans on speech rather than civil restrictions.  In fact, neither
*Reno* nor *Ashcroft* imposed an absolute ban, because both created defenses—
including, as critical here, age verification.  *Reno*, 521 U.S. at 881; *Ashcroft*, 542
U.S. at 662, 668.  Moreover, while the distinction between a ban and a burden may
have some relevance when examining tailoring, the Supreme Court has made
clear—in precisely this context—that "content-based *burdens* must satisfy the
same rigorous scrutiny as … content-based *bans*."  *Playboy*, 529 U.S. at 812
(emphases added).  That familiar constitutional principle spans other contexts too.
*See, e.g.*, *Buckley v. Valeo,*  424 U.S. 1, 25, 44-45 (1976) (applying rigorous
scrutiny to limitation, rather than ban, on political contributions and expenditures);
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (same for
limitation on firearm carrying).[2]

---

[2]  Texas's suggestion (Br. 14) that the level of scrutiny should differ because this
case involves a state rather than federal law finds no support in precedent.  *See,
e.g.*, *Brown*, 564 U.S. at 799 (applying strict scrutiny to state law restricting free

Texas also suggests (Br. 16-17) that *Reno* and *Ashcroft* did not actually apply strict scrutiny. That is wishful thinking. In *Ashcroft*, the Court described the decision in *Reno* as holding the relevant statute "unconstitutional because it was not narrowly tailored to serve a compelling governmental interest and because less restrictive alternatives were available." 542 U.S. at 661. That is the unmistakable language of strict scrutiny. And in *United States v. Playboy Entertainment Group*, the Court held unequivocally that, in reviewing a statute burdening sexually explicit speech, "[t]he standard is strict scrutiny." 529 U.S. at 814; *accord, e.g.*, *SEIU, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (citing *Reno* as reason to apply strict scrutiny).

Finally, Texas tries (Br. 16) to distinguish *Reno* and *Ashcroft* by relying on the Court's holding in *Ginsberg* that New York could prohibit the sale of pornographic magazines to minors. But to describe the holding in that case is to distinguish the issue in this one. The claim in *Ginsberg* was that the burden on *minors' speech* violated the First Amendment. 390 U.S. at 636-37. By contrast, this challenge is based on the burden that the Act imposes on *adults*. *Ginsberg* had no occasion to consider that issue, because the law did not ensnare expression

---

speech); *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (same); *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (same for local law).

between adults; indeed, Texas asserts (Br. 1) that it adopted the Act precisely because laws like the one in *Ginsberg* "are no longer enough."

Texas's repeated reliance on *Brown* (Br. 13, 15-16) fails for the same reason:  the issue in *Brown* was whether the State could ban the sale of video games to *minors*, not whether such a ban would infringe the speech rights of adults.  564 U.S. at 794-95, 804-05.  And in any event, the Court in *Brown* struck down that restriction on minors under "strict scrutiny," particularly for lack of requisite tailoring.  *Id.* at 799.  This is accordingly an *a fortiori* case from *Brown*, which does not avail Texas.

### 2.    Texas Effectively Concedes That The Act Pursues Speaker-Based Discrimination

Texas confirms in the clearest, boldest terms that the Act's true purpose is indeed as Appellees' described it:  to target and stigmatize the adult-content industry, different from all other potential conveyors of identical content as deemed inappropriate for minors.  To quote Texas (Br. 20), the Act targets "a limited set of commercial pornographers," dubbed "Big Porn."  Texas claims these "Pornographers" "seek profit from peddling depictions of bestiality" and "criminal conduct" (Br. 23, 27), imperiling even "*adults*," who allegedly need Texas's

"protect[ion]." Br. 27 (also citing *Barbier v. Connolly*, 113 U.S. 27, 31 (1884), as endorsing laws promoting "health, peace, morals, education, and good order").[3]

Of course, the Act is not an anti-bestiality law. Nor is it directed against obscenity or any other crime, as separately addressed by Texas's penal code. *See* Tex. Penal Code § 43.21. Nor does it—per its title—purport to protect against any perceived scourge other than "sexual material harmful to *minors*." Tex. Civ. Prac. & Rem. Code § 129B *et seq.* (emphasis added).

This appeal concerns the Act as drafted and enacted by Texas's Legislature. And the Act, by its terms, regulates specific expression, based on its *content*, because that *content* has been deemed *inappropriate* for minors. It is thus fatal to Texas's defense that the Act, by Texas's own account, does *not* reflect principled,

---

[3] Although Texas's lawyers now try to rationalize (Br. 23) the Legislature's fixation by introducing extra-record evidence (never offered below) about measures reportedly taken by one social-media site, nothing in the legislative record begins to justify the Legislature's choice to leave search engines and social media wholly untouched. *See Schwarz v. Folloder*, 767 F.2d 125, 128 n.2 (5th Cir. 1985) ("introduc[ing] new evidence on appeal is totally improper"). It bears noting that the choice the Legislature made here departs, without explanation, from the Legislature's concerted regulation of social media last year. *Cf. NetChoice v. Paxton*, 49 F.4th 439, 444 (5th Cir. 2022) (regulating "social media platforms"). As for Texas's one-sentence suggestion (Br. 23) that search engines will not continue to supply the same sexual content to minors post-Act, it defies claims and findings alike. *See infra* at 13-14.

evenhanded regulation of the content supposedly of concern (sexually-explicit material), in order to protect the audience supposedly of concern (minors). *See, e.g.*, *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 543-547 (1993). Instead, the Act reflects discrimination against a discrete set of speakers while leaving other speakers perfectly free to make precisely the same content available to minors. Such an approach gravely compounds First Amendment concerns.

Appellees have detailed (Br. 32-35) and this Court has recognized why such speaker-based discrimination raises a red flag. *See Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014) ("the First Amendment prohibits restrictions distinguishing among different speakers, allowing speech by some but not others"). Indeed, "[i]n the ordinary case it is all but dispositive," necessitating strict scrutiny even if no other aspect of the law does. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). Far from negating this line of precedent, Texas's brief drives home why it applies.

### 3. Texas Cannot Properly Invoke The "Secondary Effects" Doctrine

Seeking to avoid strict scrutiny, Texas argues (Br. 19-21) for application of the "secondary effects" doctrine and attendant intermediate scrutiny. But Texas rightly acknowledges (Br. 19) that the little-used doctrine is about physical zoning,

10

addressing such things as "the effects of noise on the surrounding community," "prevent[ing] crime," and "maintain[ing] property values." Texas leaps from these phenomena—all of which concern effects on *non*-listeners—to the "effects" on the "minds" of minors. Tex. Br. 20. That gives away the game: the Act targets the supposed *primary* effects of adult content on *listeners*, different from any "secondary" effect on a geographic community.

Although Texas cites *Boos v. Barry*, 485 U.S. 312 (1988), *Boos* in fact supports Appellees' point with uncannily on-point language: "To take an example factually close to *Renton,* if the ordinance there was justified by the city's desire to prevent *the psychological damage it felt was associated with viewing adult movies*, then analysis of the measure as a content-based statute would have been appropriate. The hypothetical regulation targets the direct impact of a particular category of speech, not a secondary feature that happens to be associated with that type of speech." *Id.* at 321 (emphasis added). Texas's express concerns regarding "weak[] brain function" and "low self-esteem"—as spelled out in the Act's "health warnings"—are just another way to capture the concept of "psychological damage." § 129B.004(1). Laws like the Act pose the specter that "the *ideas* expressed by speech … and not its objective effects, may be the real reason for

governmental proscription." *Brown*, 564 U.S. at 799. The same concern looms when government turns its sights on sexual expression.

Even where government's concern with primary effects is not expressly confessed, as it is here, the "secondary effects" doctrine is inapplicable in this context. Whenever the government has regulated media such as the Internet and cable television on behalf of minors, the Supreme Court has rejected governmental efforts to extend the "secondary effects" doctrine. *See Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 825 F.3d 149, 161-63 (3d Cir. 2016) (explaining that the "secondary effects" doctrine is limited to physical zoning restrictions). Thus, in *Playboy*, addressing cable television, the Court "made clear that the lesser scrutiny afforded regulations targeting the secondary effects of crime or declining property values has no application to content-based regulations targeting the primary effects of protected speech." 529 U.S. at 815. Likewise, in *Reno*, addressing the Internet, the Court explained that, because "the purpose of the CDA is to protect children from the primary effects of 'indecent' and 'patently offensive' speech … the CDA is a content-based blanket restriction on speech, and, as such, cannot be properly analyzed as a form of time, place, and manner regulation." *Reno*, 521 U.S. at 868

12

(cleaned up).   Invocation of the "secondary effects" doctrine here is equally misplaced and foreclosed.

### B.    Texas Effectively Confirms That The Age-Verification Requirement Is Unlikely To Withstand Strict Scrutiny

As Texas's tortured efforts to avoid strict scrutiny suggest, it is highly unlikely to prevail under the applicable standard.   *See* Free Speech Orgs. Br. 8-9 (collecting numerous similar laws that have been invalidated).   Texas concedes (Br. 22-23) that the Act is underinclusive because it exempts search engines (expressly) and social-media platforms (*de facto*) that display the same content Appellees do.   Unable to cite anything from the legislative record explaining this yawning gap, Texas's lawyers do what they can to spin possible justifications.   For starters, they posit, incongruously, that the unregulated providers "do not seek profit" (Br. 23)—never mind the *dangers* these other sources purportedly pose to *minors*.

Next, Texas claims (Br. 23) that search engines "typically take the browser to websites that would be covered," but the evidence and findings below (by no means clearly erroneous) establish the opposite: "This argument ignores visual search, much of which is sexually explicit or pornographic, and can be extracted

from Plaintiffs' websites *regardless of age verification*." ROA.1715 (emphasis added).

Nor does Texas offer much to defend the Act's conspicuous overinclusiveness. Texas does not deny that its age-verification mandate will sweep in millions of adult users who have every right to view protected content. The State's principal defense of the Act's overinclusiveness (Br. 22) is that it burdens rather than bans that protected speech. But that fails to address the critical constitutional question: whether that burden is *necessary* to achieve the Act's ends, as compared to the available alternatives. Texas points (Br. 24) to the adoption of age verification "by purveyors of nicotine and alcohol," suggesting that there is "[n]othing about pornography [that] transforms this common-sense way to restrict minors' access to adult materials into a constitutional violation." But Texas there ignores the First Amendment protections attaching to sexual expression, as though pornography and its "Big Porn" peddlers are all properly put to roast on the pyres of obscenity.

Most importantly, Texas does not come close to showing clear error in the district court's considered findings that content-filtering software is efficacious and available, and that a blanket age-verification mandate is not the least speech-

14

restrictive means of accomplishing the Act's putative objective.  Texas struggles to distinguish (Br. 24-25) *Ashcroft*'s identification of content filtering as a less-restrictive means of protecting minors online.  As the district court explained, however, *Ashcroft*'s analysis is as salient now as it was then; if anything, the evolution of more sophisticated content-filtering technology more vividly demonstrates the excessiveness of the Act's blunderbuss mandate.  ROA.1736, 1738.  While Texas claims (Br. 25) that "blocking and filtering is only effective if a child seeks access to pornography on routers 'which are in [the child's] home,'" blocking is not limited to home routers.  *See* ROA.1845 (filtering can be "done on the device level on your phone").

Texas also mentions (Br. 25) the Act's prohibition against "retain[ing]" personal information.  But this overlooks the Act's failure to prohibit *transmission* of the same.  ROA.1730 ("while the commercial entities (e.g., Plaintiffs) are required to delete the data, that is not true for the data in transmission").  Suffice it to say that Texas's claims about content-filtering, the Act's underinclusivity, and other key topics defy the balance of the record evidence, together with the district court's findings.  There is no clear error here, as the unrefuted record evidence shows.

15

Finally, none of Texas's strained attempts to rationalize the Act's misshapen contours is grounded in the legislative record.  ROA.1740-41.  Proper tailoring is the job of the Legislature, and should reflect legislative deliberation and judgment on key points.  *See* Appellees' Br. 42-43.  Here, the Legislature itself never considered anything as an alternative to the enacted age-verification requirement and ostensibly acted out of animus to smite Appellees, as reflected in the "health warnings" and now confirmed by Texas's brief.  As such, no amount of *post hoc* legal arguments or factual development is likely to salvage the Act.

## C.    Texas Misstates And Misapplies The Standard For Facial Challenges

Unable to defend the age-verification provision on the merits, Texas questions (Br. 9-12) whether a facial challenge can succeed against it.  Yet Appellees have not confined themselves to a facial-only challenge and any distinction between facial-versus-as-applied relief is irrelevant at this stage, for Texas has never suggested that the preliminary injunction should be *narrower* in scope (as distinct from nonexistent).  In any case, Appellees have explained (Br. 24) why the statutory text together with the district court's unchallenged findings establish facial invalidity under black-letter First Amendment law, per cases

16

including *United States v. Stevens*, 559 U.S. 460, 473 (2010) and *Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018).

Texas suggests (Br. 15) that one identified instance of obscenity on a regulated website should somehow rescue the provision from invalidation. But the statutory text is not directed at speech that is obscene for adults; rather, that is separately regulated by Texas and outside the scope of this challenge. Without conceding that the single video called out by Texas is obscene, it suffices for Appellees to note that the statute designedly sweeps beyond any such content and into swaths of protected speech, as evident from the plain text and found below.[4]

### D.    Texas Scarcely Defends The "Health Warnings"

Texas does not defend the warnings as capable of withstanding strict scrutiny, perhaps because it recognizes (even though it does not acknowledge) how sensationalist they are and how extraordinary it is for the State to impose such a speech mandate on private actors. In specified large font, the Act brands the following upon Appellees' websites:

---

[4] Texas cites *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211 (5th Cir. 2023), but there the challenged law regulated purely commercial speech and "only applie[d] to actually misleading representations that fall outside the First Amendment's protection." *Id.* at 220.

TEXAS HEALTH AND HUMAN SERVICES WARNING:
Pornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function.

TEXAS HEALTH AND HUMAN SERVICES WARNING:
Exposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses.

TEXAS HEALTH AND HUMAN SERVICES WARNING:
Pornography increases the demand for prostitution, child exploitation, and child pornography.

§ 129B.004(1).  And the Act further imposes a disclaimer for referral for "HELP" with "MENTAL HEALTH OR SUBSTANCE USE DISORDERS" from "LOCAL TREATMENT FACILITIES, SUPPORT GROUPS, AND COMMUNITY-BASED ORGANIZATIONS."  § 129B.004(2).  As *NIFLA* instructs, such "government-drafted script[s]" ordinarily receive strict scrutiny, which the warnings concededly cannot withstand.  138 S. Ct. at 2371.  Regardless, as in *NIFLA*, these disclosures fail even under intermediate scrutiny and *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).  *NIFLA*, 138 S. Ct. at 2375, 2377.  The district court's findings should be dispositive on these points, and Texas again fails to identify any clear error.

### 1.    Texas Fails To Show *Zauderer* Applies Or That The Act Could Survive It

*Zauderer* does not apply because the "disclosures" are neither factual nor uncontroversial, as the district court found and Texas hardly disputes.  ROA.1750-58.  Rather than argue that the district court clearly erred in its numerous findings, Texas argues around them.  Thus, Texas argues (Br. 28-29) that *NIFLA* supports it because pornography is less controversial than abortion.  But if abortion set the bar, *Zauderer* would apply to virtually everything else.  The district court's detailed findings that pornography is both ideologically and scientifically controversial bring this case well within *NIFLA*'s protections.  ROA.1755-58.  Indeed, Texas's putative distinction of *NIFLA* actually works against it.   Just as the disclosures there did not "relate[] to the services that licensed clinics provide," 138 S. Ct. at 2372, the "abuse hotline" redirects users of Appellees' websites, urging them to seek counseling elsewhere.  And as *amici* properly warn, accepting Texas's argument would greenlight compelled speech for all manner of controversial subjects across the ideological spectrum.  Free Speech Orgs. Br. 23-25.

What is more, Texas ignores (Br. 26, 28) the findings against it by comparing the Act's warnings to literally accurate disclosures, notwithstanding

that the district court found them incomparable based on the record evidence. *See Am. Meat Inst. v. USDA*, 760 F.3d 18, 27 (D.C. Cir. 2014) (country-of-origin labels); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229. 250 (2010) ("accurate statement" of legal status). By Texas's account (Br. 28), Appellees' rigorous, science-based objections are just bleating by corporate shills. But the factual findings show that Texas is departing from today's science. ROA.1758 (the Act requires "a far cry from cigarette warnings").

Even assuming *Zauderer* were triggered, Texas fails to show, as it must, that the "health warnings" and "abuse hotline" are not "unduly burdensome" and are sufficiently fitted to its asserted interests. *NetChoice*, 49 F.4th at 485. At the outset, Texas wrongly suggests (Br. 26) that *Zauderer*'s requirements equate to rational-basis review. *See, e.g.*, *Am. Meat Inst.*, 760 F.3d at 33 (Kavanaugh, J., concurring in the judgment) ("It is important to underscore that those *Zauderer* fit requirements are far more stringent than mere rational basis review."). Texas is thus wrong in its premise that it can prevail merely by hypothesizing any conceivable justification.

Nor are Texas's justifications plausible. While Texas says that "multiple safeguards" are necessary for minors' sake (Br. 27), it cannot get its story straight,

as it argues on the same page that the warnings are meant to benefit adults. Nor does Texas explain how the warnings can benefit minors despite not being written in terms "that most minors would understand." ROA.1749, 1753. Texas also suggests that the branding of the Texas Health and Human Services Department—itself literally deceptive and misleading (*see* ROA.1750)—reduces the burden. That is backwards: "Requiring a company to publicly condemn itself is undoubtedly a more effective way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Nat'l Ass'n of Mfs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (cleaned up). That is why a label that "conveys moral responsibility for the Congo war"—just like the Act's label conveying moral responsibility for, *e.g.*, prostitution—cannot withstand First Amendment scrutiny. *Id.* at 530, 554.[5]

Nor can Texas dispute that, even as to advertisements, the sheer volume and size of the required text—badly misplaced in the context of Internet pixels—will effectively "drown[] out" Appellees' "own message." *NIFLA*, 138 S. Ct. at 2378;

---

[5] Texas cites *Johanns v. Livestock Marketing Association*, but that was a subsidies case about *government* speech, where "attribution" to the plaintiffs could have triggered a First Amendment *violation.* 544 U.S. 550, 564 (2005).

*see* ROA.38, 1750.   And the requirement that the "abuse hotline" repeat across every webpage compounds the burdens and problems exponentially. § 129B.004(2).   In sum, *Zauderer* affords no basis to reverse the district court's determination of likely success.

### 2.   Texas Fails To Show Intermediate Scrutiny Applies Or That The Act Could Survive It

To invoke intermediate scrutiny, Texas equates (Br. 30) for-profit speech with commercial speech, but the Supreme Court holds to the contrary:  "Some of our most valued forms of fully protected speech are uttered for a profit." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989).  Even commercial speech, if "inextricably intertwined" with fully protected speech, leads to strict scrutiny, depending on "the nature of the speech taken as a whole and the effect of the compelled statement thereon."  *Riley v. Nat'l Fed'n of the Blind of N. C., Inc.*, 487 U.S. 781, 796 (1988).  Contrary to this instruction, Texas focuses (Br. 30) on advertisements in isolation.  That cannot save the "warnings," which infect whole websites brimming with protected speech.  Nor can it save the age-verification requirement, which operates as a gating restriction on all of Appellees' expression, not just the commercial aspects.  And Texas's citation to *NetChoice* is inapposite, because *NetChoice* never applied intermediate scrutiny.  *See* 49 F.4th at 485.

22

In claiming to withstand intermediate scrutiny (Br. 29), Texas ignores the factual findings and does not identify any respect in which the district court clearly erred. Instead, Texas seems to suggest (Br. 29) that its interest in protecting minors can carry its burden under intermediate scrutiny. "But simply having a substantial interest does not" suffice. *Junior Sports Mags. Inc. v. Bonta*, 2023 WL 5945879, at *5 (9th Cir. Sept. 13, 2023). The law must provide the required fit as well. And the Act fails in multiple respects once scrutinized under *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980), just as the district court ruled (in the alternative) and multiple precedents confirm. Appellees' Br. 51-22. Ultimately, Texas is unlikely either to obtain intermediate scrutiny or to prevail even if it does.

### E. Texas Fails To Confront Precedent And Evidence Showing Why Section 230 Is Likely Violated As To Certain Appellees

After initially suggesting that members of the adult-content industry are somehow precluded from seeking Section 230's protections (Br. 31), Texas concedes the key points. Section 230 "instructs courts not to treat internet companies as the publishers [or speakers] of third-party content," and whether a cause of action requires a court to do so depends on the facts. Tex. Br. 32-33. These concessions make it impossible for Texas to distinguish *Doe v. MySpace*,

23

528 F.3d 413, (5th Cir. 2008), with respect to the specific Appellees claiming Section 230's protections. Tellingly, Texas does not purport to address *MySpace*, this Court's seminal precedent, until more than three pages into the relevant section of its brief, and then only in a short paragraph. Tex. Br. 34.

*MySpace* controls here by all indications, which is more than sufficient to establish Appellees' likely success. Recognizing this problem, Texas argues (Br. 34) that Appellees do not qualify for protection because they themselves are "information content providers" responsible for the "creation or development" of the adult content they host. But Texas fails to identify any clear error in the district court's contrary factual findings. ROA.1761-62. Instead, Texas quibbles with the precise wording of the allegations and declarations, going so far as asserting (Br. 36) that Appellees are wrong about how their own websites work.

Texas ultimately posits (Br. 37) that, because Appellees are in the adult business, they "encourage" adult content to exist on their sites, thereby nullifying Section 230's protections.[6] But Texas's own case refutes that: "An interactive service provider becomes an information content provider whenever their actions cross the line into substantively altering the content at issue in ways that make it

---

[6] Never presented below, this argument is not preserved. *See Thomas v. Ameritas Life Ins. Corp.*, 34 F.4th 395, 402 (5th Cir. 2022).

unlawful." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 129 (4th Cir. 2022). Here, without *any* altering by Appellees, Appellees are held liable simply because the Legislature deems their third-party content harmful. Texas's arguments confirm that Appellees' Section 230 claims are likely to succeed.

Separately, Texas misperceives (Br. 38) that the same party cannot invoke both Section 230 and the First Amendment. What Section 230 disallows are claims equating carriers of speech with the creators of speech, *see MySpace*, 528 F.3d at 418-20, while the First Amendment protects carriers of speech *alongside* creators. *See, e.g.*, *Playboy*, 529 U.S. at 806, 812 (cable operators receive First Amendment protection); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) (same). In reading *NetChoice* to hold otherwise, Texas would force this Court into a direct conflict with Supreme Court precedent. *But see NetChoice*, 49 F.4th at 468 ("a statute may not abrogate constitutional rights"). In any event, Appellees would *also* be permitted to pursue their challenge on behalf of Texas users of their sites, exactly as the Supreme Court permitted in *Virginia v. American Booksellers Association*, 484 U.S. 383, 386, 392-93 (1988). Although Texas suggests (Br. 48) that *Virginia* did not apply the overbreadth doctrine, *Virginia* speaks eloquently for itself: "[I]n the First Amendment context, litigants are

permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* (cleaned up).

## II. TEXAS CANNOT REFUTE THAT THE IRREPARABLE HARMS AND THE EQUITIES FAVOR AFFIRMANCE

### A. Texas Fails To Rebut Appellees' Numerous Irreparable Harms

#### 1. The District Court Did Not Clearly Err In Finding Multiple Dimensions Of Irreparable Harm

While Texas initially suggests that Appellees' injuries are speculative rather than imminent (Br. 39), the district court found otherwise: "It is not credible for the Attorney General to state that '[p]orn is absolutely terrible for our kids' but simultaneously claim that they will not enforce a law ostensibly aimed at preventing that very harm." ROA.1766-67. If anything, Texas's pursuit of an interim stay confirms just how serious it is about immediate enforcement, thereby fortifying the court's findings of concomitant burdens and chills.

Notably, the district court's determination of irreparable harms rests on factual findings that Texas does not purport to challenge, much less show to be clearly erroneous. While Texas insists (Br. 45) that compliance costs are negligible, the district court found otherwise based on Appellees' evidence.

26

ROA.1699 ("at minimum, $40,000.00 per 100,000 verifications"). This alone establishes irreparable injury sufficient to affirm the preliminary injunction, especially given that Texas's sovereign immunity concededly renders this monetary damage unrecoverable. ROA.1766.

Texas argues (Br. 45) that the Act will not reduce Appellees' audience. Again, the district court found otherwise, tracing the vast sweep of the Act's chilling effect. ROA.1728-32. Texas argues (Br. 45-47) that Appellees, especially Jane Doe, are not "entitled" to an audience of children. But children are not the target of Texas's off-putting "health warnings" any more than they are the target audience of Appellees, and Texas's authorities are inapposite. *See Snyder v. Phelps*, 562 U.S. 443, 459-60 (2011) (enforcing the First Amendment's command that the government may act "only sparingly to protect unwilling listeners from protected speech"); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986) (addressing speech in public schools); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48 (1983) (same).

Texas also tries (Br. 46) to deny loss of goodwill by invoking support from the electorate. Yet that reasoning is faulty on its face—given that the "electorate" is not monolithic and users of Appellees' websites are likely to have their own

27

distinct perspective—and contradicted by on-point "surveys show[ing] that the majority of Americans would refuse to submit to age verification." ROA.1817. Finally, Texas argues (Br. 46) that "subscription-based" Appellees will not suffer. This ignores that age verification will reduce initial enrollment, that users' payment information is less sensitive as compared to their government-issued identification, and that the Act promises none of the "secur[ity]" now trumpeted by Texas. ROA.1727-34, 1873 ("The federal court system was hacked. Major governmental entities with huge firewalls and all kinds of security systems have been hacked.").

### 2. Contrary To Texas's Partial Attack, All Appellees Have First Amendment Claims

Texas also argues (Br. 40-44) that *certain* Appellees[7] based abroad cannot assert First Amendment claims, relying on *USAID v. Alliance for Open Society International* (*AOSI II*), 140 S. Ct. 2082, 2088-89 (2020). It thereby overlooks the ability of other Appellees to carry the same challenge, along with Appellees' shared ability to vindicate the rights of their U.S. visitors to the sites in any event. That aside, Texas misreads *AOSI II*. At issue there was whether the government

---

[7] To be precise, Texas appears to direct this point at four of the thirteen challengers. Br. 42 n.5.

could impose certain conditions on its funding to "combat HIV/AIDS abroad," which conditions were challenged as applied to foreign aid organizations "operating abroad." *Id.* at 2085-86. The Court rejected that challenge, reasoning that a foreign entity operating outside U.S. territory cannot benefit from U.S. constitutional protections for its activities abroad. *Id.* at 2087. In this case, by contrast, Appellees' exchange of protected expression is occurring *in Texas* and subject to sanction *by Texas*.[8] *AOSI II* does not apply where, as here, "the recipients of their speech and speech-related conduct" are in the United States. *Thunder Studios v. Kazal*, 13 F.4th 736, 743 (9th Cir. 2021).

### B.    Texas Lacks Any Plausible Basis For Reversal Based On The Balance of Harms And Public Interest

Once merged and considered in light of irreparable harms and the merits, the remaining factors overwhelmingly favor Appellees. In arguing for a different

---

[8] Texas briefly argues (Br. 42-43) that foreign entities lack any cause of action under § 1983 because they are not the "party injured," but ignores Appellees' injuries in the form of monetary losses and suppressed expression. Texas also suggests that foreign Appellees fall beyond U.S. jurisdiction, but disregards its own acknowledgement that Pornhub, in particular, is foremost among the Act's targets. Unless and until Texas stipulates that the Act is unenforceable against particular Appellees, they all have standing to challenge the Act's prescription and enforcement as against them. Texas cannot have it both ways—complaining that the preliminary injunction impedes it from enforcing the Act against foreign Appellees, while suggesting that it can never enforce the Act against those same Appellees given jurisdictional limitations.

result simply because the preliminary injunction suspends enforcement of a state law (deemed to be likely invalid in multiple respects), Texas comes perilously close to suggesting that state laws should be impervious to preliminary relief in federal court.  Numerous precedents from the Supreme Court and this Court are to the contrary, particularly where First Amendment rights are at stake—including in cases indistinguishable from this one, specifically involving laws designed to protect minors from sexual content.  *See, e.g.*, *Ashcroft*, 542 U.S. at 673; *Reno*, 521 U.S. at 885.

If anything, the Act is more susceptible to an injunction than its federal predecessors, which at least had the virtue of covering all content deemed unsuited for minors, whatever its source.  Here, Texas is out to squash "Big Porn," while leaving precisely the same content accessible to minors from other ubiquitous sources that remain unregulated.  There is no urgent need to let this new, anomalous and very likely unconstitutional campaign barrel forward.  The district court acted well within its discretion by balancing the factors as it did and maintaining accord with *Reno* and *Ashcroft*.

**CONCLUSION**

For the foregoing reasons and those previously stated, Appellees respectfully request that this Court lift the administrative stay, deny Appellant's motion for stay pending appeal, and affirm the preliminary injunction.

Dated:  September 27, 2023          Respectfully submitted,

                                    *s/     Derek L. Shaffer*
                                       Derek L. Shaffer
                                       Michael T. Zeller
                                       Christopher G. Michel
                                       Scott L. Cole
                                       Arian J. Koochesfahani
                                       Jeffrey K. Sandman

                                       *Counsel for Appellees*

31

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  I also certify that service will be accomplished on all registered CM/ECF users by the appellate CM/ECF system, that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13, and that the document has been scanned with CrowdStrike Falcon software and is free of viruses.

Dated:  September 27, 2023          *s/    Derek L. Shaffer*
                                    Derek L. Shaffer

                                    *Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

I certify the following in compliance with Federal Rule of Appellate Procedure 32(g):  The foregoing motion is in 14-point, proportionally spaced Times New Roman font and contains 6,409 words, excluding the parts of the document exempted by Rule 32(f).

Dated:  September 27, 2023          *s/   Derek L. Shaffer*
                                    Derek L. Shaffer

                                    *Counsel for Appellees*

32