No. 23-50627

# In the United States Court of Appeals
# for the Fifth Circuit

Free Speech Coalition, Incorporated; MG Premium, Limited; MG Freesites, Limited; WebGroup Czech Republic. a.s.; NKL Associates, s.r.o.; Sonesta Technologies, s.r.o.; Sonesta Media, s.r.o.; Yellow Production, s.r.o.; Paper Street Media, L.L.C.; Neptune Media, L.L.C.; Jane Doe; MediaME, S.R.L.; Midus Holdings, Incorporated,

*Plaintiffs-Appellees*,

*v.*

Angela Colmenero, Attorney General, State of Texas,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## CORRECTED BRIEF FOR APPELLANT

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

Kyle D. Highful
Assistant Solicitor General

Coy Allen Westbrook
John Ramsey
Assistant Attorneys General

Counsel for Defendant-Appellant

## CERTIFICATE OF INTERESTED PERSONS

No. 23-50627

FREE SPEECH COALITION, INCORPORATED; MG PREMIUM, LIMITED; MG FREESITES, LIMITED; WEBGROUP CZECH REPUBLIC. a.s.; NKL ASSOCIATES, s.r.o.; SONESTA TECHNOLOGIES, s.r.o.; SONESTA MEDIA, s.r.o.; YELLOW PRODUCTION, s.r.o.; PAPER STREET MEDIA, L.L.C.; NEPTUNE MEDIA, L.L.C.; JANE DOE; MEDIAME, S.R.L.; MIDUS HOLDINGS, INCORPORATED,

*Plaintiffs-Appellees*,

*v.*

ANGELA COLMENERO, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant*.

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Lanora C. Pettit
LANORA C. PETTIT
*Counsel of Record for*
*Defendant-Appellant*

i

## Statement Regarding Oral Argument

This Court has already set this case for oral argument on October 4. The Attorney General agrees that oral argument is appropriate as the law at issue, *see* Act of May 25, 2023, 88th Leg., R.S., Ch. 676, § 1 ("H.B. 1181"), is one of several similar laws aimed at combatting a growing public-health crisis associated with ubiquitous availability of obscene, degrading, and often violent internet pornography to minors. *See* Marc Novicoff, *A Simple Law Is Doing the Impossible. It's Making the Online Porn Industry Retreat*, Politico (Aug. 8, 2023), https://www.politico.com/news/magazine/2023/08/08/age-law-online-porn-00110148. Plaintiffs—one of which "gets more global users than Amazon or Netflix" and has been described as the "YouTube of pornography," *id.*—have raised several First Amendment challenges as well as a preemption claim based on the Communications Decency Act ("CDA"). Oral argument may be of assistance to the Court in assessing these overlapping claims.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ..................................................... i

Statement Regarding Oral Argument.................................................. ii

Table of Authorities ..................................................................... v

Introduction ............................................................................... 1

Statement of Jurisdiction .............................................................. 2

Issues Presented.......................................................................... 2

Statement of the Case .................................................................. 2

    I.   Factual Background ............................................................. 2

        A.   The plague of childhood exposure to pornography ............................. 2

        B.   The operation of pornographic websites ................................. 5

    II.  H.B. 1181................................................................... 6

    III. Legal Proceedings ............................................................ 8

Summary of the Argument............................................................. 9

Standard of Review .................................................................... 11

Argument ................................................................................ 11

    I.   Pornographers Failed to Show a Likelihood of Success on the Merits. .......................................................................... 11

        A.   H.B. 1181 comports with the First Amendment.............................. 12

            1.   The First Amendment does not protect Pornographers' obscenity. ......................................................... 12

            2.   H.B. 1181's age-verification requirement does not violate the First Amendment. .................................................16

                a.   H.B. 1181 survives *Ginsberg*'s rational-basis review. ...............16

                b.   Alternatively, H.B. 1181 survives intermediate scrutiny under the secondary-effects doctrine.......................19

                c.   H.B. 1181's age-verification requirement survives even strict scrutiny. ................................................. 21

            3.   H.B. 1181's notice requirement does not violate the First Amendment. ................................................. 26

        B.   Section 230 does not preempt H.B. 1181............................. 30

1. Section 230 was enacted to protect children, not pornographers. ...........................................................31

2. Section 230 does not prohibit the enforcement of H.B. 1181's obligations. .......................................... 32

3. Pornographers have not shown that they merely host third-party content. .................................... 34

4. To the extent Section 230 protects Pornographers, they cannot assert First Amendment claims. ...................................... 38

II. The Remaining Preliminary-Injunction Factors Favor the Attorney General. ........................................................... 39

A. Pornographers did not show irreparable harm. ...................... 39

1. The Foreign Websites lack constitutional rights to be irreparably harmed. ....................................... 40

2. Pornographers have not shown that H.B. 1181 affects their viewership, let alone causes irreparable harm. ........................... 44

3. Jane Doe cannot show harm at all. ............................. 46

4. Because FSC's members have not shown irreparable harm, neither has FSC. ........................................ 47

B. The balance of equities favors the Attorney General. ........................ 49

Conclusion ................................................................ 50

Certificate of Service ..................................................... 51

Certificate of Compliance ................................................ 51

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .................................................................. 40

*Am. Meat Inst. v. U.S. Dep't of Ag.*,
760 F.3d 18 (D.C. Cir. 2014) .................................................... 26

*Armour v. City of Indianapolis*,
566 U.S. 673 (2012) .................................................................. 18

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ........................................... 13-17, 25, 29

*Ashcroft v. ACLU*,
535 U.S. 564 (2002) .................................................................. 25

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) .................................................................. 27

*Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*,
627 F.3d 547 (5th Cir. 2010) .................................................... 48

*Barbier v. Connolly*,
113 U.S. 27 (1884) .................................................................... 27

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986) ............................................................. 45, 47

*Boos v. Barry*,
485 U.S. 312 (1998) .................................................................. 20

*Boumediene v. Bush*,
553 U.S. 723 ............................................................................. 40

*Brown v. Entm't Merchants Ass'n*,
564 U.S. 786 (2011) ........................................... 12-16, 23

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................. 39, 41

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ......................................... 26, 29, 30

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) ............................................................. 19, 20

*Clapper v. Amnesty Intern. USA*,
568 U.S. 398 (2013) .................................................................. 47

v

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004) ........................................................................17

*CTIA–The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ................................................. 26, 28

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
710 F.3d 579 (5th Cir. 2013) ......................................................... 36

*Doe v. WebGroup Czech Republic, et al.*; No. 2:21-cv-024828-VAP-SK,
U.S. (C.D. California 2020) ........................................................... 41

*Doe v. Facebook, Inc.*,
142 S. Ct. 1087 (2022) .................................................................... 32

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ......................................................... 34

*Doe v. Webgroup Czech Republic, a.s.*,
No. 2:21-cv-02428-VAP-SKx, 2022 WL 982248 (C.D. Cal. Jan. 13,
2022).............................................................................................. 42

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975)........................................................................ 12

*Everson v. Bd. of Ed. of Ewing Twp.*,
330 U.S. 1 (1947) ........................................................................... 27

*F.C.C. v. Beach Commc'n, Inc.*,
508 U.S. 307 (1993)........................................................................ 18

*In re Facebook, Inc.*,
625 S.W.3d 80 (Tex. 2021) ............................................................ 32

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ..................................................32, 37

*Ginsberg v. State of New York*,
390 U.S. 629 (1968) ............................................................... 12, 16-18

*Google, Inc. v. Hood*,
822 F.3d 212 (5th Cir. 2016) ......................................................... 39

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council
of Balt.*,
721 F.3d 264 (4th Cir. 2013) ......................................................... 26

*Green v. Am. Online (AOL)*,
318 F.3d 465 (3d Cir. 2003)........................................................... 34

*Harris v. Evans*,
20 F.3d 1118 (11th Cir. 1994)........................................................ 48

*Harrison v. Young*,
  48 F.4th 331 (5th Cir. 2022) .............................................................. 11

*Henderson v. Source for Pub. Data, L.P.*,
  53 F.4th 110 (4th Cir. 2022) ................................................. 32, 34, 37

*Humana, Inc. v. Jacobson*,
  804 F.2d 1390 (5th Cir. 1986) .......................................................... 39

*Hunt v. Wash. Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ......................................................................... 48

*Johanns v. Livestock Mktg. Ass'n*,
  544 U.S. 550 (2005) ......................................................................... 27

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ......................................................................... 43

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ......................................................................... 48

*Lotus Vaping Techs., LLC v. FDA*,
  73 F.4th 657 (9th Cir. 2023) ............................................................ 27

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*,
  141 S. Ct. 13 (2020) .................................................................. 32, 37

*Manzari v. Associated Newspapers, Ltd.*,
  830 F.3d 881 (9th Cir. 2016) ............................................................ 43

*Maryland v. King*,
  567 U.S. 1301 (2012) ....................................................................... 49

*McMahon v. Fenves*,
  946 F.3d 266 (5th Cir. 2020) ............................................................ 47

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010) ......................................................................... 28

*Miller v. California*,
  413 U.S. 15 (1973) ........................................................ 9, 12, 13, 15, 18

*Mink v. AAAA Dev. LLC*,
  190 F.3d 333 (5th Cir. 1999) ............................................................ 23

*Miss. Power & Light Co. v. United Gas Pipeline Co.*,
  760 F.2d 618 (5th Cir. 1985) ............................................................ 49

*Nat'l Inst. of Fam. and Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) .................................................................. 28-30

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ................. 11, 14, 30, 31, 33-35, 38, 46

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................................10, 49

*Oles v. City of New York*,
No. 22-1620-CV, 2023 WL 3263620 (2d Cir. May 5, 2023) ........................... 26

*Paradigm Media Grp., Inc. v. City of Irving*,
No. 3:01-CV-612-R, 2002 WL 1776922 (N.D. Tex. July 30, 2002).................. 21

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983)........................................................................ 45

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
734 F.3d 406 (5th Cir. 2013) ............................................................ 49

*Reno v. ACLU*,
521 U.S. 844 (1997) ........................................... 13, 15, 17, 20, 24, 29

*RJR Nabisco, Inc. v. European Cmty.*,
579 U.S. 325 (2016)...................................................................... 23

*Roth v. United States*,
354 U.S. 476 (1957) ..................................................................... 18

*Sable Commc'ns of Cal., Inc. v. FCC*,
492 U.S. 115 (1989) ........................................................ 12, 18, 21

*Snyder v. Phelps*,
562 U.S. 443 (2011)...................................................................... 45

*Stanley v. Georgia*,
394 U.S. 557 (1969) ..................................................................... 43

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).....................31-33

*Tex. All. for Retired Ams. v. Scott*,
28 F.4th 669 (5th Cir. 2022) .............................................................11

*Thunder Studios, Inc. v. Kazal*,
13 F.4th 736 (9th Cir. 2021) ............................................................ 44

*Turtle Island Foods, S.P.C. v. Strain*,
65 F.4th 211 (5th Cir. 2023) ............................................................. 9

*United States v. Hansen*,
143 S. Ct. 1932 (2023) ................................................................... 38

*United States v. Stevens*,
559 U.S. 460 (2010) ...................................................................... 22

*USAID v. All. for Open Soc. Int'l, Inc.*,
140 S. Ct. 2082 (2020) ...............................................................40-44

*Veasey v. Abbott,*
  870 F.3d 387 (5th Cir. 2017) .......................................................10, 49

*Veterans of Foreign Wars v. Tex. Lottery Comm'n,*
  760 F.3d 427 (5th Cir. 2014) .......................................................21, 23

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976) ......................................................................... 43

*Virginia v. Am. Booksellers Ass'n,*
  484 U.S. 383 (1988) ......................................................................... 48

*Vote.Org v. Callanen,*
  39 F.4th 297 (5th Cir. 2022) ....................................................... 42, 43

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ................................................................... 19, 21

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015) ......................................................................... 22

*Winter v. NRDC,*
  555 U.S. 7 (2008) ...................................................................... 11, 49

*Zauderer v. Off. of Disciplinary Counsel,*
  471 U.S. 626 (1985) ......................................................................... 26

**Constitutional Provisions and Statutes:**

U.S. Const. amend.:
  I............................................................................................ *passim*
  VIII .......................................................................................... 8
  XIV ........................................................................................... 8
28 U.S.C. § 1292(a)(1) ........................................................................ 2
42 U.S.C. § 1983 .......................................................................... 8, 42
47 U.S.C.:
  § 230 ...................................................................................... *passim*
  § 230(c).................................................................................... 33
  § 230(c)(1) ........................................................................... 32-35
  § 230(c)(2)............................................................................ 33, 34
  § 230(c)(2)(A) ............................................................................ 33
  § 230 (c)(2)(B)........................................................................... 33
  § 230(f)(3) ............................................................................ 33-36
Tex. Civ. Prac. & Rem. Code:
  § 129B.001(1) ........................................................................ 17, 30

§ 129B.001(6) ................................................................ 12, 13, 16, 17

§ 129B.001(b)(6) .......................................................................... 7

§ 129B.002 ............................................................................17, 24

§ 129B.002(a) .............................................................6, 7, 12, 14, 30

§ 129B.002(b) ..........................................................................7, 25

§ 129B.003 ............................................................................17, 34

§ 129B.003(b) .............................................................................. 7

§ 129B.004 ..................................................... 7, 12, 14, 26, 27, 29, 30

§ 129B.004(1) ......................................................................... 7, 30

§ 129B.004(2) .............................................................................. 8

§ 129B.006(a) .............................................................................. 8

§ 129B.006(d) .............................................................................. 8

Tex. Penal Code § 43.24(b) ............................................................ 1

Act of May 25, 2023, 88th Leg., R.S., Ch. 676 ..................................... ii

**Other Authorities:**

Adam Candeub, *Reading Section 230 As Written*, 1 J. Free Speech L. 139 (2021) ................................................................... 31, 32

Byrin Romney, *Screens, Teens, and Porn Scenes: Legislative Approaches to Protecting Youth from Exposure to Pornography*, 45 Vt. L. Rev. 43 (2020) ........................................................................... 2

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2013) ...................................... 39

Chiara Sabina, Janis Wolak, & David Finkelhor, *The Nature and Dynamics of Internet Pornography Exposure for Youth*, 11 CyberPsychology & Behavior 691 (2008) ............................... 4

Clay Calvert, *Underinclusivity and the First Amendment: The Legislative Right to Nibble at Problems After* Williams-Yulee, 48 Ariz. St. L. J. 525 (2015) ................................................................... 22

Danielle Keats Citron & Benjamin Wittes, *The Internet Will Not Break: Denying Bad Samaritans § 230 Immunity*, 86 Fordham L. Rev. 401 (2017) .......................................................................... 31

DoorDash, *How is My Age Verified For Alcohol Orders?*, https:// help.doordash.com/consumers/s/article/How-is-my-age-verified-for-alcohol-orders? ........................................................... 24

Erica Finkle, *Bringing Age Verification to Facebook Dating*, Meta
    (Dec. 5, 2022), https://about.fb.com/news/2022/12/facebook-
    dating-age-verification/ ....................................................................... 24

House Comm. on Judiciary & Civil Jurisprudence, Bill Analysis, Tex.
    C.S.H.B. 1181, 88th Leg., R.S. (2023) ................................................. 1

Instagram, Community Guidelines, https://help.instagram.com/
    477434105621119 ............................................................................. 23

Khadijah B. Watkins, *Impact of Pornography on Youth*, 57 J. Am. Acad.
    Child & Adolescent Psychiatry 89 (2018) ........................................... 4

Marc Novicoff, *A Simple Law Is Doing the Impossible. It's Making the
    Online Porn Industry Retreat*, Politico (Aug. 8, 2023),
    https://www.politico.com/news/magazine/2023/08/08/age-law-
    online-porn-00110148 ........................................................................ ii

Mary Graw Leary, *The Indecency and Injustice of Section 230 of the
    Communications Decency Act*, 41 Harv. J.L. & Pub. Pol'y 553 (2018) ................. 10

Matt Raymond, *How 'Big' is the Library of Congress*, Library of
    Congress Blogs (Feb. 11, 2009), https://blogs.loc.gov/loc/2009/
    02/how-big-is-the-library-of-congress ................................................. 3

Sabrina S. Adler *et. al.*, *You Want a Warning with That? Sugar-
    Sweetened Beverages, Safety Warnings, and the Constitution*, 71 Food
    & Drug L.J. 482 (2016) ...................................................................... 28

U.S. Dep't of Health & Human Servs., *The Health Consequences of
    Smoking-50 Years of Progress: A Report of the Surgeon General*
    (2014), available at http://tinyurl.com/smokingreport2014 ........................... 28

William W. Van Alstyne & Kurt T. Lash, *The American First
    Amendment in the Twenty-First Century* 885 (5th ed. 2014) ......................... 18

ZYN, *Still Have Questions?*, https://us.zyn.com/questions/ ............................. 24

# Introduction

Most, if not all, States have long prohibited distributing obscenity to minors. *E.g.*, Tex. Penal Code § 43.24(b). There is growing, bipartisan consensus that this is no longer enough: due to the growing ubiquity of such materials on the internet, "approximately one in five youth experience unwanted online exposure to sexually explicit material." House Comm. on Judiciary & Civil Jurisprudence, Bill Analysis, Tex. C.S.H.B. 1181, 88th Leg., R.S. (2023). And this explosion of "[p]ornography is creating a public[-]health crisis and having a corroding influence on minors." Novicoff, *supra*. Texas has joined the growing movement to combat this crisis by requiring commercial purveyors of online pornography to take reasonable steps to verify the age of their customers before displaying sexual material harmful to minors. *Id.* Known as H.B. 1181, the statute also requires these websites to warn of the potential risks associated with viewing such material, including addiction and mental-health disorders.

Nothing in H.B. 1181 prohibits anyone from performing in, producing, or publishing pornography whether on the internet or otherwise. It does not even prohibit anyone from accessing pornography. The district court thus erred when it concluded that the State's law violates the First Amendment and is preempted by Section 230. ROA.1770. The court compounded that error when it found domestic pornographers—the only plaintiffs who have rights under the First Amendment—are irreparably harmed given that their subscription-based business model would allow them to comply with H.B. 1181's age-verification requirements but ignored mounting

evidence of the deleterious effects of online content that sexualizes violence and glorifies the abuse of women. *E.g.*, ROA.508-11.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.  Whether plaintiffs are likely to demonstrate that either the First Amendment or CDA protect a right to distribute pornography—no matter how obscene or violent—to internet users of all ages without any warnings regarding the risks of that content.

2.  Whether the district court erred in concluding that de minimis financial costs to pornographers outweigh the State's interests in protecting children and public morals from the dangers of their product.

## STATEMENT OF THE CASE

## I.  Factual Background

### A.  The plague of childhood exposure to pornography

1.  To put it mildly, "[m]ost of today's pornography does not reflect consensual, loving, healthy relationships. Instead, pornography teaches dominance, aggression, disrespect, and objectification." Byrin Romney, *Screens, Teens, and Porn Scenes: Legislative Approaches to Protecting Youth from Exposure to Pornography*, 45 Vt. L. Rev. 43, 43 (2020) (emphasis omitted). Today, plaintiff Xnxx, for example, hosts more than 250,000 free videos of "teen bondage gangbangs," including one in which a young woman is restrained, gagged, strangled, and slapped while having sexual

intercourse with multiple men for 36 minutes. ROA.538. In that video, while the young woman is still tied up, the men strap a device around her head called a "mouth spreader" or "spider mouth gag" that forces her mouth to remain open for other sexual acts. ROA.538.

That video alone has 671,000 views, ROA 538-39. More importantly, it is *not* alone. One plaintiff's site contains 306,230 videos of "perfect girl porn," 579,497 videos of "teen hardcore" porn, and 328,273 videos of "young petite porn." ROA.399. Another's includes over 200,000 videos in the "Un Consesual" category, and 198,000 videos in the "Non Consesual Porn Porn videos"—deliberate misspellings to conceal depictions of rape. ROA.368. A third popular category is hentai, which is the "pornified" version of anime or cartoons, and often features "a grotesque creature penetrating a girl with an enormous phallus or tentacle." ROA.368. In 97% of these videos, women are the targets of aggression, most commonly "[s]panking, gagging, slapping, hair pulling, and choking." ROA.367-68. The dramatic rise in what pornographers euphemistically call "choking," is particularly concerning given that it is "defined by medical science as 'nonfatal strangulation'" and "poses grave neurological harms to victims, including unconsciousness, brain injury, seizure, motor and speech disorders, memory loss," and PTSD. ROA.368.

2.    Today's digital environment offers nearly inexhaustible amounts this material. In 2019, for example, plaintiff Pornhub alone transferred 6,597 petabytes of data. Romney, *supra*, at 50. That represents "1.36 million hours (169 years) of new content [that] were uploaded to the site," *id.*—or nearly 90,000 times the data that was in Library of Congress in 2009, Matt Raymond, *How 'Big' is the Library of Congress*,

Library of Congress Blogs (Feb. 11, 2009), https://blogs.loc.gov/loc/2009/02/how-big-is-the-library-of-congress. Indeed, Pornhub bragged that if one "started watching 2019's *new* videos in 1850, you'd still be watching them today." ROA.343 (emphasis added).

With this staggering amount of pornography available, it is perhaps unsurprising that the average age of pornography exposure is 11. Khadijah B. Watkins, *Impact of Pornography on Youth*, 57 J. Am. Acad. Child & Adolescent Psychiatry 89 (2018). One study reported that participants were as young as eight when they viewed online pornography, and 72.8% had done so by 18. Chiara Sabina, Janis Wolak, & David Finkelhor, *The Nature and Dynamics of Internet Pornography Exposure for Youth*, 11 CyberPsychology & Behavior 691, 691-92 (2008). That same study found over a third of male participants reported viewing "[s]exual activity involving bondage"; almost a third, "[s]exual activity between people and animals"; over a fifth, "[s]exual activity involving urine or feces"; and almost that many, "[r]ape or sexual violence." *Id.* at 693. According to British regulators, hentai is particularly popular with "children aged 6-12." ROA.369.

**3.** Other studies show that children who habitually view pornography exhibit "a host of mental health afflictions," including depression, disassociation, and other behavioral problems such as emulating sexual strangulation, dating violence, and sexual coercion. ROA.369-70. A British study found that "42% of 15-16-year-olds expressed the desire to mirror pornography—and more than half of all boys believe that online porn depicts realistic sexuality." ROA.370. "Research also shows that minors who view porn are at a higher risk of adult perpetration of child sexual abuse."

ROA.370. Although the risk is more acute with young girls, any child exposed to pornography is "more likely to display hypersexualization and to develop paraphilias (e.g., exhibitionism, voyeurism)." ROA.370.

As science has developed in recent years, it has become clear that dangers from early exposure to pornography are not limited to sexual proclivities and include a higher tendency toward use of tobacco, alcohol, and illegal drugs. ROA.371. It can also lead to symptoms of "irritability, poor social functioning, impulsiveness, and social anxiety," as well as "dysfunctional stress responses and poor executive function, including impairments to judgment, memory, and emotional regulation." ROA.371. And it "may trigger adolescent depression and psychosomatic symptoms" such as "headache, irritability, [and] trouble sleeping." ROA.371.

### B.  The operation of pornographic websites

Plaintiffs (collectively, "Pornographers") operate under various business models, but they generally fall in two broad categories: advertisement-based, and subscription-based. The first category generates revenue from "advertising placements on its website and through referral fees generated from certain advertisements placed by third party content creators." ROA.249. The second generates revenue from subscriptions, which permit customers to view adult content uploaded by studios from around the world. ROA.250-51.

Today, many pornographic websites already employ some form of age verification. For example, many Pornographers have Terms and Conditions that recognize the need to limit access to pornography to adults. ROA.252. "Individuals attempting to access" such services are "first barred by a pop-up requiring them to

certify that they are at least eighteen years old." ROA.252. And several Pornographers use the age-verification provider Yoti. ROA.403-04.

As the Attorney General's expert explained, the age-verification process occurs on the site's landing page, where the customer must complete the verification before proceeding further. ROA.1836. Age-verification technology comes in three general types:[1] *First*, government-issued-document verification matches a selfie with a picture of a document through the device's camera or digital wallet. ROA.1836. *Second*, age-estimation algorithms can use up to 126 biometric markers on the face—without retaining the actual image of the face—to estimates how old the user is based on facial structure. ROA.1839. *Third*, software can use the existence of some other fact to infer the age of the person seeking to access the website. ROA.1840. For example, a user providing a ".gov" email address would be assumed to be over 18 years old because he has a government job. ROA.1840. Regardless of the method used, this process is almost exclusively completed by third parties, who provide Pornographers only "the answer to the question, 'Is this person over 18? Yes or No." ROA.1837.

## II. H.B. 1181

To combat the further spread of this degrading material that is potentially dangerous to minors, the Texas Legislature enacted H.B. 1181. It applies to commercial entities that "knowingly and intentionally publish[] or distribute[] material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors." Tex. Civ. Prac. & Rem. Code § 129B.002(a).

---

[1] Similar technology is often used to verify the online purchase of other age-restricted items, such as liquor or tobacco. ROA.1841.

H.B. 1181's definition of sexual material harmful to minors tracks traditional obscenity law and speaks in terms of what is "patently offensive" under "contemporary community standards," "appeal[s] to or pander[s] to the prurient interest," and "lacks serious literary, artistic, political, or scientific value for minors." *Id.* § 129B.001(b)(6).

Once H.B. 1181 is triggered, the commercial pornographer must do two things: *First*, it must "use reasonable age verification methods" to verify that the user "is 18 years of age or older." *Id.* § 129B.002(a). To comply, the pornographer must require the potential user to (1) "provide digital identification;" or (2) "comply with a commercial age verification system that verifies age using" a "government-issued identification," or "commercially reasonable method that relies on public or private transactional data to verify the age of an individual." *Id.* § 129B.003(b). To ensure user privacy, the pornographer "may not retain any identifying information of the individual." *Id.* § 129B.002(b).

*Second*, pornographers must display two health warnings on their landing pages and advertisements. *Id.* § 129B.004. These warnings are expressly on behalf of the Texas Health and Human Services Commission and include statements that pornography "is potentially biologically addictive," can "harm human brain development," and has been "associated with low self-esteem" and an increase in "demand for prostitution" and "child exploitation." *Id.* § 129B.004(1). Covered entities must also alert users of the availability of a national hotline for those "facing mental health or substance use disorders." *Id.* § 129B.004(2).

Lastly, H.B. 1181 empowers the Texas Attorney General to bring civil-enforcement actions in state court, in which injunction and civil penalties are available. *Id.* § 129B.006(a), (d).

### III. Legal Proceedings

Four groups of plaintiffs sued Texas's Provisional Attorney General under 42 U.S.C. § 1983: (1) Free Speech Coalition Inc. ("FSC"), an association of pornographic actors, producers, distributors, and retailers; (2) domestic producers, sellers, and licensers of pornography ("Domestic Websites"); (3) foreign producers sellers, and licensers of pornography ("Foreign Websites"); and (4) Jane Doe, a pornographic actress whose content is featured on various websites. ROA.19-24. All Pornographers allege that H.B. 1181 violates the First Amendment, ROA.42-43, and the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment, ROA.43. A subset of Pornographers also allege that H.B. 1181 is preempted by 47 U.S.C. § 230, ROA.43-44, and violates their Eighth Amendment rights, ROA.44. Pornographers moved for a preliminary injunction. ROA.54.

On August 23, 2023, the district court held a hearing on Pornographers' motion—just 16 days after the Attorney General was served. At the hearing, there was little dispute that much of the content on Pornographers' websites is obscene. And the Attorney General presented expert testimony that age-verification technology is "not new" to pornographic websites, which already "use it elsewhere in the world." ROA.1854; *see* ROA.402-03. Despite refusing to view Pornographers' content, ROA.1881, the district court insisted that mainstream movies containing partial

nudity and simulated lovemaking—like Marlon Brando's *Last Tango in Paris*—are "as raw as any pornography," ROA.1877-78.

On August 31, the district court issued a preliminary injunction on the grounds that H.B. 1181 violates the First Amendment, ROA.1770, and that certain Pornographers are likely to succeed on their Section 230 claims, ROA.1762. This expedited appeal followed. ROA.1771; ECF 66.

## Summary of the Argument

**I.A.** Having chosen to assert a facial challenge, Pornographers bore "the heavy burden of showing that either no set of circumstances exists under which the Act would be valid, or the statute lacks any plainly legitimate sweep." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 220 (5th Cir. 2023) (cleaned up). Pornographers have not carried that burden on their claim that H.B. 1181 violates the First Amendment. To start, it "has been categorically settled by the [Supreme] Court, that obscene material is unprotected by the First Amendment," *Miller v. California*, 413 U.S. 15, 23 (1973), and that is precisely what H.B. 1181 seeks to regulate by limiting minors' access to materials that "appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value," *id*. at 24.

Even if undisputed presence of obscene material did not defeat Pornographers' facial claim to First Amendment protection, H.B. 1181 would survive the relevant level of constitutional scrutiny. The State's interest in protecting the health and morals of its children from the dangers of pornography is not subject to serious question. H.B. 1181 is a constitutionally permissible way to serve that interest because it does

not prevent anyone from publishing pornography or any adult from accessing it. Like the methods used to restrict access to tobacco products, H.B. 1181 merely requires users to verify that they *are* adults and provides warnings in language that the average person can understand that pornography can be dangerous. Adults are then able to act as they choose.

**B.** Pornographers are just as unlikely to show that H.B. 1181 is preempted by Section 230, which was after all enacted "to incentivize" actions "blocking explicit material from reaching children." Mary Graw Leary, *The Indecency and Injustice of Section 230 of the Communications Decency Act*, 41 Harv. J.L. & Pub. Pol'y 553, 559 (2018). Indeed, Section 230 is irrelevant because nothing in that provision immunizes Pornographers from regulation of their own content, and H.B. 1181 does nothing to punish Pornographers for hosting the content of others.

**II.**  In addition to being likely to succeed on the merits, the remaining stay factors all favor the Attorney General. Pornographers, many of whom are foreign entities and lack First Amendment rights, have failed to show any cognizable harm. By contrast, "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These concerns are particularly compelling here where the public interest to be served is to protect vulnerable children from the public-health crisis that is resulting from the explosion of online pornography.

## STANDARD OF REVIEW

A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'" *Harrison v. Young*, 48 F.4th 331, 342 (5th Cir. 2022). Any "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). This Court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo.*" *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022).

## ARGUMENT

### I.  Pornographers Failed to Show a Likelihood of Success on the Merits.

Pornographers "have asked a federal court to invalidate HB [1181] in its entirety before Texas even tries to enforce it." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 448 (5th Cir. 2022). "To put it mildly," even in the First Amendment context, "pre-enforcement facial challenges to legislative acts are disfavored" as they require courts to assess hypothetical facts and threaten to cut off the democratic process." *Id.* (quotation marks omitted). Here, Pornographers are not likely to show a right to make pornography freely available to minors under either the First Amendment or Section 230.

### A. H.B. 1181 comports with the First Amendment.

#### 1. The First Amendment does not protect Pornographers' obscenity.

Although a notoriously unclear area of law, "[t]his much has been categorically settled": obscenity "is unprotected by the First Amendment" and can be regulated. *Miller*, 413 U.S. at 23. That is just what H.B. 1181 does. It applies only to sites that host "sexual material harmful to minors." Tex. Civ. Prac. & Rem. Code § 129B.002(a); *see id.* § 129B.004. And the statute's definition of "[s]exual material harmful to minors" tracks the Supreme Court's language in *Miller*. *Compare id.* § 129B.001(6) *with Miller*, 413 U.S. at 24. Moreover, although the content on Pornographers' sites is often too graphic to describe to this Court, it fits the Supreme Court's "plain examples" of obscenity. *Compare Miller*, 413 U.S. at 25, *with* ROA.506-08, 538-39.

That H.B. 1181's definition "adds the phrases 'with respect to minors' and 'for minors'" to *Miller*'s language, ROA.67, does not establish Pornographers' entitlement to a preliminary injunction on a facial challenge for at least two reasons. *First*, the Supreme Court has repeatedly recognized that a legislature may pass laws that protect minors from material that is "obscene *as to youths*." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) (emphasis added); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). Although not a blank check, this rule recognizes that courts must "adjust[t] the definition of obscenity to social realities," including that material appropriate for adults may not be appropriate for children. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 793-94 (2011) (quoting *Ginsberg v. State of New York*, 390 U.S. 629, 638 (1968)). *Second*, some of Pornographers' content that satisfies

H.B. 1181's definition of "sexual material harmful to minors" also meets the Supreme Court's standard for *adult* obscenity. *See* ROA.538-39. And Pornographers have not alleged that they have separate landing pages and advertisements for their obscene and non-obscene content, making a preliminary injunction on a facial theory improper. *See Miller*, 413 U.S. at 26.

Pornographers' authority is not to the contrary. In *Reno v. ACLU*, the Supreme Court considered a challenge to a provision of the CDA that criminalized sending or displaying a lewd message in a way that is available to a minor. 521 U.S. 844, 859 (1997). The Supreme Court held the law unconstitutionally overbroad because it omitted *Miller*'s element that obscenity must relate to "sexual conduct." *Id.* at 870, 873. H.B. 1181, however, neither criminalizes pornography nor omits this crucial element; it only takes steps to limit its distribution to children and warn of associated risks. *See* Tex. Civ. Prac. & Rem. Code § 129B.001(6). As a result, H.B. 1181 does not "suppress[]" anything, let alone "a large amount of speech that adults have a constitutional right to receive and to address to one another." *Reno*, 521 U.S. at 874.[2]

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ("*Ashcroft II*") is similarly distinguishable—notwithstanding some superficial similarities between H.B. 1181 and the federal Child Online Protection Act ("COPA") at issue there. *Contra* ROA.1709-11. To start, *Brown* reaffirmed after *Ashcroft II* that States may protect minors from content that is obscene as to minors even if adults have a First Amendment right to view

---

[2] Decided during the internet's infancy, *Reno* felt the need to describe how the internet worked. 521 U.S. at 849-54. That internet "is unrecognizable today." Leary, *supra*, at 558.

similar materials. *See* 564 U.S. at 793-94. Moreover, COPA and H.B. 1181 function very differently: COPA criminalized the "posting, for 'commercial purposes,' of World Wide Web content that is 'harmful to minors.'" *Ashcroft II*, 542 U.S. at 661. By contrast, H.B. 1811 is not "enforced by severe criminal penalties." *Id.* at 660. And, as far as H.B. 1181 is concerned, Pornographers can create, post, and sell as much obscenity as the market will tolerate. Thus, *Ashcroft II*'s foundational premise—that the challenged law "suppresse[d] a large amount of speech," *id.* at 665—does not apply to H.B. 1181. Similarly, age verification is the requirement in H.B. 1181—not an affirmative defense as in COPA, alleviating the risk that "speakers may self-censor rather than risk the perils of trial." *Id.* at 670-71. That is, if Pornographers require age verification and post the required notices, they will not violate H.B. 1181 regardless of what content they offer. *See* Tex. Civ. Prac. & Rem. Code §§ 129B.002(a), 129B.004. And finally, COPA was a federal law. As this Court has noted, pre-enforcement facial challenges to state laws like H.B. 1181 raise "particularly troublesome" federalism concerns. *NetChoice*, 49 F.4th at 449.

Pornographers' stay response made three counterarguments, all of which fail. *First*, Pornographers' stay response asserts (at 8-9) that the Attorney General has failed to preserve the argument that Pornographers are without First Amendment protection because of the obscenity on their websites. Wrong. ROA.485; *accord* ROA.674-75, 679. Indeed, the district court expressly recognized that "Defendant argues that Plaintiffs' content is 'obscene' and therefore undeserving of First Amendment coverage." ROA.1712.

*Second*, Pornographers' motion response denied (at 8-9), conceding that *any* of their content is obscene. They did not need to. If a "teen bondage gangbang" video of a young woman being tied up, gagged, slapped, and penetrated by multiple men, ROA.538-39, does not "portray sexual conduct in a patently offensive way," *Miller*, 413 U.S. at 24, it is difficult to imagine what would. And this not cherry picking. As described above (at 3), and in the Attorney General's stay reply (at 3), "sexual practices involving coercion, deception, non-consent and criminal activity are described in mainstream online pornography in ways that position them as permissible." ROA.509; *see also* Sabina *et al.*, *supra*, at 692. Thus, this case is not about Marlon Brando movies. *Contra* ROA.1878-79. It is about "family porn," "young petite porn," "anal bondage," and other, more graphic descriptors that should not be mentioned here. *See* ROA.538.

Pornographers insist that any obscenity they offer is mingled with non-obscene material, shielding them from regulation. *See* Resp. 9-10. But Pornographers do not claim to have segregated the obscene and non-obscene materials in such a way that Texas can more narrowly tailor its law to require age verification solely for obscene content.

*Third*, Pornographers misleadingly assert that the Attorney General does not "seriously disput[e] that the law is invalid under binding Supreme Court precedent," *id.* at 1, relying heavily on *Reno*, 521 U.S. 844, and *Ashcroft II*, 542 U.S. 656, *e.g.*, Resp. 1, 11. But, as the Attorney General has pointed out above, *supra* pp. 11-14, Pornographers' cases are inapposite. Moreover, *Brown*, which came *after* the ACLU cases, reiterated "the obscenity exception to the First Amendment," 564 U.S. at

792, and noted that rational-basis review applies to regulations of material that a State deems "obscene from the perspective of a child," *id.* at 793-94.

### 2. H.B. 1181's age-verification requirement does not violate the First Amendment.

#### a. H.B. 1181 survives *Ginsberg*'s rational-basis review.

**i.**   Assuming that the district court was correct that H.B. 1181 "regulates all content that is prurient, offensive, and without value *to minors*" not just "obscene content," ROA.1712, this Court should apply rational-basis review under *Ginsberg*, 390 U.S. at 640. *Ginsberg* examined a statute prohibiting the sale of materials that were harmful to minors, which was defined as "any description or representation" of "nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it (i) predominantly appealed to the prurient, shameful or morbid interest of minors, (ii) was patently offensive to prevailing standards in the adult community as a whole with respect to what was suitable for minors, and (iii) is utterly without redeeming social importance for minors." *Id.* at 646; *see* Tex. Civ. Prac. & Rem. Code § 129B.001(6). *Ginsberg* upheld the statute under rational-basis review based on the State's interests in the well-being of children and in preserving the interests of parents. 390 U.S. at 637, 642-43.

It is no response for Pornographers to again point to *Ashcroft II*, which upheld a preliminary injunction based on the availability of less-restrictive means to achieve the statute's ends. 542 U.S. at 664. But the Supreme Court never overruled *Ginsberg*, instead reaffirming the same test in *Brown*. 564 U.S. at 794. Indeed, the Court never addressed whether strict scrutiny was the proper standard because the government

conceded the point. *Compare* Pet'r's Br. at 18, *Ashcroft II*, with *Ashcroft II*, 542 U.S. at 665-66. Such "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004).

Nor is the district court correct that *Reno* "found [*Ginsberg*] inapplicable to digital regulations." ROA.1710. Instead, *Reno* distinguished the CDA from *Ginsberg* because (1) the CDA did not permit parental consent, (2) the CDA applied to more than just commercial transactions, (3) the CDA failed to cabin its definition of harmful material *to minors* or provide for material with serious social value," and (4) the CDA defined "minor" as under 18 rather than 17. *Reno*, 521 U.S. at 865-67. Except for the fact that H.B. 1811 defines minors to include 17-year-olds, those distinctions are absent: H.B. 1811 applies only to commercial entities and requires age verification by the person accessing their websites. *See* Tex. Civ. Prac. & Rem. Code §§ 129B.001(1), .002, .003. Nothing prevents parents from logging on to the sites on behalf of their children. H.B. 1181 excludes material with serious social value from the definition of "sexual material harmful to minors" at each component of the definition. *Id.* § 129B.001(6); *Ginsberg*, 390 U.S. at 646.

The only relevant distinctions between H.B. 1811 and *Ginsberg* is that H.B. 1811 is purely civil and speaks in terms of "serious . . . value for minors," Tex. Civ. Prac. & Rem. Code § 129B.001(6), rather than "utterly without redeeming social importance," *Ginsberg*, 390 U.S. at 646. But the fact that it is civil rather than criminal *lessens* First Amendment concerns. *Ashcroft II*, 542 U.S. at 660. And the definitional

difference permissibly reflects the greater leeway that First Amendment jurisprudence gives States since *Roth v. United States*, 354 U.S. 476, 484 (1957), was replaced by *Miller*, 413 U.S. at 24. *See* William W. Van Alstyne & Kurt T. Lash, *The American First Amendment in the Twenty-First Century* 885 (5th ed. 2014).

**ii.** H.B. 1811 easily satisfies rational-basis review. "It is uncontested that pornography inappropriate for children, and the state may regulate a minor's access to pornography." ROA.1714; *Ginsberg*, 390 U.S. at 640. Indeed, Pornographers have conceded (for now) that the State's interest here is compelling. ROA.1714. They had to. *Sable Commc'ns*, 492 U.S. at 126 (recognizing a "compelling" interest before applying strict scrutiny).

And H.B. 1181 is reasonably related to its interest in protecting children. *Cf. Ginsberg*, 390 U.S. at 643. Indeed, Pornographers do not seriously argue that they can overcome the "strong presumption of validity" associated with this standard of review. *F.C.C. v. Beach Commc'n, Inc.*, 508 U.S. 307, 314 (1993). For good reason: if there is a legitimate state interest in preventing children from accessing pornography on the internet, it is entirely reasonable to require Pornographers to check their customers' age before they access the websites. Because rational-basis review does not require the government to "draw the perfect line nor even to draw a line superior to some other line it might have drawn," H.B. 1181 passes constitutional muster. *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012).

### b. Alternatively, H.B. 1181 survives intermediate scrutiny under the secondary-effects doctrine.

If the Court were to disagree and hold that H.B. 1181 is subject to heightened scrutiny because it distinguishes between content, it would survive such heightened review under the secondary-effects doctrine. Under this doctrine, a statute is aimed at the secondary effects of some expressive conduct—such as the effects of noise on the surrounding community—does *not* need to survive strict scrutiny. *E.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Instead, such regulations "promote[] a substantial government interest that would be achieved less effectively absent the regulation," and do not prevent substantially more speech than necessary to achieve the goal. *Id.* at 799 (cleaned up).

That doctrine is a staple in analyzing a State's regulation of sexually explicit but non-obscene expressive conduct like strip clubs. For example, in *City of Renton v. Playtime Theatres, Inc.*, the Supreme Court upheld a statute that prohibited adult films from being shown in certain areas, 475 U.S. 41, 43 (1986), to "prevent crime, protect the city's retail trade, maintain property values," and in general, "the quality of urban life," *id.* at 48 cleaned up). Such a regulation indisputably makes content-based distinctions, but the Court concluded the regulation was "aimed not at the *content* of the films, . . . but rather at the *secondary effects*" of theatres showing those films in the sensitive areas. *Id.* at 47.

H.B. 1181 falls neatly within that doctrine. Though seemingly making content-based distinctions, H.B. 1811 does not regulate the content of what Pornographers—which are, in a very real sense, today's adult theaters—put on their websites.

Instead, it regulates the secondary effects of that content on the still-developing minds of children. *Supra* pp. 2-3 (recounting the devastating effects of pornographic exposure on minors).

Again, *Reno* is not to the contrary because the Supreme Court did not overturn the secondary-effects doctrine but instead held that it did not save the CDA for two reasons. *First*, the CDA applied "broadly to the entire universe of cyberspace," not just a limited set of commercial pornographers. *Reno*, 521 U.S. at 867-68. *Second*, the CDA's purpose was to "protect children from the primary effects of 'indecent' and 'patently offensive' speech, rather than any 'secondary' effect of such speech." *Id.* In reaching its conclusion, *Reno* cited *Boos v. Barry*, 485 U.S. 312, 321 (1998), for the proposition that "'[r]egulations that focus on the direct impact of speech on its audience' are not properly analyzed under *Renton*." *Id.*

*Boos* demonstrates why this case is properly analyzed under the secondary-effects doctrine where *Reno* was not. There, the Court held that regulations on protests could not be justified by the secondary effects of "congestion," interference with ingress or egress," "visual clutter," or "security" because other, non-expressive conduct caused the same problems and were not regulated. 475 U.S. at 321. In other words, the only purpose of the regulation in *Boos* was to shield an unwilling audience from seeing expression. *Id.* By contrast, H.B. 1181 is not regulating pornography for the sake of regulating pornography; it is regulating children's access to pornography because of the deep, long-term effects of consuming that content. *See supra* pp. 4-5; *see also* ROA.1100. Curbing such effects on communities, families, and children themselves constitutes a substantial interest that falls squarely within the secondary-

effects doctrine. *Cf. Paradigm Media Grp., Inc. v. City of Irving*, No. 3:01-CV-612-R, 2002 WL 1776922, at *6 (N.D. Tex. July 30, 2002), *aff'd* 65 F. App'x 509 (5th Cir. 2003).

Therefore, to survive scrutiny, H.B. 1181 need only promote "a substantial government interest," and not suppress substantially more speech than necessary to achieve the government goal. *Ward*, 491 U.S. at 799. It does so. Again, the State's interest in "protecting the physical and psychological well-being of minors" from this material is not just substantial but compelling. *Sable*, 492 U.S. at 126. And the fact that children as young as eight are accessing this material amply demonstrates that this end cannot be achieved without action. *Supra* p. 4. Moreover, H.B. 1181 is adequately tailored. Far from cutting off all avenues for Pornographers to communicate their message, H.B. 1181 just requires that they check to make sure their audience is an adult while simultaneously protecting the privacy of Pornographers' customers by prohibiting them from storing those customers' data. *Supra* p. 7.

### c.  H.B. 1181's age-verification requirement survives even strict scrutiny.

Even if strict scrutiny applies, age verification is narrowly tailored to the "compelling" governmental interest of protecting minors from sexually explicit content—and often violent—content. *Sable*, 492 U.S. at 126. A narrowly tailored law "actually advances the state's interest," "could be replaced by no other regulation that could advance the interest as well with less infringement of speech," and is not so under-inclusive as to undermine the Court's confidence in the reason for the statute. *Tex. Veterans of Foreign Wars v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014).

Pornographers do not seem to contest that H.B. 1811 actually serves the purpose of limiting minors' access to pornography. It also meets the other elements of this stringent standard.

    **i.**  H.B. 1811 is not constitutionally overinclusive. In *United States v. Stevens*, the Court found that it was "plainly legitimate" for the federal government to criminalize "crush videos"—fetish videos that involved the intentional crushing of small animals. 559 U.S. 460, 466, 472 (2010). But it concluded the law was overbroad because it also criminalized "a substantial number" of other types of content—*e.g.*, "the humane slaughter of a stolen cow." *Id.* at 474-75. As already discussed, far from prohibiting a "substantial" amount of protected speech, H.B. 1181 does not prohibit *any* speech, only that Pornographers check the ages of their customers. *Supra* p. 14.

    **ii.**  H.B. 1181 is also not impermissibly underinclusive. To start, "even under strict scrutiny," a "State need not address all aspects of a problem in one fell swoop," and laws are not unconstitutional because they "conceivably could have restricted even greater amounts of speech in service of their stated interests." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). Moreover, though "underinclusivity raises a red flag," it does not render a law unconstitutional because there is "no freestanding underinclusiveness limitation." *Id.* (quotation marks omitted). Instead, it is simply considered by courts as evidence that "a law does not actually advance a compelling interest." *Id.*; Clay Calvert, *Underinclusivity and the First Amendment: The Legislative Right to Nibble at Problems After* Williams-Yulee, 48 Ariz. St. L. J. 525, 529 (2015). If H.B. 1181's age verification is underinclusive, it does not act as a surreptitious end-around for unconstitutional discrimination between speech or

speaker. For example, the *Brown* Court considered a statute seeking to protect minors from violent videogames by requiring a parent's consent and age labeling to be significantly underinclusive because it did not regulate other media having similar effects on children—*e.g.*, violent television. 564 U.S. at 789-802.

The putative gaps in H.B. 1811 identified by the district court—search engines, social media, and companies not subject to personal jurisdiction, ROA.1715-16—do not undermine the purpose of H.B. 1181 for at least two reasons. *First*, for all their faults, the Big Tech companies listed in the first two categories do not seek profit from peddling depictions of bestiality and sexual assault—unlike Big Porn. To the contrary, search engines and many social-media platforms have undertaken voluntary efforts to protect minors from sexually explicit content. *See, e.g.*, Instagram, *Community Guidelines*, https://help.instagram.com/477434105621119 (prohibiting nudity) (last visited Sept. 25, 2023). And the record reflects that using a search engine to locate explicit material typically takes the browser to websites that would be covered by H.B. 1181. ROA.398.

*Second*, it is hardly evidence of malintent that Texas has not sought to regulate entities not subject to its jurisdiction. The presumption against extraterritoriality is, after all, "a basic premise of our legal system." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016). Moreover, whether any particular foreign website has sufficient in-Texas conduct to be subject to Texas's jurisdiction is a fact-specific inquiry, *id.* at 337, and thus too uncertain to carry weight in an underinclusivity analysis, *see Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999).

**iii.** Age verification could not be replaced by any "other regulation that could advance the interest as well with less infringement of speech." *Veterans of Foreign Wars*, 760 F.3d at 440. To start, rather than requiring age verification in incidental publication of material harmful to children, H.B. 1181 is narrowly aimed at only those sites whose business model is significantly driven by distributing sexual material harmful to minors. *See* Tex. Civ. Prac. & Rem. Code § 129B.002. Age verification is a familiar technology to such sophisticated entities, which offer age-restricted products—including a number of Pornographers. ROA.1854, 403-04. Similar technology is used by purveyors of nicotine and alcohol as well as common dating sites.[3]

Nothing about pornography transforms this common-sense way to restrict minors' access to adult materials into a constitutional violation. Pornographers repeatedly tout that *Reno* expressed a *preference* for content filtering over verification—in 1997. *E.g.*, ROA. 71. That discussion is of little use, however, in assessing what constitutes the least-restrictive means to effectively serve Texas's interest for at least two reasons. *First*, in *Reno*, the government conceded there was "no effective way to determine the identity or the age of a user who is accessing material," as well as concerns about privacy. 521 U.S. at 855. A quarter-century later, commercially viable methods of age verification are available "that do not require them to disclose personal and sensitive information," ROA.428—*e.g.*, "selfie matching," ROA.1837,

---

[3] *See* ZYN, *Still Have Questions?*, ZYN Basics, https://us.zyn.com/questions/; DoorDash, *How is My Age Verified For Alcohol Orders?*, https://help.doordash.com/consumers/s/article/How-is-my-age-verified-for-alcohol-orders?language=en_US; Erica Finkle, *Bringing Age Verification to Facebook Dating*, Meta (Dec. 5, 2022), https://about.fb.com/news/2022/12/facebook-dating-age-verification/.

and age estimation, ROA. 1839-40. Moreover, the same age-verification software could be used for everything from purchasing cigarettes to accessing a dating site, ROA.1840—making the possibility of harassment extremely unlikely, particularly given the limitations Texas has placed on retaining the data, Tex. Civ. Prac. & Rem. Code § 129B.002(b). Because age verification preserves online anonymity, "a substantial amount of protected speech" will not be "chilled in the process" of regulating these websites. *Ashcroft v. ACLU*, 535 U.S. 564, 584 n.16, 602 (2002).

*Second*, as the Supreme Court itself recognized, there was a "a serious gap in the evidence" about the effectiveness of blocking and filtering in the late 1990s. *Ashcroft II*, 542 U.S. at 671. In the ensuing quarter-century, age verification "has proven an ineffective mechanism" to limit "exposure to adult content by minors." ROA.426. Put simply, although parents are the first line of defense, their children are often more adept at circumventing such software than they are at using it. ROA.425-26, 1842. And, even for parents who are more familiar with the software than their children, blocking and filtering is only effective if a child seeks to access pornography on routers "which are in your home"—as opposed to at a friend's house, library, or public WiFi network. ROA.1841. As a result, an Oxford study showed that "internet filtering tools" were "an insignificant factor in whether young people had seen explicit sexual content." ROA.427. Given that childhood pornography exposure has "become the major form of sex education for children" notwithstanding the availability of blocking software, ROA.372, Pornographers are unlikely to prove that it is an effective, less-restrictive alternative to age verification.

### 3. H.B. 1181's notice requirement does not violate the First Amendment.

Pornographers are also unlikely to show that H.B. 1181's notice requirement runs afoul of *Zauderer v. Office of Disciplinary Counsel*, which permits States to require commercial enterprises to make "purely factual and uncontroversial" disclosure regarding their products so long as they are "reasonably related to the State's interest." 471 U.S. 626, 651 (1985). Even if *Zauderer* were inapplicable, H.B. 1181 would satisfy *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980).

**a.** Under *Zauderer* and its progeny, Texas may require companies to inform "purchasers about what the [government] has concluded is appropriate use of the product they are about to buy," so long as they do not require the company to "take sides in a heated political controversy." *CTIA–The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 848 (9th Cir. 2019); *see Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 21 (D.C. Cir. 2014) (en banc). Once triggered, *Zauderer* requires only rational-basis review. *Oles v. City of New York*, No. 22-1620-CV, 2023 WL 3263620, at *3 (2d Cir. May 5, 2023); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc). H.B. 1181's disclosure requirements satisfy this test.

H.B. 1181 requires disclosure of factual information about potential risks associated with pornography use and truthfully notes the existence of a national telephone hotline. Tex. Civ. Prac. & Rem. Code § 129B.004. Those warnings are made on behalf of a government agency, alleviating concerns about compelled speech by making

clear that they cannot be attributed to Pornographers. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 564 (2005).

And those disclosures are reasonably related to Texas's acknowledged interest in protecting minors from pornography. *E.g.*, ROA.1714. Common sense and regulatory experience reflect that multiple safeguards are often necessary to prevent minors from obtaining restricted items—even absent the complications specific to the internet. *E.g.*, *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657, 674 (9th Cir. 2023). Indeed, Pornographers admit that age verification will not prevent 100% of minors from accessing their sites, ROA.63, and bemoan that the notices may be so effective that people will "abandon" their websites, ROA.81. While Pornographers' fears are likely overblown, every child deterred by H.B. 1181's notices is one fewer child who may be subjected to any of XNXX's 257,987 "teen bondage" or 196,887 "family porn" videos. *See* ROA.538.

The Legislature could also have reasonably believed that the required notices would help protect *adults* from the same risks of addiction and criminal conduct. *See* Tex. Civ. Prac. & Rem. Code § 129B.004. Under current doctrine, States may not prevent adults from viewing non-obscene pornography. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 251 (2002). But States retain power "to prescribe regulations" such as safety warnings "to promote the health, peace, morals, education, and good order of the people." *Barbier v. Connolly*, 113 U.S. 27, 31 (1884); *see Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 6 (1947).

Pornographers protest that *Zauderer* cannot apply because they dispute whether their product has the effects described by H.B. 1181. ROA.14-15. "Businesses

27

generally do not welcome the mandated inclusion of a disclosure or safety warning on their products," yet "courts have consistently rejected the argument that a disclosure requirement should be considered controversial because businesses object to it or the public may be put off by it." Sabrina S. Adler *et. al.*, *You Want a Warning with That? Sugar-Sweetened Beverages, Safety Warnings, and the Constitution*, 71 Food & Drug L.J. 482, 497 (2016). For example, tobacco companies long denied that their products were harmful, yet surgeon-general warnings are now ubiquitous. *See* U.S. Dep't of Health & Human Servs., *The Health Consequences of Smoking—50 Years of Progress: A Report of the Surgeon General* (2014) at 20, available at http://tinyurl.com/smokingreport2014.

Instead, disclosures are "controversial" under *Zauderer* when they are likely to chill protected speech, *id.*, or require a commercial entity to take a side in a political debate, *CTIA*, 928 F.3d at 848. For example, in *CTIA*, the Ninth Circuit upheld a warning requirement for cell phones, notwithstanding a "controversy concerning whether radio-frequency radiation from cell phones can be dangerous if the phones are kept too close to a user's body over a sustained period." 928 F.3d at 848. *Milavetz, Gallop & Milavetz, P.A. v. United States*, upheld Minnesota's consumer-protection laws even though a law firm providing bankruptcy assistance vigorously disputed whether it was a "debt relief agency." 559 U.S. 229, 249-50 (2010). By contrast, *National Institute of Family and Life Advocates v. Becerra* held that requiring crisis pregnancy centers to disclose the availability state-funded of abortion services because the required notice (1) "in no way relates to the services that licensed clinics provide," but instead (2) "require[d] these clinics to disclose information about

*state*-sponsored services—including abortion, anything but an 'uncontroversial' topic." 138 S. Ct. 2361, 2372 (2018).

*Becerra* demonstrates why H.B. 1181's notice requirements fall on the constitutional side of the *Zauderer* line: *First*, the notices warn of potential risks of using pornography, *see* Tex. Civ. Prac. & Rem. Code § 129B.004—precisely the "services" Pornographers provide. *Becerra*, 138 S. Ct. at 2372. *Second*, unlike abortion, addressing the public-health crisis presented by pornography is not a matter of significant political debate. To the contrary, it has drawn broad, bipartisan support in a growing number of States. Novicoff, *supra.* And, *third*, as already discussed, it will not chill protected speech. *Supra* pp. 24-25.

**b.** For similar reasons, even if *Zauderer* were inapplicable, H.B. 1181's notice requirement satisfies the "lesser protection [accorded] to commercial speech" because it "directly advances" the "substantial interest," *Central Hudson*, 447 U.S. at 563, 566, of protecting children from pornography. *Supra* pp. 21-22. Given the extraordinary danger pornography poses to minors, *see* ROA.508-11, the required notices are also "in proportion to" the State's interest, *Central Hudson*, 447 U.S. at 564.

Pornographers counter by identifying two putatively more limited restrictions on their speech. But Pornographers have not shown that either would be as effective in serving Texas's substantial interest. *First*, relying on the suggestion of *Reno* and *Ashcroft*, Pornographers again suggest content filtering. Resp. 18. But as discussed above, content filtering has proven "ineffective" to protect children from the growing flood of pornography. ROA.425-26; *supra* p. 25. And even Pornographers

acknowledge that only customers who have circumvented technological blocks designed to prevent minors' access to the site will ever see these warnings. ROA.75-76. *Second*, Pornographers suggest "public-information campaigns, as endorsed in *Becerra*." Resp. 18. But if public-information campaigns were the only constitutionally permitted solution, *Zauderer* would be dead letter. It is not. *Becerra*, 138 S. Ct. at 2372.

Nor can Pornographers avoid this conclusion by challenging whether H.B. 1181's "'health warnings' could be understood as mere regulation of commercial speech." Resp. 18; ROA.1744-48. Leaving aside that Pornographers are not here asserting a purely artistic interest in peddling pornography, the notice requirement applies only to commercial entities, Tex. Civ. Prac. & Rem. Code §§ 129B.001(1), 129B.002(a), 129B.004, including on advertisements, *id.* § 129B.004(1). Advertisements are classic commercial speech. *Central Hudson*, 447 U.S. at 571. Nor does it matter, as the district court suggested, that "[u]nlike cigarettes, lightbulbs, or food content, where compelled disclosures have been upheld, sexual material is not a fungible consumer good." ROA.1745. The same could be said of the mandatory disclosures required from social-media platforms in *NetChoice*, yet the Court had no troubling upholding the challenged statute as a permissible regulation of "commercial speech." 49 F.4th at 485-86. The Court should do the same here.

## B.  Section 230 does not preempt H.B. 1181.

Pornographers are also unlikely to show that Section 230, which "incentivize[s]" actions designed to "block[] explicit material from reaching children," Leary, *supra* at 559, somehow preempts H.B. 1181. To the contrary, Section 230

neither immunizes website operators from state-law obligations that do not require the monitoring or deletion of third-party content, nor supports a right to publish Pornographers' own content. Moreover, if Pornographers are protected by Section 230, they are *not* entitled to First Amendment protections.

### 1.   Section 230 was enacted to protect children, not pornographers.

Pornographers' reliance on Section 230 is ironic given that the law originated in response to a state-court case that penalized website operator Prodigy for seeking to operate "a family oriented computer network" by removing content "deemed to be in bad taste or grossly repugnant to community standards." *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710, at *2 (N.Y. Sup. Ct. May 24, 1995). That court concluded that by "prescreen[ing] all bulletin board postings for offensive language," *id.*, Prodigy could be held liable as the "publisher" of an anonymous, defamatory post. *Id.* at *3. *Stratton Oakmont* "caught the attention of lawmakers who wanted as much 'indecent' material as possible removed from the internet so it would be safe for children," Danielle Keats Citron & Benjamin Wittes, *The Internet Will Not Break: Denying Bad Samaritans § 230 Immunity*, 86 Fordham L. Rev. 401, 405 (2017), and led to the passage of the CDA to "protect[] from liability those providers and users seeking to clean up the Internet," *id.* at 406; *see also NetChoice*, 49 F.4th at 466.

Section 230 is thus "an effort to control pornography and other non-family-friendly material on the internet." Adam Candeub, *Reading Section 230 As Written*, 1 J. Free Speech L. 139, 142 (2021). Far from reflecting "a broader objective of immunizing platforms for destructive third-party content they encourage or

intentionally tolerate," Citron & Wittes, *supra*, at *406, one legislator declared, "We are all against smut and pornography," Candeub, *supra*, at 145 n.19. And another noted that "Congress has a responsibility to help encourage the private sector to protect our children from being exposed to obscene and indecent material on the Internet." *Id.*

Although some early decisions arguably read Section 230 too broadly, *see Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14 (2020) (Thomas, J., statement respecting the denial of certiorari), there is a growing consensus among lower courts that the statute "does not insulate a company from liability for all conduct that happens to be transmitted through the internet," *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 129 (4th Cir. 2022). "Instead, protection under § 230(c)(1) extends only to bar certain claims, in specific circumstances, against particular types of parties." *Id.*; *see also, e.g.*, *In re Facebook, Inc.*, 625 S.W.3d 80, 98 (Tex. 2021) (orig. proceeding), *cert. denied sub nom. Doe v. Facebook, Inc.*, 142 S. Ct. 1087 (2022). As the Ninth Circuit has observed, Section 230 "was not meant to create a lawless no-man's-land on the Internet." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc).

### 2. Section 230 does not prohibit the enforcement of H.B. 1181's obligations.

With striking temerity, Pornographers seek to turn Section 230 from a shield for good-faith content moderators into a sword for Big Porn. But entitled "Protection for private blocking and screening of offensive material," Section 230's text limits the liability of website operators in two targeted ways—neither of which has anything

to say about H.B. 1181's requirement that Pornographers implement reasonable age-verification measures and post health warnings. *See* 47 U.S.C. § 230. *First*, subsection (c)(1) directly abrogates *Stratton Oakmont* by providing that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Second*, subsection (c)(2)(A) protects a website "provider or user" from liability "on account of . . . any action voluntarily taken in good faith to restrict access to or availability" to (among other enumerated things) "obscene, lewd, lascivious, [or] filthy" material. Subsection (c)(2)(B) similarly limits liability for "any action taken to enable or make available to information content providers or others the technical means to restrict access to material." Notably, Section 230(c) protects only the *restriction*, not the dissemination, of content.

These parts of Section 230(c) work together. Subsection (c)(1) instructs courts not to treat internet companies as the publishers of third-party content. And, under subsection (c)(2), they do not become publishers merely because they try to filter out harmful material in good faith. *See NetChoice*, 49 F.4th at 466 (explaining this relationship); Candeub, *supra*, at 147 (same). For example, under the *Stratton Oakmont* fact pattern, subsection (c)(2) would have prevented Prodigy from being held liable for good-faith screening to provide a family-friendly environment. By contrast, if Prodigy had served as a passive conduit, subsection (c)(1) would protect it from liability for third-party defamatory content. But if Prodigy had created the defamatory post itself, nothing in subsection (c) would have protected it from liability. *See* 47 U.S.C. § 230(f)(3).

Neither part of Section 230(c) preempts H.B. 1181. H.B. 1181 neither holds Pornographers liable for third-party content, *see* 47 U.S.C. § 230(c)(1), nor imposes liability for good-faith measures to restrict access to offensive material, *see id.* § 230(c)(2).

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008), is not to the contrary. *Contra* ROA.80. Doe was sexually assaulted after she "lied about her age" to access the defendant's website. 528 F.3d at 416. This Court held that Section 230 barred her claims as "merely another way of claiming that MySpace was liable for publishing . . . third-party-generated content." *Id.* at 420. But H.B. 1181 seeks to hold pornographic sites responsible for failing to protect minors from content *they generate and promote*, not just third-party content. *See infra*, Part I.B.3. In addition, H.B. 1181 does not require "the monitoring, screening, and deletion of content from" pornographic sites. *Id.* (quoting *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003)). Once Pornographers use the age-verification methods described in Section 129B.003, their job is done. If a minor lies about his age, circumvents the age verification, and is harmed by content, Pornographers would not be liable. *Accord id.* at 416.

### 3. Pornographers have not shown that they merely host third-party content.

Even if Section 230 could otherwise apply, this record does not support Pornographers' reliance on Section 230(c)(1), ROA.79, which applies to information provided by *someone else*. Pornographers remain "responsible, in whole or in part, for the creation or development of information provided through the Internet." *Id.* § 230(f)(3); *Henderson*, 53 F.4th at 126 n.22; *NetChoice*, 49 F.4th at 466.

**a.**    Pornographers implicitly recognize that Section 230 cannot protect them if they create or develop their content, because only a subset assert Section 230 protection: FSC, MG Premium Ltd as to SpiceVids, MG Freesites Ltd as to Pornhub, WebGroup as to XVidoes, NKL as to XNxx, and MediaME SRL. ROA.21, 43. The remaining Pornographers admit that they produce their own content, which is often uploaded to their co-plaintiffs' websites. ROA.20-23. The record reflects that these entities are often run by the same people—for example, Robert Seifert has provided a declaration that he is affiliated with four Pornographers, ROA.265-67; Philippe Craveiro-Romão with two, ROA.1260-61. Whether each individual website expressly admits to producing its own content or not, no Pornographer who asserts a Section 230 claim has shown that it is entitled to relief because none of them has shown that it hosts *exclusively* third-party content.

Two Pornographers' claims fail on the face of the pleadings. Members of the trade association, FSC, include "individual adult performers" and entities allegedly involved "in the *production*, distribution, sale, and presentation of constitutionally-protected adult content." ROA.20 (emphasis added). MG Premium Ltd admits that it "writes the scripts, hires the production team, and does the pre- and post-production work" as well as "upload[ing]" content to other websites. ROA.20-21. Because these Pornographers are "responsible, in whole or in part, for the creation or development of information provided through the Internet," 47 U.S.C. § 230(f)(3), they are not entitled to protection under subsection (c)(1), *e.g.*, *NetChoice*, 49 F.4th at 466.

Although the Pornographers that run Pornhub, Xnxx, and Porndoe.com allege that they "host[] content uploaded, owned, copyrighted, and controlled by third

party content creators," ROA.21, 23, they cannot allege that do so *exclusively*. The evidence shows that Pornhub has included "a channel for Pornhub Originals" for "about 6 years. Pornhub also has a blog." ROA.539. Similarly, Xnxx includes "a link to XNXX 'Gold,'" "offer[ing] access to 'Exclusive Content,'" including "XNXX GOLD originals," ROA.539. "The website Porndoe.com had a similar scheme where" the Attorney General's declarant "could click to get original content." ROA.539. MediaME SRL insists that "original" does not mean "Porndoe produced or created the content," only "that the content is available only on Porndoe." ROA.1260. Such a self-serving declaration, which distorts the ordinary meaning of "original," hardly supports the heavy burden to enjoin H.B. 1181.

That leaves only WebGroup, which presented a declaration that its site XVideos "hosts content uploaded, owned, copyrighted, and controlled by third party content creators." ROA.21; *see also* ROA.266. Again, the complaint does not assert that XVideos hosts *only* third-party content, and the evidence is silent whether XVideos produces is own content. But that does not save WebGroup: because it had the burden of proof, that silence is deadly. *E.g.*, *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

**b.**    Even if a Pornographer hosts only third-party content, that still would not justify a preliminary injunction, because Section 230 permits liability if Pornographers are "responsible, in whole *or in part*, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230 (f)(3) (emphasis added). Thus, Pornographers can be held liable if, for example, they alter another's content, *Henderson*, 53 F.4th at 129, or help develop

36

that content by requiring subscribers to provide information, *Roommates.Com*, 521 F.3d at 1166. Moreover, Section 230 does not immunize "destructive third-party content" that websites "encourage or intentionally tolerate"—only content for which that website serves as a passive conduit. *See* Citron & Wittes, *supra*, at *406.

Here, Pornographers are far from passive conduits for third-party content on their websites. After all, they promote content in special parts of their websites—sometimes behind a paywall—as "original" or "exclusive." ROA.539. And at least Pornhub, XVideos, Xnxx, and SpiceVids admit that they affirmatively *license and advertise* rather than passively host content from other Pornographers. ROA.22-23. This type of "encourage[ment]" takes Pornographers' conduct outside the protection of Section 230. *See* Citron & Wittes, *supra*, at *406. To say otherwise would mean that sophisticated entities like Pornographers could circumvent any limitation Congress placed on Section 230 by bifurcating their operations between creators and hosts of obscene content. *Cf. Malwarebytes*, 141 S. Ct. at 16 (Thomas, J., statement respecting the denial of certiorari) (warning against such abuse). Such an outcome should be rejected as irreconcilable with the text, context, or purpose of Section 230, which was designed to limit the access of children to the exact type of content that Pornographers seek to peddle. *Compare supra* Part. I.B.1, *with* Antonin Scalia & Bryan A. Garner, Reading Law the Interpretation of Legal Texts 63 (2012) ("A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored.").

**4.   To the extent Section 230 protects Pornographers, they cannot assert First Amendment claims.**

Finally, the district court wrongly concluded that H.B. 1811 somehow violates *both* the First Amendment *and* Section 230 with respect to the same Pornographers. ROA.1770. This Court has explained that Pornographers cannot have it both ways because "§ 230 reflects Congress's judgment that [websites] are not acting as speakers or publishers when they host user-submitted content." *NetChoice*, 49 F.4th at 468. If they are not publishers, then they are not entitled to First Amendment protection. *See id.* at 469.

Pornographers attempt to reconcile these positions by asserting that they may "assert the rights of Texas adults who visit their sites." Resp. 19 n.8. Although opaque, this sentence seems to suggest a view that Pornographers may assert a Section 230 claim for themselves and a First Amendment claim for their customers. But the challenge to H.B. 1181's notice requirement is *not* asserted on behalf of customers, ROA.42, ¶ 80, and the age-verification claim is not limited to the First Amendment rights of their customers, *see* ROA.42-43. It certainly does not try to demonstrate that requiring adult customers to verify their age before accessing whatever subset of third-party-produced content that these website may host—which is, again, the only content that implicates Section 230—would have the type of "lopsided" effect on *adult* customers as to implicate the First Amendment under overbreadth theory. *United States v. Hansen*, 143 S. Ct. 1932, 1940 (2023). Absent such

evidence, Pornographers have failed to establish an entitlement to a preliminary injunction.[4]

## II. The Remaining Preliminary-Injunction Factors Favor the Attorney General.

### A. Pornographers did not show irreparable harm.

In addition to being unlikely to succeed on the merits, Pornographers have failed to show "[p]erhaps the single most important prerequisite for" interim relief—that they are "likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2013 Apr. 2023 update). Pornographers insist that H.B. 1181 "poses a significant threat of imminent injury to [their] constitutional rights across the board," which "money damages cannot fully repair." ROA.81. But "invocation of the First Amendment cannot substitute" for this requirement of demonstrating "an imminent, non-speculative . . . injury." *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). Instead, each Pornographer must demonstrate "a significant threat of injury from [an] impending action," which is "imminent." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). No Pornographer can meet this burden, let alone show that the district court's sweeping injunction is "no more burdensome to the defendant than necessary" to remedy that Pornographer's injury. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

---

[4] Policing this burden of proof is particularly important here given that, unlike the typical case, Section 230 has been raised as a claim rather an affirmative defense. As a result, the Attorney General has had a limited opportunity to develop facts to rebut Pornographers' assertions.

### 1. The Foreign Websites lack constitutional rights to be irreparably harmed.

**a.** To start, based on the Foreign Websites' representations about their operations, they cannot show irreparable constitutional harm because "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *USAID v. Alliance for Open Soc. Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) ("*AOSI II*") (citing *Boumediene v. Bush*, 553 U.S. 723, 770-71 (2008)). It does not matter whether the Foreign Website has an American affiliate: "foreign affiliates are foreign organizations," which "operating abroad have no First Amendment rights." *Id.* at 2088. "[Domestic] plaintiffs cannot export their own First Amendment rights to shield foreign organizations from Congress's funding conditions." *Id.* at 2089.

*AOSI II* examined a law that prohibited the disbursement of government funds to aid organizations unless they explicitly opposed prostitution and sex trafficking. 140 S. Ct. 2082. In 2013, the Supreme Court struck down this requirement as it applied to domestic aid agencies. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ("*AOSI I*"). Seven years later, *AOSI II* upheld the same requirement as it applied to the domestic agencies' foreign affiliates because "plaintiffs' foreign affiliates are foreign organizations, and foreign organizations operating abroad have no First Amendment rights." 140 S. Ct. at 2088.

*AOSI II* should have precluded any injunctive relief on behalf of any Foreign Website as unnecessary to remedy irreparable harm domestic Pornographers may

have demonstrated. *Cf. Califano*, 442 U.S. at 702. *But see infra* Part II.A.2-3 (explaining why no domestic Pornographer has demonstrated such harm).

**b.**    The district court distinguished *AOSI II* in what it deemed "two critical ways." ROA.1703. Neither distinction is constitutionally significant.

*First*, the court asserted that unlike in *AOSI II*, Pornographers "do not seek to challenge" a law "with extraterritorial effect." ROA.1703. Neither did the plaintiffs in *AOSI II*. 140 S. Ct. at 2085. Instead, the plaintiffs were American agencies asserting that restrictions imposed on foreign affiliates—which shared the same name, trademarks, logos, funding sources, operating structure, and mission—affected *their* constitutional rights. *Id.* at 2094 (J. Breyer, dissenting). The Court rejected this argument, reiterating that "plaintiffs' foreign affiliates are foreign organizations, and foreign organizations operating abroad have no First Amendment rights"—notwithstanding any effect on the American affiliate. *Id.* at 2088.

*Second*, the district court distinguished *AOSI II* because "[t]he foreign NGOs had no domestic operations and did not plan to convey their relevant speech into the United States." ROA.1703. But the court could provide no citation for this factual distinction because it relies on two faulty premises: (1) that the plaintiffs in *AOSI II* were foreign organizations, and (2) that the Foreign Websites should be deemed to have "domestic operations" because they host a website. As just noted, the first premise is factually wrong. The second is belied by the Foreign Websites own statements that they "do not have offices" in "the United States and are not registered to do business in [any] U.S. State." Declaration of Robert Seifert ¶ 3, *Doe v. WebGroup Czech Republic, et al.*; No. 2:21-cv-024828-VAP-SK, U.S. (C.D.

California 2020), Dkt. 134-5.[5] They also have no employees, property, bank accounts, mailing addresses, phone numbers, or designated agents in this country. *Id.* at ¶¶ 3-4. They do not pay U.S. taxes, have U.S. servers, *id.* at ¶¶ 20-22, or "solicit from" or aim videos at "any particular country." *Id.* at ¶¶ 13, 19." *Id.* To hold that such entities are nonetheless present in the United States would render the principle behind *AOSI II* a legal nullity because foreign organizations could create their own constitutional protections by posting policy statements online, thereby "convey[ing] their relevant speech into the United States." ROA.1703.[6]

    **c.** The district court also suggested that the First Amendment rights of U.S. residents to *hear* speech provides global constitutional cover for foreign websites operators. *See* ROA.1705. This is wrong for at least three reasons. *First*, by its terms, Section 1983 permits suit only by "any citizen of the United States or other person within the jurisdiction thereof." 42 U.S.C. § 1983. Because the Foreign websites are neither citizens of the United States nor persons within its jurisdiction, they lack statutory standing to sue. *See Vote.Org v. Callanen*, 39 F.4th 297, 304 (5th Cir. 2022).

---

[5] In *Doe v. Webgroup Czech Republic, a.s.*, NKL Associates and WebGroup Czech Republic (among others) were sued for broadcasting the victimization of a child who had been trafficked. No. 2:21-cv-02428-VAP-SKx, 2022 WL 982248 (C.D. Cal. Jan. 13, 2022). Notably, the declarant quoted above, Robert Seifert, also provided a declaration here on behalf of the same two Pornographers, as well as plaintiffs Sonesta Media, s.r.o. and Sonesta Technologies, s.r.o. ROA.264-68. For the avoidance of doubt, the Attorney General does not concede the accuracy of Pornographers' description of their operations but accept them for the purposes of this appeal.

[6] Notably, the foreign organizations had websites accessible to U.S. residents, sometimes sharing website addresses with their U.S.-based affiliates. *See* Br. for Resp., *AOSI II*, 2020 WL 1154731, at *8 (U.S. Feb. 26, 2020).

Nor would Foreign Websites be "*the party injured.*" *Id.* The Texan deprived of access would be. If U.S. affiliates "cannot export their own First Amendment rights to shield foreign organizations," *AOSI II*, 140 S. Ct. at 2088, neither can U.S. *customers* do so because wherever such customers are located, the Foreign Website remains a "foreign organizations, and foreign organizations operating abroad have no First Amendment rights." *Id.*

*Second*, the district court's primary authority is inapposite because unlike here, the plaintiffs included a domestic audience who were actually deprived of access to protected speech. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Va. State Board of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). Although the plaintiffs in *Kleindienst v. Mandel* also included the foreign speaker, he was a "symbolic" plaintiff without his own constitutional claim. 408 U.S. 753, 762 (1972). By contrast, none of Pornographers' potential customers chose to sue even pseudonymously—likely because H.B. 1181 does not cut adults' access to anything on Pornographers' websites or penalize anyone for producing, distributing, accessing, or possessing pornography. *Cf. Stanley*, 394 U.S. at 558.

*Third*, similarly misplaced was the court's reliance on cases involving defamation by foreigners. *See* ROA.1703-04. As the district court recognized, the substantive law of defamation is itself "significantly cabined by the First Amendment," ROA.1703 (quoting *Manzari v. Associated Newspapers, Ltd.*, 830 F.3d 881, 884 (9th Cir. 2016))—regardless of the identity of the defendant. As a result, these cases provide little guidance regarding whether Foreign Websites can assert claims based on the First Amendment in the first instance. The district court thought it "would make

little sense to allow Plaintiffs to exercise First Amendment rights as a defense in litigation but deny them the ability to raise a pre-enforcement challenge to imminent civil liability on the same grounds." ROA.1704. But this ignores that, the law makes innumerable distinctions between matters that can be raised as an affirmative defense and what can be raised as a pre-enforcement challenge.

*Thunder Studios, Inc. v. Kazal* illustrates why these defamation-by-foreigners cases are also factually inapt. 13 F.4th 736 (9th Cir. 2021). *Thunder Studios* involved speech specifically targeted to U.S. residents about U.S. residents on the streets of California. *Id.* at 739-40. According to the Ninth Circuit, this fact distinguished *Thunder Studios* from *AOSI II* notwithstanding that the defendants were residents of Australia. *Id.* at 744. By contrast, the Foreign Websites go to great efforts to have no contact with the United States, *supra* pp. 41-42, and they post non-targeted content on the "decentralized, global medium of communication that links people, institutions, corporations, and governments around the world." ROA.28.

\* \* \*

In sum, because the Foreign Websites are "foreign organizations operating abroad," they "have no First Amendment rights," *AOSI II*, 140 S. Ct. at 2088, and thus cannot face a "significant threat of imminent injury to constitutional rights" sufficient to justify a preliminary injunction, *contra* ROA.81.

### 2. Pornographers have not shown that H.B. 1181 affects their viewership, let alone causes irreparable harm.

Domestic Websites can (in theory) establish such a harm, but they face an uphill battle in doing so because the record reflects the cost of complying with H.B. 1181

amounts to a few cents per subscriber, ROA.559-60, which will be passed on to their customers. Their alternative theory—that they will suffer a loss of goodwill "as Texas adults abandon Plaintiffs' platforms in response to the demand that they reveal personal information and the false 'health warnings' [H.B. 1181] requires," ROA.81—also fails for at least four reasons.[7]

*First*, the Pornographers provide no evidence that H.B. 1181 reduces adult viewership. This absence is particularly noticeable because they have implemented age verification in other places—for example, just across the border in Louisiana. ROA.543, 1854, 1856-57.

*Second*, assuming a loss of adult viewership, a right to speak does not include an untrammeled right of access to any audience. *E.g.*, *Snyder v. Phelps*, 562 U.S. 443, 459 (2011) (summarizing the captive-audience doctrine); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48 (1983) (allowing a school to limit access to teachers' mailboxes). And "First Amendment jurisprudence has [specifically] acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). Pornographers make no effort to disentangle any (hypothetical) loss in viewership from a loss of good will among *adults*.

---

[7] If the Court concludes the Foreign Websites have constitutional rights, these arguments also foreclose their reliance on a loss of goodwill to establish irreparable harm.

*Third*, the Court cannot presume a loss of good will given that everyone involved in this case agrees that children should not have access to pornography. *See, e.g.*, ROA.259, 1858. As does a broad, bipartisan coalition of the electorate. *Supra* pp. 1, 29. As a result, it is far from a given that whichever Domestic Websites have not yet voluntarily adopted age-verification technology would lose good will by taking such a common-sense step to protect children.

And *fourth*, the Domestic Websites are especially unlikely to suffer harm because they are subscription-based. ROA.22-23. As a result, they already collect account and payment information from their customers. *See* ROA.22-23. Pornographers have provided no evidence that such customers will abandon the Domestic Websites upon the implementation of a secure, reasonable method of age verification. And absent such evidence, Pornographers have not shown they are entitled to the extraordinary relief of a preliminary injunction facially invalidating a state law. *Cf. Netchoice*, 49 F. 4th at 449 (noting that courts "look particularly askance at a litigant who wants unelected federal judges to countermand the State's democratically accountable policy makers").

### 3. Jane Doe cannot show harm at all.

Jane Doe, who makes and publishes pornographic videos on various pornographic websites, cannot bridge the gap left by the institutional Pornographers. ROA.259. Even assuming the pseudonymous Doe has First Amendment rights because she is an American citizen operating in America, *see supra* Part II.A.1, H.B. 1181 says nothing about performing in pornography, and Doe has not alleged that she

operates a pornographic website. As a result, H.B. 1181 will have no effect on her—even if it may cause some pornographic websites to incur additional, marginal costs.

Doe counters that though her "business consists of producing legal content—featuring only consenting adults," she will be harmed because "the restrictions the Act would place on [her] ability to reach [her] audience," ROA.23; *see also* ROA.259. But she has no more right to an "unlimited audience where [her] speech is sexually explicit and the audience may include children" than her institutional co-plaintiffs. *Fraser*, 478 U.S. at 684.[8]

Doe's main complaint is that she disagrees with H.B. 1181. ROA.23. But "[t]hat is a generalized psychological injury, not a particularized free-speech one." *McMahon v. Fenves*, 946 F.3d 266, 271 (5th Cir. 2020). Doe's "passion, however sincere, does not place [her] among the injured." *Id.* at 272. Without an injury, Doe is not entitled to the extraordinary relief of a preliminary injunction.

### 4. Because FSC's members have not shown irreparable harm, neither has FSC.

Because FSC relies on associational standing, its members' failure to establish irreparable harm means it has also failed to meet this crucial prerequisite. ROA.68, 81-82. Although FSC also claims harm on behalf of viewers, ROA.20, it only has "standing to bring suit on *behalf of its members*" and then only when (among other things) "its *members* would otherwise have standing to sue in their own right." *Hunt*

---

[8] To the extent Doe is asserting that there will be a ripple effect on her viewer-generated revenues, such a theory involves a "chain of contingencies" that would—given the complete absent evidence—not support standing, let alone a preliminary injunction. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013).

*v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (emphasis added); *see also Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Based on the complaint, FSC's membership includes "hundreds of businesses and individuals involved in the production, distribution, sale and presentation" of internet pornography. ROA.20. Given the absence of any allegation that its members include *consumers* of pornography, the Court must presume those members can be divided into the same three categories as plaintiffs in this suit—namely Foreign Websites, Domestic Websites, and Individual Performers. ROA.19-24, 672. Such members have not shown irreparable harm, so neither has FSC.

*Virginia v. American Booksellers Association*, 484 U.S. 383 (1988), does not permit FSC to sue on behalf of all viewers of pornography. *Contra* ROA.20, 68. That case allowed plaintiff bookstores to assert the constitutional interests of their customers *not* on associational standing but on the narrow doctrine of *third-party* standing. *See* 484 U.S. at 642-43; *see also Harris v. Evans*, 20 F.3d 1118 (11th Cir. 1994). That doctrine, however, requires a "close relationship between the party asserting the right and the person who possesses the right" and some impediment to that person's ability to sue on their own behalf. *Kowalski v. Tesmer*, 543 U.S. 125, 125 (2004). FSC—which professes not to know whether visitors to its members' websites are adults—can hardly show a "close relationship." And it certainly has offered no evidence that those unidentified customers are impeded from bringing their own suit for simply being asked to verifywhether they are adults or children. Thus, FSC is not entitled to a preliminary injunction.

## B.   The balance of equities favors the Attorney General.

Finally, the district court erred in failing to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey*, 870 F.3d at 391; *see also, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). And because the State is defendant, its interest merge with those of the public. *Nken*, 556 U.S. at 435.

Those sovereignty-based injuries are particularly acute here given that the law in question is designed to protect the emotional, mental, and physical wellbeing of Texas children. *Supra* pp. 4-5. Such an interest "is a hurdle which must be overcome before employing the drastic remedy of interim injunctive relief," *Miss. Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 633 (5th Cir. 1985), and cannot be overcome here given the non-existent injuries imposed on each of the Pornographers. Put another way, because enforcing H.B. 1181 violates no First Amendment right, and enjoining H.B. 1181 protects no child, the equities overwhelming favor allowing the implementation of H.B. 1181 to proceed as soon as possible.

## Conclusion

The Court should reverse and remand.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Lanora C. Pettit
Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

Kyle D. Highful
Assistant Solicitor General

Coy Allen Westbrook
John Ramsey
Assistant Attorneys General

Counsel for Defendant-Appellant

## CERTIFICATE OF SERVICE

On September 25, 2023, Brief for Appellant was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. On September 27, 2023, this Corrected Brief for Appellant was similarly served. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
Lanora C. Pettit

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,899 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
Lanora C. Pettit